# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA

FILED

FEB - 5 2008

RICHARD W. WIEKING
U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

Dear Sir or Madam:    **E-filing**

**CV 08    0815**

Your petition has been filed as civil case number _____

A filing fee of $5.00 is now due.  If you are unable to pay the entire filing fee at this time, you must sign and complete this court's Prisoner's In Forma Pauperis Application in its entirety.  If the application is granted, you will not have to prepay the fee.

**VRW**

**(PR)**

Your petition is deficient because you did not pay the filing fee and:

1. ___✓___ you did not file an In Forma Pauperis Application.

2. _____ the In Forma Pauperis Application you submitted is insufficient because:

     _____ You did not use the correct form.  You must submit this court's current Prisoner's In Forma Pauperis Application.

     _____ Your In Forma Pauperis Application was not completed in its entirety.

     _____ You did not sign your In Forma Pauperis Application.

     _____ You did not submit a Certificate of Funds in Prisoner's Account completed and signed by an authorized officer at the prison.

     _____ You did not attach a copy of your prisoner trust account statement showing transactions for the last six months.

     _____ Other _____

Enclosed you will find this court's current Prisoner's In Forma Pauperis Application, which includes a Certificate of Funds in Prisoner's Account form, and a return envelope for your convenience.

**Warning: YOU MUST RESPOND TO THIS NOTICE.   If you do not respond within THIRTY DAYS  from the filing date stamped above, your action will be DISMISSED, the file closed and the entire filing fee will become due immediately.  Filing a Prisoner's In Forma Pauperis Application will allow the court to determine whether prepayment of the filing fee should be waived.**

Sincerely,
RICHARD W. WIEKING, Clerk,

By_____
                Deputy Clerk

rev. 11/07

MONJEZ

1  **PETITION FOR A WRIT OF HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

2  Name __MONTEZ_____VICTOR_____M._____
        (Last)       (First)     (Initial)

3  FILED

   Prisoner Number __C-48215_____
   FEB - 5 2008

4  Institutional Address __Correctional Training Facility__

5  RICHARD W. WIEKING
   CLERK, U.S. DISTRICT COURT

   _____P.O. Box 689, Soledad, CA 93960__NORTHERN DISTRICT OF CALIFORNIA

6  ======================================================

7  **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

8  VICTOR M. MONTEZ,_____  )

   (Enter the full name of plaintiff in this action.)

9                            )  CV 08 0815

           vs.               )  Case No. _____
                             )  (To be provided by the clerk of court)

10 BEN CURRY (Warden),_____  )

11 _____  )  **PETITION FOR A WRIT**
                             )  **OF HABEAS CORPUS** VRW

12 _____  )

13 _____  )  (PR)

14 (Enter the full name of respondent(s) or jailor in this action)  )  E-filing

15                           )

16 ======================================================

   Read Comments Carefully Before Filling In

17 Underline{When and Where to File}

18     You should file in the Northern District if you were convicted and sentenced in one of these

19 counties: Alameda, Contra Costa, Del Norte, Humboldt, Lake, Marin, Mendocino, Monterey, Napa,

20 San Benito, Santa Clara, Santa Cruz, San Francisco, San Mateo and Sonoma. You should also file in

21 this district if you are challenging the manner in which your sentence is being executed, such as loss of

22 good time credits, and you are confined in one of these counties. Habeas L.R. 2254-3(a).

23     If you are challenging your conviction or sentence and you were not convicted and sentenced in

24 one of the above-named fifteen counties, your petition will likely be transferred to the United States

25 District Court for the district in which the state court that convicted and sentenced you is located. If

26 you are challenging the execution of your sentence and you are not in prison in one of these counties,

27 your petition will likely be transferred to the district court for the district that includes the institution

28 where you are confined. Habeas L.R. 2254-3(b).

PET. FOR WRIT OF HAB. CORPUS

1  <u>Who to Name as Respondent</u>

2      You must name the person in whose actual custody you are. This usually means the Warden or

3  jailor. Do not name the State of California, a city, a county or the superior court of the county in which

4  you are imprisoned or by whom you were convicted and sentenced. These are not proper

5  respondents.

6      If you are not presently in custody pursuant to the state judgment against which you seek relief

7  but may be subject to such custody in the future (e.g., detainers), you must name the person in whose

8  custody you are now <u>and</u> the Attorney General of the state in which the judgment you seek to attack

9  was entered.

10  A. INFORMATION ABOUT YOUR CONVICTION AND SENTENCE

11      1. What sentence are you challenging in this petition?

12        (a)   Name and location of court that imposed sentence (for example; Alameda

13            County Superior Court, Oakland):

14  **Los Angeles County Superior Court**   **Los Angeles**

15            Court                     Location

16        (b)   Case number, if known  **LA A146105**

17        (c)   Date and terms of sentence **5/21/1982 – 15 yeasr to life**

18        (d)   Are you now in custody serving this term? (Custody means being in jail, on

19            parole or probation, etc.)    Yes **XX**   No _____

20            Where?

21            Name of Institution: **Correctional Training Facility**

22            Address:    **P.O. Box 689, Soledad, CA 93960**

23      2. For what crime were you given this sentence? (If your petition challenges a sentence for

24  more than one crime, list each crime separately using Penal Code numbers if known. If you are

25  challenging more than one sentence, you should file a different petition for each sentence.)

26  **Second degree murder 187**

27  

28  

PET. FOR WRIT OF HAB. CORPUS    **– 1 –**

3.  Did you have any of the following?

      Arraignment:                         Yes _____     No _____

      Preliminary Hearing:            Yes _____     No _____

      Motion to Suppress:            Yes _____     No _____

4.  How did you plead?

      Guilty _____    Not Guilty _____    Nolo Contendere _____

      Any other plea (specify) _____

5.  If you went to trial, what kind of trial did you have?

      Jury _____    Judge alone _____    Judge alone on a transcript _____

6.  Did you testify at your trial?          Yes _____     No _____

7.  Did you have an attorney at the following proceedings:

      (a)     Arraignment             Yes _____     No _____

      (b)     Preliminary hearing     Yes _____     No _____

      (c)     Time of plea            Yes _____     No _____

      (d)     Trial                 Yes _____     No _____

      (e)     Sentencing             Yes _____     No _____

      (f)     Appeal               Yes _____     No _____

      (g)     Other post-conviction proceeding     Yes _____     No _____

8.  Did you appeal your conviction?          Yes _____     No _____

      (a)     If you did, to what court(s) did you appeal?

           Court of Appeal           Yes _____     No _____

           Year: _____    Result:_____

           Supreme Court of California    Yes _____     No _____

           Year: _____    Result:_____

           Any other court           Yes _____     No _____

           Year: _____    Result:_____

      (b)     If you appealed, were the grounds the same as those that you are raising in this

_N. A._

_PAROLE HEARING_

1                petition?                                          Yes _____      No_____

2        (c)     Was there an opinion?                      Yes _____      No_____

3        (d)     Did you seek permission to file a late appeal under Rule 31(a)?

4                                                                   Yes _____      No_____

5                If you did, give the name of the court and the result:

6                _____

7                _____

8    9. Other than appeals, have you previously filed any petitions, applications or motions with respect to

9    this conviction in any court, state or federal?              Yes  XX       No_____

10        [Note: If you previously filed a petition for a writ of habeas corpus in federal court that

11   challenged the same conviction you are challenging now and if that petition was denied or dismissed

12   with prejudice, you must first file a motion in the United States Court of Appeals for the Ninth Circuit

13   for an order authorizing the district court to consider this petition. You may not file a second or

14   subsequent federal habeas petition without first obtaining such an order from the Ninth Circuit. 28

15   U.S.C. §§ 2244(b).]

16        (a)     If you sought relief in any proceeding other than an appeal, answer the following

17                questions for each proceeding. Attach extra paper if you need more space.

18        I.      Name of Court: **Los Angeles County Superior Court**

19                Type of Proceeding: _____ **habeas corpus** _____

20                Grounds raised (Be brief but specific):

21                a. **SAME AS RAISED HEREIN**

22                b._____

23                c._____

24                d._____

25                Result: **denied** _____ Date of Result: **8/15/2007**

26        II.     Name of Court: **App. Ct. of Calif., 2nd App. Dist.**

27                Type of Proceeding: _____ **habeas corpus** _____

28                Grounds raised (Be brief but specific):

PET. FOR WRIT OF HAB. CORPUS        – 3 –

a. **SAME AS RAISED HEREIN**

b. _____

c. _____

d. _____

Result: **denied** _____ Date of Result: **11/2/2007**

III.    Name of Court: **California Supreme Court**

Type of Proceeding: **Petition for Review**

Grounds raised (Be brief but specific).

a. **SAME AS RAISED HEREIN**

b. _____

c. _____

d. _____

Result: **denied** _____ Date of Result: **1/3/2008**

IV.     Name of Court: _____

Type of Proceeding: _____

Grounds raised (Be brief but specific):

a. _____

b. _____

c. _____

d. _____

Result: _____ Date of Result: _____

(b)     Is any petition, appeal or other post-conviction proceeding now pending in any court?

                                    Yes _____     No **XX**

Name and location of court: _____

**B. GROUNDS FOR RELIEF**

State briefly every reason that you believe you are being confined unlawfully. Give facts to

support each claim. For example, what legal right or privilege were you denied? What happened?

Who made the error? Avoid legal arguments with numerous case citations. Attach extra paper if you

need more space.  Answer the same questions for each claim.

### Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMEDMENTS TO THE
UNITED STATES CONSTITUTION WHEN THE BOARD OF PAROLE
HEARINGS DECISION FINDING HIM UNSUITABLE FOR PAROLE WAS
NOT SUPPORTED BY ANY EVIDENCE THAT PETITIONER IS A
<u>CURRENT</u> THREAT TO PUBLIC SAFETY TWENTY-SIX YEARS AND
SEVEN PAROLE HEARINGS AFTER THE COMMITMENT OFFENSE, THE
DECISION BEING ARBITRARY AND CAPRICIOUS.

---

## S U P P O R T I N G   F A C T S

### The Plea Agreement

On August 11, 1980, Victor Montez (hereafter Petitioner) was
arrested for the murder of Michael Stewart, the murder occurring
on August 10, 1980.

In an "information" alleging several charges, all of which but
one were dropped (EXHIBIT 1), Petitioner was charged with "murder"
in violation of Penal Code § 187.[1/]  The charge being for the minimum
elements of the offense, that is, Petitioner, "with malice
aforethought (did) murder Michael Stewart, a human being."

On March 26, 1982, after being advised of his constitutional
rights, primarily to trial by jury, confront witnesses and cross-
examination, and the right to present a defense (EXHIBIT 2, pp.
4-5), Petitioner entered into a stipulated plea agreement, a contract,
with the state of California to one count of second degree murder;
that is, "did unlawfully kill another human being with malice
aforethought" with the use of a firearm in violation of Penal Code
§ 12022.5 (EXHIBIT 2, p. 6, 7).  In negotiating the plea, it was

---

1.  All codes and regulations are California, unless otherwise noted.
    California Code of Regulations, Title 15, will be cited, Cal. Code Regs.,
    tit. 15.

proffered that the murder of Mr. Stewart "was an unfortunate situation...that Mr. Montez never intended to kill the victim; that this was strictly an accident" (EXHIBIT 2, p. 9).  There was no objection by the prosecution.

On March 26, 1982, Petitioner was sentenced to 15 years to life plus two years for the use of a firearm, to be served consecutively (EXHIBIT 3), being credited with 648 days in custody, plus 324 days good time credits, for a total of 972 days preconviction credit (EXHIBIT 4).  A probation officer's report (POR) (EXHIBIT 5) was filed in conjunction with sentencing.

## The Parole Hearing

On May 31, 2006, Victor Montez (hereafter Petitioner) appeared before the Board of Parole Hearings (hereafter Board) for his SEVENTH parole suitability hearing.  Petitioner's minimum eligible parole date (MEPD was fixed at April 9, 1990 (EXHIBIT 6, HT 1:7-16).[2]

Petitioner was sworn to tell the truth (HT 8:3-7).

## The commitment offense

The facts of Petitioner's commitment offense were read into the record, being taken from Petitioner's Life Prisoner Evaluation Report (LPER) from June 2002 (EXHIBIT 7), reading from the LPER at HT 8:17-9:26:

> On August 9, 1980, Montez and two women, one of whom was his wife, were on their way to Oxnard when their vehicle became disabled.  The two women began to hitchhike on the Ventura Freeway while Montez hid in the bushes.  It was agreed that the two women would appear as two females stranded on the freeway while Montez would approach the motorist who stopped and exhibit a firearm he carried in his waistband.  The victim, Michael Stewart stopped for the women.  The women entered the rear seat while beckoning to Montez who was still hiding in the

---

2.  Reference to parole hearing transcript will be designated by HT followed by page and, when necessary, line number, e.g., (HT 1:1).

bushes. He ran to the car and brandished a small caliber firearm and entered the rear seat of the car. He pointed the firearm at the back of the victim's head and told him to drive them to Oxnard or he would kill him. Montez then fired, striking and killing the victim. Montez exited the car, dragged the body from the car and secreted the body beneath an overhanging tree and shrubs. After leaving the body, Montez, his wife and the other female companion drove the victim's car to Oxnard.

Petitioner "basically concurs with the report" (HT 10:3), with few exceptions; those exceptions being that "he never threatened the victim, in fact he offered the victim money for gas" (HT 10: 4-6), Petitioner did have the gun pointed at the victim's head, but "believes the gun fired when the victim adjusted himself in the car seat and his elbow knocked the gun" (HT 10:6-11), Petitioner has no "intention to kill the victim" (HT 10:12-13), and "he never threatened the witness with violence if she contacted the police as is alleged" (HT 10:20-24). The facts of the offense are immutable and have remianed consistent since the POR (EXHIBIT 5, pp. 6-10).

### Prior criminal history

The Board reviews Petitioner's prior criminal history, starting with his juvenile record. Petitioner has no convictions as a juvenile (HT 11:16-24). As an adult, on April 26, 1973, given one year summary probation for entering non-commercial dwelling, while in custody for possession of marijuana charge, on October 19, 1973, convicted of sales and transportation of marijuana, January 7, 1974, Petitioner was convicted of "possession of marijuana and sent to CYA (HT 12:5-7), and has a conviction for "theft from motor vehicle" in the state of New Mexico, being released from custody on April 22, 1978 (HT 12:5-17; EXHIBIT 5, p. 5). None of Petitioner's prior convictions were serious or violent offenses.

///////

- 7 -

Prior social history

Petitioner began smoking marijuana at the age of 13, and started using heroin on weekends, progressing to a $200 a day habit by the age of 15 and would take Valium when heroin was not available (HT 14:8-15:2).

Petitioner dropped out of school at age 16 and entered Job Corps, remaining there eleven months learning to operate heavy equipment (HT 15:3-14).

From the Job Corps, Petitioner entered the United States Army, serving as a paratrooper in the Special Forces, being honorably discharged in 1972 (HT 15:14-26). Petitioner stayed free of drugs while in the military and believes he should have stayed in the military (HT 16:1-4).

While incarcerated in New Mexico, Petitioner earned his GED (HT 16:6-7). Petitioner earned certification as a welder during that time, also (HT 16:9-10).

Petitioner lived with a woman for approximately one year in New Mexico (HT 16:11-13), then returned to California where he met and entered into a relationship with Denise Garcia, marrying her in April, 1980, assuming responsibility for her two children, then having a daughter together (HT 16:14-17). Petitioner is now a grandfather (HT 17:5-8), and although divorced from his wife, who was also his crime partner in the instant offense, remains in contact and has support of his children (HT 33:19-20).

Prior to the instant offense, Petitioner was employed as a roofer (HT 18:2-10).

Petitioner believes he had a good family life growing up

- 8 -

## Postconviction behavior

It was noted that Petitioner has been "extremely active" since his 2002 hearing (HT 24:18-20), having completed two certifications from Federal Emergency Management in Emergency Preparedness, and Radiological Emergency Management (HT 24:21-24). Petitioner received three laudatory chronos for participation in the Prison Industries Authority employability program (HT 24:24-27), and sixteen laudatory chronos for his continued participation in Alcoholics Anonymous and Narcotics Anonymous (HT 25:1-3).

Petitioner completed a thirteen week IMPACT workshop (a victim's awareness self-help group) (HT 25:9-11).

Although Petitioner has disciplinary write-ups, the last one being in 1993, "there are no write-ups for violence or weapons" (HT 25:24-25).

Petitioner has received "exceptional and above-average work reports" on his job in the furniture factory (HT 25:25-26:5).

## Psychological evaluation

Petitioner's psychological evaluation, dated May 11, 2006 (EXHIBIT 8), was prepared by Dr. Macomber, one of the Board's own forensic experts. Highlighting relevant factors, the Board notes: "Dr. Macomber writes that in the past based upon your criminal history you had been diagnosed as having antisocial personality disorder. But at this point in your life there is no evidence of any antisocial thinking or values. That your values are solidly pro-social, you have deep feelings of concern and empathy toward others" and the diagnostic label of antisocial is no longer appropriate (HT 28:7-17; EXHIBIT 8, p. 2). Petitioner has a Global Assessment of Functioning

(HT 18:21-24); there was no abuse in the home (HT 19:1-11).

Parole plans

Petitioner will parole to his mother's home in Oxnard, which she owns (HT 19:15-22), and she will help financially and in any way she can (HT 35:13-20). Petitioner has a firm offer of employment from Ideal Upholstery in Ventura where he will start at $9.00 an hour (HT 20:6-20). Petitioner has alternative plans, arranging for an interview with a live-in program at the Ventura County Rescue Mission, with the requirements for admittance laid out for the Board (HT 22:23-23:13). Petitioner's daughter will provide housing, and, as her husband is starting his own business, the possibility of employment for Petitioner (HT 36:7-14).

Petitioner also has the support of Martha Duran, a woman whom he married while incarcerated, now divorced (due to the pressures of incarceration), residing in Oxnard and offering housing, and all the support "required so he can be a productive member of society" (HT 37:10-26), the Board finding this to be "very good" (HT 38:1).

Petitioner went to the effort to contact several organizations in the community that can provide housing and other services to re-enter society successfully, California Veterans Assistance, Luthern Social Services of Southern California, and New Directions of Los Angeles, as well as a pamphlet from Prison Industry Authority of job placement assistance and other services through parole services (HT 39:15-40:11).

Additionally, not only is Petitioner a certified welder and heavy equipment operator, but since being incarcerated, among other vocational trades, has obtained certification as a paralegal (HT 48:11-13).

(GAF) Score of 90 (EXHIBIT 8, p. 3 [the highest score possible,
relating to global social functioning]).

Most importantly, relating to current threat to public safety,
covered at HT 28:26-29:20, Petitioner quotes directly from Dr.
Macomber's evaluation (EXHIBIT 8, pp. 3-4), under assessment of
dangerousness:

> In considering potential for dangerous behavior when released to the community,
> the Level of Service Inventory-Revised was administered.  This is an actuarial
> measure that assesses criminal history, substance abuse history, institutional
> adjustment, social relationships and other factors to determine current risk
> on parole.  He obtained a score of 5.1 cumulative frequency for prison inmates.
> This means that of 1000 men were released  on parole, he would do better on parole
> than 95 of them.  This is a low risk score.  At this point in his life, due to
> maturity, growth, and increased insight, he poses no more risk to society than
> the average citizen in the community.  In fact, based on the positive changes
> in his life, he probably poses less risk to society than the average citizen.

In response, the Board cogently stated: "<u>That's a conclusion
I won't disagree with</u> but that's certainly open to discussion at
some other time" (HT 29:20-22, emphasis added).  The Board continues,
"Under clinical observations and recommendations the doctor writes
that prognosis for successful adjustment in the community is
excellent" (HT 29:22-25; EXHIBIT 8, p. 4).

Correctional officials agree that Petitioner "would probably
pose a low degree of threat to the public at this time, if released
from prison" (EXHIBIT 7, p. 4, [that was two years prior]).

<u>Opposition to parole</u>

The deputy district attorney representing Los Angles County,
after reiterating the facts of the case (HT 41:20-44:18), believing
Petitioner's substance abuse is merely in "institutional remission
(HT 45:2-7), and being critical of Petitioner exercising his
constitutional right not to discuss the case or incriminate himself,
believing that demonstrates failure to accept responsibility for

- 11 -

the offense (HT 45:7-15), opposed parole (HT 45:20-21).

### D E C I S I O N

In concluding that Petitioner is "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety" if released from prison (HT 53:12-15), the Board relied on the following findings:

1. The commitment offense, feeling "that the offense was carried out on an especially cruel manner" (HT 53: 21-22), stating the victim "was shot in the head after he stopped to render aid in what he thought were two individuals that were in distress along the side of the freeway" (HT 53:22-26); being "carried out in a very dispassionate and calculated manner" (HT 54:1-2), putting "the two women out on the freeway as a lure and that you were hiding in the bushes and unfortunately it was Mr. Stewart that was the first Samaritan that decided to stop and help. The victim was defiled after the offense in that he was stripped...(HT 54:3-12 [there is absolutely no evidence, and Petitioner denies, that Mr. Stewart was stripped of the clothing he was wearing, see EXHIBIT 5, pp. 6-7]); and the motive "was very trivial" (HT 54:14), in that the "worst case scenario you could have just ordered him out to the side of the freeway but that's neither here nor there at this point n time" (HT 54: 15-18). The Board then reread the statement of facts into the record (HT 54:21-56:3).

2. Prior criminal history, stating Petitioner had "an escalating pattern of criminal conduct and that you had failed previous grants of probation...previous attempts to correct your criminality through the CYA commitment" (HT 56:4-20), citing Petitioner's dismissed

charges and non-violent criminal convictions (HT 56:1216).

3.  Parole plans needed to be shored up, the Board completely ignoring the offer of residence and financial support from Petitioner's mother (HT 19:15-22) and confirmed job offer (HT 20:6-20), criticizing the halfway houses Petitioner contacted as not being satisfactory (HT 56:23-57:3), stating that Petitioner needs a backup plan with a member of his family, which he has, and being critical of the offer of residence and assistance from Ms. Duran whom Petitioner married and divorced while incarcerated (HT 57:21-23), finally stating "[i]t might be fine with the next Board but from my experience with the parole division they probably would not approve that" (HT 58:16-19).

4.  "[T]he representative from the Los Angeles County District Attorney's Office indicating opposition to parole" (HT 58:2-5).

The only two factors considered in Petitioner's favor for parole suitability were: (1) "As far as your institutional behavior you have programmed very well" (HT 56:16-18); and (2) "[s]o far as the psychological report prepared by Dr. Macomber in May 1006, it's favorable" (HT 56:22-23).  In reference to programming very well and Petitioner's long ago disciplinary write-ups, the Board stated: "They are not an issue at least with this panel and I can't see them being an issue with the next panel you come before" (HT 60:24-61:1).

The Board recommended that Petitioner "continue in your AA/NA, whichever is available, and continue to earn positive chronos" (HT 58:7-9).

In reference to the offense being "carried out in a dispassionate and calculated manner" see EXHIBIT 9, defining "execution-type murders" - victim bound and made to knell....

## J U D I C I A L   P R O C E E D I N G S

The Board's decision became final on September 28, 2006 (EXHIBIT 6, HT 61), and Petitioner filed his writ of habeas corpus in the Superior Court of California, Los Angeles County, on January 2, 2007, 96 days hence, being denied on August 15, 2007 (EXHIBIT 10).

In affirming the Board's decision, the State court opined that "there is some evidence to support the Board's finding that 'the motive for the crime is inexplicable or very trivial in relation to the offense' (Cal. Code Regs., tit. 15, §2402(c)(1)(E).) .... The Board was justified in concluding that this motive is materially less significant [] than those motives which conventionally drive people to commit murder, thus indicating that petitioner poses a greater risk to society if released than is ordinarily present" (EXHIBIT 9, pp. 1-2). The State court also opined that "the record reflects that petitioner had an unstable social history prior to the commitment offense, which is a factor tending to indicate unsuitability for parole (Cal. Code Regs., tit. 15, §2402, subd. (c)(3))"; the State court then citing Petitioner's preconviction drug use, convictions for non-violent offenses, then concluded, "He dropped out of high school when he was sixteen years old. Heavy drug use, school problems, and prior criminality are some evidence of an unstable social history" (EXHIBIT 10, p. 2). (Petitioner did not drop out of high school because of drug use or school problems, but to join Job Corps, after which he joined the United States Army and honorably discharged.)

On September 21, 2007, Petitioner filed a habeas corpus in the California Court of Appeals, Second Appellate District. The writ

was summarily denied on November 2, 2007 (EXHIBIT 11).

On November 9, 2007, Petitioner filed in the California Supreme Court a Petition for Review, being summarily denied January 3, 2008 (EXHIBIT 12).

Total days from date of the Board's decision becoming final and State court remedies being exhausted is 481 days, with 341 of those days tolled, for a total of 140 untolled days.

* * * * * * *

If any of these grounds was not previously presented to any other court, state briefly which grounds were not presented and why:

All claims have been exhausted.

- 15 -

1     List, by name and citation only, any cases that you think are close factually to yours so that they

2 are an example of the error you believe occurred in your case.  Do not discuss the holding or reasoning

3 of these cases:

4     SEE MEMORANDUM OF LAW ATTACHED HERETO, pp. 17-24

5 _____

6 _____

7 Do you have an attorney for this petition?               Yes_____     No_XX_

8 If you do, give the name and address of your attorney:

9 _____

10     WHEREFORE, petitioner prays that the Court grant petitioner relief to which s/he may be entitled in

11 this proceeding.  I verify under penalty of perjury that the foregoing is true and correct.

12

13 Executed on _29 Jan. 2008_                    _____

14                   /Date                                      Victor M. Montez
                                                           Signature of Petitioner

15

16

17

18

19

20 (Rev. 6/02)

21

22

23

24

25

26

27

28

PET. FOR WRIT OF HAB. CORPUS        - 16 -

## M E M O R A N D U M   O F   L A W

### A.  Jurisdiction of the Court

Whether Petitioner is limited to 365 days after the Board's decision becomes final minus tolled time while exhausting state remedies, or 365 days, or plus 60 days to file certiorari after the California Supreme Court decision is final, Petitioner's federal writ is timely filed, thus the Court has jurisdiction.

### B.  Liberty Interest in Parole

It is crystallized, California's indeterminately sentenced prisoners have a <u>liberty interest</u> in parole (<u>Greenholtz v. Inmates of Nebraska Penal and Correctional Complex</u> (hereafter <u>Grenholtz</u>), 441 U.S. 1 (1979); <u>In re Rosenkrantz</u>, 29 Cal.4th 616, 654-656 (2002); <u>Sass v. California Board of Prison Terms</u> (hereafter <u>Sass</u>), 461 F.3d 1123 (9th Cir. 2006); <u>Irons v. Carey</u>, 479 F.3d 658 (9th Cir. 2007)). Respondent should be warned from raising or making any meritless and frivolous argument to the contrary and wasting the Court's limited time and resources.

### C.  <u>There Is No Evidence Petitioner, Being Convicted of Second Degree Murder and Sentenced to an Indeterminate Term of 15 Years to Life, is CURRENTLY Dangerous Twenty-Six Years After the Commitment Offense.</u>

Dr. Macomber, the Board's own forensic expert, stated, in his considering Petitioner's social history, prior criminal history, parole plans, and rehabilitation, in his expert opinion: "due to maturity, growth, and increased insight, he poses no more risk to society than the average citizen in the community. IN fact, based on the positive changes in his life, he probably poses less risk to society than the average citizen" (EXHIBIT 8, pp. 3-4). The Board

agreed: That's a conclusion I won't disagree with but that's certainly open to discussion at some other time" (HT 29:2-22). It is time for that discussion and the Board to present some evidence, any evidence, that, absent contravening evidence that does not exist, Petitioner is currently an unreasonable parole risk. The focus of parole suitability, therefore, is rehabilitation -- as articulated by the United States Supreme Court: "The decision turns on...primarily what a man is and what he may become rather than simply what he has done" (Greenholtz, 442 U.S., at 10, supra). Thus, REHABILITATION could be said to be the Greenholtz doctrine. If there is no evidence Petitioner is a CURRENT threat to the public, he is to be paroled.

Petitioner has always maintained that shooting of the victim was accidental, but has never tried to diminish his responsibility, always knowing full well that but for having a gun in his hand in the first place Mr. Stewart would still be alive today. At no time has the prosecution ever contested or disagreed that the killing of Mr. Stewart was accidental, taking place in August, 1980, 26 years prior to the parole suitability hearing at bench becoming final.

Petitioner's minim eligible parole date (MEPD) was fixed to be April 9, 1990 (HT 1:7-16), thus at the time of the hearing at bench Petitioner was 16 years past his MEPD. Case at bench is distinguishable from Irons v. Carey, 479 F.3d 658 (9th Cir. 2007), explaining that Irons minimum term was 17 years on his 17 years to life sentence (Id., at 662, 665), in that Irons' offense occurred in 1984. Petitioner's offense occurring, and being sentenced pursuant to Penal Code § 190 (In re Diaz, 13 Cal.App.4th 1755, 1760 (1993), prior to January 1, 1983, "(commencing with Section 2930)...shall

apply to reduce the minimum term of 15 or 25 years in the state prison imposed pursuant to this section, but the person shall not otherwise be released on parole prior to that time[,]" he has a "liberty interest" in Penal Code § 2931 credits to reduce his minimum term on the second degree murder conviction from 15 years to 10 years.

After midnight, December 31, 1982, the § 2931 credit statute was repealed (Penal Code § 2931(d) ["This section shall not apply to any person whose crime was committed on or after January 1, 1983"]). On and after January 1, 1983, the custody credit statute was Penal Code § 2933, the credits being "a privilege, not a right" (§ 2933(b)). The difference being § 2933 is an earning statute, while § 2931 was a giving statute, giving Petitioner a "liberty interest" in the sentence reduction credits (Greenholtz, 442 U.S. 1, 4 (1979) ["An inmate becomes eligible for discretionary parole when the minimum term, less good-time credits, has been served"]; see also Toussaint v. McCarthy, 801 F.2d 1080, 1085 (9th Cir. 1986) ["section 2931 creates a constitutionally protected liberty interest"]).

Thus, Petitioner, at the time of the hearing at bench, was sixteen (16) years past his minimum term for second degree murder, and one year past the minimum term for first degree murder in calendar years, or, applying § 2931 credits, 10 years past the minimum term for first degree murder.

a.    The Commitment Offense Is Not Reliable Evidence

"The Governor's assumption that a prisoner may be deemed unsuitable for release on the basis of the commitment offense 'alone' is correct (citation), [] but the proposition must be properly

- 19 -

understood.  The commitment offense is one of only two factors
indicative of unsuitability a prisoner cannot change" (In re Scott
II, 133 Cal.App.4th 573, 594-595 (2005)).  "Reliance on such an
immutable factor 'without regard to or consideration of subsequent
circumstances' may be unfair (citation), and 'runs contrary to the
rehabilitative goals espoused by the prison system and could result
in a due process violation.' (Biggs v. Terhune, [] 334 F.3d [910],
917 [9th Cir. 2003])" (In re Scott II, 133 Cal.App.4th, at 595, supra;
In re Elkins, 144 Cal.App.4th 475, 496 (2006)).  "Therefore, a life
term offense or any other offenses underlying an indeterminate
sentence must be particularly egregious to justify the denial of
a parole date" (In re Rosenkrantz, 29 Cal.4th, at 683, supra, citation
omitted, emphasis added).  However, although initially the
egregiousness of the offense may be used to deny parole, after 15
to 20 years the commitment offense in and of itself loses probative
value in predicting current or future dangerousness (In re Roderick,
154 Cal.App.4th 242, 277 (2007); In re Lee, 143 Cal.App.4th 1400,
1412 (2006); In re Scott II, 133 Cal.App.4th, at 595, supra;
Rosenkrantz v. Marshall, 444 S.Supp.2d 1063, 1084 (C.D. Cal. 2006)).

   The Ninth Circuit Court of Appeals recently concluded the
suitability and unsuitability factors set out in Cal. Code Regs.,
tit. 15, § 2402(c) and (d), in the precedent setting case of Hayward
v. Marshall, ___ F.3d ___, 2008 U.S. App. LEXIS 40, *17-18 (9th Cir.
2008):

   "Even though these suitability and unsuitability factors are helpful in analyzing
   whether a prisoner should be granted parole, California courts have made it clear
   that the 'findings that are necessary to deem a prisoner unsuitable for parole,'
   Irons [v. Carey], 505 F.3d [846,] at 851 [(9th Cir. 2007)], 2007 WL 2927359,
   at *3, are not that a particular factor or factors indicating unsuitability
   exists, but that a prisoner's release will unreasonably endanger public safety.

In re Dannenberg, 156 Cal.App.4th 1387, 2007 WL 3408290, *9 (Cal. Ct. App. 2007), modified, 2007 Cal. App. LEXIS 1985, 2007 WL4227229 (Cal. Ct. App. Dec. 3, 2007); In re Lee, 143 Cal.App.4th 1400, 1408, 49 Cal.Rptr.3d 931 (Cal. Ct. App. 2006); In re Scott, 133 Cal.App.4th 573, 595, 34 Cal.Rptr.3d 905 (Cal. Ct. App. 2005); see Cal. Penal Code § 3041(b) (providing that the Board 'shall set a release date unless...consideration of the public safety requires a more legthy period of incarceration for this individual'). For our purposes, then, '[t]he test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety. Some evidence of the existence of a particular factor does not necessarily equate to some evidence the parolee's release unreasonably endangers public safety.' Lee, 143 Cal.App.4th at 1408 (citations and footnotes omitted); see also In re Elkins, 144 Cal.App.4th 475, 499, 50 Cal.Rptr.3d 503 (Cal. Ct. App. 2006) (holding that the 'governor, in reviewing a suitability determination, must remain focused...on facts indicating that release currently poses 'an unreasonable risk of danger to society'" (citing Cal. Code Regs. tit. 15, § 2402(a))); Scott, 133 Cal.App.4th at 591 ('The factor statutorily required to be considered and the overarching consideration, is "'public safety.'" (citing Cal. Penal Code § 3041(b))" (emphasis and ellipses in original).

It has never been contested that the killing of Mr. Stewart was accidental, Petitioner's gun accidentally firing when Mr. Stewart moved his seat and hit Petitioner's arm, a very tragic accident and one Petitioner fully accepts responsibility for, but the offense, under the circumstances, could not have been "dispassionate and calculated" as the Board declared (HT 54:1-2; Cal. Code Regs., tit. 15, § 2402(c)(1)(B) ["The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder"]). The accidental killing of Mr. Stewart does not fit the definition of "execution-style murder" (see EXHIBIT 12).

Moreover, "calculated" denotes planning and premeditation. In that Petitioner was convicted of second degree murder, in a plea agreement "stipulated" to the minimum elements of the offense (EXHIBIT 2, p. 5), the State is now precluded from retrying the case and finding elements of first degree murder, especially when those elements were not there to begin with (In re Gray, 151 Cal.App.4th 379, 405-407; Brown v. Kane, Slip Copy, 2007 WL 1288488, *7 (N.D.

- 21 -

Cal. 2007), ["characterization of Petitioner's actions as premeditated is incorrect because the trial court found that the offense was murder in the second degree"]).

The Board also found that Mr. Stewart "was defiled after the offense in that he was stripped, his body was concealed along the shoulder of the Ventura Freeway and just basically left in the shrubbery" (HT 54:8-12). Concealing the body is not being "defiled"; and, there is absolutely no evidence that Mr. Stewart was "stripped" of his clothing. The evidence points to the contrary (EXHIBIT 5, pp. 67 ["The victim's pants were open and partially down, the zipper was partially broken and the top button pulled off"]). This most likely occurred when Mr. Stewart was dragged out of his car and across the ground, but he certainly was not "defiled," that is, raped (see People v. Moore, 196 Cal.App.2d 91 (1961), definition of defiled).

b.  <u>The State Court Decision Is Unreasonable In Light Of The Facts</u>.

When comparing the Board's decision to the decision of the State court, last "reasoned" decision, it is apparent the state court made findings to justify its decision the Board did not make.

After reciting the Board's decision, the state court adds (EXHIBIT 9, p. 2):

> "Additionally, the record reflects that petitioner had an unstable social history prior to the commitment offense, which is a factor tending to indicate unsuitability for parole. (Cal. Code Regs., tit. 15, § 2402(, subd. (c)(3).) Petitioner began using heroin when he was thirteen years old. He eventually developed a $200 a day habit. He was first arrested at the age of thirteen and had several more arrests as an adult, leading to sentences of probation and state prison in New Mexico. He dropped out of high school when he was sixteen years old. Heavy drug use, school problems, and prior criminality are some evidence of an unstable social history. (<u>In re Van Houton</u> (2004) 116 Cal.App.4th 339, 353)."

Firstly, the regulations "distinguish[] between criminal history (§ 2402, subd. (b)) with the latter being defined in terms of social

- 22 -

relationships (§ 2402, subd. (c)(3)) as distinguished from criminal activity. The two factors are thus distinct and should not be conflated" (In re Roderick, 154 Cal.App.4th, at 269, supra). Secondly, arrests alone to not constitute prior offenses or constitute reliable evidence of criminal misconduct. Petitioner is presumed innocent until proven otherwise (Penal Code § 1096). This presumption of innocence is a fundamental principle of our criminal justice system (Estelle v. Gamble, 425 U.S. 501, 503 (1976)). Petitioner, as a juvenile, was arrested for malicious mischief and having marks on his arm, ages 9 and 13 respectively (EXHIBIT 5, p. 4). As an adult, Petitioner was arrested for burglary, dismissed; a second burglary, dismissed; a battery, dismised, leaving two drug related convictions, entering a non-commercial building, and theft from a motor vehicle (EXHIBIT 5, p. 5). Thus, Petitioner's prior, non-violent, criminal history are not crimes that constitute a previous record of violence within the definition of the regulations (Cal. Code Regs., tit. 15, § 2402(c)(2). To the contrary, in that Petitioner "lacks any significant history of violent crime" (Cal. Code Regs., tit. 15, § 2402(d)(6)), it tends to militate toward suitability for parole.

It appears the state court was bent on denying Petitioner's writ looking for "any evidence" rather than whether the evidence was sufficient to show a current threat and went in search of makeweight justifications to do so. The courts cannot be silent parole commissioners and make findings the Board did not make. "Given the extraordinarily deferential standard of review we (the courts) already apply to the Board's decisions, it would be inappropriate for courts to salvage the Board's inadequate findings by inferring

- 23 -

factors that might have been relied upon" (<u>In re Roderick</u>, 154 Cal.App.4th, at 265, <u>supra</u>).  Yet, that's exactly what the state court did in case at bench, demonstrating a bias.  Therefore, this Court should review the evidence de novo.

### C O N C L U S I O N

"Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>.  <u>Superintendent v. Hill's</u> standard might be quite low, but it does require the decision <u>not</u> be arbitrary, and reliance on only the facts of the crime might eventually make for an arbitrary decision" (<u>Willis v. Kane</u>, 458 F.Supp.2d 1126, 1130 (N.D. Cal. 2007); <u>In re Roderick</u>, 154 Cal.App.4th, at 277, <u>supra</u>). As warned by the Ninth Circuit: "in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from relevant California statutes" (<u>Irons v. Carey</u>, 505 F.3d 846, 854 (9th Cir. 2007); <u>Hayward v. Marshall</u>, 2008 U.S. App. LEXIS 40, *23, <u>supra</u>). After 26 years on what by all accounts was a tragic accidental shooting, Petitioner's rehabilitation and uncontroverted forensic evidence cogently favorable to parole, Petitioner being less of a threat than the average citizen, the Board, and state court, abused its discretion, denying Petitioner due process of law.  Petitioner is entitled to relief.

WHEREFORE, it is respectfully requested that the writ be GRANTED and the Board ordered, unless there is new evidence since Petitioner's 2006 parole suitability hearing that would preponderate toward

unsuitability, to conduct a new hearing within ten (10) days and fix Petitioner's term proportionate and uniform to his culpability for second degree murder, and, that any and all excess custody credits be applied to his period of parole he may serve.  Moreover, in that the Governor is bound by the same factors the Board is bound by, hold, if there is no evidence Petitioner is a current threat for the Board based on the evidence and factors, that neither can there be evidence for the Governor, therefore expecting Petitioner to be paroled.

DATED: 29 Jan. 2008

Respectfully submitted,

Victor M. Montez
Petitioner in pro se

- 25 -

**E X H I B I T  1**

## SUPERIOR COURT OF THE STATE OF CALIFORNIA
### FOR THE COUNTY OF LOS ANGELES

255

| The People of the State of California, | No. A146105 |
|---|---|
| Plaintiff, | |

VICTOR MANUEL MONTEZ
and
DENISE MARIE MONTEZ,

Defendants

**INFORMATION**
MURDER (Sec. 187, P.C.) - Ct. I
ROBBERY (Sec. 211, P.C.) - Ct. II
ATTEMPTED KIDNAPPING (Sec. 664/209,
P.C.) - Ct. III

The said VICTOR MANUEL MONTEZ and DENISE MARIE MONTEZ

are

x/accused by the District Attorney of and for the County of Los Angeles, State of California, by this

information, of the crime of MURDER, in violation of Section 187, Penal Code of

California,

a felony, committed as follows: That the said VICTOR MANUEL MONTEZ and DENISE MARIE MONTEZ

on or about the  10th  day of August, 1980, at and in the County of Los Angeles, State of California,

did willfully and unlawfully, and with malice aforethought murder Michael Stewart, a

human being.

It is further alleged that the murder of Michael Stewart was committed by
defendant VICTOR MANUEL MONTEZ while the defendant was engaged in the com-
mission of robbery in violation of Penal Code Section 211 within the meaning
of Penal Code Section 190.2(a)(17).

It is further alleged that the murder of Michael Stewart was committed by
defendant DENISE MARIE MONTEZ while defendant was an accomplice in the com-
mission of robbery in violation of Penal Code Section 211, within the meaning
of Penal Code Section 190.2(a)(17).

It is further alleged that the murder of Michael Stewart was committed by
defendant VICTOR MANUEL MONTEZ while the defendant was engaged in the attempted
commission of kidnapping in violation of Penal Code Sections 207 and 209,
within the meaning of Penal Code Section 190.2(a)(17).

SEE SPECIAL ALLEGATIONS CONTINUED ON ATTACHED SHEET

Filed in open Superior Court of the State of
California, County of Los Angeles, on motion
of the District Attorney of said County.

DATED:

JOHN J. CORCORAN, Clerk

By _____ Deputy

JOHN K. VAN DE KAMP, District Attorney

for the County of Los Angeles, State of California

By _____ XXXXXXXXXX _____
Deputy

761550A2-Rev. 7-77-PS 8-77

Filed in open Superior Court of the State of
California, County of Los Angeles, on motion
of the District Attorney of said County.

DATED:

JOSEPH A. BUSCH, District Attorney
for the County of Los Angeles, State of California
By
Deputy

**E X H I B I T   2**

**ORIGINAL FILED**

APR 15 1982

**COUNTY CLERK**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NW R                    HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                          )
                    Plaintiff,            )
                                          )
        vs.                               )    NO. A 146 105
                                          )
                                          )        PLEA
VICTOR MANDEL MONTEZ,                      )
DENISE MARIE MONTEZ,                       )
                                          )
                    Defendants.           )

VAN NUYS, CALIFORNIA, FRIDAY, MARCH 26, 1982, 9:25 A.M.

            Upon the above date, the defendants being

present in court and represented by counsel, CARL BURKOW, Esq.

representing defendant Victor, IRWIN PRANSKY, Deputy Public

Defender of the County of Los Angeles representing defendant

Denise, the People being represented by IRVIN COHEN, Deputy

District Attorney of the County of Los Angeles, the following

proceedings were held.

            (Bonnie Frankfurt, Official Reporter, CSR #2332.)

            THE COURT:  203, 204, Victor Montez and Denise Marie

Montez.

MR. PRANSKY: Your Honor, at this time I believe the District Attorney has gotten together and has understood what the plea agreement is.

MR. COHEN: That is correct. I have conferred with Mr. Weisberg and it is my understanding that --

THE COURT: Can you hear?

A DEFENDANT: Not that good.

THE COURT: Speak up, Mr. Cohen.

MR. COHEN: Yes, Your Honor.

Since the matter was previously called, I have discussed the case with Mr. Weisberg who is the trial Deputy District Attorney.

It is my understanding that it is agreeable with the People that if the defendant Victor Montez withdraws his previous plea of not guilty to a violation of Section 187 of the Penal Code, that being the charge of murder, and enters a guilty plea to that charge as murder in the second degree and admits the use of a firearm, to-wit, a handgun, that this would be agreeable with the People.

The defendant's exposure to time in custody would be from 17 years to life.

As to the defendant Denise Marie Montez, it is the People's intention to add an additional count, violation of Section 32 of the Penal Code, accessory after the fact.

It is my understanding the defendant Denise Montez will enter a plea of guilty to that charge.

The maximum exposure to time in custody for

that charge is an open plea, and the maximum time she can serve is up to three years in the State Prison, the sentence being up to the court.

Have I accurately outlined the disposition of this case, Mr. Pransky?

MR. PRANSKY: Yes.

MR. COHEN: Mr. Burkow?

MR. BURKOW: Yes.

MR. COHEN: Mr. Montez, did you understand what I said concerning the disposition of this case?

DEFENDANT VICTOR MONTEZ: Yes, sir, I did.

MR. COHEN: Is it your desire to enter a plea as I outlined in the disposition?

DEFENDANT VICTOR MONTEZ: Yes, sir.

MR. COHEN: At this time do you withdraw your previous plea of not guilty to the murder charge so you can enter this plea?

DEFENDANT VICTOR MONTEZ: Yes, sir.

MR. COHEN: Has anyone made any other promises to you other than what I have said in open court to get you to enter this guilty plea?

DEFENDANT VICTOR MONTEZ: No, sir.

MR. COHEN: Mr. Pransky, may it be stipulated that an additional count be alleged as to your client, a violation of Section 32 of the Penal Code, that being the felony of accessory after the fact?

MR. PRANSKY: So stipulated.

MR. COHEN: Waive further reading of the amendment and

statement of rights as to the amendment?

MR. PRANSKY: So waive further reading.

MR. COHEN: Denise Montez, do you understand what I said as to the disposition of this case concerning yourself?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Is that your desire to proceed in that manner?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Has anyone made any other promises to you other than what I have said in open court to get you to enter this guilty plea?

DEFENDANT DENISE MONTEZ: No.

MR. COHEN: I must advise each of you that if you are not citizens of the United States that the entry of these guilty pleas may have the consequences of deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States.

If you are citizens of the United States, this would not apply to you.

Further, in order for each of you to enter these guilty pleas you must know, understand and give up certain constitutional rights.

Each of you have the right to a trial by jury or, if both sides agree, you can have a trial by the judge.

Each of you have a right to confront witnesses against you in open court and have your attorneys cross-examine these witnesses.

Each of you have a right to present a defense

1  by having witnesses brought into court who would testify for

2  you by using the subpoena powers of the court at no cost to

3  either of you.

4          Finally, each of you have the right against

5  self-incrimination. This means that neither of you have to say

6  anything against yourself.

7          Now, Mr. Victor Montez, have you discussed all

8  these rights with your attorney Mr. Burkow?

9          DEFENDANT VICTOR MONTEZ: Yes, sir, I have.

10         MR. COHEN: After discussing these rights with Mr.

11  Burkow, do you believe you understand them?

12         DEFENDANT VICTOR MONTEZ: Yes, sir.

13         MR. COHEN: Understanding these rights and knowing

14  that you must give them up in order to enter this guilty plea,

15  do you give up these rights?

16         DEFENDANT VICTOR MONTEZ: Yes, sir.

17         MR. COHEN: Mr. Burkow, join?

18         MR. BURKOW: Join in the waivers.

19         MR. COHEN: Denise Montez, have you discussed all these

20  constitutonal rights with your attorney Mr. Pransky?

21         DEFENDANT DENISE MONTEZ: Yes.

22         MR. COHEN: After discussing these rights with Mr.

23  Pransky, do you believe you understand them?

24         DEFENDANT DENISE MONTEZ: Yes.

25         MR. COHEN: Understanding these rights and knowing

26  that you must give them up in order to enter this guilty plea,

27  do you give up those rights?

28         DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Mr. Victor Montez, are you pleading guilty or entering this plea freely and voluntarily?

DEFENDANT VICTOR MONTEZ: Yes, sir, I am.

MR. COHEN: Denise Montez, are you entering this plea freely and voluntarily?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Has anyone used any force or threats of force or anything similar to that against either of you in order to get you to enter these pleas, Victor Montez?

DEFENDANT VICTOR MONTEZ: No.

MR. COHEN: Denise Montez?

DEFENDANT DENISE MONTEZ: No.

MR. COHEN: Victor Montez, is it a correct statement that in the county of Los Angeles you did unlawfully kill another human being with malice aforethought? Is that what you did?

DEFENDANT VICTOR MONTEZ: Pardon me?

MR. COHEN: Is that what you did?

DEFENDANT VICTOR MONTEZ: Yes, I did.

MR. COHEN: In the commission of this particular offense, did you personally use a handgun?

DEFENDANT VICTOR MONTEZ: Yes, I did.

MR. COHEN: Counsel, stipulate to a factual basis for the plea?

MR. BURROW: Stipulate.

MR. COHEN: Denise Montez, is it a correct statement that you knew after this murder had been committed that you harbored, concealed and aided your co-defendant with the intent

that your co-defendant avoided or escaped arrest, trial,

conviction or punishment for this offense?

Is that what you did?

DEFENDANT DENISE MONTEZ:  Yes.

MR. COHEN:  Counsel, stipulate to a factual basis for

the plea?

MR. PRANSKY:  So stipulated.

THE COURT:  Excuse me.  Victor Montez, Mr. Montez, do

you understand that at the end of doing your actual time in

custody in the State Prison that you would be subject to parole?

Do you understand that?

DEFENDANT VICTOR MONTEZ:  Yes.

THE COURT:  Mrs. Montez, likewise if you should end up

in State Prison on this matter when you finish doing your

actual time in custody you also will be subject to parole.

Do you understand that?

DEFENDANT DENISE MONTEZ:  Yes.

MR. COHEN:  Victor Mandel Montez, in this case

A 146 105 to a violation of Section 187 of the Penal Code, that

being the felony of murder in the second degree, how do you

plead, guilty or not guilty?

DEFENDANT VICTOR MONTEZ:  Guilty.

MR. COHEN:  As to the allegation that in the commission

of this murder you personally used a firearm, do you admit or

deny that?

DEFENDANT VICTOR MONTEZ:  I admit.

MR. COHEN:  Counsel, concur in the plea?

MR. BURKOW:  Concur.

MR. COHEN: Denise Marie Montez, to the violation of Section 32 of the Penal Code, that being the felony of accessory after the fact, how do you plead, guilty or not guilty?

DEFENDANT DENISE MONTEZ: Guilty.

MR. COHEN: Mr. Pransky, concur in the plea?

MR. PRANSKY: Counsel concurs in the plea.

THE COURT: All right. The court finds as to each defendant they have knowingly, understandingly and intelligently given up their constitutional rights. The plea is made freely and voluntarily with an understanding of the nature and the consequences thereof.

The court finds there is a factual basis for the plea. The court accepts the plea.

MR. PRANSKY: April 21st, Your Honor?

THE COURT: 21, no. After the 23rd.

MR. PRANSKY: April 23rd?

THE COURT: 23rd. Probation and sentence hearing April the 23rd, 9:00 o'clock. Both of you are ordered back at that time.

MR. PRANSKY: Your Honor, I want to be heard as to bail in this matter.

THE COURT: Go ahead.

MR. PRANSKY: Your Honor, bail in this matter has been in excess of $50,000.00. In addition thereto, there has been a $20,000.00 bail imposed upon my client on a misdemeanor matter in Ventura County.

She has now entered a plea of guilty to an

offense which carries a maximum of three years.  She has been in custody for 19 months.

This matter has gone to the Court of Appeals and it has gone up to the Supreme Court.

Immediately following the Supreme Court's ruling, I started to negotiate this case with Mr. Weisberg, and he came to an agreement that as to my client the worst that they could ever prove would be an accessory after the fact.

This was an unfortunate situation.  But I honestly believe that Mr. Montez never intended to kill the victim; that this was strictly and accident.

My client's wife or -- I should say, excuse me -- the wife of Mr. Montez was present at the time; that she was quite frightened.  She was upset as well as Mr. Montez being quite upset.

They did not know what to do under the circumstances.

I think that it is only natural that a wife would come to the assistance of her husband.

The extent of her being accessory after the fact is driving the vehicle back to Oxnard where they had originally -- where there original destination.

The victim had agreed to take them to Oxnard, but unfortunately by accident he was killed.

The other part of this accessory after the fact is that my client and her husband temporarily resided in a motel for probably less than 24 hours.

I would urge the court, since she has done 19

9

months, the maximum that she would have to do would be three years.

Although she has a prior record, she has never been to State Prison and I don't believe she has any felony convictions.

What would probably be done in this particular case at the worst would be to impose the mid-term, because I cannot foresee any elements in aggravation.

Considering what her involvement was as a wife who was there to assist her husband under the worst of circumstances, if she got two years in the State Penitentiary she will have already served that time, since one does 16 months on two years.

If the court saw fit to place her on probation, she really would only have approximately five months more to do if she was ever incarcerated in the future.

I think Ventura County on a 6478 violation of probation has been totally unreasonable in setting a bail of over $20,000.00.

By the court releasing her on her own recognizance, it would require the Ventura County to come and pick up Miss Montez, and she could clear up that matter prior to probation and sentencing.

I urge the court on behalf of Mrs. Montez to release her on her own recognizance. She has been in the county jail under the worst of circumstances because she has been charged with a 187. She was in a special barracks.

It was only recently that she was allowed to



work in the kitchen. Now she stands convicted of the least serious of all felonies.

THE COURT: What is the People's position?

MR. COHEN: I have no idea what the People's position is, Your Honor.

MR. PRANSKY: I would ask this: --

MR. COHEN: I was trying to get hold of Mr. Weisberg to see what his position was. His line has been busy for the last ten minutes while Mr. Pransky has been --

MR. PRANSKY: Additionally, I would add this, Your Honor: That Mrs. Montez while she was incarcerated did give birth. There is a child.

Her time should be reduced as quickly as possible and she would like to get there as quickly as possible.

Under the totality of the circumstances, I don't think the court would certainly be misplacing any confidence or abusing its discretion by leaving her out OR.

THE COURT: Okay. Mr. Burkow, do you wish to be heard on this matter?

MR. BURKOW: Yes, I do have an additional request.

THE COURT: Go ahead.

MR. BURKOW: I understand there is no opposition if somehow there is a way they could visit today under --

THE COURT: They can visit today. It is agreeable with me if it is agreeable with the sheriff.

MR. BURKOW: Could Your Honor request that through the sheriff somehow that they be permitted to visit today? If possible, prior to their being taken back --

THE BAILIFF:  For a couple moments if th  want to sit here, yes.

MR. BURKOW:  We were --

MR. PFANSKY:  We were somewhat promised by Mr. Mayer that they would have some time together.

THE COURT:  Let's try to arrange that.  Have you heard from Mr. Weisberg?

MR. COHEN:  No, I haven't, Your Honor.  I am working on it.

THE COURT:  Let me hold that matter then.  I want to hear from the District Attorney.

MR. BURKOW:  May I then be excused?

THE COURT:  Yes, you are finished.

MR. BURKOW:  Thank you, Your Honor.

MR. COHEN:  Your Honor, on that matter I have just spoken to Mr. Weisberg.  His feeling is that the People oppose an OR release.

THE COURT:  Did he have any reason?

MR. COHEN:  Apparently it is a State Prison case.

THE COURT:  All right.

(Recess taken in this matter.)

11:25 A.M.

THE COURT:  204, Montez:  All right.  In this matter Denise Montez  the OR motion --

MR. COHEN:  Your Honor, in that particular matter apparently it is Mr. Weisberg's position that she should not be released on her own recognizance.

1    Apparently, there is just a very short time

2    until her sentence date. Mr. Weisberg's feeling is that there

3    is a good possibility if she is released on her own

4    recognizance she wouldn't report to the probation officer.

5    Further, that in the past she has had a failure

6    to appear in Ventura County, and also based on the nature of

7    the offense that she should not be released at this time.

8    MR. PRANSKY: In answer to that, Your Honor, as stated

9    by Mr. Burkow, there are so many equities in this particular

10   case that I overlooked probably the most important one is the

11   fact that she did while in custody give birth to a child who

12   is in the care of her mother.

13   Mrs. Montez has worked in the Oxnard area

14   almost all of her life. She has been informed that her mother

15   is ill, that the child is ill.

16   She failed to appear on that Ventura matter and

17   I think that is on the basis of failing to pay a fine.

18   I am sure that she has a very keen interest in

19   what happens to her husband as well as what happens to her.

20   There is just five months more that if she

21   would have to serve, if the court gave her the maximum.

22   I don't believe that there is any risk that

23   she would not come back to this court. If she has all those

24   matters cleared up in Ventura, and I anticipate that that would

25   summarily take care of the matter in Ventura.

26   THE COURT: All right. In this matter, the bail is

27   reduced to $2,500.00. Motion to reduce to OR is denied.

28   MR. PRANSKY: Thank you.

(Proceedings adjourned)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO. R        HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                  Plaintiff, )
                           ) NO. A 146 105
         vs.                    ) REPORTER'S
                           ) CERTIFICATE
VICTOR MANDEL MONTES, )
DENISE MARIE MONTES, )
                  )
               Defendants. )

STATE OF CALIFORNIA    )
                 ) ss
COUNTY OF LOS ANGELES   )

       I, BONNIE FRANKFURT, Official Reporter of the Superior Court of the State of California, for the County of Los Angeles do hereby certify that the foregoing is a true and correct transcript of all of the admonitions given and waivers and admissions taken at the time of the taking of the plea in the above-entitled cause.

       Dated this 13th day of April, 1982.

                                Bonnie Frankfurt     CSR #2331
                                Official Reporter

**E X H I B I T   3**

**ORIGINAL FILED**

JUL 13 1982

**COUNTY CLERK**

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO. R            HON. DAVID A. HOROWITZ, JUDGE

| | |
|---|---|
| THE PEOPLE OF THE STATE OF CALIFORNIA, | |
| Plaintiff, | |
| vs. | NO. A 146105 |
| VICTOR MANUEL MONTEZ, | STATE PRISON |
| Defendant. | |

VAN NUYS, CALIFORNIA; FRIDAY, MAY 21, 1982; 10:20 A.M.

Upon the above date, the defendant being

present in court and represented by counsel, CARL BURKOW,

Esq., the People being represented by RALPH MAYER, Deputy

District Attorney of the County of Los Angeles, the following

proceedings were held:

(Alexandria Walsh, Official Reporter, CSR #4416.)

THE COURT: Number 302, Victor Montez.

As of April 23, he had 619 days actually served.

What is the total now?

1     MR. BURKOW: As of -- I did not compute it from the

2    23rd of April on, but I think that today would make it another

3    29 days, which would make it 648 days.

4     THE COURT: Okay.

5         The court has read and considered the probation

6    report.

7         Waive arraignment for judgment?

8     MR. BURKOW: Yes, Your Honor. There is no legal cause.

9     THE COURT: Do you wish to be heard?

10    MR. BURKOW: I would just briefly ask the court to

11   understand one thing. I think the sentence is locked in as

12   far as the sentencing is concerned. I think that's pretty

13   much preordained. But I think on behalf of Mr. Montez I'd

14   be less than open with the court if I didn't indicate that this

15   individual is not the same individual who was arrested on the

16   night in question. He has undergone many, many changes.

17       He would hope that the court -- society would

18   somehow understand that. But at no time was it his intention

19   to have the incident culminate in the way that it did. It's

20   bad enough that he admitted that there was a crime involved,

21   but it certainly in his mind had never but for an accident and

22   his rash judgment in having a weapon would have never ended

23   in the way that it did. He would hope that somehow the court

24   would understand that and the prison authorities would

25   understand that.

26       With that it's submitted, Your Honor.

27     THE COURT: I agree with you. It's unfortunate to see

28   a person who was honorably discharged, a paratrooper in the

2

1   Special Forces ending up with seventeen to life in the State
2   Prison. It's very unfortunate, Mr. Montes. I hope you are
3   successful in the future.
4                   Very well. In this matter probation is denied.
5   You're sentenced to the State Prison for a period of seventeen
6   years to life. It's fifteen to life plus the enhancement,
7   12022.5, which is an additional two years. Seventeen to life
8   is the total.
9                   Given credit for 468 days actually served plus
10  214 days good time and work time.
11                  Motion on remaining counts?
12  MR. MAYER: To dismiss, Your Honor.
13  THE COURT: Granted.
14                  (Proceedings were concluded.)
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NW R                    HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,

                    Plaintiff,

                                                    NO. A 146105

            vs.

VICTOR MANUEL MONTES,                               REPORTER'S
                                                    CERTIFICATE

                    Defendant.

STATE OF CALIFORNIA     )
                        )  ss
COUNTY OF LOS ANGELES   )

        I, ALEXANDRIA WALSH, Official Reporter of the
Superior Court of the State of California, for the County of
Los Angeles, do hereby certify that the foregoing is a true
and correct transcript of the proceedings held at the time of
pronouncing sentence; that the views and recommendations of
the court, if any, were contained therein pursuant to Section
1203.01 of the Penal Code.

        Dated this 6th day of July, 1987.

                        /s/ Alexandria Walsh        CSR #4418
                            Official Reporter

**E X H I B I T  4**

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES**

3 PAS

DATE MAY 21 1982

DAVID HOROWITZ

STATUCE/NICODEM

JUDGE

DEPT. ABRUCKLE/HEGLEN
FRANKLIN/WALSH

CASE NO. A146105

PEOPLE OF THE STATE OF CALIFORNIA     DEPUTY DISTRICT ATTY.

01 MONTEZ VICTOR ANGELA     604     CLARKE     C. Burrow
209     01CTS

BOX CHECKED IF ORDER APPLICABLE

NATURE OF PROCEEDINGS     PLS     10-15-80

... IS SWORN AS THE ENGLISH ... INTERPRETER

CRIMINAL PROCEEDINGS ADJOURNED/RESUMED

DEFENDANT ORDERED DELIVERED TO DEPARTMENT OF CORRECTIONS PER SECTION 1203.03 PENAL CODE

ON ... MOTION, PROBATION AND SENTENCE HEARING CONTINUED TO

AT ... A.M. IN DEPT. ... SUPPLEMENTAL PROBATION REPORT/PROGRESS REPORT ORDERED

DEFENDANT PERSONALLY AND ALL COUNSEL WAIVE TIME FOR SENTENCING

PROBATION DENIED. SENTENCE IS IMPOSED AS FOLLOWS:

IMPRISONED IN STATE PRISON FOR ☐ TERM PRESCRIBED BY LAW

COURT SELECTS THE ... TERM OF 15 YEARS FOR THE BASE TERM AS TO COUNT

... AS INDICATED IN BOX AT BELOW

COMMITTED TO CALIFORNIA YOUTH AUTHORITY. THE TERM OF IMPRISONMENT TO WHICH THE DEFENDANT WOULD
HAVE BEEN SENTENCED PURSUANT TO SECTION 1170 PENAL CODE IS ... YEARS

IMPRISONED IN LOS ANGELES COUNTY JAIL FOR TERM OF

FINED IN SUM OF ... PLUS ASSESSMENT TO BE PAID TO COUNTY CLERK

SENTENCE IS SUSPENDED

PROCEEDINGS SUSPENDED

PROBATION GRANTED FOR A PERIOD OF ... YEARS ☐ SEE CONDITIONS LISTED BELOW

PROBATION TO BE WITHOUT FORMAL SUPERVISION

1. SPEND FIRST ... IN COUNTY JAIL ☐ ROAD CAMP OR ROAD OR FARM RECOMMENDED
   WORK FURLOUGH PROGRAM RECOMMENDED ... NOT TO BE ELIGIBLE FOR COUNTY PAROLE
2. PAY FINE OF $ ... PLUS SURCHARGE OF $5.00 PURSUANT TO SECTION 1205 PENAL CODE, PLUS ADDITIONAL
   FINE OF $5000.00 ... PURSUANT TO SECTION 11372.5 HEALTH AND SAFETY CODE, TOTAL FINE OF $ ...
   ASSESSMENT TO BE PAID TO COUNTY CLERK. PROBATION OFFICER IN SUCH AMOUNT AND MANNER AS HE SHALL PRESCRIBE
   MINIMUM PAYMENT OF FINE/RESTITUTION TO BE $ ... PER ...
3. MAKE RESTITUTION THROUGH PROBATION OFFICER IN SUCH AMOUNT AND MANNER AS HE SHALL PRESCRIBE
   TOTAL AMOUNT OF RESTITUTION TO INCLUDE A 2% SERVICE CHARGE AS AUTHORIZED BY WELFARE & INST. CODE
5. NOT DRINK ANY ALCOHOLIC BEVERAGE AND STAY OUT OF PLACES WHERE THEY ARE THE CHIEF ITEM OF SALE
   NOT USE OR POSSESS ANY NARCOTICS, DANGEROUS OR RESTRICTED DRUGS OR ASSOCIATED PARAPHERNALIA, EXCEPT
   WITH VALID PRESCRIPTION, AND STAY AWAY FROM PLACES WHERE USERS CONGREGATE
7. NOT ASSOCIATE WITH PERSONS KNOWN BY YOU TO BE NARCOTIC OR DRUG USERS OR SELLERS
8. SUBMIT TO PERIODIC ANTI-NARCOTIC TESTS AS DIRECTED BY THE PROBATION OFFICER
9. HAVE NO BLANK CHECKS IN POSSESSION, NOT WRITE ANY PORTION OF ANY CHECKS, NOT HAVE BANK ACCOUNT UPON
    WHICH YOU MAY DRAW CHECKS
10. NOT GAMBLE OR ENGAGE IN BOOKMAKING ACTIVITIES, OR HAVE PARAPHERNALIA THEREOF IN POSSESSION, AND NOT
    BE PRESENT IN PLACES WHERE GAMBLING OR BOOKMAKING IS CONDUCTED
11. NOT ASSOCIATE WITH ...
12. CO-OPERATE WITH PROBATION OFFICER IN A PLAN FOR ...
13. SUPPORT DEPENDENTS AS DIRECTED BY PROBATION OFFICER
14. SEEK AND MAINTAIN TRAINING/SCHOOLING OR EMPLOYMENT AS APPROVED BY PROBATION OFFICER
15. MAINTAIN RESIDENCE AS APPROVED BY PROBATION OFFICER
16. SURRENDER DRIVER'S LICENSE TO CLERK OF COURT TO BE RETURNED TO DEPARTMENT OF MOTOR VEHICLES
17. NOT DRIVE A MOTOR VEHICLE UNLESS LAWFULLY LICENSED AND INSURED
18. NOT OWN, USE OR POSSESS ANY DANGEROUS OR DEADLY WEAPONS
19. SUBMIT HIS PERSON AND PROPERTY TO SEARCH OR SEIZURE AT ANY TIME OF THE DAY OR NIGHT, BY ANY LAW ENFOR-
    CEMENT OFFICER WITH OR WITHOUT A WARRANT
    OBEY ALL LAWS, ORDERS, RULES AND REGULATIONS OF THE PROBATION DEPARTMENT AND OF THE COURT

82. DEFENDANT TO BE GIVEN CREDIT FOR 670 DAYS IN CUSTODY ... DAYS GOOD TIME/WORK TIME

83. SENTENCE COUNTS TO RUN CONSECUTIVELY/CONCURRENTLY WITH ... Total 972 days

84. STAY OF EXECUTION GRANTED TO

85. ON MOTION OF ... COUNTS ... DISMISSED IN FURTHERANCE OF JUSTICE

86. COURT ADVISES DEFENDANT OF HIS APPEAL/PAROLE RIGHTS

87. FURTHER ORDER AS FOLLOWS: ADDITIONAL CONDITIONS OF PROBATION

Additional 2 years ps for 12022.5 Penal Code
Allegation in Count I to run consecutive to
sentence on Count I

SHERIFF IS ORDERED TO ALLOW DEFENDANT ... PHONE CALLS AT DEFENDANT'S OWN EXPENSE
DEFENDANT FAILS TO APPEAR WITH/WITHOUT SUFFICIENT EXCUSE ☐ BAIL FORFEITED ☐ O.R. REVOKED
BENCH WARRANT ORDERED ISSUED/AND HELD UNTIL ... ☐ NO BAIL ☐ BAIL FIXED AT $
DEFENDANT APPEARING, BENCH WARRANT ORDERED RECALLED/QUASHED
WARRANT/WARRANT ABSTRACT FILED ... ☐ WARRANT RECALL WRITTEN ... RECALL NO

**E X H I B I T   5**

Name _Julie Davis_ Date _11-18-82_    I certify that this image is a true copy per master certification on this fiche.
Name _David Hatton_ Date _11-18-82_

**COURT COPY**

302

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

PROBATION OFFICERS REPORT

☑ REPORT SEQUENCE # 1

THE PEOPLE OF THE STATE OF CALIFORNIA,
                                    Plaintiff

vs.

VICTOR MONTEZ,
                                    Defendant

TRUE NAME

VICTOR MANUEL MARQUEZ-MONTEZ

| DEPT. | ATTY. | JUDGE |
|---|---|---|
| NW-R | BURKOW | HOROWITZ |
| HEARING | C.I.I. NO. | COURT CASE NO. |
| 4-23-82 | A01881745 | A-146105 |
| DPO | AREA OF FICHE | |
| GRISMORE | LSFV | |
| ADDRESS IF IN CUSTODY, EXPECTED ADDRESS WHEN RELEASED | | PROB. NO. |

(LAST)
131 NORTH BALSAM
OXNARD, CA
(NO TELEPHONE)

APR 23 1982
_____ County Clerk
BY M. McKenzie, DEPUTY

CHARGED WITH THE CRIME(S) OF

CT. I: 187 PC (MURDER) WITH USE ALLEGATION PURSUANT TO PENAL CODE 12022(A) AND
PENAL CODE SECTION 12022.5; CT. II: 211 PC (ARMED ROBBERY) WITH USE ALLEGATION
PURSUANT TO PENAL CODE SECTION 12022(A) AND PENAL CODE SECTION 12022.5; *

CONVICTED OF THE CRIME(S) OF

CT. I: 187 PC WITH USE ALLEGATION PURSUANT TO SECTION 12022.5
CT. III 654/209 PC WITH ALLEGATIONS AND ALLEGATIONS OF CT.I
CONTINUED TO P&S HEARING.  CT. II: 211 PC DISMISSED AT **

| | BY PLEA, CT. | TRIED IN JAIL THIS CASE |
|---|---|---|
| PLEA | 619 | |

☐ Pre-conviction invest. (131.3 C.C.P.)    ☐ Drug Diversion invest. (1000.1 (a) P.C.)

| COMPANION CASES | DISPOSITION |
|---|---|
| DENISE MONTEZ | P&S HEARING 4-23-82 |

PERSONAL HISTORY

| AGE | BIRTHDATE | RACE | FORMAL EDUCATION | AGE LEFT SCHOOL |
|---|---|---|---|---|
| 28 | 7-6-53 | MEX/AM | 15 YEARS | 16 |
| MARITAL STATUS | HOME INCLUDES | | | NO. OF DEPENDENTS |
| MARRIED | WIFE, THREE CHILDREN | | | FOUR |
| OCCUPATION | INCOME PER MONTH | WHERE EMPLOYED | | |
| (LAST) ROOFER | Ø | NOT | | |
| HEALTH | CAME TO STATE | CAME TO COUNTY | BRANCH MILITARY SERVICE | KIND OF DISCHARGE |
| GOOD | 1956-1957 | NOT | U.S. ARMY | HONORABLE |

SUPPLIED BY

* CT. III: 654/209 PC (ATTEMPTED KIDNAPPING WITH INTENT TO COMMIT
ROBBERY) PURSUANT TO PENAL CODE SECTION 12022(A) AND PENAL CODE
SECTION 12022.5.

** APPELLATE COURT HEARING OF 11-25-80.

(AS SUPPLIED BY DEFENDANT AND CONFIRMED BY WIFE.)

DEFENDANT IS THE FOURTH OF NINE CHILDREN BORN TO

MANUEL ALVAREZ MONTEZ AND REYNOLDA MARQUEZ MONTEZ IN ELSA, TEXAS.

HE WAS RAISED BY HIS PARENTS IN OXNARD, CALIFORNIA.  THE DEFENDANT

AND HIS FAMILY CAME TO CALIFORNIA WHEN HE WAS APPROXIMATELY THREE OR



1  FOUR YEARS OF AGE AND SETTLED IN SATICOY, CALIFORNIA. THEY

2  SUBSEQUENTLY MOVED TO OXNARD, CALIFORNIA. THE DEFENDANT HAS NEVER

3  LIVED IN LOS ANGELES COUNTY.

4      THE DEFENDANT, HIS WIFE, TWO CHILDREN AND A STEPSON,

5  LAST RESIDED AT THE HOME OF THE DEFENDANT'S PARENTS IN OXNARD,

6  CALIFORNIA FOR APPROXIMATELY TWO MONTHS. UPON RELEASE, THE DEFENDANT

7  EXPECTS TO EITHER RETURN TO OXNARD OR LIVE IN SAN BERNADINO.

8      THE DEFENDANT'S PARENTS WERE DIVORCED IN 1973 OR 1974.

9  THE FATHER IS A MECHANIC-WELDER AND HAS NOT REMARRIED. THE MOTHER'S

10 OCCUPATION IS UNKNOWN. SHE REMARRIED IN 1980 TO A MR. COLON.

11     THE DEFENDANT ATTENDED CHANNEL ISLAND HIGH SCHOOL FOR

12 APPROXIMATELY ONE YEAR AND DROPPED OUT AT THE AGE OF 16 YEARS WHEN HE

13 ENROLLED IN THE JOB CORPS FOR APPROXIMATELY 11 MONTHS STUDYING HEAVY

14 EQUIPMENT OPERATOR. HE LEFT THE JOB CORPS IN NOVEMBER OF 1969.

15 WHILE IN THE NEW MEXICO STATE PENITENTIARY IN 1977 OR 1978, THE

16 DEFENDANT OBTAINED HIS GENERAL EDUCATION DIPLOMA THROUGH THE DIVISION

17 OF VOCATIONAL REHABILITATION. HE RECEIVED A CERTIFICATE FOR WELDING.

18 HE APPEARS TO BE OF AVERAGE INTELLIGENCE.

19     THE DEFENDANT CO-HABITATED WITH LORENA R. MOLINA IN

20 NEW MEXICO FROM APRIL OF 1975 UNTIL JUNE OF 1976 WHEN HE WAS COMMITTED

21 TO THE NEW MEXICO STATE PENITENTIARY. HE RETURNED TO THE HOME OF

22 MISS MOLINA IN APRIL OF 1978 AND REMAINED THERE UNTIL FEBRUARY OF 1979.

23 THE DEFENDANT CO-HABITATED WITH DENISE GARCIA FROM MAY OF 1979 UNTIL

-2-

1  THEY MARRIED IN APRIL OF 1980. HE ASSUMED RESPONSIBILITY FOR HIS
2  WIFE'S SON, WHO WAS THEN ONE YEAR OF AGE. THERE WERE TWO DAUGHTERS
3  BORN OF THIS UNION; ONE ON FEBRUARY 9, 1980, AND THE SECOND IN
4  JANUARY OF 1981.

5      THE DEFENDANT'S   27-YEAR-OLD BROTHER, ANASTACIO,
6  HAD ONE LAW ENFORCEMENT CONTACT AS A JUVENILE FOR CURFEW AND MALICIOUS
7  MISCHIEF.

8      THE DEFENDANT WAS LAST EMPLOYED AS A ROOFER FOR
9  SOUTHERN CALIFORNIA ROOFING COMPANY IN DOWNEY FROM JUNE OF 1980 UNTIL
10  MID-JULY OF 1980. HE INDICATES THE JOB WAS THEN FINISHED AND HIS
11  SALARY WAS $11.90 PER HOUR. THE DEFENDANT INDICATES THERE HAS BEEN
12  NO OTHER EMPLOYMENT. HE PLANS TO RETURN TO ROOFING OR WELDING UPON
13  HIS RELEASE.

14      THE DEFENDANT ENLISTED IN THE UNITED STATES ARMY ON
15  SEPTEMBER 8, 1970, ACHIEVED A RATING OF E-2, AND WAS HONORABLY
16  DISCHARGED ON SEPTEMBER 18, 1972. HE WAS A PARATROOPER IN THE
17  SPECIAL FORCES.

18      FINANCIAL INFORMATION:
19      THE DEFENDANT LAST PAID RENT OF $75 PER MONTH. HE
20  OWNS A 1952 GMC, PICK UP VALUED AT $700. HE INDICATES THE CITY
21  TOWED THE TRUCK AWAY AND ITS WHEREABOUTS ARE NOW UNKNOWN. HIS
22  FINANCIAL STATUS IS CURRENTLY POOR.
23  -3-

SUBSTANCE ABUSE:

THE DEFENDANT FIRST BEGAN SMOKING MARIJUANA AT THE AGE OF 13 YEARS UTILIZING IT TWO TO THREE TIMES PER WEEK. AT THE AGE OF 13, HE BEGAN SHOOTING HEROIN ON WEEKENDS AT A COST OF FIVE DOLLARS PER CAPSULE. THIS HABIT SUBSEQUENTLY PROGRESSED UNTIL HIS DAILY USE AMOUNTED TO $200 PER DAY. AT THE AGE OF 15, HE BEGAN TAKING VALIUMS "WHENEVER THERE WAS NO STUFF". THE DEFENDANT TOOK QUAALUDES ONE TIME ONLY AT THE AGE OF 19 YEARS. HE SUPPORTED HIS HABIT THROUGH ODD JOBS AND BURGLARIES. THE DEFENDANT HAS NEVER OVERDOSED.

FROM MAY OF 1979 THROUGH MAY OF 1980, THE DEFENDANT WAS IN THE VICTORY OUT REACH PROGRAM LOCATED ON STAR ROUTE 27, HELENDALE, CALIFORNIA. THE MAIN OFFICE IS LOCATED AT 747 MOUNT VERNON AVENUE IN SAN BERNADINO.

GANG ACTIVITY:

THE DEFENDANT DENIES ANY GANG AFFILIATIONS.

PRIOR RECORD:

SOURCES OF INFORMATION:

DEPARTMENT OF JUSTICE (2-24-82), CII (4-16-82), DEFENDANT.

JUVENILE HISTORY:

AGE 9      OXNARD PD - MALICIOUS MISCHIEF, C&R  NA

AGE 13     OXNARD PD - MARKS ON ARM.  NA

-4-

98C6520 - PROB. 6A - FS 2.82

1    (DEFENDANT SAYS MATTER DISMISSED AS HE STATED HE WAS GOING
2    INTO THE JOB CORPS.)

3                    ADULT HISTORY:

3-6-73          VENTURA SO - 459 PC (BURGLARY) - 4-26-73, DISMISSED N/A
4               FURTHERANCE OF JUSTICE.

5    4-13-73     VENTURA SO - 11550 H&S (UNDER INFLUENCE CONTROLLED
6               SUBSTANCE) - 11364 H&S (POSSESSION CONTROLLED SUBSTANCE
                PARAPHERNALIA) - 459 PC (BURGLARY). 1-7-74, CONVICTED
7               OF 11530 H&S (POSSESSION MARIJUANA) - CYA COMMITMENT.

8    4-17-73     VENTURA SO - 459 PC (BURGLARY) - DISMISSED.
                4-26-73, PG, 602.5 PC (ENTERING NON-COMMERCIAL
9               DWELLING) - ONE YEAR SUMMARY PROBATION.

10   10-19-73    VENTURA SO - 11360 H&S (SELL OR TRANSPORT MARIJUANA/
                HASH) FTA.

11   1-16-74     VENTURA SO - 242 PC (BATTERY) -

12   (DEFENDANT STATES THE INCIDENT HAPPENED WHILE IN COUNTY JAIL
13   AND MATTER WAS DISMISSED.)

14   DATE UNKNOWN   NEW MEXICO - 459 PC (THEFT FROM MOTOR VEHICLE) -
                COMMITTED TO NEW MEXICO STATE PENITENTIARY. RELEASED
15              4-22-78.

16   (DEFENDANT STATES HE TURNED HIMSELF IN AS HE WAS AWARE OF A
     BENCH WARRANT HAVING BEEN ISSUED.  HE SAYS HE WAS DISHONORABLY
17   DISCHARGED FROM THE CALIFORNIA YOUTH AUTHORITY JURISDICTION ON
     JUNE 3, 1977 WHEN COMMITTED ON THIS CHARGE.)

18   PRESENT OFFENSE:

19          DEFENDANT WAS ARRESTED ON AUGUST 11, 1980 AT 12:00 NOON

20   BY THE LOS ANGELES POLICE DEPARTMENT WITH THE ASSISTANCE OF THE

21   OXNARD POLICE DEPARTMENT AT THE PLAZA MARINA HOTEL, LOCATED AT

22   711 WEST HUENEME, OXNARD AND BOOKED FOR 187 OF THE PENAL CODE (MURDER).

23   AT THE TIME OF THE ARREST, THERE WAS AN OUTSTANDING OXNARD WARRANT

                    -5-

76C692G - PROJ. GA - PS 282



1  NUMBER 013334AM01 WITH BAIL SET AT $75.  THERE WAS NO BAIL SET ON

2  HIS CURRENT ARREST.  HE WAS CHARGED ON THE INFORMATION WITH COUNT

3  ONE, 187 PENAL CODE (MURDER) DURING THE COMMISSION OF A ROBBERY AND

4  KIDNAPPING PURSUANT TO PENAL CODE SECTION 190.2(A)(17); COUNT TWO,

5  211 PENAL CODE (ROBBERY); COUNTS THREE, 664/209 PENAL CODE (ATTEMPTED

6  KIDNAPPING TO COMMIT ROBBERY).  ALL THREE COUNTS ALLEGED THE USE OF

7  A FIREARM PURSUANT TO SECTION 12022.5 OF THE PENAL CODE AND PURSUANT

8  TO SECTION 12022(A) OF THE PENAL CODE.  IT WAS ALSO ALLEGED, IN ALL

9  THREE COUNTS, DEFENDANT INFLICTED GREAT BODILY INJURY AS DEFINED IN

10  SECTION 12022.7 OF THE PENAL CODE.  COUNT TWO WAS DISMISSED ON

11  OCTOBER 1, 1980 AND UPHELD BY THE APPELLATE COURT ON NOVEMBER 25, 1980.

12  ON MARCH 26, 1982, THE DEFENDANT PLED GUILTY TO COUNT ONE WITH THE

13  USE ALLEGATION PURSUANT TO PENAL CODE SECTION 12022.5.  REMAINING

14  COUNTS AND ALLEGATIONS WERE CONTINUED TO THE PROBATION AND SENTENCING

15  HEARING.

16  FACTS ;  BASED ON THE ARREST REPORT, A WITNESS, MARK LABASH,

17  INFORMED LOS ANGELES COUNTY SHERIFFS THAT HE HAD OBSERVED TWO MALE

18  SUSPECTS ON AUGUST 10, 1980 AT 1:48 A.M. DRAGGING A BODY TO THE

19  SHOULDER OF THE VENTURA FREEWAY WEST OF VALLEY CIRCLE OFF RAMP.  AT

20  4:00 A.M. ON THE SAME DATE, DEPUTIES OBSERVED THE VICTIM WITH A

21  GUNSHOT WOUND TO HIS UPPER TORSO AND LYING IN A SUPINE POSITION ON

22  THE FREEWAY SHOULDER.  DEATH WAS INDICATED AS OCCURRING AT 2:18 A.M.

23  THE VICTIM'S PANTS WERE OPEN AND PARTIALLY DOWN, THE ZIPPER WAS

-6-                                                          Con +

PARTIALLY BROKEN AND THE TOP BUTTON WAS PULLED OFF. A BULLET HOLE
WAS OBSERVED BEHIND HIS RIGHT EAR AND A GUITAR PICK WAS STUCK TO
HIS LEFT CHEEK WITH BLOOD. MRS. IRMA CEBALLOS (22), 237 LARK STREET,
OXNARD, CALIFORNIA, INFORMED OFFICERS AT THE LOS ANGELES POLICE
DEPARTMENT, WEST VALLEY STATION, ON AUGUST 11, 1980 THAT AT
APPROXIMATELY 10:30 P.M. ON AUGUST 9, 1980, SHE AND TWO ASSOCIATES,
VICTOR MONTEZ, AND DENISE MONTEZ, HAD BEEN VISITING SAN BERNADINO,
AND HAD STOPPED IN SAN FERNANDO VALLEY FOR A PIZZA ON THEIR RETURN
TRIP. WHEN THE THREE ATTEMPTED TO START THEIR BROWN STATION WAGON
AFTERWARDS, IT FAILED TO START AND THEY DECIDED TO HITCHHIKE ON THE
VENTURA FREEWAY. THEY FIRST APPROACHED AN UNKNOWN MALE APPROXIMATELY
ONE-HALF HOUR LATER. SUBSEQUENTLY, IT WAS AGREED THAT THE WITNESS
AND MRS. MONTEZ WOULD APPEAR AS TWO FEMALES STRANDED ON THE FREEWAY
WHILE MR. MONTEZ WOULD APPROACH ANY MOTORIST WHO STOPPED AND EXHIBIT
A FIREARM HE CARRIED IN HIS WAISTBAND. THE DEFENDANT HID IN A BUSH
AREA WHILE THE WOMEN HITCHHIKED. THE VICTIM APPROACHED IN A SILVER
DATSUN, STATION WAGON, LICENSE NUMBER 82BYHP, CONVERSED WITH
MRS. MONTEZ, THEN ALLOWED THEM TO ENTER HIS VEHICLE. THE WITNESS
ENTERED THE FRONT SEAT AND MRS. MONTEZ ENTERED THE REAR SEAT WHILE
BECKONING TO THE DEFENDANT WHO WAS HIDING IN THE BUSHES. THE
DEFENDANT RAN TO THE VEHICLE BRANDISHING A SMALL CALIBER FIREARM.
AND ENTERED THE REAR SEAT OF THE VEHICLE. HE THEN POINTED THE
WEAPON AT THE REAR PORTION OF THE VICTIM'S HEAD AND TOLD HIM TO TAKE

-7-

con't.

1  THEM TO OXNARD OR HE WOULD KILL HIM. THE DEFENDANT FIRED ONE ROUND,
2  WITHOUT WARNING, STRIKING THE VICTIM APPROXIMATELY IN THE LOWER RIGHT
3  OF HIS HEAD. THE VICTIM FELL FORWARD, THE DEFENDANT EXITED THE
4  REAR PASSENGER DOOR AND OPENED UP THE FRONT PASSENGER DOOR. THE
5  DEFENDANT THEN DRUG THE VICTIM'S BODY ACROSS THE FRONT SEATS FROM
6  THE DRIVER'S SIDE AND SECRETED THE BODY BENEATH AN OVERHANGING TREE
7  AND SHRUB AREA. THE WITNESS THEN OBSERVED THE DEFENDANT GOING THROUGH
8  THE VICTIM'S GARMENTS BUT WAS UNSURE OF WHAT WAS REMOVED. THE
9  WITNESS AND MRS. MONTEZ HAD ALSO EXITED THE VEHICLE. THE DEFENDANT
10 THEN INSTRUCTED THE WITNESS TO RE-ENTER THE VEHICLE AND TOLD HIS
11 WIFE TO WEAR GLOVES SO AS NOT TO LEAVE HER FINGERPRINTS ON THE VEHICLE.
12 HE THEN ENTERED THE REAR SEAT AND INSTRUCTED HIS WIFE TO DRIVE THE
13 VEHICLE TO 456 CHANNEL ISLAND BOULEVARD IN OXNARD. UPON ARRIVAL AT
14 THE RESIDENCE WHICH IS OCCUPIED BY THERESA RAMIREZ, MRS. MONTEZ
15 REMOVED CLOTHING WHICH HAD BELONGED TO THE VICTIM AND ATTEMPTED TO
16 WASH THEM. THE WITNESS WAS UPSET AND THE DEFENDANT COMFORTED HER
17 INDICATING THEY COULD NOT BE IDENTIFIED AND THERE WAS NO WAY TO
18 TRACE THEIR LOCATION. WHEN THE WITNESS SUGGESTED THEY TURN THEMSELVES
19 IN, THE DEFENDANT THREATENED HER WITH ACTS OF VIOLENCE AND STATED SHE
20 WOULD BE KILLED IF SHE CONTACTED THE POLICE. THE WITNESS THEN
21 STATED THE WEAPON HAD BEEN SOLD TO AN UNKNOWN FEMALE IN THE OXNARD
22 AREA AND A GUITAR, WHICH HAD BEEN TAKEN FROM THE VICTIM'S VEHICLE,
23 WAS ALSO SOLD TO SOMEONE IN THE OXNARD AREA. THE WITNESS THEN

-8-

Cont.

1  WILLINGLY ACCOMPANIED LOS ANGELES POLICE DEPARTMENT DETECTIVES TO THE

2  OXNARD POLICE STATION AND IDENTIFIED A PHOTO OF THE DEFENDANT.  AT

3  APPROXIMATELY 12:10 P.M. ON AUGUST 11, 1980, THE WITNESS IDENTIFIED

4  THE VICTIM'S VEHICLE AT 149 ELIZA COURT IN THE CITY OF OXNARD.

5  THERESA RAMIREZ LATER INFORMED OFFICERS THAT MR. AND MRS. MONTEZ

6  HAD LEFT HER RESIDENCE AT APPROXIMATELY 4:00 P.M. ON AUGUST 10, 1980.

7  MRS. RAMIREZ INFORMED OFFICERS THAT SHE HAD ORDERED THE DEFENDANT

8  AND HIS WIFE OUT OF HER HOME AS THEY WERE ATTEMPTING TO SELL STOLEN

9  GOODS AND STATED THEY COULD BE LOCATED AT THE PLAZA MARINA HOTEL.

10 LOS ANGELES POLICE OFFICERS WENT TO THAT LOCATION ACCOMPANIED BY

11 OXNARD POLICE OFFICERS AND WERE INFORMED THE DEFENDANT AND HIS WIFE

12 WERE OCCUPYING APARTMENT NUMBER 25.  THE DEFENDANT ANSWERED THE DOOR

13 TO APARTMENT 25 AND A REVOLVER WAS OBSERVED ON THE NIGHTSTAND.  BOTH

14 THE DEFENDANT AND HIS WIFE WERE THEN ARRESTED.                    END

15 DEFENDANT'S STATEMENT:

16         THE DEFENDANT HAS NOT SUBMITTED A WRITTEN STATEMENT.

17 ORALLY, HE STATES THAT HE, HIS WIFE, AND IRMA CEDALLOS WERE LOOKING

18 FOR A RIDE IN THE SAN FERNANDO VALLEY WHERE HE HAD DRIVEN HIS CAR

19 AND IT HAD BROKEN DOWN.  THEY WERE EN ROUTE TO OXNARD FROM

20 SAN BERNADINO.  HE SAW A GUY PARKED AT A GAS STATION AND OFFERED

21 HIM $20 FOR A RIDE, BUT THE PERSON HAD NO GAS.  THEY THEN WALKED ON

22 TO THE 101 FREEWAY AND THE WOMEN WERE TOLD TO ATTEMPT TO GET A RIDE

23 WHILE THE DEFENDANT HID.  HE STATED HE WOULD CATCH THEM LATER.  A

-9-

1  CAR STOPPED AND OFFERED THEM A RIDE. THE DEFENDANT THEN CHANGED HIS
2  MIND, RAN TO THE CAR, AND PUSHED HIS WIFE OUT OF THE WAY KNOCKING
3  HER DOWN. THE VICTIM WAS SCARED AND THE DEFENDANT TOLD HIM THAT
4  "NOTHING WOULD HAPPEN TO HIM. JUST GIVE ME A RIDE." THE VICTIM
5  AGREED AND THE DEFENDANT LET HIM GO. HE STATES HE HAD A GUN IN HIS
6  HAND AND, WHEN THE VICTIM ADJUSTED HIMSELF IN HIS SEAT, HE ACCIDENTLY
7  HIT THE GUN WHICH WENT OFF AND KILLED HIM. THE DEFENDANT TOOK THE
8  VICTIM OUT OF THE CAR, PUT HIS BODY IN THE BUSHES, RE-ENTERED THE
9  VEHICLE AND DROVE TO OXNARD. HE DENIES HAVING GONE THROUGH THE
10 VICTIM'S POCKETS AS HE STATES HE HAD NO INTENTION OF ROBBING OR
11 HURTING ANYONE.

12 INTERESTED PARTIES:

13          CYNTHIA STEWART, VICTIM'S SISTER, INDICATES THE
14 VICTIM WAS SIX FEET TWO INCHES, APPROXIMATELY 170 POUNDS, AGE 33
15 YEARS, SINGLE WITH NO DEPENDENTS. SHE STATES THAT IN 1976 HE HAD
16 AN ATTACK IN HIS LEFT EYE OF HISTOPLASMOSIS WHICH IS AN EYE DISEASE
17 AND CAUSES BLINDNESS. SHE INDICATED THE ILLNESS CLOGS ONE'S VISION
18 AND THAT THE DOCTOR HAD STATED THIS WAS THE WORST CASE EVER SEEN.
19 SHE STATES HER BROTHER WAS RETURNING TO ALTADENA FROM BAND PRACTISE
20 IN WOODLAND HILLS. THE CAR WAS SUBSEQUENTLY RETURNED, BUT WAS TOTALLY
21 STRIPPED. MISS STEWARD RECEIVED A CALL FROM THE OXNARD POLICE
22 DEPARTMENT INDICATING HER BROTHER'S CAR HAD BEEN FOUND; HOWEVER, SHE
23 DID NOT KNOW AT THE TIME THAT THE HOMICIDE VICTIM WAS ACTUALLY HER

-10-

BROTHER. SHE STATES THERE WAS INSURANCE WHICH COVERED HER BROTHER'S
FUNERAL EXPENSES. ALSO, MISS STEWART WAS INFORMED BY THE POLICE
DEPARTMENT OF HER ELIGIBILITY FOR VICTIM'S COMPENSATION.

EVALUATION:

THE DEFENDANT, WHO INDICATES HIS ONLY EMPLOYMENT WAS
FOR A PERIOD OF ONE AND ONE-HALF MONTHS SINCE HIS RELEASE FROM THE
NEW MEXICO STATE PENITENTIARY IN 1978, HAS HAD THE ADVANTAGE OF
BEING THE PRODUCT OF AN INTACT FAMILY ENVIRONMENT UNTIL THE AGE OF
20 OR 21 YEARS. HOWEVER, HE WAS COMMITTED TO THE CALIFORNIA YOUTH
AUTHORITY SOON AFTER HIS 21ST BIRTHDAY FOR POSSESSION. HIS ONLY
OTHER CONTACT WITH LAW ENFORCEMENT HAS BEEN OF A MODERATE NATURE.
HE COMES FROM A LARGE FAMILY AND NO OTHER MEMBERS ARE INDICATED AS
HAVING BEEN ARRESTED. THE DEFENDANT HAS OBTAINED THE EQUIVALENT OF
A HIGH SCHOOL DIPLOMA AND HAS HAD <u>TRAINING AS A HEAVY EQUIPMENT
OPERATOR AND TRAINING IN WELDING</u>, YET NO ATTEMPTS WERE MADE TO
OBTAIN CONTINUAL EMPLOYMENT. THE DEFENDANT HAS BEEN HEAVILY INVOLVED
IN THE USE OF NARCOTICS AND HAS BEEN ADDICTED TO SAME FOR THE
MAJORITY OF HIS LIFETIME. HE INDICATES REMORSE OVER THIS CURRENT
MATTER AND DENIES ANY INTENT OF HARM TO ANYONE. THE VICTIM WAS A
YOUNG MAN WITH NO DEPENDENTS; HOWEVER, IT APPEARS HE MAY HAVE HAD A
VISION PROBLEM AND POSSIBLY NOT OBSERVED THE DEFENDANT APPROACHING
HIS VEHICLE.

THIS WAS A CRIME OF A VIOLENT NATURE AND THE DEFENDANT'S

-11-



STATEMENT OF FEELING REMORSE IS IN DIRECT CONTRADICTION TO STATEMENTS

OBTAINED FROM THE ONLY EYEWITNESSES TO THE INCIDENT.

<u>SENTENCING CONSIDERATIONS:</u>

DUE TO THE CHARGE OF MURDER WITHIN THE USE ALLEGATION

HAVING BEEN FOUND TRUE, THE DEFENDANT IS INELIGIBLE FOR PROBATION

PURSUANT TO SECTION 1203.06 OF THE PENAL CODE AND 1203.075 OF THE

PENAL CODE.

CIRCUMSTANCES IN AGGRAVATION:

1. PRE-PLANNED USE OF A FIREARM.

2. A VIOLENT CRIME WHICH CAUSED THE DEATH TO THE VICTIM.

3. DEFENDANT THREATENED THE VICTIM WITH A FIREARM.

4. DEFENDANT ATTEMPTED TO CONCEAL THE VICTIM FROM SIGHT.

5. THE DEFENDANT TAMPERED WITH EVIDENCE USEFUL IN THE INVESTIGATION OF THIS CRIME.

CIRCUMSTANCES IN MITIGATION:

1. DEFENDANT'S VEHICLE WAS INOPERATIVE.

2. THE DEFENDANT IS A HEROIN ADDICT.

CIRCUMSTANCES IN MITIGATION AND IN AGGRAVATION SUPPORT

A MOTION FOR THE HIGHER BASED TERM.

<u>RECOMMENDATION:</u>

IT IS RECOMMENDED THAT PROBATION BE DENIED AND THAT

-12-

1   DEFENDANT BE SENTENCED TO STATE PRISON WITH PRE-IMPRISONMENT OF

2   619 DAYS.

3   RESPECTFULLY SUBMITTED,

4   KENNETH E. KIRKPATRICK
     PROBATION OFFICER

5

6   BY

7    LYNETTE GRISMORE, DEPUTY
     EAST SAN FERNANDO VALLEY AREA OFFICE

8    901-3979

9

10   READ AND APPROVED:         I HAVE READ AND CONSIDERED
                           THE FOREGOING REPORT OF THE
                           PROBATION OFFICER.

11

12   ART KEENER, SDPO

13   (SUBMITTED 4-16-82)      JUDGE OF THE SUPERIOR COURT
     (TYPED 4-20-82)

14   LG:BS      (6)

15   -13-

16

17

18

19

20

21

22

23

**E X H I B I T   6**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )                    CDC Number C-48215
                          )
VICTOR MONTEZ              )        **INMATE**
                          )
_____)         **COPY**

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 31, 2006

10:57 A.M.

PANEL PRESENT:

JACK GARNER, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

VICTOR MONTEZ, Inmate
KATERA E. RUTLEDGE, Attorney for Inmate
HERBERT LAPIN, Deputy District Attorney
TWO CORRECTIONAL OFFICERS, Unidentified

CORRECTIONS TO ·THE DECISION HAVE BEEN MADE

_____    No      See Review of Hearing
_____    Yes     Transcript Memorandum

Ramona Cota              Peters Shorthand Reporting

ii

## INDEX

|                               | PAGE |
| ----------------------------- | ---- |
| Proceedings                   | 1    |
| Case Factors                  | 8    |
| Pre-Commitment Factors        | 11   |
| Post-Commitment Factors       | 23   |
| Parole Plans                  | 19   |
| Closing Statements            | 41   |
| Recess                        | 52   |
| Decision                      | 53   |
| Adjournment                   | 61   |
| Transcriber Certification     | 62   |

--oOo--

1

1       P R O C E E D I N G S

2           DEPUTY COMMISSIONER SMITH:  We are on the

3   record.

4           PRESIDING COMMISSIONER GARNER:  All

5   right, this is a Subsequent Parole Consideration

6   Hearing for Victor Montez, M-O-N-T-E-Z, CDC

7   number C-48215.  The date today is May 31, 2006.

8   It is now 10:57 a.m. and we are located at the

9   Correctional Training Facility in Soledad.  The

10  inmate was received on June 1, 1982 from Los

11  Angeles County.  The offense is murder in the

12  second degree with the use of a firearm, the

13  case number is A Adam, 146105.  Count number one

14  is PC 187 with 12022.5.  The term was 15 years

15  to life plus 2 and the minimum eligible parole

16  date was April 9, 1990.  This hearing is going

17  to be tape-recorded and for purposes of voice

18  identification for the transcriber each of us at

19  the table is going to be required to state our

20  first name, last name, spelling the last name.

21  When we get to you, Mr. Montez, if you'd also

22  give us your CDC number, please.

23          INMATE MONTEZ:  Yes sir.

24          PRESIDING COMMISSIONER GARNER:  I'll

25  start and go to my left.  I'm Jack Garner, G-A-

26  R-N-E-R, Commissioner.

27          DEPUTY COMMISSIONER SMITH:  My name is

2

1    Dennis Smith, S-M-I-T-H, I'm a Deputy

2    Commissioner.

3        **DEPUTY DISTRICT ATTORNEY LAPIN**:  Herbert

4    Lapin, L-A-P-I-N, Deputy District Attorney Los

5    Angeles County.

6        **ATTORNEY RUTLEDGE**:  Katera E. Rutledge,

7    R-U-T-L-E-D-G-E, attorney for Mr. Montez.

8        **INMATE MONTEZ**:  Victor M. Montez, M-O-N-

9    T-E-Z, C number is C-48215.

10       **PRESIDING COMMISSIONER GARNER**:  Okay,

11   thank you.  And for the record, we do have two

12   correctional peace officers in the room for

13   purposes of security.  Okay, Ms. Rutledge and

14   Mr. Montez, I have a BTB (sic) 1073.  This is

15   the reasonable accommodation associated with the

16   Americans with Disabilities Act.  And the form

17   was signed over a year ago now, it was May 10,

18   2005, and at that time you indicated you didn't

19   need any help for your parole hearing.  No

20   disabilities were identified from the file and

21   the fact that you had a GED was noted.  Let me

22   go ahead and ask you, has anything occurred

23   since May 10 of 2005 that we need to provide an

24   accommodation for today?

25       **INMATE MONTEZ**:  As far as ADA?  No.

26       **PRESIDING COMMISSIONER GARNER**:  Your

27   ability to see, hear, mobility, anything like

3

1   that.

2        **INMATE MONTEZ:**  No, I'm all right.

3        **PRESIDING COMMISSIONER GARNER:**  You're

4   okay.  Are you on any medications?

5        **INMATE MONTEZ:**  No.

6        **PRESIDING COMMISSIONER GARNER:**  No

7   medications.  So you're set to go?

8        **INMATE MONTEZ:**  Ready to go, sir.

9        **PRESIDING COMMISSIONER GARNER:**

10  Ms. Rutledge?

11       **ATTORNEY RUTLEDGE:**  Yes.

12       **PRESIDING COMMISSIONER GARNER:**  All

13  right, thank you.  This hearing is being

14  conducted pursuant to Penal Code Section 3041

15  and 3042 and the rules and regulations of the

16  Board of Parole Hearings governing parole

17  consideration hearings for life inmates.  The

18  purpose of today's hearing is to consider your

19  suitability for parole.  In doing so we will

20  consider the number and nature of the crimes you

21  were committed for, your prior criminal and

22  social history and your behavior and programming

23  since your commitment.  We have had the

24  opportunity to review your Central File and your

25  prior hearing transcript.  You will be given the

26  opportunity to correct or clarify the record.

27  We will consider your progress since your

4

1    commitment and since your last hearing.  Your

2    updated counselor's report and psychological

3    report will also be considered.  And any change

4    in your parole plans should be brought to our

5    attention.  We will reach a decision today and

6    inform you whether or not we find you suitable

7    for parole and the reasons for our decision.  If

8    you are found suitable for parole the length of

9    your confinement will be explained to you.  This

10   hearing will be conducted in two phases.  I will

11   discuss with you the crime you were committed

12   for, your prior criminal and social history,

13   your parole plans and any letters of support or

14   opposition that may be in the file.

15   Commissioner Smith will discuss with you your

16   progress since your commitment, your counselor's

17   report and your psychological evaluation.  Once

18   that is concluded the Commissioners, the

19   district attorney and your attorney will be

20   given an opportunity to ask you questions.  The

21   questions from the district attorney will be

22   asked through the Chair and you should direct

23   your answers back to the panel.  Before we

24   recess for deliberations the district attorney,

25   your attorney and you will be given an

26   opportunity to make a final statement regarding

27   your parole suitability.  Your statement should

5

1    be directed to why you feel you are suitable for

2    parole.  We will then recess, clear the room and

3    deliberate.  Once we have completed our

4    deliberations we will resume the hearing and

5    announce our decision.  The California Code of

6    Regulations states regardless of time served a

7    life inmate shall be found unsuitable for and

8    denied parole if in the judgment of the panel

9    the inmate would pose an unreasonable risk of

10   danger to society if released from prison.  Now

11   Mr. Montez, you have certain rights.  The rights

12   included a timely notice to this hearing, the

13   right to review your Central File and the right

14   to present relevant documents.  And I'd ask you

15   at this time, have those rights been met?

16          **INMATE MONTEZ:**  Yes.

17          **PRESIDING COMMISSIONER GARNER:**  All

18   right.

19          **ATTORNEY RUTLEDGE:**  Yes.

20          **PRESIDING COMMISSIONER GARNER:**  You also

21   have a right to be heard by an impartial panel.

22   Today the panel will be myself and Commissioner

23   Smith.  Any objection to the panel?

24          **INMATE MONTEZ:**  No sir.

25          **ATTORNEY RUTLEDGE:**  No.

26          **PRESIDING COMMISSIONER GARNER:**  Thank

27   you.  You will receive a copy of our written

6

1   tentative decision today.  The decision is

2   subject to review by the Decision Review Unit

3   and by the entire Board meeting as a body.  It

4   will become effective in 120 days and a copy of

5   the tentative decision and a copy of the

6   transcript will be sent to you.  You might

7   recall from previous Boards, in May 2004 the

8   appeal procedure changed and now you are

9   required to go through the courts if you want to

10  appeal a panel decision.

11        **INMATE MONTEZ:**  Yes sir.

12        **PRESIDING COMMISSIONER GARNER:**  All

13  right.  And you are not required to admit your

14  offense or discuss your offense if you do not

15  wish to do so.  However, this panel does accept

16  as true the findings of the court and you are

17  invited to discuss the facts and circumstances

18  of the offense if you desire.  The Board will

19  review and consider any prior statements you

20  have made regarding the offense in determining

21  your suitability for parole.  At this time I

22  will ask Commissioner Smith if there is any

23  confidential material in your C File and if

24  we'll be using it today?

25        **DEPUTY COMMISSIONER SMITH:**  There is

26  confidential information but it will not be used

27  this morning.

7

1          PRESIDING COMMISSIONER GARNER:  All

2    right, thank you.  Counselors, I have the

3    hearing checklist back, thank you.  And do we

4    have any additional documents to submit today?

5          ATTORNEY RUTLEDGE:  Yes, we'll submit

6    them when we get to the parole plans.

7          PRESIDING COMMISSIONER GARNER:  All

8    right.  Any preliminary objections?

9          ATTORNEY RUTLEDGE:  No.  We only have --

10   We just want to note for the record that

11   Mr. Montez's hearing is eight months late.

12         PRESIDING COMMISSIONER GARNER:  Okay.

13   We'll note that and just tell you we're making

14   progress.  A year ago it might have been a year

15   or more so we're getting down there.  The

16   backlog is getting chipped away at.  And if we

17   keep a full house of Commissioners we'll get to

18   you a little more quickly.

19         INMATE MONTEZ:  Yes.

20         DEPUTY COMMISSIONER SMITH:  Counsel, if

21   Mr. Montez does have letters regarding any

22   parole plans, if I could see those now to review

23   those so that Commissioner Garner will be able

24   to address those as soon as we get to that

25   point.  I would appreciate that, thank you.

26         PRESIDING COMMISSIONER GARNER:  Okay, and

27   will Mr. Montez be speaking with us today?

8

1          **ATTORNEY RUTLEDGE:**  He'll speak on all
2    issues except the commitment offense.
3          **PRESIDING COMMISSIONER GARNER:**  Okay, get
4    you to raise your right hand, sir.  Do you
5    solemnly swear or affirm that the testimony you
6    give at this hearing will be the truth, the
7    whole truth and nothing but the truth?
8          **INMATE MONTEZ:**  Yes I do.
9          **PRESIDING COMMISSIONER GARNER:**  All
10   right, thank you.  Okay.  Insomuch as Mr. Montez
11   has elected not to speak about the commitment
12   offense I'll go ahead and put into the record a
13   summary of the commitment offense.  And I am
14   taking this from the June 2002 Board Report that
15   was prepared by Correctional Counselor I initial
16   M. Rubio, R-U-B-I-O.
17          "In that on August 9, 1980 Montez
18          and two women, one of whom was
19          his wife, were on their way to
20          Oxnard when their vehicle became
21          disabled.  The two women began
22          to hitchhike on the Ventura
23          Freeway while Montez hid in the
24          bushes.  It was agreed that the
25          two women would appear as two
26          females stranded on the freeway
27          while Montez would approach the

9

1          motorist who stopped and exhibit

2          a firearm he carried in his

3          waistband.  The victim, Michael

4          Stewart (phonetic) stopped for

5          the women.  The women entered

6          the car and Ms. Montez entered

7          the rear seat while beckoning to

8          Montez who was still hiding in

9          the bushes.  He ran to the car

10         and brandished a small caliber

11         firearm and entered the rear

12         seat of the car.  He pointed the

13         firearm at the back of the

14         victim's head and told him to

15         drive them to Oxnard or he would

16         kill him.  Montez then fired,

17         striking and killing the victim.

18         Montez exited the car, dragged

19         the body from the car and

20         secreted the body beneath an

21         overhanging tree and shrubs.

22         After leaving the body Montez,

23         his wife and the other female

24         companion drove the victim's car

25         to Oxnard.  Montez was arrested

26         on August 11, 1980."

27  From the same report the version that was placed

10

1    into the report by the correctional counselor

2    for the prisoner's version indicates that Montez

3    basically concurs with the report.

4            "He states he never threatened the

5            victim, in fact he offered the

6            victim money for gas.  He had the

7            gun pointed at the time at the

8            victim's head.  Montez believes

9            the gun fired when the victim

10           adjusted himself in the car seat

11           and his elbow knocked the gun.

12           Montez states it was not his

13           intention to kill the victim.

14           Montez explained he was in

15           possession of the gun, that it was

16           stolen, as he was attempting to

17           sell it to purchase drugs.  He

18           claimed he was not intoxicated or

19           under the influence of drugs at

20           the time of the offense.  He

21           claims he never threatened the

22           witness with violence if she

23           contacted the police as is

24           alleged.  His wife was

25           subsequently convicted of

26           accessory to murder and committed

27           to CDC for a period of three

11

1              years, at which time she paroled.

2              He has had no subsequent contact

3              with her.  He claims the purpose

4              of stopping the vehicle on the

5              freeway was simply to get a ride

6              back to Oxnard.

7         **DEPUTY COMMISSIONER SMITH:**  Commissioner,

8    if I may.  The two letters that were provided

9    are both from the same individual, they are both

10   employment letters.  The most recent one is

11   March, is dated March 1, 2006.  That's in the

12   Board packet so you will be addressing that when

13   we get to that point.  So I am going to return

14   these two letters to counsel.

15        **PRESIDING COMMISSIONER GARNER:**  Okay.

16   Okay, thank you.  All right, so far as a prior

17   record.  Reading from the same report it

18   indicates that the first arrest was at the age

19   of nine, arrested for malicious mischief,

20   counseled and released.  At the age of 13

21   released for needle marks on his arm.  According

22   to Montez this matter was dismissed as you were

23   going to go into the Job Corps.  Both those

24   correct, sir?

25        **INMATE MONTEZ:**  Yes sir.

26        **PRESIDING COMMISSIONER GARNER:**  All

27   right, thank you.  The first adult arrest

12

1    occurred at the age of 19, arrested for

2    burglary, the case was dismissed.  One month

3    later arrested for under the influence of a

4    controlled substance and possession of substance

5    paraphernalia and burglary.  And then on January

6    7, 1974, convicted of possession of marijuana

7    and sent to CYA.  Arrest history is inclusive of

8    burglary April 17 of '73 which was dismissed,

9    entering a non-commercial dwelling.  April 26,

10   '73 for which you sustained one year probation.

11   Selling and transporting marijuana October '73.

12   FTA and a battery on January 16, '74, which was

13   dismissed.  Theft of a vehicle in February of

14   1976.  And the indication was that that one was

15   in the state of New Mexico and you were

16   sentenced to the New Mexico State Penitentiary,

17   being paroled April 22, 1978.  Is that the

18   correct period of time?

19           **INMATE MONTEZ:**  Yes.

20           **PRESIDING COMMISSIONER GARNER:**  Okay.

21           **INMATE MONTEZ:**  I believe it is.

22           **PRESIDING COMMISSIONER GARNER:**  All

23   right.  And so far as the commitment offense,

24   again we have that.  That was August 11 in 1980.

25   So far as your personal life.  You were the

26   fourth of eleven children born to your parents

27   whose marriage remained intact until you were 20

13

1    years of age.  Your parents, did they separate

2    or divorce?

3         **INMATE MONTEZ:**  My father has since

4    deceased but my mother is still alive.

5         **PRESIDING COMMISSIONER GARNER:**  Your

6    mother is still alive.  So when you were 20

7    years of age, that's when your mother and father

8    split up?

9         **INMATE MONTEZ:**  Yes.

10        **PRESIDING COMMISSIONER GARNER:**  And then

11   he subsequently passed away?

12        **INMATE MONTEZ:**  That was about the time,

13   yes.

14        **PRESIDING COMMISSIONER GARNER:**  All

15   right.  And your mother remarried in 1980.  Is

16   that correct?

17        **INMATE MONTEZ:**  I believe so, yes.

18        **PRESIDING COMMISSIONER GARNER:**  Okay.

19        **DEPUTY COMMISSIONER SMITH:**  Mr. Montez,

20   if I could ask you to move to the microphone

21   just a little bit closer to you.  That way you

22   don't have to lean forward and I can make sure I

23   can get your voice on the tape.

24        **INMATE MONTEZ:**  Okay.

25        **DEPUTY COMMISSIONER SMITH:**  Thank you.

26        **INMATE MONTEZ:**  Sorry.

27        **PRESIDING COMMISSIONER GARNER:**  All

14

1    right, all right.  You were born in Texas and

2    the family relocated to California when you were

3    three or four years old.  Your father was

4    employed as a mechanic and a welder and you have

5    a brother that was committed to CDC for murder.

6    You had another brother who has had contact with

7    law enforcement but never received a commitment

8    to CDC.  Began smoking marijuana two to three

9    times a week at the age of 13 and at the age of

10   13 began using heroin on weekends.  And it

11   progressed to the point where you were

12   supporting a $200 a day habit, correct?

13        **INMATE MONTEZ:**  Yes sir.

14        **PRESIDING COMMISSIONER GARNER:**  And about

15   what age was that?

16        **INMATE MONTEZ:**  The heroin?

17        **PRESIDING COMMISSIONER GARNER:**  The

18   heroin, yeah.

19        **INMATE MONTEZ:**  I believe I was 13 or 14.

20        **PRESIDING COMMISSIONER GARNER:**  That's a,

21   that's a pretty healthy budget for dope.

22        **INMATE MONTEZ:**  Well that came --

23        **PRESIDING COMMISSIONER GARNER:**  That came

24   later?

25        **INMATE MONTEZ:**  Years later.

26        **PRESIDING COMMISSIONER GARNER:**  All

27   right.  And at the age of 15 you began taking

15

1    Valium when you couldn't get the heroin and you

2    supported your habit via odd jobs and

3    burglaries.  And you dropped out of high school

4    at 16.  Was that associated with some of the

5    criminal difficulties?

6         INMATE MONTEZ:  I just -- it might have

7    been.

8         PRESIDING COMMISSIONER GARNER:  Prior to

9    dropping out of school how did you do in school?

10        INMATE MONTEZ:  Average student, I guess.

11        PRESIDING COMMISSIONER GARNER:  All

12   right.  And you stayed in the job corps for

13   about 11 months studying as a heavy equipment

14   operator.  It looks like you went into the Army

15   in 1970, got honorably discharged in '72,

16   serving as a paratrooper in the Special Forces.

17   Correct?

18        INMATE MONTEZ:  Yes.

19        PRESIDING COMMISSIONER GARNER:  Where did

20   you serve?

21        INMATE MONTEZ:  I served in the 82nd.

22        PRESIDING COMMISSIONER GARNER:  Okay.

23        INMATE MONTEZ:  Stateside.

24        PRESIDING COMMISSIONER GARNER:  All

25   stateside?

26        INMATE MONTEZ:  Yes sir.

27        PRESIDING COMMISSIONER GARNER:  Okay.

16

1   Did you get clean while you were in the

2   military?

3           **INMATE MONTEZ:** I did, I did, I did all

4   right in the military. I should have stayed in.

5           **PRESIDING COMMISSIONER GARNER:** Okay.

6   And you got your GED while you were at the

7   penitentiary in New Mexico.

8           **INMATE MONTEZ:** Yes sir.

9           **PRESIDING COMMISSIONER GARNER:** And that

10  you have got certificates for welding. And that

11  you lived in a common law relationship for about

12  a year in New Mexico and you remained in that

13  relationship until February of '79. You then

14  lived with a Denise Garcia from May of '79 until

15  you got married in April of '80. And you

16  assumed the responsibility for your wife's son

17  and then you had two daughters together. They

18  are now being cared for and raised by

19  grandparents.

20          **INMATE MONTEZ:** Yes.

21          **PRESIDING COMMISSIONER GARNER:** How old

22  are they now?

23          **INMATE MONTEZ:** One is 26 and the other

24  one is 25.

25          **PRESIDING COMMISSIONER GARNER:** Okay.

26  How are they doing?

27          **INMATE MONTEZ:** They're doing real good.

17

1          **PRESIDING COMMISSIONER GARNER:**  Both

2   doing good?  Married?

3          **INMATE MONTEZ:**  Yes.  The youngest one

4   just recently got married in November.

5          **PRESIDING COMMISSIONER GARNER:**  And the

6   oldest one, does she have grandchildren for you?

7          **INMATE MONTEZ:**  Yeah, both of them got

8   grandchildren for me.

9          **PRESIDING COMMISSIONER GARNER:**  Okay.

10  And it speaks to your crime partner, your wife

11  and the time she served and that you remain in

12  contact with her and divorced in '83.  At the

13  time of the offense your wife and the children

14  resided in your parents' home in Oxnard.

15         **INMATE MONTEZ:**  Yes.

16         **PRESIDING COMMISSIONER GARNER:**  Okay.

17  While you were growing up, up until let's say

18  the time you were about 16 or 17, were you ever

19  hospitalized for any reason?

20         **INMATE MONTEZ:**  No.

21         **PRESIDING COMMISSIONER GARNER:**  Never

22  been hospitalized, okay.

23         **INMATE MONTEZ:**  I had my tonsils out when

24  I was a kid but that was way before that.

25         **PRESIDING COMMISSIONER GARNER:**  Okay.

26  That's kind of a routine thing.  While you were

27  living with your wife at your folks' home in

18

1   Oxnard were you working?

2       **INMATE MONTEZ:**  I was working as a

3   roofer.

4       **PRESIDING COMMISSIONER GARNER:**  Working

5   as a roofer.

6       **INMATE MONTEZ:**  Some company out of

7   Industrial City.

8       **PRESIDING COMMISSIONER GARNER:**  All

9   right.  Full time or just by the job?

10      **INMATE MONTEZ:**  It was just a job site.

11      **PRESIDING COMMISSIONER GARNER:**  Okay.

12  Were you paid under the table or did you get a

13  real check?

14      **INMATE MONTEZ:**  Well I got a check but I

15  signed it over to the guy that hired me so I

16  don't know if it was under the table or what?

17      **PRESIDING COMMISSIONER GARNER:**  Then he

18  gave you cash?

19      **INMATE MONTEZ:**  And then he gave me cash.

20      **PRESIDING COMMISSIONER GARNER:**  Okay.

21  How was your, how was your family life growing

22  up?

23      **INMATE MONTEZ:**  It was good.  I believed

24  it was good.

25      **PRESIDING COMMISSIONER GARNER:**  Any

26  issues of abuse in the household?

27      **INMATE MONTEZ:**  None.

19

1          PRESIDING COMMISSIONER GARNER:  With you

2    or your brothers and sisters?  Your mother, was

3    she ever abused?

4          INMATE MONTEZ:  You mean beatings or

5    stuff like that?

6          PRESIDING COMMISSIONER GARNER:  I'm going

7    to distinguish between a whipping and a

8    righteous beating.

9          INMATE MONTEZ:  No, no, no.  I mean, you

10   know, we got our, we got our whippings when we

11   had them coming.

12         PRESIDING COMMISSIONER GARNER:  Okay.  So

13   far as your parole plans, and this is going back

14   and it may change based on some of the letters.

15   But at the time this report was written you were

16   going to be released to your mother's home in

17   Oxnard.  Is that the same home you were living

18   in at the time you got arrested --

19         INMATE MONTEZ:  Yes.

20         PRESIDING COMMISSIONER GARNER:   -- or has

21   she moved?  Does she own the home or renting it?

22         INMATE MONTEZ:  It's her home, yes.

23         PRESIDING COMMISSIONER GARNER:  Okay.

24         INMATE MONTEZ:  But as far -- May I say

25   something?  As far as that, there were certain

26   programs that I had written to and the latest

27   was this one right here that I haven't given to

20

1   -- it was a drug program.

2       **PRESIDING COMMISSIONER GARNER:**  Well this

3   is old enough, let me go right to, right to the

4   letters, which will give me a more current

5   assessment as to what you plan to do.  All

6   right.  The first one is March 1, 2006.  It's

7   typed and signed and it's signed by a Sal, S-A-

8   L, Flores and Flores is with an S on the end.

9   And there is also a business card attached to it

10  for the firm of Ideal Upholstery with an address

11  in Ventura, California.  And the person that

12  wrote the letter, his name is on the business

13  card.  Remind the Board that my offer for

14  employment for him is still available and the

15  place of business again is noted in Ventura,

16  California.  And that upon his release he is to

17  contact me, establish a work schedule.  An

18  hourly salary of $9, advancement based on

19  performance.  And it provides a telephone number

20  if we want to contact Mr. Flores.  The second

21  letter is --

22      **DEPUTY COMMISSIONER SMITH:**  Commissioner,

23  if I may.  The letter on the second -- the date

24  of the second letter is 5/30/2002.

25      **PRESIDING COMMISSIONER GARNER:**  Um-hmm.

26      **INMATE MONTEZ:**  Yes.

27      **DEPUTY COMMISSIONER SMITH:**  Was that

21

1    letter addressed at your last hearing in June

2    2002?

3        **INMATE MONTEZ:**  No.  I think it might

4    have been, I'm not sure.  I presented one of the

5    letters.

6        **DEPUTY COMMISSIONER SMITH:**  Do you have a

7    more current letter from them?

8        **INMATE MONTEZ:**  I think it was the one

9    you just, the one for 2006.

10       **ATTORNEY RUTLEDGE:**  Let me just clarify.

11   The letters that we've given you were the

12   updated job letter.  Now he doesn't have -- if

13   you're talking about the Freedom House dated

14   2002, that's no longer his plan.

15       **INMATE MONTEZ:**  I think he's referring to

16   the job letters, right?

17       **DEPUTY COMMISSIONER SMITH:**  No, I'm

18   referring to Freedom House, your residential

19   plans.

20       **INMATE MONTEZ:**  No, these are it right

21   here.

22       **ATTORNEY RUTLEDGE:**  Yes, these no longer

23   apply, this one.  It's an old letter they should

24   have never put in here.

25       **INMATE MONTEZ:**  That bed might be gone by

26   now, you know.

27       **DEPUTY COMMISSIONER SMITH:**  Well that's

22

1    my point, it's a letter that is four years old.

2    Not only may the bed be gone but that entire

3    operation may be gone.

4         **INMATE MONTEZ:**  Yeah.  I have a current

5    letter.

6         **DEPUTY COMMISSIONER SMITH:**  Okay, great,

7    that's what I wanted to ask.  Because there is

8    no reason for the Commissioner to read a letter

9    in that one, may have been addressed at your

10   last hearing, and two, is four years old.  So I

11   appreciate you bringing the more current one.

12        **INMATE MONTEZ:**  Thank you.

13        **PRESIDING COMMISSIONER GARNER:**  All

14   right, this is a letter that is dated May 9,

15   2006 and it is from the Ventura County Rescue

16   Mission.  And it's an outreach of the ministry

17   of Rescue Mission Alliance.  And it is from a

18   Kyle, K-Y-L-E, Venning, V like Victor, E-N-N-I-

19   N-G, he is the interim chaplain counselor.  The

20   staff at Ventura County Rescue Mission has

21   accepted your request for an interview to

22   determine if you qualify for your drug and

23   alcohol program.  It speaks to upon a release

24   that you report directly to the Mission for

25   intake and all your court-appointed obligations

26   with the exception of parole meetings must be

27   taken care of before you commit to the nine-

23

1   month recovery program.  You will need a

2   driver's license, ID card and social security

3   card.  The indication is they don't provide

4   transportation.  The letter is not a guarantee

5   of acceptance into the program.  You've got to

6   go through the intake interview process before

7   being accepted.  Then it speaks to being a

8   Christ-centered and Biblically based program and

9   provides a telephone number for you to call

10   prior to your arrival.  And attached to it is a

11   description of the program, a brochure that was

12   provided.  I'll get these back to you before the

13   end of the hearing.  Okay, let me go ahead and

14   note that we sent out our legal notices, the

15   3042 notices that went to all the agencies that

16   had a direct involvement in your case.  For the

17   record there is no written correspondence but we

18   do have a representative from the Los Angeles

19   County District Attorney's Office who will be

20   speaking later in the hearing.  At this time let

21   me ask you to direct your attention over here to

22   Commissioner Smith who is going to talk to you

23   about your post-conviction factors.

24          **DEPUTY COMMISSIONER SMITH:**  Mr. Montez,

25   you were received by the Department of

26   Corrections June 1, 1982.  You were received

27   here at CTF January 21, 1998.  You have a

24

1    classification score of 19.  Your last hearing

2    was held on June 20, 2002.  That was your sixth

3    subsequent hearing and you received a two year

4    denial at that time.

5         **INMATE MONTEZ:**  Yes.

6         **DEPUTY COMMISSIONER SMITH:**  The next

7    hearing was scheduled for August 31, 2004.  That

8    was postponed as the psychological evaluation

9    that was available for that hearing was old and

10   a new evaluation was requested.  And we have

11   that and I'll address that.  It's unfortunate

12   that it took as long as it did for you to come

13   back before the Board again.  But as

14   Commissioner Garner indicated, at that time the

15   Board was short of staff to conduct the hearings

16   and we're catching up with that.  So we

17   apologize for the delay but obviously you are

18   here nevertheless.  Since your last hearing you

19   have been, you have been extremely active, for

20   lack of a better word.  You completed two EMI

21   certificates from the Federal Emergency

22   Management Agency October of '03 and November of

23   '03 for Emergency Preparedness, Radiological

24   Emergency Management.  You received three

25   laudatory chronos, two in April of 2006 and one

26   in June of 2004 for a completion and

27   participation in the employability program.  You

25

1    received six -- pardon me -- 16 laudatory

2    chronos all referencing your active AA and NA

3    participation but it appears to be primarily AA.

4          **INMATE MONTEZ:**  Yes.

5          **DEPUTY COMMISSIONER SMITH:**  And those

6    laudatory chronos go back from July of 2002

7    through April of this year.  And because your

8    last hearing was June 2002 that's basically as

9    far back as I went.  You also received a

10   laudatory chrono December of 2002 for completing

11   the 13-week IMPACT workshop.  Your disciplinary

12   history has actually become quite positive.  You

13   have received only four CDC 128(a)s, the last

14   one was in May 1989 and that was for a broken

15   window in a cell.  And you received seven CDC

16   115s, the last one September of 1993 and that

17   was for non-performance.  In looking over the

18   list there were a couple of initial 115s for

19   possession of a controlled substance.  But since

20   that point, and that goes back to 1992 was the

21   last one and that was a positive test for

22   opiates.  There has certainly been no indication

23   that you have been involved in any controlled

24   substance use since 1992 and there are no write-

25   ups for violence or weapons.  You have been

26   assigned for some period of time to the PIA wood

27   product area as a furniture assembler.  Is that

26

1  still accurate?

2      **INMATE MONTEZ:** Yes.

3      **DEPUTY COMMISSIONER SMITH:** And you

4  received exceptional and above-average work

5  reports in that area. Your participation in AA

6  has certainly been ongoing and been very

7  consistent. Is that a program that you find

8  important to you? And the reason that I ask

9  that question is that some individuals simply

10  attend that kind of a program because it looks

11  better than not, and others of course have a

12  real commitment to the program. And that's the

13  reason I asked the question. How do you feel

14  about the program?

15      **INMATE MONTEZ:** The program is, some

16  people would say it's a crutch, like religion.

17  But other people see it, the seriousness of it,

18  as a fellowship. If you feel that, if you feel

19  that you're going to relapse then you've got

20  somebody that you can lean on and help you

21  through it. That's what AA/NA is really about.

22  To guide you through your hard times.

23      **DEPUTY COMMISSIONER SMITH:** Is that a

24  program that you'll continue to participate in

25  in the community?

26      **INMATE MONTEZ:** Yes, that's why I, that's

27  why one of the reasons that I got that program

27

1    from that Rescue Mission because they offer

2    AA/NA and fellowship.  But really AA/NA, the 12

3    principles, they're all Biblical but they have

4    taken the religion aspect out of it.

5         **DEPUTY COMMISSIONER SMITH:**  Do you know

6    the steps?

7         **INMATE MONTEZ:**  I know the steps as they

8    pertain to me to keep me from relapsing.  The

9    way I apply them to myself and the things, I

10   have to do for people that I might have hurt,

11   you know.  How to make amends, how to keep from

12   falling back.

13        **DEPUTY COMMISSIONER SMITH:**  Before I

14   review the psychological evaluation are there

15   any other activities that you have been involved

16   in since your last hearing that I haven't

17   addressed that we should be aware of?

18        **INMATE MONTEZ:**  No, basically you've

19   covered all bases.

20        **DEPUTY COMMISSIONER SMITH:**  You certainly

21   have a very positive -- if something should come

22   to mind before we recess let me know because we

23   want to make sure that we've captured all the

24   positives.

25        **INMATE MONTEZ:**  Yes sir.

26        **DEPUTY COMMISSIONER SMITH:**  The

27   psychological evaluation was dated May 11, 2006

1    prepared by Dr. Macomber, M-A-C-O-M-B-E-R.   And
2    I am going to identify or address just a couple
3    of sections that I think are most, most
4    important.   And then if you or counsel have any
5    comments or would like to address any of the
6    other sections I'll certainly give you that
7    opportunity.   Going to page two Dr. Macomber
8    writes that in the past based upon your criminal
9    history you had been diagnosed as having
10   antisocial personality disorder.   But at this
11   point in your life there is no evidence of any
12   antisocial thinking or values.   That your values
13   are solidly pro-social, you have deep feelings
14   of concern and empathy toward others.   The
15   doctor concludes that therefore there is no
16   longer an appropriate diagnostic label of
17   antisocial behavior.   Moving to page three under
18   assessment of dangerousness the doctor writes
19   that in considering the potential for dangerous
20   behavior in the institution you have remained
21   disciplinary-free for over 12 years.   And that
22   due to your years of being disciplinary-free the
23   doctor concludes that you no longer possess a
24   risk to the institution.   And compared to other
25   inmates your potential for dangerous behavior is
26   below average.   In considering the potential for
27   dangerous behavior when released to the

```
 1   community the doctor addresses a measure or an
 2   exam that was given, identified as the Level of
 3   Service Inventory Revised document.  And that
 4   document is an actuarial measure that assesses
 5   criminal history, substance abuse history,
 6   institutional adjustment, social relationships
 7   and other factors that are used to determine
 8   current risk level on parole.  You obtained a
 9   score of 5.1.  And as the doctor notes in the
10   report, that means that if 100 men were released
11   on parole you would do better on parole than 95
12   of them.  And the doctor notes, obviously, that
13   this is a low risk.  The doctor goes on to
14   conclude that at this point in your life due to
15   your maturity, growth, increased insight, that
16   you possess no more risk to society than the
17   average citizen in the community.  In fact,
18   based upon the positive changes in your life you
19   probably pose less risk to society than the
20   average citizen.  That's a conclusion I won't
21   disagree with but that's certainly open for
22   discussion at some other time.  Under clinical
23   observations and recommendations the doctor
24   writes that the prognosis for successful
25   adjustment in the community is excellent.
26   Mr. Montez, counsel, any comments or any other
27   sections you would like to have addressed for
```

30

1   the record?

2       **ATTORNEY RUTLEDGE:**  Not at this time,

3   nothing.

4       **INMATE MONTEZ:**  No sir.

5       **DEPUTY COMMISSIONER SMITH:**  All right,

6   thank you, I'll return it to Commissioner

7   Garner.

8       **PRESIDING COMMISSIONER GARNER:**

9   Mr. Montez, let me ask you.  It looks like the

10  last indication of drug use while incarcerated

11  was 1992 when you tested positive on a urine

12  analysis for opiates, is that correct?

13      **INMATE MONTEZ:**  Yes sir, that is correct.

14      **PRESIDING COMMISSIONER GARNER:**  Have you

15  been clean since that point?

16      **INMATE MONTEZ:**  Yes sir.  Well that's

17  when, that was a wake-up call.  Because I said,

18  if I'm not going to change now, you know, I'm

19  not ever going to change.

20      **PRESIDING COMMISSIONER GARNER:**  So '92

21  would have been your last --

22      **INMATE MONTEZ:**  My last abuse, yes.

23      **PRESIDING COMMISSIONER GARNER:**  Your last

24  abuse, okay.  And you did have the little

25  episode at Folsom where you were actually

26  charged but they chose not to prosecute you and

27  you wound up with 115s.

31

1       **INMATE MONTEZ:**  I think the one in Folsom

2  was '82, wasn't it?

3       **PRESIDING COMMISSIONER GARNER:**  Yeah, I

4  think --

5       **INMATE MONTEZ:**  The one in CRC was in

6  '92.

7       **PRESIDING COMMISSIONER GARNER:**  That's

8  correct, yeah.  Yeah, you had an October 22 of

9  '82 and that was the marijuana and then December

10  29 of '82.  Both of those were Folsom.  But the

11  last urinalysis was at CRC.

12       **INMATE MONTEZ:**  Yes sir.

13       **PRESIDING COMMISSIONER GARNER:**  Okay.

14  What caused the change from your plans in 2002

15  when you were going to live with your mother to

16  the present date?

17       **INMATE MONTEZ:**  Well I had -- actually I

18  had two letters.  I had the Freedom Home one and

19  I had my mother's.  And they had given me a

20  choice, right, where I would, where I would like

21  to stay it.  I said I would like to stay at my

22  mother's house but the Freedom Home offered the

23  program.  That's why I had answered my mother's

24  house.

25       **PRESIDING COMMISSIONER GARNER:**  Okay.

26  Are you, are you in contact with your family?

27       **INMATE MONTEZ:**  Yes.

32

1          **PRESIDING COMMISSIONER GARNER:**  Let me,

2     let me just quit beating around the bush.

3     Normally what we find in situations where we

4     have large families we find a lot of letters of

5     support that come in from the family, albeit

6     offering financial support, offering you a place

7     to live, offering you a car, or just offering

8     you spiritual and emotional support.  I note

9     that there are some family members that have

10    problems but you still have a lot of other folks

11    left over.  And I was just wondering why you

12    don't have any letters from your family?

13          **INMATE MONTEZ:**  They're right here.

14          **ATTORNEY RUTLEDGE:**  He means -- They

15    write you letters in the institution but have

16    they provided support letters for you?

17          **INMATE MONTEZ:**  Yes.

18          **PRESIDING COMMISSIONER GARNER:**  Have you

19    provided those to your counselor to get into

20    your file?

21          **INMATE MONTEZ:**  The counselor that I was

22    going to give them to, he said just to bring

23    them over here.

24          **PRESIDING COMMISSIONER GARNER:**  When did

25    he tell you that?

26          **INMATE MONTEZ:**  A couple of weeks ago.

27          **PRESIDING COMMISSIONER GARNER:**  All

33

1  right, well that's good advice a couple of weeks

2  ago because they wouldn't have made it in in

3  that time.

4        **ATTORNEY RUTLEDGE:**  (Inaudible).

5        **PRESIDING COMMISSIONER GARNER:**  Okay,

6  okay.

7        **ATTORNEY RUTLEDGE:**  (Inaudible).

8        **PRESIDING COMMISSIONER GARNER:**  Thanks.

9  Well it just surprised me because normally with

10  large, intact families like that we get a lot of

11  letters.

12        **ATTORNEY RUTLEDGE:**  (Inaudible)?

13        **INMATE MONTEZ:**  My mother and my ex-wife

14  and her kids.

15        **PRESIDING COMMISSIONER GARNER:**  Okay.

16  Okay, thank you.

17        **ATTORNEY RUTLEDGE:**  And this is since the

18  last hearing?

19        **INMATE MONTEZ:**  And this is from my

20  daughter.  Some of those are from my last

21  hearing and some of those I just received.

22        **PRESIDING COMMISSIONER GARNER:**  Okay, I

23  am going to read recent ones so that we don't --

24  and particularly those that I'm able to find --

25        **INMATE MONTEZ:**  Well the last hearing I

26  was supposed to have.

27        **PRESIDING COMMISSIONER GARNER:**  The one

34

1   where it was postponed?

2         **ATTORNEY RUTLEDGE:**  That was one --

3         **INMATE MONTEZ:**  And current.  There's

4   some current ones in there.

5         **PRESIDING COMMISSIONER GARNER:**  Okay.

6   Well, let me get started.  The first one is done

7   in a memo form, it's from Victoria Garcia.  It

8   doesn't provide a date.  Daughter of Victor.

9   Inform you that my father has my full support in

10  whatever he may need to get onto his feet and

11  become a productive member of society.  That you

12  won't fall again.  That you have been doing many

13  things to get yourself together and ask that we

14  give you a chance.  For the record, the address

15  noted in this is in the city of Oxnard.  I'll

16  try to make this next one out.  This goes back

17  to '04 and it's from Renee Montez with an

18  address in Denver.  It says, but you can tell

19  the Board you have a place to reside wherever I

20  am and Armando said you can stay with him.  Let

21  me just do the one that's contained here.  A

22  place to reside wherever I am at and that

23  whatever you need I'll do what I can.  In fact,

24  the Coors Brewing Company has an ex-felon

25  program.  They could put you to work in the

26  brewery warehouse welding or whatever.  And if

27  you have access to the Internet check out the

1    job listing at Coors and other places.  And this

2    was from Renee Montez who is a sister.

3         **INMATE MONTEZ:**  Actually that was my

4    brother.

5         **PRESIDING COMMISSIONER GARNER:**  Oh, Renee

6    is a brother?

7         **INMATE MONTEZ:**  Yeah.

8         **PRESIDING COMMISSIONER GARNER:**  Okay, I'm

9    sorry about that.

10        **INMATE MONTEZ:**  He's my youngest one.

11        **PRESIDING COMMISSIONER GARNER:**  That one

12   can go either way.

13        **DEPUTY COMMISSIONER SMITH:**  There's an

14   undated letter from his mother, the one --

15        **PRESIDING COMMISSIONER GARNER:**  Okay, we

16   have a handwritten letter from your mother.

17   She's Reynalda, R-E-Y-N-A-L-D-A, address noted

18   in Ventura.  Victor does have a place to live

19   ion my home.  Also if finances are needed he'll

20   have that as well.  Take that into consideration

21   and what he has done to better himself since

22   incarcerated.  She is now 78, she was 54 when

23   you went into prison.  That she lost a son to a

24   violent act and still miss him.  Mercy for those

25   last few years of my life by letting him come

26   home to me.  SO that one is from your mother.

27   August 12, 2004, it's handwritten, and this one

36

1    is from -- is Garcia the last name?  I can't

2    make it out.

3            **INMATE MONTEZ:**  That's Victoria Garcia.

4            **PRESIDING COMMISSIONER GARNER:**  Victoria

5    Garcia.  And this would be?

6            **INMATE MONTEZ:**  My daughter.

7            **PRESIDING COMMISSIONER GARNER:**  Daughter,

8    okay.  Daughter of Victor.  Father has my

9    support and my husband's.  Full support as

10   helping him financially.  Also my husband

11   Richard is in the process of opening his own

12   small business which enables him to offer my

13   father employment.  In the process of buying our

14   own home.  We'll have a place for him to live.

15   Only a few months old when you were

16   incarcerated.  Speaks to you not making the best

17   choices but that you have changed and that --

18   allow my father to come home to his family, his

19   mother, daughters and three beautiful

20   grandchildren ages one through five.  We are

21   anxiously awaiting his arrival.  And that one,

22   again, I think I said it was August 12, 2004.

23           **DEPUTY COMMISSIONER SMITH:**  There are two

24   letters here from Martha Duran, the most recent

25   is dated May 4, '06.  That will be the one that

26   Commissioner Garner will address.  There are

27   actually two letters attached but the other one

37

1    is older so we'll address the most current.

2    Also just in case you're wondering, there was a

3    copy of the letter that your mother sent that I

4    just pulled, pulled out to the side.  That

5    letter has already been addressed.  And before

6    you read that I'm going to turn the tapes.

7             (The tape was turned over.)

8         **DEPUTY COMMISSIONER SMITH:**  Thank you.

9         **PRESIDING COMMISSIONER GARNER:**  Okay.

10   The date has already been noted on the letter

11   and it's from Martha Duran, who is your ex-wife.

12   I want to again reaffirm that I am still willing

13   and able to support in whatever area is needed.

14   We'll work together with the assigned parole

15   agent to make sure he keeps his appointments,

16   signs up for all services that are required so

17   he can be a productive member of society, assist

18   him in finding a job.  And as far as having a

19   place to parole, he has a place to live with me.

20   I am employed, I have transportation it will not

21   be a problem.  I stand with him and still

22   support his strongly.  And this is from Martha

23   Duran who provided a cell phone telephone number

24   and there is an address, it looks like it's in

25   Oxnard.  So Ms. Duran is in the Oxnard area?

26        **INMATE MONTEZ:**  Yes.

27        **PRESIDING COMMISSIONER GARNER:**  All

38

1  right, very good.  With that, that pretty much
2  got all the letters of support from your family?
3       INMATE MONTEZ:  Yes.  I was going to
4  bring the real old ones to show a pattern but I
5  didn't think they were needed.
6       PRESIDING COMMISSIONER GARNER:  No, this
7  is, this is fine.  Okay, with that I'm going to
8  ask you to direct your attention -- excuse me,
9  we've already done that.  I'm ahead of myself.
10 Okay, I will ask if Commissioner Smith has any
11 follow-up questions.
12      DEPUTY COMMISSIONER SMITH:  No, I have no
13 questions.
14      PRESIDING COMMISSIONER GARNER:  All
15 right.  Mr. Lapin, any questions?
16      DEPUTY DISTRICT ATTORNEY LAPIN:  I know
17 that the inmate refuses to discuss the offense.
18 I'm wondering if he will refuse to also discuss
19 where he may have gotten the gun regarding the
20 offense?
21      INMATE MONTEZ:  I don't see no reason to.
22 I believe this was settled when the District
23 Attorney's Office offered me a plea bargain.
24 All this was supposed to be, have been taken
25 care of.  I don't know why they keep bringing it
26 up.
27      ATTORNEY RUTLEDGE:  That would mean he

39

1    doesn't --

2         **DEPUTY DISTRICT ATTORNEY LAPIN:**   Then

3    that's a refusal.   Also I would like to know if

4    he committed any other crime prior to the crime

5    that he is being incarcerated for on that

6    evening?

7         **INMATE MONTEZ:**   I don't see how that has

8    any bearing on this hearing.

9         **PRESIDING COMMISSIONER GARNER:**   Other

10   than those read into the record, sir?

11        **DEPUTY DISTRICT ATTORNEY LAPIN:**   I have

12   no other questions.

13        **PRESIDING COMMISSIONER GARNER:**   All

14   right.   Ms. Rutledge, questions?

15        **ATTORNEY RUTLEDGE:**   I wanted to ask my

16   client to authenticate these letters.   What are

17   these letters?

18        **INMATE MONTEZ:**   Those were, those were

19   more letters from different programs to give the

20   Board.   If they weren't satisfied with the ones,

21   the choice that I made that they might be able

22   to pick from those.

23        **ATTORNEY RUTLEDGE:**   I would note that

24   Mr. Montez has written to several other social

25   services like California Veterans Assistance,

26   Lutheran Social Services in Southern California

27   and New Directions of Los Angeles, if the Board

40

1  wishes to view those during deliberations.  But

2  I just wanted to note that he has also pursued

3  other areas.  And he also had -- I saw a flier

4  in your file about assistance offered through

5  the parole program.  What was that about?

6      **INMATE MONTEZ:**  That was from -- The PIA

7  has a -- I don't know if you gave it back to me.

8  The PIA that I work for has a representative in

9  the EDD that when we get out we go directly to

10  them and if we don't have a job they'll help us

11  get one and our driver's license.

12      **ATTORNEY RUTLEDGE:**  All right.  And then

13  the last question would be, you told the

14  Commissioner that you stopped the drugs about

15  '93.  Have you had any other life changes?  Do

16  you want to explain to us why you, what's

17  happened to you since you have been in prison as

18  far as life changes go.

19      **INMATE MONTEZ:**  Well it's like I

20  explained earlier.  In 1992, you know, I was

21  like, you know, I was doing the same things up

22  until 1992.  When I got that last write-up for

23  the dirty UA I said, you know, there has to be a

24  change, you know.  If I'm going to make it in

25  the streets if you guys ever let me out I have

26  to, I have to prove to myself that I can make

27  it.  And being in prison with all this madness

41

1    going around and keeping myself clean without

2    getting any write-ups and trying to be a model

3    citizen as far as prison is concerned is trying

4    to show that I can be a model citizen out in the

5    street.  But it has to start in here.  I had to

6    start in here.

7         **ATTORNEY RUTLEDGE:**  All right, no further

8    questions.

9         **PRESIDING COMMISSIONER GARNER:**  All

10   right, Mr. Lapin, would you like to close.

11        **DEPUTY DISTRICT ATTORNEY LAPIN:**  Yes I

12   would.  And Commissioner Garner, I would like to

13   add to the facts as you disclosed them earlier.

14   Going from the probation officer's report

15   starting at page seven line three.  Where I

16   believe Mrs. Irma Sabalos (phonetic), who was

17   the third person in the vehicle, informed

18   officers of the Los Angeles Police Department

19   West Valley Division on August 11, 1980 that:

20        "At approximately 10:30 p.m. on

21        August 9, 1980 she and two

22        associates, Victor Montez and

23        Denise Montez, had been visiting

24        San Bernardino and had stopped in

25        San Fernando Valley for a pizza on

26        the return trip.  When the three

27        attempted to start the brown

42

1          station wagon afterwards it failed

2          to start and they decided to

3          hitchhike on the Ventura Freeway.

4          They first approached an unnamed

5          male approximately one-half hour

6          later.  Subsequently it was agreed

7          that the witness and Mrs. Montez

8          would appear as two females

9          stranded on the freeway while

10         Mr. Montez would approach any

11         motorist who stopped and exhibit a

12         firearm he carried in his

13         waistband.  The defendant hid in

14         the bush area while the women

15         hitchhiked.  The victim approached

16         in a silver Datsun station wagon,

17         license number 828 YHP, conversed

18         with Mrs. Montez then allowed them

19         to enter his vehicle.  The witness

20         entered the front seat and

21         Mrs. Montez entered the rear seat

22         while beckoning to the defendant

23         who was hiding in the bushes.  The

24         defendant ran to the vehicle

25         brandishing a small caliber

26         firearm and entered the rear seat

27         of the vehicle.  He then pointed

43

1          the weapon at the rear portion of
2          the victim's head and told him to
3          take them to Oxnard or he would
4          kill him.  The defendant fired one
5          round without warning striking the
6          victim approximately in the lower
7          right of the head.  The victim
8          fell forward.  The defendant
9          exited the rear passenger door and
10         opened the front passenger door.
11         The defendant drug the victim's
12         body across the front seat from
13         the driver's side and secreted the
14         body beneath an overhanging tree
15         and shrub area.  The witness then
16         observed the defendant going
17         through the victim's garment but
18         was unsure of what was removed.
19         The witness and Mrs. Montez had
20         also exited the vehicle.  The
21         defendant then instructed the
22         witness to re-enter the vehicle
23         and told his wife to wear gloves
24         so as not to leave her
25         fingerprints on the vehicle.  He
26         then entered the rear seat and
27         instructed his wife to drive the

44

1          vehicle to 456 Channel Islands

2          Boulevard in Oxnard.  Upon arrival

3          at that residence, which was

4          occupied by Teresa Ramirez,

5          Mrs. Montez removed clothing which

6          had belonged to the victim and

7          attempted to wash them.  The

8          witness was upset and the

9          defendant comforted her,

10         indicating they could not be

11         identified and there was no way to

12         trace their location.  When the

13         witness suggested they turn

14         themselves in the defendant

15         threatened her with acts of

16         violence and stated she would be

17         killed if she contacted the

18         police."

19    I believe those factors need to be considered by

20    this Board, those factors in aggravation of this

21    offense.  This is an extremely atrocious crime

22    committed by a admitted heroin addict.  There

23    was absolutely no reason for this individual to

24    have been killed.  The inmate, his wife and a

25    friend, the car broke down and they were trying

26    to get a ride to Oxnard and apparently the

27    victim agreed to take them.  Why he had to kill

45

1    him is only known to him.  His drug abuse can be

2    documented back to the age of 13 when he was

3    noticed by a law enforcement agency to have

4    marks on his arms.  And that drug abuse

5    apparently continued at least through 1992 and

6    is only in remission at this point because he is

7    in prison.  The fact that he has refused to

8    discuss the offense, I understand he has that

9    right to do so.  He has also refused to discuss

10   any other factors regarding where he got the gun

11   or if there were any other crimes committed.

12   That only shows that this individual has not

13   really accepted responsibility for his crime, a

14   crime that can only be determined to be an

15   aggravated situation.  There is nothing in

16   mitigation other than the psychiatric report and

17   his recent years of laudatory type chronos in

18   his file and a lack of discipline.  But the

19   crime is so atrocious and so wanton and uncalled

20   for that I'm suggesting the Board deny him

21   parole for another five years.  Thank you.

22        **PRESIDING COMMISSIONER GARNER:**  Thank

23   you.  Ms. Rutledge.

24        **DEPUTY COMMISSIONER SMITH:**  Ms. Rutledge,

25   before we go into your closing, and Mr. Lapin,

26   I'll certainly give you an opportunity to

27   follow-up, I have one quick question I want to

46

 1    interrupt.  Mr. Montez, what period of time were

 2    you and Martha Duran married?

 3          **INMATE MONTEZ:**  I think it was '93 to

 4    '95.

 5          **DEPUTY COMMISSIONER SMITH:**  So you were

 6    married while you were in prison?

 7          **INMATE MONTEZ:**  Yes sir.

 8          **DEPUTY COMMISSIONER SMITH:**  Okay.  So you

 9    have never resided together.

10          **INMATE MONTEZ:**  No.

11          **DEPUTY COMMISSIONER SMITH:**  Okay, thank

12    you.  I appreciate that.  Mr. Lapin, any follow-

13    up questions?

14          **DEPUTY DISTRICT ATTORNEY LAPIN:**  No,

15    thank you.

16          **DEPUTY COMMISSIONER SMITH:**  Okay.

17          **ATTORNEY RUTLEDGE:**  All right, thank you.

18    I just wanted to note that the Commissioner read

19    the prisoner's version from the 2002 Board

20    report.  And in that it indicates that

21    Mr. Montez gave a statement to his counselor,

22    the probation officer that he had the gun

23    pointed at the victim's head and he believed the

24    gun fired when the victim adjusted himself.

25    That it was not his intention to kill the

26    victim.  I would also note that the narrative

27    read by the People taken from the probation

47

1    report was by the third accomplice who was

2    granted immunity.  That statement would likely

3    have problems being admissible in a regular

4    court of law due to certain evidence rules.  I

5    know the evidence rules don't apply here but

6    however information still has to be reliable.

7    And I would ask the Board to give that statement

8    its due weight on what you think would be

9    reliable.  Going to the factors in suitability

10   for Mr. Montez.  This crime only involved one

11   victim.  It wasn't dispassionate, calculated or

12   an execution-style murder based upon what he has

13   told, his comments he has made about the murder.

14   It appears that the -- also based on the facts

15   that the victim, they had a plan that he was

16   supposed to drive them somewhere.  So it really

17   wouldn't make sense, I would speculate, for him

18   to shoot the guy if they were asking him for a

19   ride somewhere and he got back in the car with

20   them.  There was -- It wasn't an especially

21   heinous crime or atrocious.  The motive for the

22   crime, it appears that it was an accident.

23   Mr. Montez looks like he had a stable family

24   when he was growing up.  He doesn't have any

25   history of psychological problems.  His

26   institutional behavior since 1993 has been very

27   positive.  He has a very positive psych report,

48

1    which I will go into in a moment, and he has not

2    had any write-ups in it looks like 13 -- his

3    last 115 I believe was in '93.  None of those

4    write-ups have been violent.  His prior prison

5    term was for car theft.  It sounded like most of

6    his crimes were property, theft of property type

7    offenses.  This would appear to be his first

8    conviction for violence.  He did serve the

9    United States in the Army for two years and

10   while he's been here he has gotten several

11   vocations.  He is also a certified legal

12   assistant and paralegal?

13          **INMATE MONTEZ:**  Yes.

14          **ATTORNEY RUTLEDGE:**  And he did

15          that, that's in his C File,

16          through a mail program.  He has

17          been in AA and NA consistently for

18          the last, since his last hearing.

19          He's had two different anger

20          management courses, he's done peer

21          education.  He has laudatory

22          chronos from IEP.  He's done the

23          IMPACT program and I think that

24          just -- kind of parlay that.

25          Aside from his work with the PIA

26          and the IEP program I want to go

27          into his insight and remorse into

49

```
 1          the crime.  It looks like the

 2          IMPACT program may have had some

 3          impact on him.  In the 2004, I

 4          think it's the Board Report --

 5          this is by your counselor, right?

 6          Yeah.  It states on the very last

 7          page, but I can't see the page

 8          number.  Oh, it's page number

 9          five.  It says:

10          "While discussing the facts of the

11          crime Montez was candid when

12          expressing remorse for the victim

13          and makes no excuses for his

14          behavior.  He realizes that his

15          actions is what led to the demise

16          of the victim. He indicates that

17          he must prove to himself and

18          society, thereby earning society's

19          trust in order to integrate back

20          into the free world in the future.

21          He expressed the need to continue

22          AA and NA counseling in order to

23          eliminate the unnecessary

24          stressors in his life.  In terms

25          of employment the prisoner has

26          acquired skills in welding,

27          plumbing, furniture assembly --"
```

50

```
 1   And in parentheses:
 2         "-- standard line and semi-custom,
 3         roofing, cement finisher and
 4         upholstery repair.  He has a GED
 5         and has earned a certificate as a
 6         legal assistant and paralegal."
 7   So it appears that the rehabilitation programs
 8   available to him have helped him gain insight
 9   and helped him with his remorse.  And that
10   counselor recommended that he remain
11   disciplinary-free, which he has done,
12   participate in NA programs, which he's continued
13   to do.  I think it would appear that he is
14   definitely trying to deal with the contributing
15   factor to this crime, the drug addiction, the
16   long-term drug addiction issues.  I would note
17   in the file too that he is -- in the recent
18   psych report by Dr. Macomber it indicates that
19   he became a Christian at some point and he is
20   aware -- I'm quoting from page two, I'm reading:
21         "He is aware of the importance of
22         remaining clean and sober.  He is
23         very active in Bible studies.  His
24         understanding and knowledge of the
25         Bible are significant and
26         considerable.  He has incorporated
27         Biblical values into his life.  As
```

51

```
1              a result he is determined to lead
2              a wholesome, helpful to others
3              productive life that pleases both
4              God and man.  He asserts drugs is
5              no longer a problem in his life."
6    So all those things considered what I think we
7    have here is a rehabilitated inmate.  Somebody
8    who is the poster boy for the reason why we have
9    sentences that start with a certain number of
10   years and go to life.  We have a 53-year-old man
11   who has been in the system now for 24 years.
12   And those 24 years have been good to him as far
13   as helping him with his substance abuse issues
14   and to get some insight into the crime and
15   change the person that he is.  He does not pose
16   an unreasonable risk of danger, he does meet the
17   suitability factors and I would ask that the
18   Board give him a parole date, thank you.
19         PRESIDING COMMISSIONER GARNER:  Okay,
20   thank you.  Mr. Montez, this is your opportunity
21   to address the panel on the subject of your
22   suitability for parole.
23         INMATE MONTEZ:  Yes sir.  Before when I
24   came up before the Board I was always asked, do
25   you think you're ready?  Up until 1997 my answer
26   was always, and because I believed it, no, I'm
27   not ready.  I admitted at that time that I
```

52

1  wasn't ready.  Now I can tell you that this day,

2  that I am ready.  Mind, spirit and soul I am

3  ready to go out there and be a productive member

4  to society.  If I wasn't I'd tell you myself I

5  wasn't ready.  I am more than ready.  I wish I

6  could take back that day but I can't.  His

7  people suffer, my people suffer, you know,

8  because we went through the same thing.  I am

9  deeply sorry.  I never tried to make contact

10  with the family because I think that would hurt

11  them more.  But if I could apologize to them I

12  would.  I wouldn't ask for forgiveness because,

13  you know, I think that would be an insult to

14  them.  I just hope you take that into

15  consideration.  Thank you.

16          **PRESIDING COMMISSIONER GARNER:**  Thank

17  you.  It is now 11:59 a.m. and we'll recess for

18  deliberations.

19                    R E C-E S S

20                      --oOo--

21

22

23

24

25

26

27

53

1       **CALIFORNIA BOARD OF PAROLE HEARINGS**

2                   **D E C I S I O N**

3       **DEPUTY COMMISSIONER SMITH:**  We are back

4   on the record.  Everyone previously identified

5   is back in the hearing room.

6       **PRESIDING COMMISSIONER GARNER:**  Very

7   good, thank you.  It's 12:20 p.m. in the matter

8   of Victor Montez, C Charles 48215.  Mr. Montez,

9   the panel has reviewed all the information

10  received from the public and relied on the

11  following circumstances in concluding you are

12  not suitable for parole and would pose an

13  unreasonable risk of danger to society or a

14  threat to public safety if you were released

15  from prison.  I want to tell you right out of

16  the chute we're going to deny you for a year and

17  we'll talk a little bit more about that as we

18  proceed through the hearing.  We started with

19  the commitment offense. ～Although we considered

20  many factors we started with the commitment

21  offense and we felt that the offense was carried

22  out in an especially cruel manner.  The victim,

23  Michael Stewart, 33 years of age, was shot in

24  the head after he stopped to render aid to what

25  he thought were two individuals that were in

26  distress along the side of the freeway.  The

27  **VICTOR MONTEZ C-48215  DECISION PAGE 1  05/31/06**

54

```
 1   offense was carried out in a very dispassionate
 2   and calculated manner in that the first vehicle
 3   to stop was going to be the target.  It was
 4   pretty clearly drawn that you put the two women
 5   out on the freeway as a lure and that you were
 6   hiding in the bushes and unfortunately it was
 7   Mr. Stewart that was the first Samaritan that
 8   decided to stop and help.  The victim was  no facts
 9   defiled after the offense in that he was
10   stripped, his body was concealed along the
11   shoulder of the Ventura Freeway and just
12   basically left in the shrubbery.  The motive for
13   the crime, when you consider the magnitude of
14   the offense, it was very trivial.  You had the
15   car.  The worst case scenario you could have
16   just ordered him out to the side of the freeway
17   but that's neither here nor there at this point
18   in time.  The conclusions were drawn from the
19   statement of facts that were taken from the June
20   2002 calendar in that:
21             "On August 9, 1980 Montez and two
22             women, one of whom was his wife,
23             were on their way home, on their
24             way to Oxnard when their car
25             became disabled.  The two women
26             began to hitchhike on the Ventura
27   VICTOR MONTEZ C-48215  DECISION PAGE 2  05/31/06
```

55

1        Freeway while Montez hid in the
2        bushes.  It was agreed that the
3        two women would appear as two
4        females stranded on the freeway
5        while Montez would approach the
6        motorist who stopped and exhibit a
7        firearm he carried in his
8        waistband.  The victim, Michael
9        Stewart stopped for the women.
10       The women entered the car and Ms.
11       Montez entered the rear seat while
12       beckoning to Montez who was still
13       hiding in the bushes.  He ran to
14       the car brandishing a small
15       caliber firearm and entered the
16       rear seat of the car.  He pointed
17       the firearm at the back of the
18       victim's head and told him to
19       drive them to Oxnard or he would
20       kill him.  Montez then fired,
21       striking and killing the victim.
22       Montez exited the car, dragged the
23       body from the car and secreted the
24       body beneath an overhanging tree
25       and shrubs.  After leaving the
26       body Montez, his wife and the
27  **VICTOR MONTEZ C-48215  DECISION PAGE 3  05/31/06**

56

```
 1            other female companion drove the

 2            victim's car to Oxnard.  Montez

 3            was arrested on August 11, 1980."

 4   So far as your previous record the panel noted

 5   at the time that you did have an escalating

 6   pattern of criminal conduct and that you had

 7   failed previous grants of probation.  And that

 8   you had failed from society's previous attempts

 9   to correct your criminality through the CYA

10   commitment.  So far as the social history the

11   panel noted -- the criminality, excuse me.  The

12   controlled substances and entering a non-

13   commercial dwelling which was an offense, a

14   602.5 offense, which was associated with a

15   burglary, which was dismissed in the interest of

16   justice.  Excuse me.  As far as your

17   institutional behavior you have programmed very

18   well.  So far as the misconduct goes it is old

19   and dated.  The last 128, you've had a total of

20   four, was May 26, 1989 and the last 115 was

21   September 16, 1995 for non-performance of work.

22   So far as the psychological report prepared by

23   Dr. Macomber in May 2006, it's favorable.  So

24   far as your parole plans the one thing that we

25   wanted to note is we did take into consideration

26   the letter that you had from essentially the

27   VICTOR MONTEZ C-48215  DECISION PAGE 4  05/31/06
```

57

1    halfway house is for an interview only.  And we
2    realize that very few of the halfway houses will
3    give you a firm commitment but one of that
4    things that really amplifies is the need to have
5    a firm backup parole plan that's very
6    comprehensive with a member of the family.  Or
7    two; you can certainly have more than one.  Also
8    if you are concerned about paroling back to the
9    county of the commitment offense, if the panel
10   thinks that you have a better shake and a better
11   chance going to another location to another
12   county we have the authority to parole you into
13   that county.  So in this situation it looks like
14   the lion's share of your family is in the
15   Ventura County area.  So if your letters come
16   forward from Ventura County with respect to
17   offers of housing, those would coincide with the
18   job offer that you have from Mr. Flores because
19   I believe that the job offer and his business is
20   in Ventura County.  So get started as soon as
21   you can.  I will share with you that the panel
22   does have some concerns about the offer of
23   housing from Martha Duran.  We think you would
24   be better served with family members.  That's
25   not to say it would be excluded.  We're just
26   thinking that the family members are more of a
27   **VICTOR MONTEZ C-48215  DECISION PAGE 5  05/31/06**

58

1    positive and might serve your interest in a more

2    positive way.  You were here, you heard the

3    response from the representative from the Los

4    Angeles County District Attorney's Office

5    indicating opposition to parole.  So what we're

6    going to do at this point is we're going to

7    encourage you to continue your AA/NA, whichever

8    is available, and continue to earn the positive

9    chronos.  And with that I'll ask Commissioner

10   Smith if he has got additional comments.

11        **DEPUTY COMMISSIONER SMITH:**  Sir, quite

12   frankly with regard to the residential plan with

13   Ms. Duran.  The parole division probably would

14   not approve that since you no longer have a

15   relationship.  She's an ex-wife and that you

16   don't have a history of residing.  It might be

17   fine with the next Board but from my experience

18   with the parole division they probably would not

19   approve that.

20        **INMATE MONTEZ:**  I understand.

21        **DEPUTY COMMISSIONER SMITH:**  You know, I

22   am certainly not being critical of your efforts,

23   your efforts are all positive.  But I am just

24   suggesting that in this next year spend time to

25   really, really firm up the plans.  You have got

26   a lot of options.  You know, I'd focus on the

27   **VICTOR MONTEZ C-48215  DECISION PAGE 6  05/31/06**

59

1    strongest ones.

2          **INMATE MONTEZ:**  Okay.

3          **DEPUTY COMMISSIONER SMITH:**  You are

4    certainly moving in the right direction.  You

5    may be disappointed and if you are I certainly

6    understand that.  But you are headed in the

7    right direction, in my opinion.  I believe that

8    all things being equal with some improvements

9    that at your next hearing you will be a much

10   stronger candidate.  A strong candidate today

11   but a much stronger candidate the next time.  So

12   don't lose focus on what your objective is --

13         **INMATE MONTEZ:**  No.

14         **DEPUTY COMMISSIONER SMITH:**  -- which is

15   to get out of here.  Okay?

16         **INMATE MONTEZ:**  Yes.

17         **DEPUTY COMMISSIONER SMITH:**  I wish you

18   well sir.  Good luck to you.

19         **INMATE MONTEZ:**  Thank you.

20         **PRESIDING COMMISSIONER GARNER:**  I'll go

21   ahead and echo the comments.  I am certainly

22   glad I asked about letters from your family now

23   because they really are -- they are more of an

24   asset than you will ever know.  We have a lot of

25   inmates that come before us that basically have

26   no one on the outside, absolutely no one on the

27   **VICTOR MONTEZ C-48215  DECISION PAGE 7  05/31/06**

60

1  outside.  They have either outlived them all or

2  the family has just basically written them off.

3  So you have got an asset there.  It's going to

4  be your strength.  It's going to be your social

5  and support network.  Your employer is not going

6  to provide that, you're family is going to

7  provide your support network.  The other thing,

8  that whatever family member you think offers you

9  the best plan for yourself, it would be helpful

10  also to have that family member identify AA/NA

11  resources that are immediately in the

12  neighborhood near them or the closest possible

13  to them.  And whether they're along public

14  transportation routes or they are going to offer

15  to drive you there.  Those are all things that

16  shore you up as a better candidate.  I echo his

17  sentiment.  I hope that you are not too

18  disappointed.  Keep your focus because right now

19  the only thing that in my mind you have to work

20  on is shoring up the parole plans.  I'll tell

21  you, don't slip on any banana peels calling a 15

22  or a 128 because that's not going to help you.

23  You've got some distance between those and you

24  don't have to worry abut them right now.  They

25  are not an issue at least with this panel and I

26  can't see them being an issue with the next

27  **VICTOR MONTEZ C-48215  DECISION PAGE 8  05/31/06**

61

1   panel you come before.  With that I'll go ahead

2   and note that it is now 12:28 p.m. and I am

3   going to wish you the best of luck.  Get to

4   work.

5        INMATE MONTEZ:  Okay.  Well I just want

6   to say that I read First Peter's 2:14 and I

7   submitted to that so I am not disappointed.

8   (Indiscernible).

9        ATTORNEY RUTLEDGE:  Thanks a lot.

10       DEPUTY COMMISSIONER SMITH:  Thank you

11  both.

12       ATTORNEY RUTLEDGE:  Good luck to you.

13       INMATE MONTEZ:  Thank you.

14                    --oOo--

15

16

17

18

19                      ˙

20

21

22

23  PAROLE DENIED ONE YEAR

24  THIS DECISION WILL BE FINAL ON:                    SEP 2 8 2006

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  VICTOR MONTEZ C-48215  DECISION PAGE 9  05/31/06

62

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 - 61, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of
VICTOR MONTEZ, CDC NO. C-48215, on MAY 31, 2006,
and that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a
disinterested party in the above-mentioned
matter and have no interest in the outcome of
the hearing.

Dated August 13, 2006, at Sacramento
County, California.

RAMONA COTA
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

**E X H I B I T  7**

## LIFE PRISONER EVALUATION REPORT
## SUBSEQUENT PAROLE CONSIDERATION HEARING
## JUNE 2004 CALENDAR

MONTEZ, VICTOR MANDEL                                    C48215

I.    **COMMITMENT FACTORS:**

   A.    **Life Crime:** All relevant documents from the previous hearing including the transcripts, have been considered and that information appears valid, and the writer has no further information to add.

   1.    **Summary of Crime:** Remains the same as stated in the previous hearings.

   2.    **Prisoner's Version:** Remains the same as stated in the previous hearings.

   3.    **Aggravating/Mitigating Circumstances:**

      a.    **Aggravating Factors:** Remains the same as stated in the previous hearings.

      b.    **Mitigating Factors:** Remains the same as stated in the previous hearings.

   B.    **Multiple Crime(s):** None.

   1.    **Summary of Crime:** N/A.

   2.    **Prisoner's Version:** N/A.

COPY TO INMATE ON

II.    **PRECONVICTION FACTORS:**

   A.    **Juvenile Record:** Documents from the previous hearings have been considered and that information remains valid.

   B.    **Adult Convictions:** Documents from the previous hearing have been considered and that information remains valid.

     **C.**    **Personal Factors:** Documents from the previous hearings have been considered and that information remains valid.

## III.   **POSTCONVICTION FACTORS:**

     **A.**    **Special Programming/Accommodations:** None.

     **B.**    **Custody History:** Documents from the previous hearings have been considered and the information remains valid. During the period of time since the last hearing, the prisoner has remained at the Correctional Training Facility and housed in the general population in a dorm setting. He has maintained a stable work record and presently assigned to the PIA Wood Furniture Assembly Factory. In review of the prisoner's work performance covering a period from 4/1/02 to 7/01/02, he demonstrated satisfactory work grades. However, noting a period from 7/1/02 to 11/01/02 per CDC 101 Work Supervisor's Reports dated 9/1/02, 10/1/02 and 11/1/02, the prisoner's work performance declined due to his attitude towards his supervisor and staff, his interest in his respective assigned work, teamwork building participation and quality of work. His supervisor comments were: Inmate Montez continued to actively pursue a transfer out of the Assembly Shop and has not worked since his last report dated 10/02. His quarterly report periods from 11/01/02 to 8/1/03 dated 2/1/03, 5/1/03 and 8/1/03, reflect improvement grades of satisfactory to above average work grades. In addition, during this review period, Montez enrolled in an Independent Study Program through Coastline Community College and was unable to complete the semester. However, he enrolled into the Federal Emergency Management Agency Institute, which is an independent study course. He earned two (2) Certificates of Achievement dated 11/13/03, in Radiological Emergency Management and Emergency Preparedness, USA dated 10/17/03. Finally, there are no documents in the Central File to reflect any vocational training upgrading experience during this review period.

     **C.**    **Therapy and Self-Help Activities:** Participation in Narcotics Anonymous per CDC 128B dated 7/2/01, 7/10/01, 10/01/01, 10/2/01, 1/11/02, 1/17/02, 2/15/02, 3/29/02, 4/11/02, 07/01/02, 07/17/02, 10/01/02, 10/16/02, 12/21/02, 1/8/03, 4/23/03 and 5/6/03.

          Participated in the donation drive for the American Red Cross in response to the terrorist attacks of September 11, 2001 in New York, Pennsylvania and Washington D.C. per CDC 128 dated 12/13/01.

          Participated in and completed the Muslim Development Center's Anger Management Course per CDC 128B dated 2/20/02.

Successfully completed a thirteen-week Impact workshop - self-help group designed to provide education and awareness relative to the profound negative impact of crime and its affect on victims and the ripple effect on society per CDC · 128-B dated 12/16/02.

**D.**    **Disciplinary History:** None during this review period. However, (7) CDC 115's and (4) 128-A's are noted.

CDC 128A's

| | | |
|---|---|---|
| 11/06/84 | CTF | Unauthorized Covering on Window. |
| 08/19/85 | CTF | Failure to Report to Work. |
| 11/21/86 | CTF | Unexcused Absence from School. |
| 05/26/89 | CMC-East | Broken Window in Cell. |

CDC 115's

| | | |
|---|---|---|
| 10/22/82 | FOL | Possession of Marijuana. Disposition: Guilty. 10 days disciplinary detention suspended, plus 90 days screen visits. |
| 12/29/82 | FOL | Possession of Marijuana. Disposition: Guilty. 10 days disciplinary detention plus 90 days screen visits. |
| 06/25/83 | FOL | Out of Cell Without Authorization. Disposition: Guilty. Counseled and reprimanded. |
| 03/03/86 | CTF | Possession of Contraband Shirt. Charged $8.50 plus 30 days loss of yard privileges. |
| 01/09/89 | CMC | Non-Performance (work). Disposition: Guilty, 15 days loss of credit. |
| 02/12/92 | CRC | Positive U/A for Opiates. Disposition: Guilty, 150 days loss of credit plus 120 days loss of contact visiting. |
| 09/16/93 | CRC | Non Performance (work). Disposition: Guilty, assessed 10 hours extra duty. |

**E.**    **Other:** On 6/20/02, Montez was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #6. The Board's decision was to deny

parole for (2) years, and recommend that the prisoner remain disciplinary free and participate in narcotic anonymous self-help and therapy programs.

## IV.    FUTURE PLANS:

A.    **Residence:** The prisoner indicates that his parole plans have changed. His plans are to live at the Freedom House, located at 460 South "F" Street, Oxnard, CA 93030. Telephone: 805-483-8343. Contact person: Jeff Simpson, Administrator. This facility is a 90- day clean and sober living environment for men. A letter of conditional acceptance was noted in the Central File dated 5/30/03. If released from prison, Montez states that he wants to make it on his own merit out in the free world, without the assistance or help of his family. However, he states that updated letters of support from his family and friends are forthcoming.

B.    **Employment:** Remains the same as indicated in the previous Board Report dated 6/2002. In addition, the prisoner completed 915 hours and received a Certificate of Legal Assistant/ Paralegal from the Blackstone School of Law Paralegal Studies, Inc. dated 11/9/01, at Dallas, Texas. During this interview, the prisoner did not offer a job reference, however, he feels confident that he will secure employment once he is released. His secondary plans are to work in the oil fields around in the state.

C.    **Assessment:** At the present time, the prisoner's parole plans appears stable at this time. Montez indicates that his plans are to reside in a residential home with a 12 step program that offers a sober and clean living environment for drug and alcohol offenders. He also indicates, once he completes this program, he will be able to secure employment and become independent to reintegrate back into society. He has acquired skills in welding, plumbing, furniture assembly (standard line and semi-custom), roofing, cement finisher and upholstery repair. He received a Certificate from the Blackstone Paralegal Studies, Inc., as a legal assistant/paralegal by completing 915 hours of correspondence studies. However, Montez did not offer a job reference at this time, he feels confident that he will secure employment once he is released.

## V.    USINS STATUS: N/A.

## VI.    SUMMARY:

A.    Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would probably pose a low degree of threat to the public at this time, if released from prison. This impression is based on the

prisoner's disciplinary history for eleven years, his stable work record, participation in self-help programs and his efforts of educational upgrading experience during this review period. While discussing the facts of the crime, Montez was candid when expressing remorse for the victim, and makes no excuses for his behavior. He realizes that his action's is what lead to the demise of the victim. He indicates that he must prove to himself and society thereby earning society's trust, in order to integrate back into free world in the future. He expressed the need to continue A.A. and N.A. counseling in order to eliminate the unnecessary stressors in his life. In terms of employment, the prisoner has acquired skills in welding, plumbing, furniture assembly (standard line and semi-custom), roofing, cement finisher and upholstery repair. He has a GED, and has earned a certificate as a legal assistant and paralegal. Montez indicates, once he is released, he is confident that he will secure employment and use the tools that he has gained and experienced to become a positive member of society.

**B.**  Prior to release the prisoner could benefit from:
1)  Remaining disciplinary free,
2)  Participate in Narcotics Anonymous Self-Help Programs and therapy programs.

**C.**  This report is based upon an interview with the prisoner on 3/25/04 lasting approximately 1.5 hours and a complete review of the Central File lasting 3 hours.

**D.**  Montez was afforded an opportunity to examine his Central File on 3/25/04 per the Olson decision per CDC 128B.

**E.**  No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

BOARD OF PRISON TERMS                                                              STATE
OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
 TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
 TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
 ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 07/01 to 6/02 | | | **PLACEMENT**: Remained at the Correctional Training Facility - II and housed in the general population. **CUSTODY**: Medium A. **VOC. TRAINING**: None during this review period. **ACADEMICS**: None noted.this review period. **WORK RECORD**: Assigned to the PIA Wood Furniture Factory Assembly Shop. There are no work supervisor reports in the Central File noting work performance during this period. **GROUP ACTIVITIES**: Participated in N/A per CDC 128B's dated 7/10/01, 10/01/01, 10/02/01, 1/11/02, 1/17/02, 2/15/02, 3/29/02 an 4/11/02. Participated in and completed the Muslim Development Center's Anger Management Course per CDC 128B dated 2/20/02. **PSYCH. TREATMENT**: None during this review period. **PRISON BEHAVIOR**: None during this review period. **OTHER**: N/A. |
| | | | DATE |
| MONTEZ, VICTOR | C48215 | | CTF-SOLEDAD                    JUN/2004 |

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| STCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 06/02 to 06/03 | | | **PLACEMENT**: Remained at the Correctional Training Facility- II and housed in the general population. **CUSTODY**: Medium A **VOC. TRAINING**:None during this review period. **ACADEMICS**: None during this rating period. **WORK RECORD**: Assigned to the PIA Wood Furniture Assembly Shop. He earned above average work grades and received exceptional grades for the use of tools and equipment per CDC 101 dated 7/1/02. However, a CDC 101 dated 9/1/02, reflects the prisoner's performance declined due to his attitude toward his supervisor and staff, his interest in his respective assigned work, teamwork building and participation and quality of work. His supervisor comments: Montez continues to "opt out" of work, whenever he is given the chance, as noted a CDC 101 dated 11/01/02. He continues to actively pursue a transfer and has not worked since his last report per CDC 101 dated 11/1/02. **GROUP ACTIVITIES**: Participated in NA per CDC 128B's dated 7/17/02, 7/1/02, 10/1/02, 10/16/02, 12/1/02, 1/8/03, 4/23/03, and 5/6/03. He completed a thirteen week Impact workshop self help group designed to provide education and awareness relative to the profound negative impact of crime and its affect on victims and the ripple effect on society per CDC 128B dated 12/16/02. **PSYCH. TREATMENT**: None during this review period. **PRISON BEHAVIOR**: None during this review period. **OTHER**: On 6/20/02, Montez was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #6. The Board's decision was to deny parole for (2), and recommend that the prisoner remain disciplinary free and participate in Narcotic Anonymous self-help and therapy programs. |

ORDER:

☐ BPT date advanced by          months.          ☐          BPT date affirmed without change.
☐ PBR date advanced by          months.          ☐          PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:
☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

MONTEZ, VICTOR                    C48215                    CTF-SOLEDAD                    JUN/2004

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

BOARD OF PRISON TERMS                                                                                          STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6/03 to 3/31/04 (Present) | | | **PLACEMENT**: Remained at the Correctional Training Facility- II and housed in the General Population. **CUSTODY**: Medium A **VOC. TRAINING**: None noted during this review period. **ACADEMICS**: Enrolled into the Federal Emergency Management Agency Institute and completed (2) independent study courses and received Certificate(s) of Achievement in - Emergency Preparedness, USA dated 10/17/03 and Radiological Emergency Management dated 11/13/03. **WORK RECORD**: The prisoner remained assigned to the PIA Wood Furniture Assembly Factory. His attitude changed and his work performance reflected satisfactory work grades per CDC 101 dated 5/01/03, and 8/1/03. **GROUP ACTIVITIES**: None noted during this review period. **PSYCH. TREATMENT**: None noted during this review. **PRISON BEHAVIOR**: None noted during this review. **OTHER**: N/A. |

ORDER:

☐  BPT date advanced by  _____ months.        ☐  BPT date affirmed without change.
☐  PBR date advanced by  _____ months.        ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐  Previously imposed conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

MONTEZ, VICTOR            C48215                    CTF-SOLEDAD                    JUN/2004

BOARD OF PRISON TERMS                                                                                          STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                                              Page _3_

LIFE PRISONER EVALUATION REPORT
PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

6

_____     7-14-04
H. Staten                     Date
Correctional Counselor I


_____     7-14-04
R. Leach                      Date
Correctional Counselor II


_____     7-14-04
R. Pope                       Date
Facility Captain


_____     7-16-04
D. S. Levorse                 Date
Classification and Parole Representative


MONTEZ, VICTOR        C48215              CTF-SOLEDAD        JUN/2004

BOARD OF PRISON TERMS

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

STATE OF CALIFORNIA

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

**ADDENDUM**

☐ PROGRESS HEARING

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 4/04 to 4/05 | | | **PLACEMENT**: CTF.<br>**CUSTODY**: Medium A.<br>**VOC. TRAINING**: None noted during this period.<br>**ACADEMICS**: None noted during this period.<br>**WORK RECORD**: Inmate Montez continued as a Furniture Assembler and received exceptional and above average ratings in various categories on his work supervisor's reports.<br>**GROUP ACTIVITIES**: He continued his participation in A.A/N.A Program. On 6/10/04 Montez received a CDC 128B laudatory chrono.for his participation in the Inmate Employability Program.<br>**PSYCH. TREATMENT**: None during this review period.<br>**PRISON BEHAVIOR**: Inmate Montez remained disciplinary free during this period.<br>**OTHER**: None. |

CORRECTIONAL COUNSELOR'S SIGNATURE

DATE 5/12/05

MONTEZ, VICTOR          C48215          CTF-SOLEDAD

COPY TO INMATE ON
May 18, 2005

BPT 1004 (REV 7/86)

LIFE PRISONER: POSTCONVICTiON PROGRESS REPORT                    **ADDENDUM**

_____        5/12/05
S. Arno                        Date
Correctional Counselor I

_____        5/12/05
R. Leach                       Date
Correctional Counselor II

_____        5-13-05
R. Pope                        Date
Facility Captain

_____  CAPR  5-17-05
D.S. Levorse                   Date
Classification and Parole Representative

MONTEZ                    C48215              CTF-SOLEDAD

BOARD OF PRISON TERMS                                                    STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| | |
|---|---|
| ☐ | DOCUMENTATION HEARING |
| ☒ | PAROLE CONSIDERATION HEARING |
| ☐ | PROGRESS HEARING |

**ADDENDUM**

INSTRUCTIONS
TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 4/05 to 4/06 (Present) | | | **PLACEMENT**: CTF.<br>**CUSTODY**: Medium A.<br>**VOC. TRAINING**: None noted during this period.<br>**ACADEMICS**: None noted during this period.<br>**WORK RECORD**: He continued his assignment as a Furniture Assembler in the P.I.A. Wood Products section and received exceptional and above average ratings in various categories on his Work Supervisor's Reports.<br>**GROUP ACTIVITIES**: Inmate Montez continued his fine participation in the AA Program per several CDC 128B laudatory chronos.<br>**PSYCH. TREATMENT**: None noted during this period.<br>**PRISON BEHAVIOR**: He remained disciplinary free during this period.<br>**OTHER**: None. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                    DATE  4/25/06

MONTEZ, VICTOR          C48215                CTF-SOLEDAD

BPT 1004 (REV 7/86)

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                                    **ADDENDUM**

_____          _____
S. Arno                                          Date
Correctional Counselor I


_____          _____
F.I. DeGuzman                                    Date
Correctional Counselor II (A)


_____          _____
R. Pope                                          Date
Facility Captain


_____          _____
D.S. Levorse                                     Date
Classification and Parole Representative


MONTEZ, VICTOR                 C48215                 CTF-SOLEDAD

**E X H I B I T   8**

MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
May, 2006 Lifer Calendar


CORRECTIONAL TRAINING FACILITY SOLEDAD
MAY, 2006


| | |
|---|---|
| **NAME:** | **MONTEZ, VICTOR** |
| **CDC#:** | **C-48215** |
| **DOB:** | **7/6/53** |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE** |
| **DATE OF OFFENSE:** | **8/9/80** |
| **SENTENCE:** | **17 YEARS TO LIFE** |
| **MEPD:** | **4/9/90** |
| **EVALUATION DATE:** | **5/11/06** |


I.    **IDENTIFYING INFORMATION:**

Mr. Victor Montez is a 52 year old, first term, divorced, Hispanic male. He is a
Christian. He has served 25 years on his sentence.

**SOURCES OF INFORMATION:**

This evaluation is based upon a single 90 minute interview, plus review of the
central and medical files.

The psychological evaluation, written on 6/20/00, at CTF-Soledad for the BPT by
Dr. Terrini, Psychologist, contains a Psychosocial Assessment. This information
was reviewed with the inmate and is still current and valid. As a result, this
information will not be repeated at this time.

MONTEZ, VICTOR
C-48215
5/11/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.   CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Montez related during the interview in a serious, outgoing, friendly and cooperative manner. His mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. His affect was appropriate. There was no evidence of anxiety or of depression. His eye contact was good. Intellectually, he was functioning in the average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were very good.

Mr. Montez has a criminal background associated with his heroin addiction. He continues to attend Alcoholics Anonymous. He has not used drugs since 1992, when he last received a positive urinalysis test. He has been clean and sober now for 14 years. Mr. Montez is very aware of the destructive effects of drugs or of alcohol in a person's life. He is aware of the importance of remaining clean and sober. He is very active in Bible studies. His understanding and knowledge of the Bible are significant and considerable. He has incorporated Biblical values into his life. As a result, he is determined to lead a wholesome, helpful to others, productive life, that pleases both God and man. Use of drugs is no longer a problem in his life. It certainly is not a current diagnostic problem.

He has acquired significant vocational skills. He has experience as a welder, working with the arc and gas. He also is certified in Vocational Office Machine Repair. He has worked as a plumber. He is working now in PIA Furniture Manufacturing. He also has worked as a heavy equipment operator in the past. He also attended Blackstone School of Law and is certified as a paralegal. In addition to this achievement, he has completed the Inmate Employability Program, Finding Employment, sponsored by Prison Industries Authority. He continues to attend Alcoholics Anonymous. He has his GED. He also has completed Anger Management.

In the past, based upon his criminal history, Mr. Montez has been diagnosed as having an Anti-Social Personality Disorder. At this point in his life there is no evidence of any antisocial thinking or values. His values are solidly pro-social. He has deep feelings of concern and empathy towards others. Therefore, this is no longer an appropriate diagnostic label.

MONTEZ, VICTOR
C-48215
5/11/06
PAGE 3

### CURRENT DIAGNOSTIC IMPRESSION

| | |
|---|---|
| Axis I: | No mental disorder |
| Axis II: | No personality disorder |
| Axis III: | No physical disorder |
| Axis IV: | Life term incarceration |
| Axis V: | Current GAF: 90 |

## XIII.  REVIEW OF LIFE CRIME

Mr. Montez accepts full responsibility for the commitment offense. He put a gun to the victim's head in an effort to rob him. The victim's elbow hit the gun, and it went off accidentally. He stated that he did not intend to hurt the victim. He does take full responsibility for the victim's death. He stated that due to his actions, and the victim's loss of his life, the victim's family has suffered. He commented how he understands how the victim's family has never been able to recover from their suffering due to the victim's loss of life. He knows this, because he has developed insight into what the family feels when they lose a loved one. He lost a brother in a similar situation. The family is still suffering from this loss. His feelings of remorse appear to be sincere and genuine.

He stated that he had become a Christian through the ministry of Victory Outreach prior to this offense. He stated that he had begun to backslide. He stated that because he was disobedient to God and God's expectations for his life, he was a disobedient child and God placed him in a situation, where he would have ample opportunity to study the Bible, explore his own life, seek forgiveness for his sins, and grow spiritually. He stated that he believes that when this process in which he must continue to grow and advance spiritually is finished, God will allow him to be released from prison.

## XIV.  ASSESSMENT OF DANGEROUSNESS

A.  In considering potential for dangerous behavior in the institution, he has remained disciplinary free for over 12 years. Prior to that time, he did receive disciplinaries for possession of marijuana and use of heroin. At that point in time, his potential for dangerous behavior was higher. However, due to his years of being disciplinary free, he no longer poses a risk to the institution; and compared to other inmates, his potential for dangerous behavior is below average.

B.  In considering potential for dangerous behavior when released to the community, the Level of Service Inventory-Revised was administered.

MONTEZ, VICTOR
C-48215
5/11/06
PAGE 4

This is an actuarial measure that assesses criminal history, substance abuse
history, institutional adjustment, social relationships and other factors to
determine current risk level on parole. He obtained a score of 5.1
cumulative frequency for prison inmates. This means that if 100 men
were released on parole, he would do better on parole than 95 of them.
This is a low risk score. At this point in his life, due to his maturity,
growth, and increased insight, he poses no more risk to society than the
average citizen in the community. In fact, based upon the positive
changes in his life, he probably poses less risk to society than the average
citizen.

C. There are no significant risk factors in this case.

## XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with
routine parole planning. This man has a supportive family in the community. He
plans on living with his mother in Oxnard. He also has developed job offers in
the community. He also has letters in the file, indicating that he has been
accepted for placement in a residential substance abuse program. He has
numerous vocational skills that will enable him to maintain work in the
community. All of these positive factors are strong indicators that he will do well
on parole. The prognosis for successful adjustment in the community is excellent.

*M. Macomber PhD*

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

*B. Zika, Ph.D.*

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:     5/11/06
T:     5/12/06

**E X H I B I T   9**

California
Department of Corrections

# Memorandum

October 23, 1997

cc:   CDW'S
      AW'S
      C&PR CCRM
      HCM
      LIT COOR

To:   Wardens
      Classification and Parole Representatives
      Classification Staff Representatives
      Correctional Counselor IIIs

Subject:  **CLARIFICATION OF CALIFORNIA CODE OF REGULATIONS SECTION 3375.2 HOUSING FOR LEVEL I AND LEVEL II LIFE-TERM INMATES**

This memorandum clarifies questions regarding the California Department of Corrections' policy for housing life-term inmates. The California Code of Regulations Section 3375.2 (a)(7)(A) explains an inmate serving any life term shall not be housed in a Level I or II facility if "...the commitment offense involved multiple murders, unusual violence, execution-type murders or received high notoriety."

Staff repeatedly question the meaning and intent of these exclusionary factors. Staff shall use the following definitions in applying this policy:

- "Multiple murders" means the inmate killed more than one victim during the commission of the crime for which the inmate is currently serving the life term. This does not include inmates who have killed more than one person during their criminal career. Serial killers shall be excluded from Level I or II placement even if the murders were prosecuted separately.

- "Unusual violence" means offenses wherein the inmate tortured the victim over a period of time or intentionally made the victim endure great pain and suffering. While stabbing, shooting, or beating the victim may be very violent, it is not necessarily "unusual violence."

- "Execution-type murders" include those crimes wherein the victim was shot in the head after being bound or cuffed, made to kneel, made to lie down, or made to face a wall. This does not include all crimes wherein the victim was killed to prevent testimony, killed in a "drive-by" shooting, or killed as an informant by orders of prison or street-gang leadership.

- "High notoriety" is meant to describe those cases that received, at least, statewide media coverage. Extensive coverage by local newspapers or television stations is not sufficient for exclusion.

**E X H I B I T   10**

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| Date: | AUGUST 15, 2007 | | | |
|---|---|---|---|---|
| Honorable: | STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| | NONE | Bailiff | NONE | Reporter |

|  | (Parties and Counsel checked if present) |
|---|---|
| BH004498<br>In re,<br>VICTOR M. MONTEZ,<br>　　　Petitioner,<br><br>On Habeas Corpus | Counsel for Petitioner:<br><br><br>Counsel for Respondent: |

Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on January 2, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4[th] 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on June 1, 1982 after a conviction for second-degree murder with use of a firearm. He was sentenced to seventeen years to life. His minimum parole eligibility date was April 9, 1990. The record reflects that on August 9, 1980, petitioner, his wife, and a female companion were traveling to Oxnard when their car broke down on the Ventura Freeway. The two women stood on the side of the freeway waiting for someone to stop to offer help, while petitioner hid in the bushes. The victim stopped for the two stranded women. As they entered the vehicle, petitioner ran up brandishing a gun. He ordered the driver to take them to Oxnard. He then fired the weapon killing the victim. He dragged the body out of the car and hid it under a tree and shrubs. Then, petitioner and his crime partners drove off in the victim's car. Petitioner contends that he fired the gun accidentally when the victim attempted to adjust the seat.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on May 31, 2006. Petitioner was denied parole for one year. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.

The Court finds that there is some evidence to support the Board's finding that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal.App.4[th] 871, at 893.) In this case, petitioner and his crime partners killed the victim because they needed a ride to Oxnard. The Board was justified in concluding that this motive is materially less significant motives than those motives which

| Minutes Entered |
|---|
| 08-15-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | |
|---|---|---|
| Date: | AUGUST 15, 2007 | |
| Honorable: STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO | Deputy Clerk |
| NONE | Bailiff | NONE | Reporter |

| | (Parties and Counsel checked if present) |
|---|---|
| BH004498 In re, VICTOR M. MONTEZ, Petitioner, On Habeas Corpus | Counsel for Petitioner: |
| | Counsel for Respondent: |

conventionally drive people to commit murder, thus indicating that petitioner poses a greater risk of danger to society if released than is ordinarily present.

Additionally, the record reflects that petitioner had an unstable social history prior to the commitment offense, which is a factor tending to indicate unsuitability for parole. (Cal. Code Regs., tit. 15, §2402, subd. (c)(3).) Petitioner began using heroin when he was thirteen years old. He eventually developed a $200 a day habit. He was first arrested at the age of thirteen and had several more arrests as an adult, leading to sentences of probation and state prison in New Mexico. He dropped out of high school when he was sixteen years old. Heavy drug use, school problems, and prior criminality are some evidence of an unstable social history. (*In re Van Houten* (2004) 116 Cal.App.4th 339, 353.)

The Court rejects petitioner's argument that he is entitled to release based on the terms of his plea agreement. A plea bargain violation claim depends upon the actual terms of the agreement, not the subjective understanding of the defendant or deficient advice provided by his attorney. (*In re Honesto* (2005) 130 Cal.App.4th 81, 91-93.) According to the terms of his plea bargain, petitioner pled guilty to second degree murder with use of a firearm and agreed to a sentence that carried a maximum term of life in prison. Petitioner has "no vested right to determination of his sentence at less than the maximum." (*In re Schoengarth* (1967) 66 Cal.2d 295, 302.) Therefore, the Board did not violate the plea bargain in finding petitioner unsuitable for parole.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Victor M. Montez
C-48215
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

Department of Justice- State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

| Minutes Entered |
|---|
| 08-15-07 |
| County Clerk |

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | CONFORMED COPY<br><br>AUG 1 5 2007<br><br>LOS ANGELES<br>SUPERIOR COURT<br><br>Joseph M. Pulido |
| PLAINTIFF/PETITIONER:<br><br>VICTOR M. MONTEZ | |
| CLERK'S CERTIFICATE OF MAILING<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004498 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

- ☐ Order Extending Time
- ☐ Order to Show Cause
- ☐ Order for Informal Response
- ☐ Order for Supplemental Pleading

- ☒ Order re: Writ of Habeas Corpus
- ☐ Order
- ☐ Order re:
- ☐ Copy of Petition for Writ of Habeas Corpus for the Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

August 15, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_ , Clerk
　　 Joseph M. Pulido

Victor M. Montez
C-48215
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

Department of Justice- State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

**E X H I B I T   11**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re | B202287 |
| VICTOR M. MONTEZ, | (L.A.S.C. Nos. A146105, BH004498) |
| on | O R D E R |
| Habeas Corpus. | |

COURT OF APPEAL - SECOND DIST.
**F I L E D**
NOV - 2 2007
JOSEPH A. LANE          Clerk
P. GONZALEZ        Deputy Clerk

THE COURT*:

    The petition for writ of habeas corpus, filed September 21, 2007, has been read and considered.

    The petition is denied.

| | | |
|---|---|---|
| *MALLANO, Acting P. J. | VOGEL, J. | JACKSON, J.** |

\**Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

January 29, 2008

Victor M. Montez, C-48215
CTF-East Dorm (ED-181L)
P.O. Box 689
Soledad, CA 93960

Petitioner in pro se


Clerk of the Court
United States District Court
Northern District of California
450 Golden Gate Ave.
San Francisco, CA 94102

RE: FILING WRIT OF HABEAS CORPUS

Clerk of the Court:

    Please find enclosed the original of my habeas corpus petition.
Please bill me for the filing fee.  I apologize for the inconvenience
my request may cause, but if I send my writ through the prison Trust
Office it will be delayed, maybe even lost.  When I receive the notice
of payment due I will make arrangements for the filing fee to be
paid by a family member.  Again, I apologize.

Respectfully,


Victor M. Montez
Petitioner in pro se

UNITED STATES POSTAGE
$ 04.90⁰
FIRST-CLASS
02 1M
0004229613
MAILED FROM ZIP CODE 93960

VICTOR MONTEZ, C-4824C
CTF-EAST DORM (ED-181C)
P.O. Box 6X9
SOLEDAD, CA 93960

LEGAL MAIL
PRIORITY MAIL

TO: UNITED STATES DISTRICT COURT
Northern District of California
450 GOLDEN GATE AVE.
SAN FRANCISCO, CA 94102

RECEIVED
FEB - 1 2008
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CA.

$ 04.90

VICTOR MONTEZ, C-48245

CTF-EAST DORM (ED-181C)

P.O. BOX 689

SOLEDAD, CA 93960

LEGAL MAIL

PRIORITY MAIL

TO: UNITED STATES DISTRICT COURT

Northern District of California

450 GOLDEN GATE AVE.

SAN FRANCISCO, CA 94102

RECEIVED

FEB -1 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA