1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DANE R. GILLETTE
   Chief Assistant Attorney General
3  JULIE L. GARLAND
   Senior Assistant Attorney General
4  JESSICA N. BLONIEN
   Supervising Deputy Attorney General
5  STEVEN G. WARNER, State Bar No. 239269
   Deputy Attorney General
6   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
7   Telephone: (415) 703-5747
    Fax: (415) 703-5843
8   Email: Steven.Warner@doj.ca.gov

9  Attorneys for Respondent Warden Ben Curry
   SF2008200126
10

11              IN THE UNITED STATES DISTRICT COURT

12           FOR THE NORTHERN DISTRICT OF CALIFORNIA

13                   SAN FRANCISCO DIVISION

14

15  **VICTOR M. MONTEZ,**                    Case No. C 08-0815 VRW

16                          Petitioner,      **ANSWER TO ORDER TO SHOW
                                             CAUSE; MEMORANDUM OF**
17              v.                           **POINTS AND AUTHORITIES**

18  **BEN CURRY, Warden,**

19                          Respondent.      Judge:  The Honorable Vaughn R. Walker

20

21       As an Answer to the Petition for Writ of Habeas Corpus filed by inmate Victor M. Montez,

22  Respondent admits, alleges, and denies that:

23       1.    Montez is in the lawful custody of the California Department of Corrections and

24  Rehabilitation following his 1982 conviction of second-degree murder.  (Pet. at 1.)  Montez is

25  serving a life sentence with the possibility of parole.  (*Id.*)

26       2.    In 2007, Montez filed a petition for writ of habeas corpus in Los Angeles County

27  Superior Court, alleging that the Board of Parole Hearings' 2006 decision denying him parole

28  violated his due process rights.  (Ex. 1, Super. Ct. Pet.; Ex. 2, [Super. Ct.] Order Re:  Writ of

1    Habeas Corpus.)  The superior court denied the petition, finding that "the record contains 'some

2    evidence' to support the Board's finding that petitioner is unsuitable for parole." (Ex. 2 at 2

3    (citations omitted).)

4        3.    Montez then raised the same claims in petitions to the California Court of Appeal and

5    the California Supreme Court. (Ex. 3, Ct. App. Pet.; Ex. 4, Sup. Ct. Pet.)  Both courts summarily

6    denied the petitions. (Ex. 5, Ct. App. Order; Ex. 6, Sup. Ct. Denial.)

7        4.    Respondent admits that Montez exhausted his state court remedies regarding the claim

8    that the Board's 2006 decision violated his due process rights.  Respondent denies that Montez

9    has exhausted his claims to the extent they are interpreted more broadly to encompass any

10    systematic issues beyond this claim.

11        5.    Respondent admits that the Petition is timely under 28 U.S.C. § 2244(d)(1).

12    Respondent admits that the Petition is not subject to any other procedural bar.

13        6.    Respondent denies that Montez is entitled to federal habeas relief under 28 U.S.C. §

14    2254 because the state court decisions were not contrary to, or an unreasonable application of

15    clearly established federal law as determined by the United States Supreme Court, or based on an

16    unreasonable determination of the facts.

17        7.    Respondent denies that Montez has a federally protected liberty interest in parole and,

18    therefore, alleges that he has not stated a federal question invoking this court's jurisdiction.  The

19    Supreme Court has not clarified the methodology for determining whether a state has created a

20    federally protected liberty interest in parole. *See Greenholtz v. Inmates of Neb. Penal & Corr.*

21    *Complex*, 442 U.S. 1, 12 (1979) (liberty interest in conditional parole release date created by

22    unique structure and language of state parole statute); *Sandin v. Connor*, 515 U.S. 472, 484

23    (1995) (federal liberty interest in correctional setting created only when issue creates an "atypical

24    or significant hardship" compared with ordinary prison life); *Wilkinson v. Austin*, 545 U.S. 209,

25    229 (2005) (*Sandin* abrogated *Greenholtz's* methodology for establishing the liberty interest).

26    Continued confinement under an indeterminate life sentence does not impose an "atypical or

27    significant hardship" under *Sandin* since a parole denial does not alter an inmate's sentence,

28    impose a new condition of confinement, or otherwise restrict his liberty while he serves his

Answer to Order to Show Cause; Mem. of P. & A.                                    *Montez v. Curry*
                                                                                  Case No. C 08-0815 VRW

2

1     sentence.  Thus, Respondent asserts that Montez does not have a federal liberty interest in parole.

2     Respondent acknowledges that in *Sass v. Cal. Bd. of Prison Terms*, 461 F.3d 1123, 1128 (9th

3     Cir. 2006) the Ninth Circuit held that California's parole statute creates a federal liberty interest

4     in parole under the mandatory-language analysis of *Greenholtz*, but preserves the argument,

5     which is pending en banc review in *Hayward v. Marshall*, 527 F.3d 797 (9th Cir. 2008).

6         8.     Even if Montez has a federal liberty interest in parole, he received all due process to

7     which he is entitled under clearly established federal law because he was provided with an

8     opportunity to be heard and a statement of reasons for the Board's decision.  *Greenholtz*, 442

9     U.S. at 16.

10        9.     Respondent denies that the some-evidence standard is clearly established federal law in

11     the parole context.

12        10.    Respondent denies that the Board's 2006 decision violated Montez's federal due

13     process rights, was arbitrary, or was unsupported by any evidence.

14        11.    Respondent affirmatively alleges that Montez references his plea agreement as

15     background to the challenged hearing.  However, to the extent that this Court interprets the plea

16     agreement reference as a legal contention, Respondent affirmatively alleges that it is a state law

17     claim that is untimely and not properly before this Court.

18        12.    Respondent denies that clearly established federal law requires the Board to present

19     evidence of an inmate's current dangerousness when denying parole.  Respondent further denies

20     that rehabilitation is the *Greenholtz* doctrine or that the case is clearly established federal law

21     standing for the proposition that the focus of parole suitability is rehabilitation.  Respondent

22     affirmatively alleges that Montez's contentions about his Minimum Eligible Parole Date

23     (MEPD) and credits are state law claims not properly before this Court and unrelated to review of

24     the state courts' decisions.

25        13.    Respondent denies that the commitment offense is not reliable evidence of Montez's

26     unsuitability.  Respondent affirmatively alleges that Montez cites no clearly established United

27     States Supreme Court law and improperly re-characterizes the offense facts in support of this

28     contention.

1    14.  Respondent affirmatively alleges that Montez's claim that the Board found elements of

2  first-degree murder apply to Montez's crime is a state law claim not property before this Court.

3    15.  Respondent affirmatively alleges that Montez's contentions about the state courts'

4  findings about his social history and prior crimes are state law claims not properly before this

5  Court. (See Pet. at 23-24 (citing *In re Roderick*, 154 Cal. App. 4th 242 (2007).) To the extent

6  that this Court interprets these contentions as federal claims, Respondent affirmatively alleges

7  that Montez has not shown that the state court made unreasonable factual determinations.

8    16.  Respondent denies that the state courts showed bias in their decisions.  Respondent

9  affirmatively alleges that Montez has failed to meet his burden of proof as to this contention.

10    17.  Respondent affirmatively alleges that an evidentiary hearing is unnecessary.  Montez's

11  claims can be resolved on the existing state court record. *Baja v. Ducharme*, 187 F.3d 1075,

12  1078 (9th Cir. 1999).

13    18.  Respondent denies that Montez is entitled to an order requiring the Board to conduct a

14  new hearing within ten days, fix Montez's term, and apply all excess custody credits unless there

15  is no new evidence since the 2006 hearing.  Respondent further denies that this proceeding

16  affects any review by the Governor, or that Montez is entitled to an order preventing the

17  Governor from considering Montez's case factors at any future review.  The remedy is limited to

18  the process that is due, which is a new Board hearing comporting with due process. *See, e.g.,*

19  *Benny v. U.S. Parole Comm'n*, 295 F.3d 977, 984-85 (9th Cir. 2002) (a liberty interest in parole

20  is limited by the Board's exercise of discretion, and a due process error does not entitle an inmate

21  to a favorable parole decision).

22    19.  Montez fails to state or establish any grounds for habeas corpus relief.

23    20.  Except as expressly admitted in this Answer, Respondent denies the allegations of the

24  Petition.

25  ///

26  ///

27  ///

28  ///

1          **MEMORANDUM OF POINTS AND AUTHORITIES**

2                   **INTRODUCTION**

3      Montez claims that the Board's 2006 decision finding him unsuitable for parole violated his

4 due process rights. But Montez merely alleges a disagreement with the Board's decision, and

5 fails to establish that the state court decisions denying his due process claims were contrary to, or

6 an unreasonable application of clearly established federal law as determined by the United States

7 Supreme Court, or were based on an unreasonable determination of the facts. Thus, there are no

8 grounds for federal habeas relief.

9                     **ARGUMENT**

10                        **I.**

11 **MONTEZ HAS NOT SHOWN THAT HE IS ENTITLED TO RELIEF UNDER**
**AEDPA.**

12

13      Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) a federal court

14 may not grant a writ of habeas corpus unless the state court's adjudication was either: 1)

15 "contrary to, or involved an unreasonable application of, clearly established Federal law, as

16 determined by the Supreme Court of the United States;" or 2) "based on an unreasonable

17 determination of the facts in light of the evidence presented at the State Court proceeding."

18 28 U.S.C. § 2254(d)(1-2) (2000). Montez has not demonstrated that he is entitled to relief under

19 this standard.

20     **A.**   **Montez Has Not Shown that the State Court Decisions Were Contrary**
         **to Clearly Established Federal Law.**

21

22      As a threshold matter, the Court must decide what, if any, "clearly established Federal law"

23 applies. *Lockyer v. Andrade*, 538 U.S. 63, 71 (2003). In making this determination, the Court

24 may look only to the holdings of the United States Supreme Court governing at the time of the

25 state court's adjudication. *Carey v. Musladin*, ___ U.S. ___, 127 S. Ct. 649, 653 (quoting

26 *Williams v. Taylor*, 529 U.S. 362 (2000)). The only case in which the Supreme Court has

27 addressed the process due in state parole proceedings is *Greenholtz*. *Greenholtz*, 442 U.S. 1.

28 The Supreme Court there held that due process is satisfied when the state provides an inmate an

Answer to Order to Show Cause; Mem. of P. & A.                          *Montez v. Curry*
                                                      Case No. C 08-0815 VRW

1 opportunity to be heard and a statement of the reasons for the parole decision. *Id.* at 16. "The

2 Constitution does not require more." *Id.*[1] No other Supreme Court holdings require more at a

3 parole hearing.

4     Montez does not contest that he received the *Greenholtz* protections. (*See generally* Pet.)

5 Because *Greenholtz* was satisfied and *Greenholtz* is the only Supreme Court authority regarding

6 an inmate's due process rights during a parole hearing, the state court decision upholding the

7 Board's decision was not contrary to clearly established federal law. Thus, the Petition should be

8 denied.

9     Although Montez alleges that the Board's decision must be supported by some evidence,

10 there is no clearly established federal law applying this standard to parole decisions. The

11 Supreme Court has held that under AEDPA a test announced in one context is not clearly

12 established federal law when applied to another context. *Wright v. Van Patten*, ___U.S.___ 128

13 S. Ct. 743, 746-47 (2008); *Schriro v. Landrigan*, ___U.S.___, 127 S. Ct. 1933 (2007); *Musladin*,

14 127 S. Ct. at 652-54; *see also*, *Foote v. Del Papa*, 492 F.3d 1026, 1029 (9th Cir. 2007); *Nguyen*

15 *v. Garcia*, 477 F.3d 716, 718, 727 (9th Cir. 2007); *Crater v. Galaza*, 491 F.3d 1119, 1122 (9th

16 Cir. 2007). The Supreme Court developed the some-evidence standard in the context of a prison

17 disciplinary hearing, *Superintendent v. Hill*, 472 U.S. 445, 457 (1985), which is a fundamentally

18 different context than a parole proceeding. Because the tests and standards developed by the

19 Supreme Court in one context cannot be transferred to distinguishable factual circumstances for

20 AEDPA purposes, it is not appropriate to apply the some-evidence standard of judicial review to

21 parole decisions.

22     While the Ninth Circuit has applied the some-evidence standard to parole decisions, this is

23 improper under AEDPA, and the issue is currently pending before an en banc panel of the Ninth

24 Circuit. *Hayward*, 527 F.3d 797. AEDPA does not permit relief based on circuit case law.

25 _____

26     1. The Supreme Court has cited *Greenholtz* approvingly for the proposition that the "level
of process due for inmates being considered for release on parole includes an opportunity to be heard
27 and notice of any adverse decision" and noted that, although *Sandin* abrogated *Greenholtz's*
methodology for establishing the liberty interest, *Greenholtz* remained "instructive for [its]
28 discussion of the appropriate level of procedural safeguards." *Austin*, 545 U.S. at 229.

1   *Crater*, 491 F.3d at 1123, 1126 (§ 2254(d)(1) renders decisions by lower courts non-dispositive

2   for habeas appeals); *Earp v. Ornoski*, 431 F.3d 1158, 1182 (9th Cir. 2005) ("Circuit court

3   precedent is relevant only to the extent it clarifies what constitutes clearly established law." . . .

4   "Circuit precedent derived from an extension of a Supreme Court decision is not clearly

5   established federal law as determined by the Supreme Court."); *Duhaime v. Ducharme*, 200 F.3d

6   597, 600-01 (9th Cir. 2000). Therefore, the Ninth Circuit's use of the some-evidence standard is

7   not clearly established federal law and is not binding on this Court. *See, e.g., Biggs v. Terhune*,

8   334 F.3d 910 (9th Cir. 2003); *Sass*, 461 F.3d at 1128; *Irons v. Carey*, 505 F.3d 846, 851 (9th

9   Cir. 2007).

10         Montez contends that the Board's decision was arbitrary and capricious. (Pet. at 5.) This

11   contention lacks merit. The Board's findings and decision would be arbitrary if made seemingly

12   at random without individualized consideration of Montez's case. Here, the Board individually

13   considered Montez's pre- and post-conviction factors and therefore did not make arbitrary

14   findings or an arbitrary decision.

15         Similarly, Montez's additional claim that the Board's reliance on the commitment offense

16   violates due process finds no support in Supreme Court precedent. Although the Ninth Circuit

17   has suggested that this might amount to an additional due process claim, *Biggs*, 334 F.3d at 917,

18   because there is no clearly established federal law precluding reliance on unchanging factors

19   federal habeas relief is not available. 28 U.S.C. § 2254(d).

20         In sum, the only clearly established federal law setting forth the process due in the parole

21   context is *Greenholtz*. Montez does not allege that he failed to receive these protections.

22   Therefore Montez has not shown that the state court decisions denying habeas relief were

23   contrary to clearly established federal law.

24   **B.**     **Montez Has Not Shown that the State Courts Unreasonably**
              **Applied Clearly Established Federal Law.**

25

26         Habeas relief may only be granted based on AEDPA's unreasonable-application clause

27   where the state court identifies the correct governing legal rule from Supreme Court cases but

28   unreasonably applies it to the facts of the particular state case. *Williams*, 529 U.S. at 406. The

Answer to Order to Show Cause; Mem. of P. & A.                           *Montez v. Curry*
                                                                Case No. C 08-0815 VRW

1  petitioner must do more than merely establish that the state court was wrong or erroneous. *Id.* at

2  410; *Lockyer*, 538 U.S. at 75. Respondent recognizes that the Ninth Circuit applies the some-

3  evidence standard as clearly established federal law, but even accepting that premise, Montez is

4  not entitled to federal habeas relief. Indeed, the California Supreme Court has adopted *Hill*'s

5  some-evidence standard as the judicial standard to be used in evaluating parole decisions, *In re*

6  *Rosenkrantz*, 29 Cal. 4th 616 (2002), and Montez has not shown that the state courts

7  unreasonably applied the standard.

8       When, as here, the California Supreme Court denies a petition for review without

9  comment, the federal court will look to the last reasoned decision as the basis for the state court's

10  judgment. *Ylst v. Nunnemaker*, 501 U.S. 797, 803-04 (1991). In this case, the last reasoned

11  decision is the Los Angeles County Superior Court decision denying Montez's habeas petition.

12  (Ex. 2.) The superior court denied the petition and found that some evidence supported the

13  Board's denial. (Ex. 2 at 1.) Montez's claim fails: he has not shown that the superior court

14  unreasonably applied *Hill*, but rather asks this Court to re-weigh his suitability. Such a re-

15  weighing has no basis in United States Supreme Court law.

16       **C.    Montez Has Not Shown that the State Court Decisions Were**
         **Based on an Unreasonable Determination of the Facts.**
17

18       Under § 2254(d)(2), habeas corpus can not be granted unless the state courts' decisions

19  were based on an unreasonable determination of the facts in light of the evidence presented in the

20  state court. The state courts' factual determinations are presumed to be correct, and the petitioner

21  has the burden of rebutting that presumption by clear and convincing evidence. 28 U.S.C. §

22  2254(e)(1).

23       Although Montez alleges that the Board's decision is not supported by the evidence, he

24  does not show that the state court made factual errors. Here the superior court noted the facts of

25  the crime, then found that "there is some evidence to support the Board's finding that 'the motive

26  for the crime is inexplicable or very trivial in relation to the offense,'" and that "the record

27  reflects that petitioner had an unstable social history prior to the commitment offense, which is a

28  factor tending to indicate unsuitability for parole." (Ex. 2 at 1-2 (citations omitted).) Montez has

Answer to Order to Show Cause; Mem. of P. & A.                                    *Montez v. Curry*
                                                                            Case No. C 08-0815 VRW

8

1 | not alleged by clear and convincing evidence that the factual determinations are incorrect. He

2 | disagrees with the weight the Board assigned to the evidence. This disagreement does not entitle

3 | Montez to federal habeas relief.

4 | ### CONCLUSION

5 |     Montez has not demonstrated that the state court decisions denying habeas relief were

6 | contrary to, or an unreasonable application of, United States Supreme Court authority, or based

7 | on an unreasonable determination of the facts. Thus, the Petition should be denied.

8 |     Dated: August 25, 2008

9 |                     Respectfully submitted,

10 |                     EDMUND G. BROWN JR.
                        Attorney General of the State of California

11 |                     DANE R. GILLETTE
                        Chief Assistant Attorney General

12 |                     JULIE L. GARLAND
13 |                     Senior Assistant Attorney General

14 |                     JESSICA N. BLONIEN
                        Supervising Deputy Attorney General

15 |

16 |

17 |

18 |                     STEVEN G. WARNER
                        Deputy Attorney General
19 |                     Attorneys for Respondent

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 | 20132321.wpd

Answer to Order to Show Cause; Mem. of P. & A.

*Montez v. Curry*
Case No. C 08-0815 VRW

## DECLARATION OF SERVICE BY U.S. MAIL

Case Name:    **Montez v. Curry**

No.:    **U. S. D. C., N. D., S. F. DIV., C 08-0815 VRW**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made. I am 18 years of age or older and not a party to this matter. I am familiar with the business practice at the Office of the Attorney General for collection and processing of correspondence for mailing with the United States Postal Service. In accordance with that practice, correspondence placed in the internal mail collection system at the Office of the Attorney General is deposited with the United States Postal Service that same day in the ordinary course of business.

On <u>August 25, 2008,</u> I served the attached

### ANSWER TO ORDER TO SHOW CAUSE; MEMORANDUM OF POINTS AND AUTHORITIES WITH EXHIBITS 1 - 6

by placing a true copy thereof enclosed in a sealed envelope with postage thereon fully prepaid, in the internal mail collection system at the Office of the Attorney General at 455 Golden Gate Avenue, Suite 11000, San Francisco, CA 94102-7004, addressed as follows:

**Victor Montez, C-48215**
**Correctional Training Facility**
**P.O. Box 689**
**Soledad, CA 93960-0689**
In Pro Per

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on **August 25, 2008**, at San Francisco, California.

|  |  |
|---|---|
| J. Baker | *[signature]* |
| Declarant | Signature |

20135465.wpd

# EXHIBIT 1
# Part 1 of 3

MC-275

Name  **Victor M. Montez**

Address **Correctional Training Facility**

**P.O. Box 689 (ED-181L)**

**Soledad, CA 93960**

CDC or ID Number  **C-48215**

FILED
Los Angeles Superior Court

JAN 0 2 2007

John A. Clarke, Executive Officer/Clerk

By _____, Deputy
JOSEPH M. PULIDO, S.C.C.
233219

## LOS ANGELES COUNTY SUPERIOR COURT

### STATE OF CALIFORNIA

(Court)

---

**VICTOR M. MONTEZ,**

Petitioner

vs.

**BEN CURRY (Warden),**

Respondent

PETITION FOR WRIT OF HABEAS CORPUS

No. *BA01 424*

*(To be supplied by the Clerk of the Court)*

## INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

---

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

---

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

| | | | |
|---|---|---|---|
| ☐ A conviction | | ☐ Parole | |
| ☒☒ A sentence | | ☐ Credits | |
| ☐ Jail or prison conditions | | ☐ Prison discipline | |
| ☐ Other *(specify)*: _____ | | | |

1. Your name:  Victor M. Montez

2. Where are you incarcerated? **Correctional Training Facility, P.O. Box 689, Soledad, CA 93960**

3. Why are you in custody?  ☒☒ Criminal Conviction    ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

      2nd degree murder w/use of a firearm

   b. Penal or other code sections: 187 / 12022.5

   c. Name and location of sentencing or committing court: Superior Court of California, County of Los Angeles

   d. Case number:  LA A146105

   e. Date convicted or committed: March 26, 1982

   f. Date sentenced: May 21, 1982

   g. Length of sentence: 15 years to life plus 2 years firearm enhancement

   h. When do you expect to be released?  To be determined

   i. Were you represented by counsel in the trial court? ☐ Yes. ☐ No. If yes, state the attorney's name and address:
      N/A

4. What was the LAST plea you entered? *(check one)*

   ☐ Not guilty   ☒☒ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial
   N/A

6.  GROUNDS FOR RELIEF

    **Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal
enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For
additional grounds, make copies of page four and number the additional grounds in order.)*

        PLEASE SEE APPENDIX "A" PAGE 5 FOR ANSWERS TO 6, ET SEQ.

a.  Supporting facts:

    Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon
which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For
example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or
failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re
Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: *who* did exactly *what* to violate your rights at what time *(when)* or
place *(where). (If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

        PLEASE SEE APPENDIX "A" STARTING AT PAGE 5 FOR ANSWERS TO 6a

b.  Supporting cases, rules, or other authority (optional):

    *(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary,
attach an extra page.)*

        PLEASE SEE APPENDIX "B" STARTING A PAGE 16 FOR ANSWERS TO 6b

8. Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.  If yes, give the following information:
  a. Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):  N/A

  b. Result: _____  c. Date of decision: _____

  d. Case number or citation of opinion, if known: _____

  e. Issues raised: (1) _____

    (2) _____

    (3) _____

  f. Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:
    N/A

9. Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.  If yes, give the following information:
  N/A

  a. Result: _____  b. Date of decision: _____

  c. Case number or citation of opinion, if known: _____

  d. Issues raised: (1) _____

    (2) _____

    (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
  N/A

11. Administrative Review:
  a. If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:
    THERE IS NO ADMINISTRATIVE REVIEW

  b. Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.  N/A
    *Attach documents that show you have exhausted your administrative remedies.*

MC 275 (Rev. January 1, 1999)

**PETITION FOR WRIT OF HABEAS CORPUS**
- 3 -

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court? ☐ Yes. If yes, continue with number 13.    ☒☒ No. If no, skip to number 15.

13. a. (1) Name of court: _____

      (2) Nature of proceeding (for example, "habeas corpus petition"): _____

      (3) Issues raised: (a) _____

         (b) _____

      (4) Result *(Attach order or explain why unavailable)*: _____

      (5) Date of decision: _____

  b. (1) Name of court: _____

      (2) Nature of proceeding: _____

      (3) Issues raised: (a) _____

         (b) _____

      (4) Result *(Attach order or explain why unavailable)*: _____

      (5) Date of decision: _____

  c. *For additional prior petitions, applications, or motions, provide the same information on a separate page.*

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:

_____

_____

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.)

   **No delay** _____

_____

16. Are you presently represented by counsel? ☐ Yes.    ☒☒ No. If yes, state the attorney's name and address, if known:

_____

17. Do you have any petition, appeal, or other matter pending in any court? ☐ Yes.    ☒☒ No. If yes, explain:

_____

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

_____

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date: 24 Oct. 2006                    ▶ _____
                                  (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]                    **PETITION FOR WRIT OF HABEAS CORPUS**

A P P E N D I X   "A"

Answer to 6, et seq.

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION; VIOLATING  PETITIONER'S
PLEA AGREEMENT, TO FIND HIM UNSUITABLE FOR PAROLE FOR
THE **EIGHTH**  TIME AFTER TWENTY-FIVE YEARS BASED ON
IMMUTABLE FACTORS WHEN THOSE FACTORS ARE NO LONGER
RELIABLE EVIDENCE AND OTHER FINDINGS ARE NOT
"CIRCUMSTANCES SPECIFIED BY STATUTE AND BY REGULATION";
THE DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

---

Answers to 6a: Supporting facts

The Plea Agreement

On August 11, 1980, Victor Montez (hereafter Petitioner) was

arrested for the murder of Michael Stewart, the murder occurring

on August 10, 1980.

In an "information" alleging several charges, all of which but

one were dropped (EXHIBIT 1), Petitioner was charged with "murder"

in violation of Penal Code § 187.[1/]  The charge being for the minimum

elements of the offense, that is, Petitioner, "with malice

aforethought (did) murder Michael Stewart, a human being."

On March 26, 1982, after being advised of his constitutional

rights, primarily, to trial by jury, confront witnesses and

cross-examination, and the right to present a defense (EXHIBIT 2,

p. 4-5), Petitioner entered into a stipulated plea agreement,

a contract, with the state of California to one count of second degree

murder, that is, "did unlawfully kill another human being with malice

aforethought" with the use of firearm in violation of Penal Code

---

1.  All codes and regulations are California, unless otherwise noted.

proffered that the murder of Mr. Stewart "was an unfortunate situation...that Mr. Montez never intended to kill the victim; that this was strictly an accident" (EXHIBIT 2, p. 9). There was no objection by the prosecution.

On March 26, 1982, Petitioner was sentenced to 15 years to life plus two years for the use of a firearm, to be served consecutively (EXHIBIT 3), being credited with 648 days in custody, plus 324 days good time credits, for a total of 972 days preconviction credit (EXHIBIT 4). A probation officer's report (POR) (EXHIBIT 5) was filed in conjunction with sentencing.

The Parole Hearing

On May 31, 2006, Victor Montez (hereafter Petitioner) appeared before the Board of Parole Hearings (hereafter Board) for his EIGHTH parole suitability hearing. Petitioner's minimum eligible parole date (MEPD was fixed at April 9, 1990 (EXHIBIT 6, HT 1:7-16).[2/]

Petitioner was sworn to tell the truth (HT 8:3-7).

The commitment offense

The facts of Petitioner's commitment offense were read into the record, being taken from Petitioner's Life Prisoner Evaluation Report (LPER) from June 2002 (EXHIBIT 7), reading from the LPER at HT 8:17-9:26:

> On August 9, 1980, Montez and two women, one of whom was his wife, were on their way to Oxnard when their vehicle became disabled. The two women began to hitchhike on the Ventura Freeway while Montez hid in the bushes. It was agreed that the two women would appear as two females stranded on the freeway while Montez would approach the motorist who stopped and exhibit a firearm he carried in his waistband. The victim, Michael Stewart stopped for the women. The women entered the rear seat while beckoning to Montez who was still hiding in the

---

2. Reference to parole hearing transcript will be designated by HT followed by page and, when necessary, line number, e.g., (HT 1:1).

bushes. He ran to the car and brandished a small caliber firearm and entered the rear seat of the car. He pointed the firearm at the back of the victim's head and told him to drive them to Oxnard or he would kill him. Montez then fired, striking and killing the victim. Montez exited the car, dragged the body from the car and secreted the body beneath an overhanging tree and shrubs. After leaving the body, Montez, his wife and the other female companion drove the victim's car to Oxnard.

Petitioner "basically concurs with the report" (HT 10:3), with few exceptions; those exceptions being that "he never threatened the victim, in fact he offered the victim money for gas" (HT 10: 4-6), Petitioner did have the gun pointed at the victim's head, but "believes the gun fired when the victim adjusted himself in the car seat and his elbow knocked the gun" (HT 10:6-11), Petitioner had no "intention to kill the victim" (HT 10:12-13), and "he never threatened the witness with violence if she contacted the police as is alleged" (HT 10:20-24). The facts of the offense are immutable and have remained consistent since the POR (EXHIBIT 5, pp. 6-10).

Prior criminal history

The Board reviews Petitioner's prior criminal history, starting with his juvenile record. Petitioner has no convictions as a juvenile (HT 11:16-24). As an adult, on April 26, 1973, given one year summary probation for entering non-commercial dwelling, while in custody for possession of marijuana charge, on October 19, 1973, convicted of sales and transportation of marijuana, January 7, 1974, Petitioner was convicted of "possession of marijuana and sent to CYA (HT 12:5-7), and has a conviction for "theft from motor vehicle" in the state of New Mexico, being released from custody on April 22, 1978 (HT 12:5-17; EXHIBIT 5, p. 5). None of Petitioner's prior convictions were serious or violent offenses.

///////

Prior social history

Petitioner began smoking marijuana at the age of 13, and started using heroin on weekends, progressing to a $200 a day habit by the age of 15 and would take Valium when heroin was not available (HT 14:8-15:2).

Petitioner dropped out of school at age 16 and entered Job Corps, remaining there eleven months learning to operate heavy equipment (HT 15:3-14).

From the Job Corps, Petitioner entered the United States Army, serving as a paratrooper in the Special Forces, being honorably discharged in 1972 (HT 15:14-26). Petitioner stayed free of drugs while in the military and believes he should have stayed in the military (HT 16:1-4).

While incarcerated in New Mexico, Petitioner earned his GED (HT 16:6-7). Petitioner earned certification as a welder during that time, also (HT 16:9-10).

Petitioner lived with a woman for approximately one year in New Mexico (HT 16:11-13), then returned to California where he met and entered into a relationship with Denise Garcia, marrying her in April, 1980, assuming responsibility for her two children, then having a daughter together (HT 16:14-17). Petitioner is now a grandfather (HT 17:5-8), and although divorced from his wife, who was also his crime partner in the instant offense, remains in contact and has support of his children (HT 33:19-20).

Prior to the instant offense, Petitioner was employed as roofer (HT 18:2-10).

Petitioner believes he had a good family life growing up

- 8 -

(HT 18:21-24); there was no abuse in the home (HT 19:1-11).

Parole plans

Petitioner will parole to his mother's home in Oxnard, which she owns (HT 19:15-22), and she will help financially and in any way she can (HT 35:13-20). Petitioner has a firm offer of employment from Ideal Upholstery in Ventura where he will start at $9.00 an hour (HT 20:6-20). Petitioner has alternative plans, arranging for an interview with a live-in program at the Ventura County Rescue Mission, with the requirements for admittance laid out for the Board (HT 22:23-23:13). Petitioner's daughter will provide housing, and, as her husband is starting his own business, the possibility of employment for Petitioner (HT 36:7-14).

Petitioner also has the support of Martha Duran, a woman whom he married while incarcerated, now divorced (due to the pressures of incarceration), residing in Oxnard and offering housing, and all the support "required so he can be a productive member of society" (HT 37:10-26), the Board finding this to be "very good" (HT 38:1).

Petitioner went to the effort to contact several organizations in the community that can provide housing and other services to re-enter society successfully, California Veterans Assistance, Luthern Social Services of Southern California, and New Directions of Los Angeles, as well as a pamphlet from Prison Industry Authority of job placement assistance and other services through parole services (HT 39:15-40:11).

Additionally, not only is Petitioner a certified welder and heavy equipment operator, but since being incarcerated, among other vocational trades, has obtained certification as a paralegal (HT 48:11-13).

Postconviction behavior

It was noted that Petitioner has been "extremely active" since his 2002 hearing (HT 24:18-20), having completed two certifications from Federal Emergency Management in Emergency Preparedness, and Radiological Emergency Management (HT 24:21-24). Petitioner received three laudatory chronos for participation in the Prison Industries Authority employability program (HT 24:24-27), and sixteen laudatory chronos for his continued participation in Alcoholics Anonymous and Narcotics Anonymous (HT 25:1-3).

Petitioner completed a thirteen week IMPACT workshop (a victim's awareness self-help group) (HT 25:9-11).

Although Petitioner has disciplinary write-ups, the last one being in 1993, "there are no write-ups for violence or weapons" (HT 25:24-25).

Petitioner has received "exceptional and above-average work reports" on his job in the furniture factory (HT 25:25-26:5).

Psychological evaluation

Petitioner's psychological evaluation, dated May 11, 2006 (EXHIBIT 8), was prepared by Dr. Macomber, one of the Board's own forensic experts. Highlighting relevant factors, the Board notes: "Dr. Macomber writes that in the past based upon your criminal history you had been diagnosed as having antisocial personality disorder. But at this point in your life there is no evidence of any antisocial thinking or values. That your values are solidly pro-social, you have deep feelings of concern and empathy toward others" and the diagnostic label of antisocial is no longer appropriate (HT 28:7-17; EXHIBIT 8, p. 2). Petitioner has a Global Assessment of Functioning

(GAF) Score of 90 (EXHIBIT 8, p. 3 [the highest score possible, relating to global social functioning]).

Most importantly, relating to current threat to public safety, covered at HT 28:26-29:20, Petitioner quotes directly from Dr. Macomber's evaluation (EXHIBIT 8, pp. 3-4), under assessment of dangerousness:

> In considering potential for dangerous behavior when released to the community, the Level of Service Inventory-Revised was administered. This is an actuarial measure that assesses criminal history, substance abuse history, institutional adjustment, social relationships and other factors to determine current risk on parole. He obtained a score of 5.1 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 95 of them. This is a low risk score. At this point in his life, due to maturity, growth, and increased insight, he poses no more risk to society than the average citizen in the community. In fact, based on the positive changes in his life, he probably poses less risk to society than the average citizen.

In response, the Board cogently stated: "That's a conclusion I won't disagree with but that's certainly open to discussion at some other time" (HT 29:20-22, emphasis added). The Board continues, "Under clinical observations and recommendations the doctor writes that prognosis for successful adjustment in the community is excellent" (HT 29:22-25; EXHIBIT 8, p. 4).

Correctional officials agree that Petitioner "would probably pose a low degree of threat to the public at this time, if released from prison" (EXHIBIT 7, p. 4, [that was two years prior]).

Opposition to parole

The deputy district attorney representing Los Angeles County, after reiterating the facts of the case (HT 41:20-44:18), believing Petitioner's substance abuse is merely in "institutional remission (HT 45:2-7), and being critical of Petitioner exercising his constitutional right not to discuss the case or incriminate himself, believing that demonstrates failure to accept responsibility for

- 11 -

the offense (HT 45:7-15), opposed parole (HT 45:20-21).

D E C I S I O N

In concluding that Petitioner is "not suitable for parole and
would pose an unreasonable risk of danger to society or a threat
to public safety" if released from prison (HT 53:12-15), the Board
relied on the following findings:

1.  The commitment offense, feeling "that the offense was carried
out on an especially cruel manner" (HT 53: 21-22), stating the victim
"was shot in the head after he stopped to render aid in what he
thought were two individuals that were in distress along the side
of the freeway" (HT 53:22-26); being "carried out in a very
dispassionate and calculated manner" (HT 54:1-2), putting "the two
women out on the freeway as a lure and that you were hiding in the
bushes and unfortunately it was Mr. Stewart that was the first
Samaritan that decided to stop and help.  The victim was defiled
after the offense in that he was stripped...(HT 54:3-12 [there is
absolutely no evidence, and Petitioner denies, that Mr. Stewart was
stripped of the clothing he was wearing, see EXHIBIT 1, pp. 6-7]);
and the motive "was very trivial" (HT 54:14), in that the "worst
case scenario you could have just ordered him out to the side of
the freeway but that's neither here nor there at this point n time"
(HT 54: 15-18).  The Board then reread the statement of facts into
the record (HT 54:21-56:3).

2.  Prior criminal history, stating Petitioner had "an escalating
pattern of criminal conduct and that you had failed previous grants
of probation...previous attempts to correct your criminality through
the CYA commitment" (HT 56:4-20), citing Petitioner's dismissed

- 12 -

charges and non-violent criminal convictions (HT 56:12-16).

3.  Parole plans needed to be shored up, the Board completely ignoring the offer of residence and financial support from Petitioner's mother (HT 19:15-22) and confirmed job offer (HT 20:6-20), criticizing the halfway houses Petitioner contacted as not being satisfactory (HT 56:23-57:3), stating that Petitioner needs a backup plan with a member of his family, which he has, and being critical of the offer of residence and assistance from Ms. Duran whom Petitioner married and divorced while incarcerated (HT 57:21-23), finally stating "[i]t might be fine with the next Board but from my experience with the parole division they probably would not approve that" (HT 58:16-19).

4.  "[T]he representative from the Los Angeles County District Attorney's Office indicating opposition to parole" (HT 58:2-5).

The only two factors considered in Petitioner's favor for parole suitability were: (1) "As far as your institutional behavior you have programmed very well" (HT 56:16-18); and (2) "[s]o far as the psychological report prepared by Dr. Macomber in May 1006, it's favorable" (HT 56:22-23).  In reference to programming very well and Petitioner's long ago disciplinary write-ups, the Board stated: "They are not an issue at least with this panel and I can't see them being an issue with the next panel you come before" (HT 60:24-61:1).

The Board recommended that Petitioner "continue in your AA/NA, whichever is available, and continue to earn positive chronos" (HT 58:7-9).

                          C O N C L U S I O N

Based on the foregoing facts, court records and attached memorandum of law, it is respectfully requested that the Court issue

                              - 13 -

and Order to Show Cause why the writ should not be granted, and after Petitioner's term is fixed in accord with his personal culpability, why any excess credits should not be applied to any period of parole Petitioner may have to serve.

Date: _24 Oct. 2006_

Respectfully submitted,

_Victor M. Montez_

Victor Montez
Petitioner in pro per


## V E R I F I C A T I O N

I, Victor Montez, hereby declare under penalty of perjury that the foregoing facts are true and correct, and the exhibits in support of those facts are true copies thereof. Doing so the _24_ day of October, 2006, at Soledad, California.

_Victor M. Montez_

Victor Montez
Petitioner in pro per

- 14 -

## P R A Y E R   F O R   R E L I E F

I, Victor M. Montez, states that I am a prisoner of the state of California proceeding in pro per and have no relief save habeas corpus, and do thereby pray that this Honorable Court will:

1.  Issue and Order to Show Cause;

2.  Appoint Counsel to protect the rights of Petitioner;

3.  Conduct an evidentiary hearing so that Petitioner can develop the pattern of arbitrary decisions in matters of parole suitability determinations, e.g., how the Board can agree with forensic experts then render a decision contrary to clearly established evidence;

4.  Declare the rights of Petitioner;

5.  Grant the writ;

6.  Any other relief that will further justice and preserve the integrity of the Court.

Date : *24 Oct. 2006*

Prayerfully submitted,

Victor Montez
Petitioner in pro per

A P P E N D I X    "B"

M E M O R A N D U M   O F   L A W

Introduction

Petitioner respectfully presents to the Court his memorandum
of law in support of his claims and facts.  The issues presented
are consistent with the Due Process Clause of the United States
Constitution: Would the state's penological interest be served by
continued imprisonment of a prisoner who has satisfied the spirit
of the law and there is no evidence he is <u>currently</u> a threat to public
safety?

The first argument presented is consistent with the recent
decision in <u>Hamdi v. Rumsfled</u> (2004) 542 U.S. 507, 124 S.Ct. 1633,
clarifying the ambiguity of the "some evidence" standard in
<u>Superintendent v. Hill</u> (1985) 472 U.S. 455, <u>Hamdi</u> being consistent
with the Board's "preponderance of the evidence" standard found in
California Code of Regulations, tit. 15 (hereafter Cal. Code Regs.,
tit. 15), § 2000(b)(50).

Petitioner will address his claims in the following order: a.
"some evidence" standard verses "a preponderance of the evidence"
standard; b. violation of plea agreement; c. failure to consider
all relevant factors; d. opposition of district attorney not evidence;
e. parole plans; f. use of nonviolent prior offenses; g. commitment
offense no longer relaible evidence; and h. an accumulation of the
evidence will show the hearing was a farce and a sham, the Board
going in search of a pretext to justify a decision already made rather
than an honest weighing of the evidence.

///////

- 16 -

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION; VIOLATING PETITIONER'S
PLEA AGREEMENT, TO FIND HIM UNSUITABLE FOR PAROLE FOR
THE EIGHTH TIME AFTER TWENTY-FIVE YEARS BASED ON
IMMUTABLE FACTORS WHEN THOSE FACTORS ARE NO LONGER
RELIABLE EVIDENCE AND OTHER FINDINGS ARE NOT
"CIRCUMSTANCES SPECIFIED BY STATUTE AND BY REGULATION";
THE DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

---

a.  Petitioner Has A Liberty Interest In Parole And Due Process Can
Only Be Satisfied If The Administrative Level Review Is Supported
By A Preponderance Of The Evidence.

This is strictly a question of law that can only be resolved

by the Appellate Court, or California Supreme Court at the state

level.

Relying on Superintendent v. Hill, supra 472 U.S. 445, the

Rosenkrantz court held that the Due Process Clause is satisfied as

long as the Board's/Governor's decision has "some basis in fact"

and "some evidence" to support the decision (In re Rosenkrantz, supra,

29 Cal.4th, at 655-658).  The "some evidence" standard, however,

does not suggests how to apply itself when both the decision at the

administrative level and judicial level of review is based on

a "modicum of evidence."  The Hill decision was ambiguous, but that

ambiguity was cleared up in the recent United States Supreme Court

decision of Hamdi v. Rumsfeld, supra, 542 U.S. 507, 124 S.Ct., at

2651 [The "some evidence" standard applies to judicial review after

an administrative review in which "a preponderance of the evidence"

standard is applied.]  For a thorough analysis of Hamdi in the context

of prison disciplinary determinations, see the Minnesota Supreme

Court's discussion of Carrillo v. Fabian (2005) 701 N.W.2d 763

(EXHIBIT 9).

- 17 -

A parole suitability hearing is <u>not</u> a <u>disciplinary</u> hearing conducted by "correctional officials" but is "analogous to the sentencing determination made by the court" (<u>In re Roberts</u> (2005) 36 Cal.4th 575, 577-588). Indeed, Penal Code § 3041.5 affords prisoners appearing before the Board for a suitability hearing rights not afforded at disciplinary hearings and the objectives are completely different -- one is punishment for violating prison rules while the other results in freedom. One is presumed suitable for parole and parole "shall be granted" absent the prisoner being a <u>current</u> threat to public safety.

In light of <u>Hamdi v. Rumsfeld</u>, <u>supra</u>, 542 U.S. 507, it is posited: If terrorists, who are enemy combatants of the United States and not even citizens of this country, are entitled to "a preponderance of the evidence" standard at the administrative level, then are not indeterminately sentenced prisoners who are presumed suitable for parole entitled to no less? Especially when the Board's own regulations mandate that the Board's decisions must be supported by "a preponderance of the evidence" (Cal. Code Regs., tit. 15, § 2000(b)(50)). If the Board's decision only need be supported by "some evidence," and judicial review only need to look for "some evidence" to support the Board's/Governor's decision, where is the safety net when the "some evidence" standard does not suggest how to apply itself? It is time the courts revisit the Board's decisions being supported by a mere, and abused "some evidence" standard.

b. <u>Petitioner Pled Guilty To The Minimum Elements Of The Offense And Has An Expectation To Be Punished Within The Legislatively Prescribed Punishment For Second Degree Murder.</u>

Indeterminately sentenced prisoners in this state have a "liberty

interest" in parole and "an expectation that [they] will be granted
parole unless the Board finds, in the exercise of its discretion,
that [the prisoner is] unsuitable for parole in light of the
circumstances specified by statute and regulations" (In re Rosenkrantz
(2002) 29 Cal.4th 616, 654; see also In re Dannenberg (2005) 34
Cal.4th 1061, 1094 [Dannenberg "does not contravene Rosenkrantz"]).
Petitioner has a heightened expectation of parole in that he entered
into a contract with the state for second degree murder and pleading
guilty only to the minimum elements of the offense.

A plea of guilty is only an admission to the elements of the
offense as charged, not as it might have been charged (People v.
Jerome (1984) 160 Cal.App.3d 1087, 1096; Henderson v. Morgan (1976)
426 U.S. 637, 647 fn. 18; Apprendi v. New Jersey (2000) 530 U.S.
466, 526-528, Justice O'Connor, dissenting; United States v. Wuco
(9th Cir. 1976) 535 F.2d 1200, 1202 fn. 1 [it is the statement of
facts in the pleading, rather than the statutory citation that is
controlling"]).  The information charged the minimum elements of
the offense, murder of a human being "with malice aforethought"
(EXHIBIT 1).  Petitioner pled guilty to exactly that and no more
(EXHIBIT 2, p. 6:13-19; 7:18-22).

"A plea agreement is, in essence, a contract between the
defendant and the prosecutor to which the court consents to be bound"
(People v. Cunningham (1996) 49 Cal.4th 1034, 1047).  "'Plea
agreements are contractual in nature and are to be measured by the
contract standards'" (Brown v. Pool (9th Cir. 2003) 337 F.3d 1155,
1159, quoting United States v. De La Fuenta (9th Cir. 1993) 8 F.3d
1333, 1337).  "[W]hen a plea rests in any significant degree on a

promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled" (<u>Santobello v. New York</u> (1971) 404 U.S. 257, 262). If the language of the contract is ambiguous, it must be interpreted to the benefit of the defendant as he understood it (<u>Buckley v. Terhune</u> (9th Cir. 2006) 441 F.3d 688, 695).

It was after this preliminary issues in this case were decided by the appellate court that the prosecution entered into negotiations with counsel in this case. In that Petitioner has always claimed his gun went off accidentally, and when this was presented in open court (EXHIBIT 2, p. 9:9-11; 22-23), the prosecution did not object in any manner; therefore, agreeing. If the state charges and agrees to a plea of second degree murder, the defendant waiving his rights to constitutional safeguards of a trial and a challenge of the evidence, then the state too waives its right to try the case years later before the Board as a first degree murder where Petitioner does not have the constitutional safeguards of a trial. If the prosecution can dupe a defendant into waiving his constitutional rights and plead guilty to second degree murder to save the expense of a trial, then later at a parole hearing try the case as first degree murder, what then was the purpose of the plea bargain? In such a situation it is impossible to conclude that Petitioner's plea was "voluntary" (<u>Henderson v. Morgan</u>, <u>supra</u>, 426 U.S., at 646). If the district attorney foresaw this and secretly left this possibility open and gave away nothing in exchange for this plea, then he would have betrayed the ethical duty as a representative of the government to conduct the government's business fairly and

(HT 54:3-12). Firstly there is no evidence that Mr. Stewart was stripped of the clothing he was wearing, thus there is no evidence that he was "defiled." Moreover, if that were true, saying removing someone's clothing is a thin attempt to bootstrap such an act to "abused, defiled, or mutilated" which conveys an actual defiling of the body, e.g., "The multiple stab wounds to Mrs. La Bianca's lower and back and buttocks made by Van Houton constituted at least a gratuitous mutilation, as did the fork in Mr. La Bianca's stomach and the knife through his throat" (In re Van Houten (2004) 116 Cal.App.4th 339, 351), Van Houten stating "'she had stabbed a woman who was already dead, and that the more she did it the more fun it was'" (Id., at 346, citation).

In support of the motive being "very trivial" (HT 54:14), this finding was based on the victim could have just been ordered out of the car and left along the freeway. Like the Board stated, however, "but that's neither hear nor there at this point in time" (HT 54:15-18). Again, although the idea of forcing Mr. Stewart at gun point to give Petitioner and his accomplices a ride was intentional, the shooting of Mr. Stewart was an accident, thus there was no motive. Moreover, "there is no motive for unlawfully taking the life of another human being that could not be deemed 'trivial.' The Legislature has foreclosed that approach, however, by declaring that murderers with life sentences must 'normally' be given release dates... (In re Scott I, supra, 119 Cal.App.4th, at 893). Motive, too, is an immutable factor, and one that could be used forever to keep Petitioner in prison. Use of this immutable factor after a quarter century was an abuse of discretion, violating Petitioner's

- 29 -

honestly (In re Ibarra (1983) 34 Cal.3d 277, 289 [invalid and illusory concessions offered by the state "constitutes a species of fraud"; see also Santobello v. New York, supra, 404 U.S., at 261 [plea bargain contracts "presuppose fairness is securing agreement between an accused and a prosecutor"]).

Although Petitioner was not given a specific date, he did enter into this contract with an expectation of being punished for second degree murder, not first degree murder. Petitioner pled guilty to second degree murder and has exceeded the maximum legislatively prescribed punishment for second degree murder established in Cal. Code Regs., tit. 15, § 2403(c), 21 years, and now, with conduct credits, has exceeded the legislatively prescribed range of punishment for first degree murder, Cal. Code Regs., tit. 15, § 2403(b), 33 years. In fact, the facts and manner of death in case at bench calls for punishment of 18-19-20 years (Cal. Code Regs., tit. 15, § 2403(c)(III-B, no prior relationship and death almost immediate), and with conduct credits, 25 calendar years plus 9 years for conduct credits (8 years plus 1 year Monigold credits), Petitioner has served 34 years, in which his offense, if convicted of first degree murder, would be 28-29-30 years. Aside from Petitioner's contract with the state to be punished for second degree murder, for Petitioner to now be found unsuitable for parole based on the commitment offense, the offense must be "particularly egregious" for a first degree murder (In re Rosenkrantz, supra, 29 Cal.4th, at 689-690, concurring opinion by Moreno, J.). The manner of death in case at bench was a single, accidental, gunshot to the head, not "severe trauma" or "torture." In that the forensic evidence establishes Petitioner is not "presently

too dangerous to grant a fixed parole release date" (<u>In re Dannenberg,</u> <u>supra</u>, 32 Cal.4th, at 1080), and Petitioner has more than fulfilled his end of the contract, it was a violation of Petitioner's right to due process for the Board, representative of the state, to continue his imprisonment on the pretext that he is currently a threat to public safety.  This is especially so and a gross abuse of discretion when the forensic expert states Petitioner "probably poses less risk to society than the average citizen" and the Board responds "[t]hat's a conclusion I won't disagree with" (HT 29:18-22).

c.  <u>The Board Failed To Consider All Relevant And Reliable Information</u>

    "'The gravity of the commitment offense may be a sufficient basis for denying a parole application, <u>so long as the Board does not fail to consider all other relevant factors</u>'" (<u>In re Scott II</u> (2005) 113 Cal.App.4th 573, 595 [emphasis added by the court, quoting <u>In re Ramirez</u> (2001) 94 Cal.App.4th 549, 569]; <u>see also</u> <u>In re Rosenkrantz, supra</u>, 29 Cal.4th, at 655 [the Board must consider all relevant factors]).  In case at bench, not only did the Board, after agreeing with the forensic expert that Petitioner is no longer a threat to public safety (HT 29:18-22) rule contrarily, but the Board did not weigh several suitability factors pertinent to Petitioner's suitability for parole (Cal. Code Regs., tit. 15, § 2402(d)), making its decision by viewing the commitment offense in a vacuum.

    There are nine (9) factors that weigh in favor of suitability for parole (Cal. Code Regs., tit. 15, § 2402(d)).  Two of the nine are inapplicable to Petitioner, the Board failed to consider and weigh in Petitioner's favor: (1) "The prisoner does not have a record of assaulting others as a juvenile or of committing crimes with a

- 22 -

potential of persoanl bodily harm [Petitioner has no juvenile
convictions, EXHIBIT 5, p. 4]; (2) "The prisoner has experienced
reasonably stable relationships with others" [Petitioner has
maintained stable relationships with his family, ex-wife, and
children, as well as others; (3) "Signs of Remorse," Petitioner
"indicating that he understands the nature and magnitude of the
offense" (HT 52:5-14; EXHIBIT 8, p. 3); (4) motivation for the crime
will be addressed below; (5) battered woman syndrome not applicable;
(6) "The prisoner lacks any significant history of violent crime."
This, with the unsuitability factor, "The prisoner on previous
occasions inflicted or attempted to inflict serious injury on a
victim" (Cal. Code Regs., tot. 15, § 2402(c)(2)), weigh in Petitioner
favor as he has never been convicted of a violent or serious offense
(EXHIBIT 5, pp. 4-5); and (7), Petitioner's age, currently 53 years
old "reduces the probability of recidivism." Those regulatory factors
absolutely were not considered, violating Petitioner's right to due
process.

As to suitability factor 8, in spite of reading letters of
support from Petitioner's mother offering housing and financial
support (HT 19:15-22) and having a firm job offer (HT 20:6-20), and
additional offers of support from family member, definitely falling
under "realistic plans for release" (Cal. Code Regs., tit. 15, §
2402(d)(8)), the Board criticized Petitioner's correspondence with
halfway houses and offer of residence and assistance from his ex-
wife (HT 56:23-57:23), telling Petitioner he needs a backup plan
with a member of his family. Is not Petitioner's mother a member
of his family?

- 23 -

As to suitability factor nine, the only factor the Board did consider was (Cal. Code Regs., tit. 15, § 2402(d)(9) ["Institutional activities indicate an enhanced ability to function within the law upon release"]), the Board did cover and commend Petitioner for his postconviction behavior and participation in activities, or at least Petitioner's efforts were given lip service as there is no evidence in the decision that this factor was actually considered and weighed in Petitioner's favor (see In re Ramirez, supra, 94 Cal.App.4th, at 571-572). Failure to consider all relevant and reliable factors violated Petitioner's right to due process (In re Scott I (2004) 119 Cal.App.4th 871, 898; In re Ramirez, supra, 94 Cal.App.4th, at 571-572).

d. Opposition By District Attorney's Office Is Not Evidence Of Unsuitability For Parole Unless The Evidence Is Postconviction And Current.

The Board cited the Los Angeles District Attorney's Office opposition to parole as a reason to find Petitioner a current threat to public safety (HT 58:2-5). This is not a factor to be considered.

Both state and federal courts have held that opposition by the district attorney is not a factor within the regulations and guidelines upon which the Board can use to deny parole (Rosenkrantz v. Marshall (C.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 2327085, *12, fn. 14; In re Samble, 2006 WL 401282, *9 [although the Board is to consider comments by the district attorney, nowhere in the statutes or regulations is it supported that parole may be denied, or granted, based on the position of the district attorney. The district attorney's comments of the offense are merely accumulative of immutable factors that lose relevance and reliability over time

- 24 -

against positive progress in prison]).  Thus, it was arbitrary to

rely on opposition from the District Attorney's office to find

Petitioner unsuitable for parole.

e.  It Was An Abuse Of Discretion To Deny Petitioner Parole Based
    On His Parole Plans.

    Cal. Code Regs., tit. 15, § 2402(d)(8) state: "The prisoner

has made realistic plans for release or has developed marketable

skills that can be put to use upon release."  In support of finding

Petitioner unsuitable for parole on this factor, the Board stated

paroling to Ms. Duran's, Petitioner's ex-wife's residence was

unacceptable and Petitioner "would better be served with family

members" (HT 57:21-24).  Petitioner needs a backup plan with a family

member (HT 57:4-6).  This finding is totally contrary to the evidence.

    In support of parole, when reviewing Petitioner's parole plans,

he presented letters of support from family members, including his

mother, who offered housing and financial support (HT 19:15-22).

In addition, Petitioner has a firm job offer (HT 20:6-20), and

additional offers of support from family members, to include his

daughter (HT 36:7-22).  As a "backup plan" Petitioner received

correspondence from halfway houses (HT 39:23-27).

    It is beyond comprehension how the Board can read letters of

support into the record from Petitioner's mother offering residence

and financial assistance, as well as letters from other family

members, then in the decision turn around and tell Petitioner his

parole plans are insufficient because he needs a "backup plan" with

family members.  Once again proving the decision to find Petitioener

unsuitable for predetermined then going in search of a pretext to

justify a decision already made, being a farce and a sham, violating

Petitioner's right to due process.

f.  Petitioner's Non-Violent And Non-Serious Convictions Are Not
    Evidence Upon Which Parole Can Be Denied.

Under suitability factors to be considered, Cal. Code Regs.,
tit. 15, § 2402(d)(1) states: "The prisoner does not have a record
of assaulting others as a juvenile or committing crimes with a
potential of personal harm to victims." And § (6) states: "The
prisoner lacks any significant history of violent crime." Conversely,
under unsuitability factors to be considered, Cal. Code Regs., tit.
15, § 2402(c)(2) states: "The prisoner on previous occasions inflicted
or attempted to inflict serious injury on a victim." Clearly, the
regulations provide a finding of unsuitability if a prisoner has
a history of committing violent crimes, especially if those crimes
started early in life. Petitioner has no such history (EXHIBIT 5,
pp. 4-5).

Petitioner has no prior convictions for a violent or serious
offense (EXHIBIT 5, pp. 4-5). Petitioner was counseled and released
once as a juvenile for malicious mischief, and arrested for marks
on his, which was dismissed. Petitioner's adult arrests consist
of: twice for burglary, both times dismissed; and battery, dismissed.
Petitioner's convictions consist of: theft from an auotmobile;
entering a non-commercial dwelling; one burglary with drug related
offenses, being committed to California Youth Authority; and another
drug related offense. None of these offenses involved Petitioner
inflicting or attempting to inflict serious injury on a victim.
The convictions listed above do not demonstrate a significant history
of violent crime. "[T]here is nothing in the governing statutes
or regulations to support the [Board's] reliance on [Petitioner's]

- 26 -

non-violent criminal record" (<u>In re Mark Smith</u> (2003) 109 Cal.App.4th 489, 505).

Moreover, simply being arrested does not, by itself, constitute reliable evidence of criminal misconduct. Arrests alone are not reliable evidence that the accused committed the crime charged. As one court explained: "Arrests, juvenile dispositions short of [an] adjudication, and the like, can be extremely misleading and damaging if presented to the court as part of a section of the [probation] report which deals with past convictions" (<u>People v. Calloway</u> (1974) 37 Cal.App.3d 905, 908). Like any criminal defendant, Petitioner is, and was, presumed innocent until proven otherwise (Penal Code § 1096). This presumption of innocence is a fundamental principle of our criminal justice system" (<u>Estelle v. Williams</u> (1976) 425 U.S. 501, 503). The Board cannot, silently, try Petitioner for dismissed charges then use those charges to deny him parole. This finding is nothing but more fluff to add to an already flawed decision, further demonstrating the farce and sham, violating Petitioner's right to due process.

g.  <u>The Commitment Offense Is No Longer Reliable Evidence In Predicting Current Or Future Threat To Public Safety.</u>

In reviewing this claim we must not lose sight of the fact that the Board agreed with their own forensic experts when concluding: Petitioner, if released from prison today, "probably poses less risk to society than the average citizen (HT 29:18-20); the Board responding, "That's a conclusion I won't disagree with" (HT 29:20-22).

The only statutory reason to deny Petitioner parole is the "timing and gravity" of the offense (Penal Code § 3041(b)). Our Supreme Court has taken this to mean an indeterminately sentenced

- 27 -

prisoner is to be granted parole unless the prisoner "is presently too dangerous to grant a fixed parole release date" (In re Dannenberg, supra, 34 Cal.4th, at 1080), the "abiding concern that the Board not schedule the release of any life-maximum prisoner who is still dangerous" (Id., at 1088).

In finding Petitioner unsuitable for parole based on the commitment offense a quarter century after the fact it appears the Board was relying on Cal. Code Regs., tit. 15, § 2402(c)(1)(B),(C), and (E), respectively: "The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder"; "The victim was abused, defiled or mutilated during or after the offense"; and "the motive for the crime is inexplicable or very trivial in relation to the offense."

In support of the offense being "carried out in a very dispassionate and calculated manner," the Board cited that the victim "was shot in the head after he stopped to render aid in what he thought were two individuals that were in distress along the side of the freeway" (HT 53:21-26). Petitioner has always maintained, and presented at his sentencing going uncontested by the prosecution, that he never intended to kill Mr. Stewart and the shooting was an accident. There is no evidence otherwise. Regardless, this is an immutable factor that will never change and is not to be viewed and weighed as though the offense happened yesterday how Petitioner was a quarter century ago, but who he is today and his current threat to public safety.

In support of the victim being "defiled," the Board found this defilement took place when the victim was stripped of his clothing

right to due process.

Every crime will have unique facts. Merely reciting those facts, as a prelude to expressions of moral outrage, does not amount to "a preponderance of the evidence" or even "some evidence." The length of time Petitioner has already served, 25 years, combined with custody credits, exceeds the matrix for first degree murder. Regardless of the fact that Petitioner pled guilty to the minimum elements of the offense, once a petitioner convicted of second degree murder "reaches that point" in time such that he would be "eligible for parole if he had been convicted of first degree murder" it is necessary to "consider his offense would still be considered especially egregious for a first degree murder" (In re Rosenkrantz, supra, 29 Cal.4th, at 690, J. Moreno concuring, emphasis in original). The evidence in case at bench suggests Petitioner's intent to force a ride at gunpoint and the shooting was accidental. Such an accidental shooting is no more than the absolute minimum necessary to support the conviction, for which Petitioner was charged and plead guilty to.

Petitioner's offense is not "particularly egregious" for a first degree murder, much less a second degree murder. When one considers Rosenkrantz as a guidepost, the facts so well known they need not be repeated here, and 21 years after his offense, a day apart both a federal district court and a state court held enough is enough, then after 25 years in case at bench, crime for crime, enough is enough.

The commitment offense after twenty-five years, a quarter of a century, a generation, is not reliable evidence of Petitioner's

- 30 -

current threat to public safety (In re Scott II, supra, 133
Cal.App.4th, at 595; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910,
916-917; Irons v. Warden of California State Prison-Solano (E.D.
Cal. 2005) 358 F.Supp.2d 942, 947 fn. 2; Martin v. Marshall (N.D.
Cal. 2006) 431 F.Supp.2d 1038, 1047-1048; Sanchez v. Kane (C.D. Cal.
2006) ___ F.Supp.2d ___, 2006 WL 2252640, *11; Rosenkrantz v. Marshall
(C.D. Cal. 2006) ___ F.Supp.2d ___, 2006 WL 2327085, *16-17).   The
facts of the offense and motive will never change and Petitioner's
liberty should not lie on the chance that some Board in the future
might find the offense and motive not so bad.

The decision to find Petitioner unsuitable for parole, in light
of the Board agreeing with the forensic experts that he is probably
less a threat to public safety than the average citizen in the
community, was arbitrary and an abuse of discretion, violating his
right to due process, reducing the hearing to a farce and a sham.

h.  Evidence The Decision Denying Parole Was A Farce And A Sham.

The decision to deny parole must be based on an honest assessment
of the statutes and regulations (In re Rosenkrantz, supra, 29 Cal.4th
at 654).  An over view of the evidence and decision: (1) the Board's
own forensic experts concluding that Petitioner is less a threat
to public safety than the average citizen in the community and agree
with that conclusion; (2) the Board's regulations clearly stating
that only a prior history of violent offenses are unsuitability
factors but using non-violent convictions; (3) the evidence presented
clearly establishing that Petitioner's parole plans include support
from his mother and family then the Board finding that he needs
"backup parole plans" with family members; (4) the Board stating

- 31 -

that Petitioner's ancient history of disciplinaries was not a factor
for them but may be a factor for the next panel; (5) this Board did
not approve of his parole plans but the next Board may; (6) denying
parole because the district attorney opposed parole when that is
not only a factor but others are granted parole when the district
attorney opposes parole, and (7) the Board failed to consider all
relevant and reliable information and factors, the decision was
arbitrary, the Board disregarding its own regulations to justify
a decision already made, violating Petitioner's right to due process.
"Not only is a biased decision-maker constitutionally unacceptable
but 'our system of laws has always endeavored to prevent even the
probability of unfairness'" (Martin v. Marshall, supra, 431 F.Supp.2d,
at 1049, quoting In re Murchison (1955) 349 U.S. 133, 136).
Petitioner is entitled to have his parole suitability determined
by a Board free from bias or prejudice (O'Bremski v. Maass (9th Cir.
1990) 915 F.2d 418, 422), not by a Board that has a hidden political
agenda, violating Petitioner's right to due process.

### C O N C L U S I O N

Parole decisions turn on a "discretionary assessment of a
multiplicity of imponderables, entailing primarily what a man is
and what he may become rather than simply what he has done"
(Greenholtz v. Inmates of Nebraska Penal and Correctional Institute
(1979) 442 U.S. 1, 10, citation). Additionally, "[T]he behavior
record of an inmate during confinement is critical in the sense that
it reflects the degree to which the inmate is prepared to adjust
to parole release" (Id., at 15). The Board's decision was not only
fixated on immutable factors a quarter century in the past, being

historical relics, but the Board presented no contravening evidence to the psychological forensic expert's finding that Petitioner would not pose a threat to public safety if released from prison at this time, nor did the Board make any rational connections between its findings and Petitioner's **present** threat to public safety.

WHEREFORE, it is respectfully requested that this Court order the respondent to show cause why the writ should not be granted and Petitioner's term fixed, and, why any excess credits should not be applied to any time of parole he may serve.

Date: 24 Oct. 2006

Respectfully submitted,

Victor Montez
Petitioner in pro per

- 33 -

**EXHIBIT 1**
**Part 2 of 3**

EXHIBIT    "1"

255

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

The People of the State of California,

Plaintiff,

v.

VICTOR MANUEL MONTEZ
and
DENISE MARIE MONTEZ,

Defendants

No.  A146105

**INFORMATION**
MURDER (Sec. 187, P.C.) – Ct. I
ROBBERY (Sec. 211, P.C.) – Ct. II
ATTEMPTED KIDNAPPING (Sec. 664/209,
P.C.) – Ct. III

The said VICTOR MANUEL MONTEZ and DENISE MARIE MONTEZ

are
xx/accused by the District Attorney of and for the County of Los Angeles, State of California, by this
information, of the crime of MURDER, in violation of Section 187, Penal Code of
California,
a felony, committed as follows: That the said VICTOR MANUEL MONTEZ and DENISE MARIE MONTEZ

on or about the  10th    day of August, 1980, at and in the County of Los Angeles, State of California,
did willfully and unlawfully , and with malice aforethought murder Michael Stewart, a
human being.

It is further alleged that the murder of Michael Stewart was committed by
defendant VICTOR MANUEL MONTEZ while the defendant was engaged in the com-
mission of robbery in violation of Penal Code Section 211 within the meaning
of Penal Code Section 190.2(a)(17).

It is further alleged that the murder of Michael Stewart was committed by
defendant DENISE MARIE MONTEZ while defendant was an accomplice in the com-
mission of robbery in violation of Penal Code Section 211, within the meaning
of Penal Code Section 190.2(a)(17).

It is further alleged that the murder of Michael Stewart was committed by
defendant VICTOR MANUEL MONTEZ while the defendant was engaged in the attempted
commission of kidnapping in violation of Penal Code Sections 207 and 209,
within the meaning of Penal Code Section 190.2(a)(17).

SEE SPECIAL ALLEGATIONS CONTINUED ON ATTACHED SHEET

Filed in open Superior Court of the State of
California, County of Los Angeles, on motion
of the District Attorney of said County.

DATED:

JOHN J. CORCORAN, Clerk

By
Deputy

761550A2-Rev. 7-77-FS 8-77

JOHN K. VAN DE KAMP, District Attorney
for the County of Los Angeles, State of California

By ........................... xxxxxxxxxxx
Deputy

Filed in open Superior Court of the State of
California, County of Los Angeles, on motion
of the District Attorney of said County
DATED

JOSEPH P. BUSCH, District Attorney
for the County of Los Angeles, State of California
By
Deputy

EXHIBIT "2"

ORIGINAL FILED

APR 15 1982

COUNTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NW R                          HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,    )
                                          )
                    Plaintiff,            )
                                          )    NO. A 146 105
            vs.                           )
                                          )    PLEA
VICTOR MANDEL MONTEZ,                     )
DENISE MARIE MONTEZ,                      )
                                          )
                    Defendants.           )

VAN NUYS, CALIFORNIA, FRIDAY, MARCH 26, 1982, 9:25 A.M.

            Upon the above date, the defendants being

present in court and represented by counsel, CARL BUPKOW, Esq.

representing defendant Victor, IRWIN PRANSKY, Deputy Public

Defender of the County of Los Angeles representing defendant

Denise, the People being represented by IRVIN COHEN, Deputy

District Attorney of the County of Los Angeles, the following

proceedings were held:

            (Bonnie Frankfurt, Official Reporter, CSR #2332.)

            THE COURT:  203, 204, Victor Montez and Denise Marie

Montez.

1

2       MR. PRANSKY: Your Honor, at this time I believe the

3  District Attorney has gotten together and has understood what

4  the plea agreement is.

5       MR. COHEN: That is correct. I have conferred with Mr.

6  Weisberg and it is my understanding that --

7       THE COURT: Can you hear?

8       A DEFENDANT: Not that good.

9       THE COURT: Speak up, Mr. Cohen.

10      MR. COHEN: Yes, Your Honor.

11          Since the matter was previously called, I have

12  discussed the case with Mr. Weisberg who is the trial Deputy

13  District Attorney.

14          It is my understanding that it is agreeable

15  with the People that if the defendant Victor Montez withdraws

16  his previous plea of not guilty to a violation of Section 187

17  of the Penal Code, that being the charge of murder, and enters

18  a guilty plea to that charge as murder in the second degree

19  and admits the use of a firearm, to-wit, a handgun, that this

20  would be agreeable with the People.

21          The defendant's exposure to time in custody would

22  be from 17 years to life.

23          As to the defendant Denise Marie Montez, it is

24  the People's intention to add an additional count, violation of

25  Section 32 of the Penal Code, accessory after the fact.

26          It is my understanding the defendant Denise

27  Montez will enter a plea of guilty to that charge.

28          The maximum exposure to time in custody for

that charge is an open plea, and the maximum time she can serve is up to three years in the State Prison, the sentence being up to the court.

Have I accurately outlined the disposition of this case, Mr. Pransky?

MR. PRANSKY: Yes.

MR. COHEN: Mr. Burkow?

MR. BURKOW: Yes.

MR. COHEN: Mr. Montez, did you understand what I said concerning the disposition of this case?

DEFENDANT VICTOR MONTEZ: Yes, sir, I did.

MR. COHEN: Is it your desire to enter a plea as I outlined in the disposition?

DEFENDANT VICTOR MONTEZ: Yes, sir.

MR. COHEN: At this time do you withdraw your previous plea of not guilty to the murder charge so you can enter this plea?

DEFENDANT VICTOR MONTEZ: Yes, sir.

MR. COHEN: Has anyone made any other promises to you other than what I have said in open court to get you to enter this guilty plea?

DEFENDANT VICTOR MONTEZ: No, sir.

MR. COHEN: Mr. Pransky, may it be stipulated that an additional count be alleged as to your client, a violation of Section 32 of the Penal Code, that being the felony of accessory after the fact?

MR. PRANSKY: So stipulated.

MR. COHEN: Waive further reading of the amendment and

statement of rights as to the amendment?

MR. PRANSKY: So waive further reading.

MR. COHEN: Denise Montez, do you understand what I said as to the disposition of this case concerning yourself?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Is that your desire to proceed in that manner?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Has anyone made any other promises to you other than what I have said in open court to get you to enter this guilty plea?

DEFENDANT DENISE MONTEZ: No.

MR. COHEN: I must advise each of you that if you are not citizens of the United States that the entry of these guilty pleas may have the consequences of deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States.

If you are citizens of the United States, this would not apply to you.

Further, in order for each of you to enter these guilty pleas you must know, understand and give up certain constitutional rights.

Each of you have the right to a trial by jury or, if both sides agree, you can have a trial by the judge.

Each of you have a right to confront witnesses against you in open court and have your attorneys cross-examine these witnesses.

Each of you have a right to present a defense

1  by having witnesses brought into court who would testify for

2  you by using the subpoena powers of the court at no cost to

3  either of you.

4          Finally, each of you have the right against

5  self-incrimination. This means that neither of you have to say

6  anything against yourself.

7          Now, Mr. Victor Montez, have you discussed all

8  these rights with your attorney Mr. Burkow?

9          DEFENDANT VICTOR MONTEZ: Yes, sir, I have.

10         MR. COHEN: After discussing these rights with Mr.

11  Burkow, do you believe you understand them?

12         DEFENDANT VICTOR MONTEZ: Yes, sir.

13         MR. COHEN: Understanding these rights and knowing

14  that you must give them up in order to enter this guilty plea,

15  do you give up these rights?

16         DEFENDANT VICTOR MONTEZ: Yes, sir.

17         MR. COHEN: Mr. Burkow, join?

18         MR. BURKOW: Join in the waivers.

19         MR. COHEN: Denise Montez, have you discussed all these

20  constitutonal rights with your attorney Mr. Pransky?

21         DEFENDANT DENISE MONTEZ: Yes.

22         MR. COHEN: After discussing these rights with Mr.

23  Pransky, do you believe you understand them?

24         DEFENDANT DENISE MONTEZ: Yes.

25         MR. COHEN: Understanding these rights and knowing

26  that you must give them up in order to enter this guilty plea,

27  do you give up these rights?

28         DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Mr. Victor Montez, are you pleading guilty or entering this plea freely and voluntarily?

DEFENDANT VICTOR MONTEZ: Yes, sir, I am.

MR. COHEN: Denise Montez, are you entering this plea freely and voluntarily?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Has anyone used any force or threats of force for anything similar to that against either of you in order to get you to enter these pleas, Victor Montez?

DEFENDANT VICTOR MONTEZ: No.

MR. COHEN: Denise Montez?

DEFENDANT DENISE MONTEZ: No.

MR. COHEN: Victor Montez, is it a correct statement that in the county of Los Angeles you did unlawfully kill another human being with malice aforethought? Is that what you did?

DEFENDANT VICTOR MONTEZ: Pardon me?

MR. COHEN: Is that what you did?

DEFENDANT VICTOR MONTEZ: Yes, I did.

MR. COHEN: In the commission of this particular offense, did you personally use a handgun?

DEFENDANT VICTOR MONTEZ: Yes, I did.

MR. COHEN: Counsel, stipulate to a factual basis for the plea?

MR. BURGOW: Stipulate.

MR. COHEN: Denise Montez, is it a correct statement that you knew after this murder had been committed that you harbored concealed and aided your co-defendant with the intent

that your co-defendant avoided or escaped arrest, trial,

conviction or punishment for this offense?

      Is that what you did?

      DEFENDANT DENISE MONTEZ:  Yes.

      MR. COHEN:  Counsel, stipulate to a factual basis for

the plea?

      MR. PRANSKY:  So stipulated.

      THE COURT:  Excuse me.  Victor Montez, Mr. Montez, do

you understand that at the end of doing your actual time in

custody in the State Prison that you would be subject to parole?

      Do you understand that?

      DEFENDANT VICTOR MONTEZ:  Yes.

      THE COURT:  Mrs. Montez, likewise if you should end up

in State Prison on this matter when you finish doing your

actual time in custody you also will be subject to parole.

      Do you understand that?

      DEFENDANT DENISE MONTEZ:  Yes.

      MR. COHEN:  Victor Mandel Montez, in this case

A 146 105 to a violation of Section 187 of the Penal Code, that

being the felony of murder in the second degree, how do you

plead, guilty or not guilty?

      DEFENDANT VICTOR MONTEZ:  Guilty.

      MR. COHEN:  As to the allegation that in the commission

of this murder you personally used a firearm, do you admit or

deny that?

      DEFENDANT VICTOR MONTEZ:  I admit.

      MR. COHEN:  Counsel, concur in the plea?

      MR. BURKOW:  Concur.

MR. COHEN: Denise Marie Montez, to the violation of Section 32 of the Penal Code, that being the felony of accessory after the fact, how do you plead, guilty or not guilty?

DEFENDANT DENISE MONTEZ: Guilty.

MR. COHEN: Mr. Pransky, concur in the plea?

MR. PRANSKY: Counsel concurs in the plea.

THE COURT: All right. The court finds as to each defendant they have knowingly, understandingly and intelligently given up their constitutional rights. The plea is made freely and voluntarily with an understanding of the nature and the consequences thereof.

The court finds there is a factual basis for the plea. The court accepts the plea.

MR. PRANSKY: April 21st, Your Honor?

THE COURT: 21, no. After the 23rd.

MR. PRANSKY: April 23rd?

THE COURT: 23rd. Probation and sentence hearing April the 23rd, 9:00 o'clock. Both of you are ordered back at that time.

MR. PRANSKY: Your Honor, I want to be heard as to bail in this matter.

THE COURT: Go ahead.

MR. PRANSKY: Your Honor, bail in this matter has been in excess of $50,000.00. In addition thereto, there has been a $20,000.00 bail imposed upon my client on a misdemeanor matter in Ventura County.

She has now entered a plea of guilty to an

offense which carries a maximum of three years. She has been in custody for 19 months. . . .

This matter has gone to the Court of Appeals and it has gone up to the Supreme Court.

Immediately following the Supreme Court's ruling, I started to negotiate this case with Mr. Weisberg, and he came to an agreement that as to my client the worst that they could ever prove would be an accessory after the fact.

This was an unfortunate situation. But I honestly believe that Mr. Montez never intended to kill the victim; that this was strictly and accident.

My client's wife or -- I should say, excuse me -- the wife of Mr. Montez was present at the time; that she was quite frightened. She was upset as well as Mr. Montez being quite upset.

They did not know what to do under the circumstances.

I think that it is only natural that a wife would come to the assistance of her husband.

The extent of her being accessory after the fact is driving the vehicle back to Oxnard where they had originally -- where there original destination.

The victim had agreed to take them to Oxnard, but unfortunately by accident he was killed.

The other part of this accessory after the fact is that my client and her husband temporarily resided in a motel for probably less than 24 hours.

I would urge the court, since she has done 19

9

months, the maximum that she would have to do would be three years.

Although she has a prior record, she has never been to State Prison and I don't believe she has any felony convictions.

What would probably be done in this particular case at the worst would be to impose the mid-term, because I cannot foresee any elements in aggravation.

Considering what her involvement was as a wife who was there to assist her husband under the worst of circumstances, if she got two years in the State Penitentiary she will have already served that time, since one does 16 months on two years.

If the court saw fit to place her on probation, she really would only have approximately five months more to do if she was ever incarcerated in the future.

I think Ventura County on a 647B violation of probation has been totally unreasonable in setting a bail of over $20,000.00.

By the court releasing her on her own recognizance, it would require the Ventura County to come and pick up Miss Montez, and she could clear up that matter prior to probation and sentencing.

I urge the court on behalf of Mrs. Montez to release her on her own recognizance. She has been in the county jail under the worst of circumstances because she has been charged with a 187. She was in a special barracks.

It was only recently that she was allowed to

10

1   work in the kitchen.  Now she stands convicted of  e least

2   serious of all felonies.

3   THE COURT:  What is the People's position?

4   MR. COHEN:  I have no idea what the People's position

5   is, Your Honor.

6   MR. PRANSKY:  I would ask this:  --

6   MR. COHEN:  I was trying to get hold of Mr. Weisberg

7   to see what his position was.  His line has been busy for the

8   last ten minutes while Mr. Pransky has been --

9   MR. PRANSKY:  Additionally, I would add this, Your

10  Honor:  That Mrs. Montez while she was incarcerated did give

11  birth.  There is a child.

12  Her time should be reduced as quickly as

13  possible and she would like to get there as quickly as possible

14  Under the totality of the circumstances, I

15  don't think the court would certainly be misplacing any

16  confidence or abusing its discretion by leaving her out OR.

17  THE COURT:  Okay.  Mr. Burkow, do you wish to be

18  heard on this matter?

19  MR. BURKOW:  Yes, I do have an additional request.

20  THE COURT:  Go ahead.

21  MR. BURKOW:  I understand there is no opposition if

22  somehow there is a way they could visit today under --

23  THE COURT:  They can visit today.  It is agreeable

24  with me if it is agreeable with the sheriff.

25  MR. BURKOW:  Could Your Honor request that through the

26  sheriff somehow that they be permitted to visit today?  If

27  possible, prior to their being taken back --

28

11

THE BAILIFF:  For a couple moments if th   want to sit here, yes.

MR. BURKOW:  We were --

MR. PHANSKY:  We were somewhat promised by Mr. Mayer that they would have some time together.

THE COURT:  Let's try to arrange that.  Have you heard from Mr. Weisberg?

MR. COHEN:  No, I haven't, Your Honor.  I am working on it.

THE COURT:  Let me hold that matter then.  I want to hear from the District Attorney.

MR. BURKOW:  May I then be excused?

THE COURT:  Yes, you are finished.

MR. BURKOW:  Thank you, Your Honor.

MR. COHEN:  Your Honor, on that matter I have just spoken to Mr. Weisberg.  His feeling is that the People oppose an OR release.

THE COURT:  Did he have any reason?

MR. COHEN:  Apparently it is a State Prison case.

THE COURT:  All right.

(Recess taken in this matter.)


11:25 A.M.

THE COURT:    204, Montez:  All right.  In this matter Denise Montez   the OR motion --

MR. COHEN:  Your Honor, in that particular matter apparently it is Mr. Weisberg's position that she should not be released on her own recognizance.

12

Apparently, there is just a very short time until her sentence date. Mr. Weisberg's feeling is that there is a good possibility if she is released on her own recognizance she wouldn't report to the probation officer.

Further, that in the past she has had a failure to appear in Ventura County, and also based on the nature of the offense that she should not be released at this time.

MR. PRANSKY: In answer to that, Your Honor, as stated by Mr. Burkow, there are so many equities in this particular case that I overlooked probably the most important one is the fact that she did while in custody give birth to a child who is in the care of her mother.

Mrs. Montez has worked in the Oxnard area almost all of her life. She has been informed that her mother is ill, that the child is ill.

She failed to appear on that Ventura matter and I think that is on the basis of failing to pay a fine.

I am sure that she has a very keen interest in what happens to her husband as well as what happens to her.

There is just five months more that if she would have to serve, if the court gave her the maximum.

I don't believe that there is any risk that she would not come back to this court. If she has all those matters cleared up in Ventura, and I anticipate that that would summarily take care of the matter in Ventura.

THE COURT: All right. In this matter, the bail is reduced to $2,500.00. Motion to reduce to OR is denied.

MR. PRANSKY: Thank you.

(proceedings adjourned)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO. R                          HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                            Plaintiff, )
                                       )      NO. A 146 105
              vs.                      )
                                       )      REPORTER'S
VICTOR MANDEL MONTES,                  )      CERTIFICATE
DENISE MARIE MONTES,                   )
                                       )
                            Defendants.)

STATE OF CALIFORNIA    )
                       ) ss.
COUNTY OF LOS ANGELES  )

          I, BONNIE FRANKFURT, Official Reporter of the Superior
Court of the State of California, for the County of Los Angeles,
do hereby certify that the foregoing is a true and correct
transcript of all of the admonitions given and waivers and
admissions taken at the time of the taking of the plea in the
above-entitled cause.

          Dated this 13th day of April, 1982.

                                        Bonnie Frankfurt    CSR #2333
                                        Official Reporter

EXHIBIT "3"

ORIGINAL FILED

JUL 13 1982

COUNTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NW R                    HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,      )
                        Plaintiff,          )
                                            )   NO. A 146105
        vs.                                 )
                                            )   STATE PRISON
VICTOR MANUEL MONTEZ,                       )
                        Defendant.          )

VAN NUYS, CALIFORNIA; FRIDAY, MAY 21, 1982; 10:20 A.M.

            Upon the above date, the defendant being

present in court and represented by counsel, CARL BURKOW,

Esq., the People being represented by RALPH MAYER, Deputy

District Attorney of the County of Los Angeles, the following

proceedings were held:

            (Alexandria Walsh, Official Reporter, CSR #4418.)

            THE COURT: Number 302, Victor Montez.

            As of April 23, he had 619 days actually served.

What is the total now?

MR. BURROW: As of -- I did not compute it from the
23rd of April on, but I think that today would make it another
29 days, which would make it 648 days.

THE COURT: Okay.

The court has read and considered the probation
report.

Waive arraignment for judgment?

MR. BURROW: Yes, Your Honor. There is no legal cause.

THE COURT: Do you wish to be heard?

MR. BURROW: I would just briefly ask the court to
understand one thing. I think the sentence is locked in as
far as the sentencing is concerned. I think that's pretty
much preordained. But I think on behalf of Mr. Montez I'd
be less than open with the court if I didn't indicate that this
individual is not the same individual who was arrested on the
night in question. He has undergone many, many changes.

He would hope that the court -- society would
somehow understand that. But at no time was it his intention
to have the incident culminate in the way that it did. It's
bad enough that he admitted that there was a crime involved,
but it certainly in his mind had never but for an accident and
his rash judgment in having a weapon would have never ended
in the way that it did. He would hope that somehow the court
would understand that and the prison authorities would
understand that.

With that it's submitted, Your Honor.

THE COURT: I agree with you. It's unfortunate to see
a person who was honorably discharged, a paratrooper in the

2

1  Special Forces ending up with seventeen to life in the State
2  Prison.  It's very unfortunate, Mr. Montes.  I hope you are
3  successful in the future.
4        Very well.  In this matter probation is denied.
5  You're sentenced to the State Prison for a period of seventeen
6  years to life.  It's fifteen to life plus the enhancement.
7  12022.5, which is an additional two years.  Seventeen to life
8  is the total.
9        Given credit for 468 days actually served plus
10  234 days good time and work time.
11        Motion on remaining counts?
12  MR. MAYER:  To dismiss, Your Honor.
13  THE COURT:  Granted.
14        (Proceedings were concluded.)
15
16
17
18
19
20
21
22
23
24
25
26
27
28

3

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NW R                    HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,

                         Plaintiff,

                                    NO. A 146105

               vs.

                                   REPORTER'S

VICTOR MANUEL MONTEZ,                        CERTIFICATE

                        Defendant.

STATE OF CALIFORNIA    )
                   ) ss
COUNTY OF LOS ANGELES )

       I, ALEXANDRIA WALSH, Official Reporter of the
Superior Court of the State of California, for the County of
Los Angeles, do hereby certify that the foregoing is a true
and correct transcript of the proceedings held at the time of
pronouncing sentence; that the views and recommendations of
the court, if any, were contained therein, pursuant to section
1203.01 of the Penal Code.

       Dated this 6th day of July, 1982.

                              /s/ Alexandria Walsh   CSR #4418
                                Official Reporter

EXHIBIT "4"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

| Date MAY 21 1982 | | DEPT. |
| HONORABLE DAVID HOROWITZ | | ARRUCKLE/HEBLEN |
| SC2 STAIDLE/NICODEM | JUDGE | FRANKFURT/WALSH |
| | Deputy Sheriff | Reporting |

CASE NO. A146105

PEOPLE OF THE STATE OF CALIFORNIA

01 MONTEZ VICTOR SANDELL    137    664    209    01CTS

BOX CHECKED IF ORDER APPLICABLE

NATURE OF PROCEEDINGS    P&S    10-15-80

CRIMINAL PROCEEDINGS ADJOURNED/RESUMED

DEFENDANT ORDERED DELIVERED TO DEPARTMENT OF CORRECTIONS PER SECTION 1203.03 PENAL CODE

PROBATION DENIED. SENTENCE IS IMPOSED AS FOLLOWS:

DEFENDANT TO BE GIVEN CREDIT FOR ___ DAYS IN CUSTODY INCLUDING ___ DAYS GOOD TIME/WORK TIME

ADDITIONAL CONDITIONS OF PROBATION

SHERIFF IS ORDERED TO ALLOW DEFENDANT ___ PHONE CALLS AT DEFENDANT'S OWN EXPENSE.



EXHIBIT "5"

Name _____ Date 11-8-82        I certify that this image ... per master ... on this ficha;
Name _____ Date 11-18-8?

**COURT COPY**

302

SUPERIOR COURT OF CALIFORNIA
COUNTY OF LOS ANGELES
PROBATION OFFICERS REPORT

REPORT SEQUENCE # 1

THE PEOPLE OF THE STATE OF CALIFORNIA, Plaintiff

vs.

VICTOR MONTEZ, Defendant

TRUE NAME:
VICTOR MANUEL MARQUEZ-MONTEZ

| DEPT. | ATTY. | JUDGE |
|---|---|---|
| NW-R | BURKOW | HOROWITZ |
| HEARING | C.I.I. NO. | COURT CASE NO. |
| 4-23-82 | A042891745 | A-146105 |
| DPO | AREA OF FICHE | PROB. NO. |
| CRISMORE | II 1-5-FV | |

ADDRESS (IF IN CUSTODY, EFFECTED ADDRESS WHEN RELEASED) APR 2 3 1982

(LAST)
131 NORTH BALSAM, ___ County Clerk
OXNARD, CA
(NO TELEPHONE) ___
BY M. McCLENNEN, DEPUTY

CHARGED WITH THE CRIME(S) OF
CT. I: 187 PC (MURDER) WITH USE ALLEGATION PURSUANT TO PENAL CODE 12022(A) AND PENAL CODE SECTION 12022.5; CT. II: 211 PC (ARMED ROBBERY) WITH USE ALLEGATION PURSUANT TO PENAL CODE SECTION 12022(A) AND PENAL CODE SECTION 12022.5;

CONVICTED OF THE CRIME(S) OF
CT. I: 187 PC WITH USE ALLEGATION PURSUANT TO SECTION 12022.5 AND ALLEGATIONS OF CT. I
CT. III: 664/209 PC WITH ALLEGATIONS AND ALLEGATIONS OF CT. I. CT. II: 211 PC DISMISSED AT **
CONTINUED TO P&S HEARING.

| | AS PLEA, CRIMES IN JAIL ANTI | THIS CASE |
|---|---|---|
| PLEA | | 819 |

☐ Pre-conviction invest. (131.3 C.C.P.)   ☐ Drug Diversion invest. (1000.1 (a) P.C.)

DISPOSITION
P&S HEARING 4-23-82

COMPANION CASES
DENISE MONTEZ

PERSONAL HISTORY

| AGE | BIRTHDATE | RACE | FORMAL EDUCATION | AGE LEFT SCHOOL |
|---|---|---|---|---|
| 28 | 7-6-53 | MEX/AM | 15 YEARS | 16 |

| MARITAL STATUS | HOME INCLUDES | | | NO. OF DEPENDENTS |
|---|---|---|---|---|
| MARRIED | WIFE, THREE CHILDREN | | | FOUR |

| OCCUPATION | INCOME PER MONTH | WHERE EMPLOYED | | |
|---|---|---|---|---|
| (LAST) ROOFER | Ø | NOT | | |

| HEALTH | CAME TO STATE | CAME TO COUNTY | BRANCH MILITARY SERVICE | KIND OF DISCHARGE |
|---|---|---|---|---|
| GOOD | 1956-1957 | NOT | U.S. ARMY | HONORABLE |

SUPPLIED BY

* CT. III: 664/209 PC (ATTEMPTED KIDNAPPING WITH INTENT TO COMMIT ROBBERY) PURSUANT TO PENAL CODE SECTION 12022(A) AND PENAL CODE SECTION 12022.5.

** APPELLATE COURT HEARING OF 11-25-80.

(AS SUPPLIED BY DEFENDANT AND CONFIRMED BY WIFE.)

DEFENDANT IS THE FOURTH OF NINE CHILDREN BORN TO MANUEL ALVAREZ MONTEZ AND REYNOLDA MARQUEZ-MONTEZ IN ELSA, TEXAS. HE WAS RAISED BY HIS PARENTS IN OXNARD, CALIFORNIA. THE DEFENDANT AND HIS FAMILY CAME TO CALIFORNIA WHEN HE WAS APPROXIMATELY THREE OR



FOUR YEARS OF AGE AND SETTLED IN SATICOY, CALIFORNIA. THEY
SUBSEQUENTLY MOVED TO OXNARD, CALIFORNIA. THE DEFENDANT HAS NEVER
LIVED IN LOS ANGELES COUNTY.
            THE DEFENDANT, HIS WIFE, TWO CHILDREN AND A STEPSON,
LAST RESIDED AT THE HOME OF THE DEFENDANT'S PARENTS IN OXNARD,
CALIFORNIA FOR APPROXIMATELY TWO MONTHS. UPON RELEASE, THE DEFENDANT
EXPECTS TO EITHER RETURN TO OXNARD OR LIVE IN SAN BERNADINO.
            THE DEFENDANT'S PARENTS WERE DIVORCED IN 1973 OR 1974.
THE FATHER IS A MECHANIC-WELDER AND HAS NOT REMARRIED. THE MOTHER'S
OCCUPATION IS UNKNOWN. SHE REMARRIED IN 1980 TO A MR. COLON.
            THE DEFENDANT ATTENDED CHANNEL ISLAND HIGH SCHOOL FOR
APPROXIMATELY ONE YEAR AND DROPPED OUT AT THE AGE OF 16 YEARS WHEN HE
ENROLLED IN THE JOB CORPS FOR APPROXIMATELY 11 MONTHS STUDYING HEAVY
EQUIPMENT OPERATOR. HE LEFT THE JOB CORPS IN NOVEMBER OF 1969.
WHILE IN THE NEW MEXICO STATE PENITENTIARY IN 1977 OR 1978, THE
DEFENDANT OBTAINED HIS GENERAL EDUCATION DIPLOMA THROUGH THE DIVISION
OF VOCATIONAL REHABILITATION. HE RECEIVED A CERTIFICATE FOR WELDING.
HE APPEARS TO BE OF AVERAGE INTELLIGENCE.
            THE DEFENDANT CO-HABITATED WITH LORENA R. MOLINA IN
NEW MEXICO FROM APRIL OF 1975 UNTIL JUNE OF 1976 WHEN HE WAS COMMITTED
TO THE NEW MEXICO STATE PENITENTIARY. HE RETURNED TO THE HOME OF
MISS MOLINA IN APRIL OF 1978 AND REMAINED THERE UNTIL FEBRUARY OF 1979.
THE DEFENDANT CO-HABITATED WITH DENISE GARCIA FROM MAY OF 1979 UNTIL

-2-

1  THEY MARRIED IN APRIL OF 1980.  HE ASSUMED RESPONSIBILITY FOR HIS
2  WIFE'S SON, WHO WAS THEN ONE YEAR OF AGE.  THERE WERE TWO DAUGHTERS
3  BORN OF THIS UNION; ONE ON FEBRUARY 9, 1980, AND THE SECOND IN
4  JANUARY OF 1981.
5          THE DEFENDANT'S    27-YEAR-OLD BROTHER, ANASTACIO,
6  HAD ONE LAW ENFORCEMENT CONTACT AS A JUVENILE FOR CURFEW AND MALICIOUS
7  MISCHIEF.
8          THE DEFENDANT WAS LAST EMPLOYED AS A ROOFER FOR
9  SOUTHERN CALIFORNIA ROOFING COMPANY IN DOWNEY FROM JUNE OF 1980 UNTIL
10 MID-JULY OF 1980.  HE INDICATES THE JOB WAS THEN FINISHED AND HIS
11 SALARY WAS $11.90 PER HOUR.  THE DEFENDANT INDICATES THERE HAS BEEN
12 NO OTHER EMPLOYMENT.  HE PLANS TO RETURN TO ROOFING OR WELDING UPON
13 HIS RELEASE.
14          THE DEFENDANT ENLISTED IN THE UNITED STATES ARMY ON
15 SEPTEMBER 8, 1970, ACHIEVED A RATING OF E-2, AND WAS HONORABLY
16 DISCHARGED ON SEPTEMBER 18, 1972.  HE WAS A PARATROOPER IN THE
17 SPECIAL FORCES.
18          FINANCIAL INFORMATION:
19          THE DEFENDANT LAST PAID RENT OF $75 PER MONTH.  HE
20 OWNS A 1952 GMC, PICK UP VALUED AT $700.  HE INDICATES THE CITY
21 TOWED THE TRUCK AWAY AND ITS WHEREABOUTS ARE NOW UNKNOWN.  HIS
22 FINANCIAL STATUS IS CURRENTLY POOR.
23  -3-

SUBSTANCE ABUSE:

THE DEFENDANT FIRST BEGAN SMOKING MARIJUANA AT THE AGE OF 13 YEARS UTILIZING IT TWO TO THREE TIMES PER WEEK. AT THE AGE OF 13, HE BEGAN SHOOTING HEROIN ON WEEKENDS AT A COST OF FIVE DOLLARS PER CAPSULE. THIS HABIT SUBSEQUENTLY PROGRESSED UNTIL HIS DAILY USE AMOUNTED TO $200 PER DAY. AT THE AGE OF 15, HE BEGAN TAKING VALIUMS "WHENEVER THERE WAS NO STUFF". THE DEFENDANT TOOK QUAALUDES ONE TIME ONLY AT THE AGE OF 19 YEARS. HE SUPPORTED HIS HABIT THROUGH ODD JOBS AND BURGLARIES. THE DEFENDANT HAS NEVER OVERDOSED.

FROM MAY OF 1979 THROUGH MAY OF 1980, THE DEFENDANT WAS IN THE VICTORY OUT REACH PROGRAM LOCATED ON STAR ROUTE 27, HELENDALE, CALIFORNIA. THE MAIN OFFICE IS LOCATED AT 747 MOUNT VERNON AVENUE IN SAN BERNADINO.

GANG ACTIVITY:

THE DEFENDANT DENIES ANY GANG AFFILIATIONS.

PRIOR RECORD:

SOURCES OF INFORMATION:
DEPARTMENT OF JUSTICE (2-24-82), CII (4-16-82),

DEFENDANT.

JUVENILE HISTORY:
OXNARD PD - MALICIOUS MISCHIEF, C&R    N/A
OXNARD PD - MARKS ON ARM.    N/A

AGE 9
AGE 13

-4-

1   (DEFENDANT SAYS MATTER DISMISSED AS HE STATED HE WAS GOING
    INTO THE JOB CORPS.)

2

        ADULT HISTORY:

3   3-6-73        VENTURA SO - 459 PC (BURGLARY) - 4-26-73, DISMISSED IN
                  FURTHERANCE OF JUSTICE.

4

5   4-13-73       VENTURA SO - 11550 H&S (UNDER INFLUENCE CONTROLLED
                  SUBSTANCE) - 11364 H&S (POSSESSION CONTROLLED SUBSTANCE
                  PARAPHERNALIA) - 459 PC (BURGLARY). 1-7-74, CONVICTED
6                 OF 11530 H&S (POSSESSION MARIJUANA) - CYA COMMITMENT.

7   4-17-73       VENTURA SO - 459 PC (BURGLARY) - DISMISSED.
                  4-26-73, PG, 602.5 PC (ENTERING NON-COMMERCIAL
8                 DWELLING) - ONE YEAR SUMMARY PROBATION.

9   10-19-73      VENTURA SO - 11360 H&S (SELL OR TRANSPORT MARIJUANA/
10                HASH) FTA.

11  1-16-74       VENTURA SO - 242 PC (BATTERY) -

12      (DEFENDANT STATES THE INCIDENT HAPPENED WHILE IN COUNTY JAIL
        AND MATTER WAS DISMISSED.)

13  DATE UNKNOWN   NEW MEXICO - 459 PC (THEFT FROM MOTOR VEHICLE) -
                   COMMITTED TO NEW MEXICO STATE PENITENTIARY. RELEASED
14                 4-22-78.

15      (DEFENDANT STATES HE TURNED HIMSELF IN AS HE WAS AWARE OF A
16      BENCH WARRANT HAVING BEEN ISSUED.  HE SAYS HE WAS DISHONORABLY
        DISCHARGED FROM THE CALIFORNIA YOUTH AUTHORITY JURISDICTION ON
17      JUNE 3, 1977 WHEN COMMITTED ON THIS CHARGE.)

18  PRESENT OFFENSE:

19          DEFENDANT WAS ARRESTED ON AUGUST 11, 1980 AT 12:00 NOON

20  BY THE LOS ANGELES POLICE DEPARTMENT WITH THE ASSISTANCE OF THE

21  OXNARD POLICE DEPARTMENT AT THE PLAZA MARINA HOTEL, LOCATED AT

22  711 WEST HUENEME, OXNARD AND BOOKED FOR 187 OF THE PENAL CODE (MURDER).

23  AT THE TIME OF THE ARREST, THERE WAS AN OUTSTANDING OXNARD WARRANT

    -5-

    76C692G - PROB. G.A. - FS 2-82

1  NUMBER 013334AM01 WITH BAIL SET AT $75. THERE WAS NO BAIL SET ON
2  HIS CURRENT ARREST. HE WAS CHARGED ON THE INFORMATION WITH COUNT
3  ONE, 187 PENAL CODE (MURDER) DURING THE COMMISSION OF A ROBBERY AND
4  KIDNAPPING PURSUANT TO PENAL CODE SECTION 190.2(A)(17); COUNT TWO,
5  211 PENAL CODE (ROBBERY); COUNTS THREE, 664/209 PENAL CODE (ATTEMPTED
6  KIDNAPPING TO COMMIT ROBBERY). ALL THREE COUNTS ALLEGED THE USE OF
7  A FIREARM PURSUANT TO SECTION 12022.5 OF THE PENAL CODE AND PURSUANT
8  TO SECTION 12022(A) OF THE PENAL CODE. IT WAS ALSO ALLEGED, IN ALL
9  THREE COUNTS, DEFENDANT INFLICTED GREAT BODILY INJURY AS DEFINED IN
10  SECTION 12022.7 OF THE PENAL CODE. COUNT TWO WAS DISMISSED ON
11  OCTOBER 1, 1980 AND UPHELD BY THE APPELLATE COURT ON NOVEMBER 25, 1980.
12  ON MARCH 26, 1982, THE DEFENDANT PLED GUILTY TO COUNT ONE WITH THE
13  USE ALLEGATION PURSUANT TO PENAL CODE SECTION 12022.5. REMAINING
14  COUNTS AND ALLEGATIONS WERE CONTINUED TO THE PROBATION AND SENTENCING
15  HEARING.
16  FACTS:   BASED ON THE ARREST REPORT, A WITNESS, MARK LABASH,
17  INFORMED LOS ANGELES COUNTY SHERIFFS THAT HE HAD OBSERVED TWO MALE
18  SUSPECTS ON AUGUST 10, 1980 AT 1:48 A.M. DRAGGING A BODY TO THE
19  SHOULDER OF THE VENTURA FREEWAY WEST OF VALLEY CIRCLE OFF RAMP. AT
20  4:00 A.M. ON THE SAME DATE, DEPUTIES OBSERVED THE VICTIM WITH A
21  GUNSHOT WOUND TO HIS UPPER TORSO AND LYING IN A SUPINE POSITION ON
22  THE FREEWAY SHOULDER. DEATH WAS INDICATED AS OCCURRING AT 2:18 A.M.
23  THE VICTIM'S PANTS WERE OPEN AND PARTIALLY DOWN, THE ZIPPER WAS

Con't

-6-

PARTIALLY BROKEN AND THE TOP BUTTON WAS PULLED OFF. A BULLET HOLE
WAS OBSERVED BEHIND HIS RIGHT EAR AND A GUITAR PICK WAS STUCK TO
HIS LEFT CHEEK WITH BLOOD. MRS. IRMA CEBALLOS (22), 237 LARK STREET,
OXNARD, CALIFORNIA, INFORMED OFFICERS AT THE LOS ANGELES POLICE
DEPARTMENT, WEST VALLEY STATION, ON AUGUST 11, 1980 THAT AT
APPROXIMATELY 10:30 P.M. ON AUGUST 9, 1980, SHE AND TWO ASSOCIATES,
VICTOR MONTEZ, AND DENISE MONTEZ, HAD BEEN VISITING SAN BERNARDINO.
AND HAD STOPPED IN SAN FERNANDO VALLEY FOR A PIZZA ON THEIR RETURN
TRIP. WHEN THE THREE ATTEMPTED TO START THEIR BROWN STATION WAGON
AFTERWARDS, IT FAILED TO START AND THEY DECIDED TO HITCHHIKE ON THE
VENTURA FREEWAY. THEY FIRST APPROACHED AN UNKNOWN MALE APPROXIMATELY
ONE-HALF HOUR LATER. SUBSEQUENTLY, IT WAS AGREED THAT THE WITNESS
AND MRS. MONTEZ WOULD APPEAR AS TWO FEMALES STRANDED ON THE FREEWAY
WHILE MR. MONTEZ WOULD APPROACH ANY MOTORIST WHO STOPPED AND EXHIBIT
A FIREARM HE CARRIED IN HIS WAISTBAND. THE DEFENDANT HID IN A BUSH
AREA WHILE THE WOMEN HITCHHIKED. THE VICTIM APPROACHED IN A SILVER
DATSUN, STATION WAGON, LICENSE NUMBER 828YHP, CONVERSED WITH
MRS. MONTEZ, THEN ALLOWED THEM TO ENTER HIS VEHICLE. THE WITNESS
ENTERED THE FRONT SEAT AND MRS. MONTEZ ENTERED THE REAR SEAT WHILE
BECKONING TO THE DEFENDANT WHO WAS HIDING IN THE BUSHES. THE
DEFENDANT RAN TO THE VEHICLE BRANDISHING A SMALL CALIBER FIREARM
AND ENTERED THE REAR SEAT OF THE VEHICLE. HE THEN POINTED THE
WEAPON AT THE REAR PORTION OF THE VICTIM'S HEAD AND TOLD HIM TO TAKE

Con't.

-7-

JCCC927 - PROS. SA - F3 2 X3

1  THEM TO OXNARD OR HE WOULD KILL HIM. THE DEFENDANT FIRED ONE ROUND,
2  WITHOUT WARNING, STRIKING THE VICTIM APPROXIMATELY IN THE LOWER RIGHT
3  OF HIS HEAD. THE VICTIM FELL FORWARD, THE DEFENDANT EXITED THE
4  REAR PASSENGER DOOR AND OPENED UP THE FRONT PASSENGER DOOR. THE
5  DEFENDANT THEN DRUG THE VICTIM'S BODY ACROSS THE FRONT SEATS FROM
6  THE DRIVER'S SIDE AND SECRETED THE BODY BENEATH AN OVERHANGING TREE
7  AND SHRUB AREA. THE WITNESS THEN OBSERVED THE DEFENDANT GOING THROUGH
8  THE VICTIM'S GARMENTS BUT WAS UNSURE OF WHAT WAS REMOVED. THE
9  WITNESS AND MRS. MONTEZ HAD ALSO EXITED THE VEHICLE. THE DEFENDANT
10  THEN INSTRUCTED THE WITNESS TO RE-ENTER THE VEHICLE AND TOLD HIS
11  WIFE TO WEAR GLOVES SO AS NOT TO LEAVE HER FINGERPRINTS ON THE VEHICLE.
12  HE THEN ENTERED THE REAR SEAT AND INSTRUCTED HIS WIFE TO DRIVE THE
13  VEHICLE TO 456 CHANNEL ISLAND BOULEVARD IN OXNARD. UPON ARRIVAL AT
14  THE RESIDENCE WHICH IS OCCUPIED BY THERESA RAMIREZ, MRS. MONTEZ
15  REMOVED CLOTHING WHICH HAD BELONGED TO THE VICTIM AND ATTEMPTED TO
16  WASH THEM. THE WITNESS WAS UPSET AND THE DEFENDANT COMFORTED HER
17  INDICATING THEY COULD NOT BE IDENTIFIED AND THERE WAS NO WAY TO
18  TRACE THEIR LOCATION. WHEN THE WITNESS SUGGESTED THEY TURN THEMSELVES
19  IN, THE DEFENDANT THREATENED HER WITH ACTS OF VIOLENCE AND STATED SHE
20  WOULD BE KILLED IF SHE CONTACTED THE POLICE. THE WITNESS THEN
21  STATED THE WEAPON HAD BEEN SOLD TO AN UNKNOWN FEMALE IN THE OXNARD
22  AREA AND A GUITAR, WHICH HAD BEEN TAKEN FROM THE VICTIM'S VEHICLE,
23  WAS ALSO SOLD TO SOMEONE IN THE OXNARD AREA. THE WITNESS THEN

Cont

-8-

1 WILLINGLY ACCOMPANIED LOS ANGELES POLICE DEPARTMENT DETECTIVES TO THE
2 OXNARD POLICE STATION AND IDENTIFIED A PHOTO OF THE DEFENDANT. AT
3 APPROXIMATELY 12:10 P.M. ON AUGUST 11, 1980, THE WITNESS IDENTIFIED
4 THE VICTIM'S VEHICLE AT 149 ELIZA COURT IN THE CITY OF OXNARD.
5 THERESA RAMIREZ LATER INFORMED OFFICERS THAT MR. AND MRS. MONTEZ
6 HAD LEFT HER RESIDENCE AT APPROXIMATELY 4:00 P.M. ON AUGUST 10, 1980.
7 MRS. RAMIREZ INFORMED OFFICERS THAT SHE HAD ORDERED THE DEFENDANT
8 AND HIS WIFE OUT OF HER HOME AS THEY WERE ATTEMPTING TO SELL STOLEN
9 GOODS AND STATED THEY COULD BE LOCATED AT THE PLAZA MARINA HOTEL.
10 LOS ANGELES POLICE OFFICERS WENT TO THAT LOCATION ACCOMPANIED BY
11 OXNARD POLICE OFFICERS AND WERE INFORMED THE DEFENDANT AND HIS WIFE
12 WERE OCCUPYING APARTMENT NUMBER 25. THE DEFENDANT ANSWERED THE DOOR
13 TO APARTMENT 25 AND A REVOLVER WAS OBSERVED ON THE NIGHTSTAND. BOTH
14 THE DEFENDANT AND HIS WIFE WERE THEN ARRESTED.                    END

15 DEFENDANT'S STATEMENT:
16             THE DEFENDANT HAS NOT SUBMITTED A WRITTEN STATEMENT.
17 ORALLY, HE STATES THAT HE, HIS WIFE, AND IRMA CEDALLOS WERE LOOKING
18 FOR A RIDE IN THE SAN FERNANDO VALLEY WHERE HE HAD DRIVEN HIS CAR
19 AND IT HAD BROKEN DOWN. THEY WERE EN ROUTE TO OXNARD FROM
20 SAN BERNADINO. HE SAW A GUY PARKED AT A GAS STATION AND OFFERED
21 HIM $20 FOR A RIDE, BUT THE PERSON HAD NO GAS. THEY THEN WALKED ON
22 TO THE 101 FREEWAY AND THE WOMEN WERE TOLD TO ATTEMPT TO GET A RIDE
23 WHILE THE DEFENDANT HID. HE STATED HE WOULD CATCH THEM LATER, A

-9-

1  CAR STOPPED AND OFFERED THEM A RIDE. THE DEFENDANT THEN CHANGED HIS
2  MIND, RAN TO THE CAR, AND PUSHED HIS WIFE OUT OF THE WAY KNOCKING
3  HER DOWN. THE VICTIM WAS SCARED AND THE DEFENDANT TOLD HIM THAT
4  "NOTHING WOULD HAPPEN TO HIM. JUST GIVE ME A RIDE." THE VICTIM
5  AGREED AND THE DEFENDANT LET HIM GO. HE STATES HE HAD A GUN IN HIS
6  HAND AND, WHEN THE VICTIM ADJUSTED HIMSELF IN HIS SEAT, HE ACCIDENTLY
7  HIT THE GUN WHICH WENT OFF AND KILLED HIM. THE DEFENDANT TOOK THE
8  VICTIM OUT OF THE CAR, PUT HIS BODY IN THE BUSHES, RE-ENTERED THE
9  VEHICLE AND DROVE TO OXNARD. HE DENIES HAVING GONE THROUGH THE
10 VICTIM'S POCKETS AS HE STATES HE HAD NO INTENTION OF ROBBING OR
11 HURTING ANYONE.
12 INTERESTED PARTIES:
13           CYNTHIA STEWART, VICTIM'S SISTER, INDICATES THE
14 VICTIM WAS SIX FEET TWO INCHES, APPROXIMATELY 170 POUNDS, AGE 33
15 YEARS, SINGLE WITH NO DEPENDENTS. SHE STATES THAT IN 1976 HE HAD
16 AN ATTACK IN HIS LEFT EYE OF HISTOPLASMOSIS WHICH IS AN EYE DISEASE
17 AND CAUSES BLINDNESS. SHE INDICATED THE ILLNESS CLOGS ONE'S VISION
18 AND THAT THE DOCTOR HAD STATED THIS WAS THE WORST CASE EVER SEEN.
19 SHE STATES HER BROTHER WAS RETURNING TO ALTADENA FROM BAND PRACTISE
20 IN WOODLAND HILLS. THE CAR WAS SUBSEQUENTLY RETURNED, BUT WAS TOTALLY
21 STRIPPED. MISS STEWARD RECEIVED A CALL FROM THE OXNARD POLICE
22 DEPARTMENT INDICATING HER BROTHER'S CAR HAD BEEN FOUND; HOWEVER, SHE
23 DID NOT KNOW AT THE TIME THAT THE HOMICIDE VICTIM WAS ACTUALLY HER

-10-

TC-0120 - PROB. 5A - PC 2-82

BROTHER. SHE STATES THERE WAS INSURANCE WHICH COVERED HER BROTHER'S FUNERAL EXPENSES. ALSO, MISS STEWART WAS INFORMED BY THE POLICE DEPARTMENT OF HER ELIGIBILITY FOR VICTIM'S COMPENSATION.

EVALUATION:

THE DEFENDANT, WHO INDICATES HIS ONLY EMPLOYMENT WAS FOR A PERIOD OF ONE AND ONE-HALF MONTHS SINCE HIS RELEASE FROM THE NEW MEXICO STATE PENITENTIARY IN 1978, HAS HAD THE ADVANTAGE OF BEING THE PRODUCT OF AN INTACT FAMILY ENVIRONMENT UNTIL THE AGE OF 20 OR 21 YEARS. HOWEVER, HE WAS COMMITTED TO THE CALIFORNIA YOUTH AUTHORITY SOON AFTER HIS 21ST BIRTHDAY FOR POSSESSION. HIS ONLY OTHER CONTACT WITH LAW ENFORCEMENT HAS BEEN OF A MODERATE NATURE, HE COMES FROM A LARGE FAMILY AND NO OTHER MEMBERS ARE INDICATED AS HAVING BEEN ARRESTED. THE DEFENDANT HAS OBTAINED THE EQUIVALENT OF A HIGH SCHOOL DIPLOMA AND HAS HAD TRAINING AS A HEAVY EQUIPMENT OPERATOR AND TRAINING IN WELDING, YET NO ATTEMPTS WERE MADE TO OBTAIN CONTINUAL EMPLOYMENT. THE DEFENDANT HAS BEEN HEAVILY INVOLVED IN THE USE OF NARCOTICS AND HAS BEEN ADDICTED TO SAME FOR THE MAJORITY OF HIS LIFETIME. HE INDICATES REMORSE OVER THIS CURRENT MATTER AND DENIES ANY INTENT OF HARM TO ANYONE. THE VICTIM WAS A YOUNG MAN WITH NO DEPENDENTS; HOWEVER, IT APPEARS HE MAY HAVE HAD A VISION PROBLEM AND POSSIBLY NOT OBSERVED THE DEFENDANT APPROACHING HIS VEHICLE.

THIS WAS A CRIME OF A VIOLENT NATURE AND THE DEFENDANT'S

-11-

1  STATEMENT OF FEELING REMORSE IS IN DIRECT CONTRADICTION TO STATEMENTS

2  OBTAINED FROM THE ONLY EYEWITNESSES TO THE INCIDENT.

3           SENTENCING CONSIDERATIONS:

4               DUE TO THE CHARGE OF MURDER WITH THE USE ALLEGATION

5  HAVING BEEN FOUND TRUE, THE DEFENDANT IS INELIGIBLE FOR PROBATION

6  PURSUANT TO SECTION 1203.06 OF THE PENAL CODE AND 1203.075 OF THE

7  PENAL CODE.

8           CIRCUMSTANCES IN AGGRAVATION:

9            1.  PRE-PLANNED USE OF A FIREARM.

10            2.  A VIOLENT CRIME WHICH CAUSED THE DEATH TO THE
               VICTIM.

11            3.  DEFENDANT THREATENED THE VICTIM WITH A FIREARM.

12            4.  DEFENDANT ATTEMPTED TO CONCEAL THE VICTIM FROM

13                 SIGHT.

14            5.  THE DEFENDANT TAMPERED WITH EVIDENCE USEFUL IN
               THE INVESTIGATION OF THIS CRIME.

15           CIRCUMSTANCES IN MITIGATION:

16            1.  DEFENDANT'S VEHICLE WAS INOPERATIVE.

17            2.  THE DEFENDANT IS A HEROIN ADDICT.

18           CIRCUMSTANCES IN MITIGATION AND IN AGGRAVATION SUPPORT

19  A MOTION FOR THE HIGHER BASED TERM.

20

21  RECOMMENDATION:

22              IT IS RECOMMENDED THAT PROBATION BE DENIED AND THAT

23  -12-

1  DEFENDANT BE SENTENCED TO STATE PRISON WITH PRE-IMPRISONMENT OF

2  619 DAYS.

3  RESPECTFULLY SUBMITTED,

4  KENNETH E. KIRKPATRICK
   PROBATION OFFICER

5

6  BY _Lynette Grimore_

7  LYNETTE GRISMORE, DEPUTY
   EAST SAN FERNANDO VALLEY AREA OFFICE

8  901-3979

9

   READ AND APPROVED:                    I HAVE READ AND CONSIDERED
10                                        THE FOREGOING REPORT OF THE
                                          PROBATION OFFICER.
11

12 ART KEENER, SDPO

13 (SUBMITTED 4-16-82)          JUDGE OF THE SUPERIOR COURT
   (TYPED 4-20-82)
14 LG:BS        (6)

15 -13-

16

17

18

19

20

21

22

23

PROBLANG - PROB. 5A - PS 2 92

# EXHIBIT 1
# Part 3 of 3

EXHIBIT "6"

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )
                      )
VICTOR MONTEZ )
                      )
_____)

CDC Number C-48215

# INMATE COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 31, 2006

10:57 A.M.

PANEL PRESENT:

JACK GARNER, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

VICTOR MONTEZ, Inmate
KATERA E. RUTLEDGE, Attorney for Inmate
HERBERT LAPIN, Deputy District Attorney
TWO CORRECTIONAL OFFICERS, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

_____  No    See Review of Hearing
_____  Yes   Transcript Memorandum

Ramona Cota                    Peters Shorthand Reporting

53

1    CALIFORNIA BOARD OF PAROLE HEARINGS

2         D E C I S I O N

3         DEPUTY COMMISSIONER SMITH:  We are back

4    on the record.  Everyone previously identified

5    is back in the hearing room.

6         PRESIDING COMMISSIONER GARNER:  Very

7    good, thank you.  It's 12:20 p.m. in the matter

8    of Victor Montez, C Charles 48215.  Mr. Montez,

9    the panel has reviewed all the information

10   received from the public and relied on the

11   following circumstances in concluding you are

12   not suitable for parole and would pose an

13   unreasonable risk of danger to society or a

14   threat to public safety if you were released

15   from prison.  I want to tell you right out of

16   the chute we're going to deny you for a year and

17   we'll talk a little bit more about that as we

18   proceed through the hearing.  We started with

19   the commitment offense.  Although we considered

20   many factors we started with the commitment

21   offense and we felt that the offense was carried

22   out in an especially cruel manner.  The victim,

23   Michael Stewart, 33 years of age, was shot in

24   the head after he stopped to render aid to what

25   he thought were two individuals that were in

26   distress along the side of the freeway.  The

27   VICTOR MONTEZ C-48215  DECISION PAGE 1  05/31/06

54

1  offense was carried out in a very dispassionate

2  and calculated manner in that the first vehicle

3  to stop was going to be the target.  It was

4  pretty clearly drawn that you put the two women

5  out on the freeway as a lure and that you were

6  hiding in the bushes and unfortunately it was

7  Mr. Stewart that was the first Samaritan that

8  decided to stop and help.  The victim was

9  defiled after the offense in that he was

10  stripped, his body was concealed along the

11  shoulder of the Ventura Freeway and just

12  basically left in the shrubbery.  The motive for

13  the crime, when you consider the magnitude of

14  the offense, it was very trivial.  You had the

15  car.  The worst case scenario you could have

16  just ordered him out to the side of the freeway

17  but that's neither here nor there at this point

18  in time.  The conclusions were drawn from the

19  statement of facts that were taken from the June

20  2002 calendar in that:

21          "On August 9, 1980 Montez and two

22          women, one of whom was his wife,

23          were on their way home, on their

24          way to Oxnard when their car

25          became disabled.  The two women

26          began to hitchhike on the Ventura

27  **VICTOR MONTEZ C-48215  DECISION PAGE 2  05/31/06**

55

1        Freeway while Montez hid in the

2        bushes.  It was agreed that the

3        two women would appear as two

4        females stranded on the freeway

5        while Montez would approach the

6        motorist who stopped and exhibit a

7        firearm he carried in his

8        waistband.  The victim, Michael

9        Stewart stopped for the women.

10       The women entered the car and Ms.

11       Montez entered the rear seat while

12       beckoning to Montez who was still

13       hiding in the bushes.  He ran to

14       the car brandishing a small

15       caliber firearm and entered the

16       rear seat of the car.  He pointed

17       the firearm at the back of the

18       victim's head and told him to

19       drive them to Oxnard or he would

20       kill him.  Montez then fired,

21       striking and killing the victim.

22       Montez exited the car, dragged the

23       body from the car and secreted the

24       body beneath an overhanging tree

25       and shrubs.  After leaving the

26       body Montez, his wife and the

27    VICTOR MONTEZ C-48215  DECISION PAGE 3  05/31/06

56

1          other female companion drove the

2          victim's car to Oxnard.   Montez

3          was arrested on August 11, 1980."

4   So far as your previous record the panel noted

5   at the time that you did have an escalating

6   pattern of criminal conduct and that you had

7   failed previous grants of probation.  And that

8   you had failed from society's previous attempts

9   to correct your criminality through the CYA

10  commitment.  So far as the social history the

11  panel noted -- the criminality, excuse me.  The

12  controlled substances and entering a non-

13  commercial dwelling which was an offense, a

14  602.5 offense, which was associated with a

15  burglary, which was dismissed in the interest of

16  justice.  Excuse me.  As far as your

17  institutional behavior you have programmed very

18  well.  So far as the misconduct goes it is old

19  and dated.  The last 128, you've had a total of

20  four, was May 26, 1989 and the last 115 was

21  September 16, 1995 for non-performance of work.

22  So far as the psychological report prepared by

23  Dr. Macomber in May 2006, it's favorable.  So

24  far as your parole plans the one thing that we

25  wanted to note is we did take into consideration

26  the letter that you had from essentially the

27  **VICTOR MONTEZ C-48215  DECISION PAGE 4  05/31/06**

57

1    halfway house is for an interview only.  And we
2    realize that very few of the halfway houses will
3    give you a firm commitment but one of that
4    things that really amplifies is the need to have
5    a firm backup parole plan that's very
6    comprehensive with a member of the family.  Or
7    two; you can certainly have more than one.  Also
8    if you are concerned about paroling back to the
9    county of the commitment offense, if the panel
10   thinks that you have a better shake and a better
11   chance going to another location to another
12   county we have the authority to parole you into
13   that county.  So in this situation it looks like
14   the lion's share of your family is in the
15   Ventura County area.  So if your letters come
16   forward from Ventura County with respect to
17   offers of housing, those would coincide with the
18   job offer that you have from Mr. Flores because
19   I believe that the job offer and his business is
20   in Ventura County.  So get started as soon as
21   you can.  I will share with you that the panel
22   does have some concerns about the offer of
23   housing from Martha Duran.  We think you would
24   be better served with family members.  That's
25   not to say it would be excluded.  We're just
26   thinking that the family members are more of a
27   **VICTOR MONTEZ C-48215  DECISION PAGE 5  05/31/06**

58

1   positive and might serve your interest in a more

2   positive way. You were here, you heard the

3   response from the representative from the Los

4   Angeles County District Attorney's Office

5   indicating opposition to parole. So what we're

6   going to do at this point is we're going to

7   encourage you to continue your AA/NA, whichever

8   is available, and continue to earn the positive

9   chronos. And with that I'll ask Commissioner

10  Smith if he has got additional comments.

11      DEPUTY COMMISSIONER SMITH:  Sir, quite

12  frankly with regard to the residential plan with

13  Ms. Duran. The parole division probably would

14  not approve that since you no longer have a

15  relationship. She's an ex-wife and that you

16  don't have a history of residing. It might be

17  fine with the next Board but from my experience

18  with the parole division they probably would not

19  approve that.

20      INMATE MONTEZ:  I understand.

21      DEPUTY COMMISSIONER SMITH:  You know, I

22  am certainly not being critical of your efforts,

23  your efforts are all positive. But I am just

24  suggesting that in this next year spend time to

25  really, really firm up the plans. You have got

26  a lot of options. You know, I'd focus on the

27  VICTOR MONTEZ C-48215   DECISION PAGE 6   05/31/06

59

1  strongest ones.

2         INMATE MONTEZ:  Okay.

3         DEPUTY COMMISSIONER SMITH:  You are

4  certainly moving in the right direction.  You

5  may be disappointed and if you are I certainly

6  understand that.  But you are headed in the

7  right direction, in my opinion.  I believe that

8  all things being equal with some improvements

9  that at your next hearing you will be a much

10  stronger candidate.  A strong candidate today

11  but a much stronger candidate the next time.  So

12  don't lose focus on what your objective is --

13         INMATE MONTEZ:  No.

14         DEPUTY COMMISSIONER SMITH:  -- which is

15  to get out of here.  Okay?

16         INMATE MONTEZ:  Yes.

17         DEPUTY COMMISSIONER SMITH:  I wish you

18  well sir.  Good luck to you.

19         INMATE MONTEZ:  Thank you.

20         PRESIDING COMMISSIONER GARNER:  I'll go

21  ahead and echo the comments.  I am certainly

22  glad I asked about letters from your family now

23  because they really are -- they are more of an

24  asset than you will ever know.  We have a lot of

25  inmates that come before us that basically have

26  no one on the outside, absolutely no one on the

27  VICTOR MONTEZ C-48215  DECISION PAGE 7  05/31/06

60

1   outside.  They have either outlived them all or

2   the family has just basically written them off.

3   So you have got an asset there.  It's going to

4   be your strength.  It's going to be your social

5   and support network.  Your employer is not going

6   to provide that, you're family is going to

7   provide your support network.  The other thing,

8   that whatever family member you think offers you

9   the best plan for yourself, it would be helpful

10  also to have that family member identify AA/NA

11  resources that are immediately in the

12  neighborhood near them or the closest possible

13  to them.  And whether they're along public

14  transportation routes or they are going to offer

15  to drive you there.  Those are all things that

16  shore you up as a better candidate.  I echo his

17  sentiment.  I hope that you are not too

18  disappointed.  Keep your focus because right now

19  the only thing that in my mind you have to work

20  on is shoring up the parole plans.  I'll tell

21  you, don't slip on any banana peels calling a 15

22  or a 128 because that's not going to help you.

23  You've got some distance between those and you

24  don't have to worry abut them right now.  They

25  are not an issue at least with this panel and I

26  can't see them being an issue with the next

27  **VICTOR MONTEZ C-48215  DECISION PAGE 8   05/31/06**

61

1   panel you come before.  With that I'll go ahead

2   and note that it is now 12:28 p.m. and I am

3   going to wish you the best of luck.  Get to

4   work.

5           INMATE MONTEZ:  Okay.  Well I just want

6   to say that I read First Peter's 2:14 and I

7   submitted to that so I am not disappointed.

8   (Indiscernible).

9           ATTORNEY RUTLEDGE:  Thanks a lot.

10          DEPUTY COMMISSIONER SMITH:  Thank you

11  both.

12          ATTORNEY RUTLEDGE:  Good luck to you.

13          INMATE MONTEZ:  Thank you.

14                      --oOo--

15

16

17

18

19

20

21

22

23  PAROLE DENIED ONE YEAR              SEP 2 8 2006

24  THIS DECISION WILL BE FINAL ON:_____

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  VICTOR MONTEZ C-48215  DECISION PAGE 9  05/31/06

62.

CERTIFICATE AND
DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 - 61, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of
VICTOR MONTEZ, CDC NO. C-48215, on MAY 31, 2006,
and that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a
disinterested party in the above-mentioned
matter and have no interest in the outcome of
the hearing.

Dated August 13, 2006, at Sacramento
County, California.

RAMONA COTA,
TRANSCRIBER
**PETERS SHORTHAND REPORTING**

EXHIBIT    "7"

LIFE PRISONER EVALUATION REPORT
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

MONTEZ, VICTOR MANDEL                              C48215

I.   COMMITMENT FACTORS:

    A.   Life Crime: All relevant documents from the previous hearing including the transcripts, have been considered and that information appears valid, and the writer has no further information to add.

        1.   Summary of Crime: Remains the same as stated in the previous hearings.

        2.   Prisoner's Version: Remains the same as stated in the previous hearings.

        3.   Aggravating/Mitigating Circumstances:

           a.   Aggravating Factors: Remains the same as stated in the previous hearings.

           b.   Mitigating Factors: Remains the same as stated in the previous hearings.

    B.   Multiple Crime(s): None.

        1.   Summary of Crime: N/A.

        2.   Prisoner's Version: N/A.

II.  PRECONVICTION FACTORS:

    A.   Juvenile Record: Documents from the previous hearings have been considered and that information remains valid.

    B.   Adult Convictions: Documents from the previous hearing have been considered and that information remains valid.

COPY TO INMATE ON

LIFE PRISONER EVALUA⌐    REPORT                                                    2
PAROLE CONSIDERATION ⌐EARING
JUNE 2004 CALENDAR

    C.    <u>Personal Factors</u>:  Documents from the previous hearings have been considered
and that information remains valid.

III.    <u>POSTCONVICTION FACTORS</u>:

    A.    <u>Special Programming/Accommodations:</u>  None.

    B.    <u>Custody History</u>:  Documents from the previous hearings have been considered
and the information remains valid.  During the period of time since the last
hearing, the prisoner has remained at the Correctional Training Facility and
housed in the general population in a dorm setting.  He has maintained a stable
work record and presently assigned to the PIA Wood Furniture Assembly Factory.
In review of the prisoner's work performance covering a period from 4/1/02 to
7/01/02, he demonstrated satisfactory work grades.  However, noting a period
from 7/1/02 to 11/01/02 per CDC 101 Work Supervisor's Reports dated 9/1/02,
10/1/02 and 11/1/02, the prisoner's work performance declined due to his attitude
towards his supervisor and staff, his interest in his respective assigned work,
teamwork building participation and quality of work.  His supervisor
comments were: Inmate Montez continued to actively pursue a transfer out of the
Assembly Shop and has not worked since his last report dated 10/02.  His
quarterly report periods from 11/01/02 to 8/1/03 dated 2/1/03, 5/1/03 and 8/1/03,
reflect improvement grades of satisfactory to above average work grades.  In
addition, during this review period, Montez enrolled in an Independent Study
Program through Coastline Community College and was unable to complete the
semester.  However, he enrolled into the Federal Emergency Management Agency
Institute, which is an independent study course.  He earned two (2) Certificates of
Achievement dated 11/13/03, in Radiological Emergency Management and
Emergency Preparedness, USA dated 10/17/03.  Finally, there are no documents in
the Central File to reflect any vocational training upgrading experience during this
review period.

    C.    <u>Therapy and Self-Help Activities</u>:  Participation in Narcotics Anonymous per
CDC 128B dated 7/2/01, 7/10/01, 10/01/01, 10/2/01, 1/11/02, 1/17/02, 2/15/02,
3/29/02, 4/11/02, 07/01/02, 07/17/02, 10/01/02, 10/16/02, 12/21/02, 1/8/03,
4/23/03 and 5/6/03.

Participated in the donation drive for the American Red Cross in response to the
terrorist attacks of September 11, 2001 in New York, Pennsylvania and
Washington D.C. per CDC 128 dated 12/13/01.

Participated in and completed the Muslim Development Center's Anger
Management Course per CDC 128B dated 2/20/02.

Successfully completed a thirteen-week Impact workshop - self-help group designed to provide education and awareness relative to the profound negative impact of crime and its affect on victims and the ripple effect on society per CDC 128-B dated 12/16/02.

D.  **Disciplinary History:** None during this review period. However, (7) CDC 115's and (4) 128-A's are noted.

CDC 128A's

| | | |
|---|---|---|
| 11/06/84 | CTF | Unauthorized Covering on Window. |
| 08/19/85 | CTF | Failure to Report to Work. |
| 11/21/86 | CTF | Unexcused Absence from School. |
| 05/26/89 | CMC-East | Broken Window in Cell. |

CDC 115's

| | | |
|---|---|---|
| 10/22/82 | FOL | Possession of Marijuana. Disposition: Guilty. 10 days disciplinary detention suspended, plus 90 days screen visits. |
| 12/29/82 | FOL | Possession of Marijuana. Disposition: Guilty. 10 days disciplinary detention plus 90 days screen visits. |
| 06/25/83 | FOL | Out of Cell Without Authorization. Disposition: Guilty. Counseled and reprimanded. |
| 03/03/86 | CTF | Possession of Contraband Shirt. Charged $8.50 plus 30 days loss of yard privileges. |
| 01/09/89 | CMC | Non-Performance (work). Disposition: Guilty, 15 days loss of credit. |
| 02/12/92 | CRC | Positive U/A for Opiates. Disposition: Guilty, 150 days loss of credit plus 120 days loss of contact visiting. |
| 09/16/93 | CRC | Non Performance (work). Disposition: Guilty, assessed 10 hours extra duty. |

E.  **Other:** On 6/20/02, Montez was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #6. The Board's decision was to deny

parole for (2) years, and recommend that the prisoner remain disciplinary free and participate in narcotic anonymous self-help and therapy programs.

IV.   FUTURE PLANS:

    A.    **Residence:** The prisoner indicates that his parole plans have changed. His plans are to live at the Freedom House, located at 460 South "F" Street, Oxnard, CA 93030. Telephone: 805-483-8343. Contact person: Jeff Simpson, Administrator. This facility is a 90- day clean and sober living environment for men. A letter of conditional acceptance was noted in the Central File dated 5/30/03. If released from prison, Montez states that he wants to make it on his own merit out in the free world, without the assistance or help of his family. However, he states that updated letters of support from his family and friends are forthcoming.

    B.    **Employment:** Remains the same as indicated in the previous Board Report dated 6/2002. In addition, the prisoner completed 915 hours and received a Certificate of Legal Assistant/ Paralegal from the Blackstone School of Law Paralegal Studies, Inc. dated 11/9/01, at Dallas, Texas. During this interview, the prisoner did not offer a job reference, however, he feels confident that he will secure employment once he is released. His secondary plans are to work in the oil fields around in the state.

    C.    **Assessment:** At the present time, the prisoner's parole plans appears stable at this time. Montez indicates that his plans are to reside in a residential home with a 12 step program that offers a sober and clean living environment for drug and alcohol offenders. He also indicates, once he completes this program, he will be able to secure employment and become independent to reintegrate back into society. He has acquired skills in welding, plumbing, furniture assembly (standard line and semi-custom), roofing, cement finisher and upholstery repair. He received a Certificate from the Blackstone Paralegal Studies, Inc., as a legal assistant/paralegal by completing 915 hours of correspondence studies. However, Montez did not offer a job reference at this time, he feels confident that he will secure employment once he is released.

V.   USINS STATUS: N/A.

VI.   SUMMARY:

    A.    Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would probably pose a low degree of threat to the public at this time, if released from prison. This impression is based on the

LIFE PRISONER EVALUAT    .REPORT
PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

prisoner's disciplinary history for eleven years, his stable work record, participation in self-help programs and his efforts of educational upgrading experience during this review period. While discussing the facts of the crime, Montez was candid when expressing remorse for the victim, and makes no excuses for his behavior. He realizes that his action's is what lead to the demise of the victim. He indicates that he must prove to himself and society thereby earning society's trust, in order to integrate back into free world in the future. He expressed the need to continue A.A. and N.A. counseling in order to eliminate the unnecessary stressors in his life. In terms of employment, the prisoner has acquired skills in welding, plumbing, furniture assembly (standard line and semi-custom), roofing, cement finisher and upholstery repair. He has a GED, and has earned a certificate as a legal assistant and paralegal. Montez indicates, once he is released, he is confident that he will secure employment and use the tools that he has gained and experienced to become a positive member of society.

B.    Prior to release the prisoner could benefit from:
1)    Remaining disciplinary free,
2)    Participate in Narcotics Anonymous Self-Help Programs and therapy programs.

C.    This report is based upon an interview with the prisoner on 3/25/04 lasting approximately 1.5 hours and a complete review of the Central File lasting 3 hours.

D.    Montez was afforded an opportunity to examine his Central File on 3/25/04 per the Olson decision per CDC 128B.

E.    No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

BOARD OF PRISON TERMS                                                                                          STATE
OF CALIFORNIA
# LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐ DOCUMENTATION HEARING

☒ PAROLE CONSIDERATION HEARING

☐ PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 07/01 to 6/02 | | | **PLACEMENT**: Remained at the Correctional Training Facility - II and housed in the general population. **CUSTODY**: Medium A. **VOC. TRAINING**: None during this review period. **ACADEMICS**: None noted this review period. **WORK RECORD**: Assigned to the PIA Wood Furniture Factory Assembly Shop. There are no work supervisor reports in the Central File noting work performance during this period. **GROUP ACTIVITIES**: Participated in N/A per CDC 128B's dated 7/10/01, 10/01/01, 10/02/01, 1/11/02, 1/17/02, 2/15/02, 3/29/02 an 4/11/02. Participated in and completed the Muslim Development Center's Anger Management Course per CDC 128B dated 2/20/02. **PSYCH. TREATMENT**: None during this review period. **PRISON BEHAVIOR**: None during this review period. **OTHER**: N/A. |
| | | | DATE |

| | | | |
|---|---|---|---|
| MONTEZ, VICTOR | C48215 | CTF-SOLEDAD | JUN/2004 |

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER . POSTCONVICTION PROGRESS REPORT

| STCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 06/02 to 06/03 | | | **PLACEMENT:** Remained at the Correctional Training Facility- II and housed in the general population.<br>**CUSTODY:** Medium A<br>**VOC. TRAINING:** None during this review period.<br>**ACADEMICS:** None during this rating period.<br>**WORK RECORD:** Assigned to the PIA Wood Furniture Assembly Shop. He earned above average work grades and received exceptional grades for the use of tools and equipment per CDC 101 dated 7/1/02. However, a CDC 101 dated 9/1/02, reflects the prisoner's performance declined due to his attitude toward his supervisor and staff, his interest in his respective assigned work, teamwork building and participation and quality of work. His supervisor comments: Montez continues to "opt out" of work, whenever he is given the chance, as noted a CDC 101 dated 11/01/02. He continues to actively pursue a transfer and has not worked since his last report per CDC 101 dated 11/1/02.<br>**GROUP ACTIVITIES:** Participated in NA per CDC 128B's dated 7/17/02, 7/1/02, 10/1/02, 10/16/02, 12/1/02, 1/8/03, 4/23/03, and 5/6/03. He completed a thirteen week Impact workshop self help group designed to provide education and awareness relative to the profound negative impact of crime and its affect on victims and the ripple effect on society per CDC 128B dated 12/16/02.<br>**PSYCH. TREATMENT:** None during this review period.<br>**PRISON BEHAVIOR:** None during this review period.<br>**OTHER:** On 6/20/02, Montez was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #6. The Board's decision was to deny parole for (2), and recommend that the prisoner remain disciplinary free and participate in Narcotic Anonymous self-help and therapy programs. |

ORDER:

☐  BPT date advanced by      months.          ☐   BPT date affirmed without change.
☐  PBR date advanced by      months.          ☐   PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐   Previously imposed conditions affirmed.
☐   Add or modify

☐   Schedule for Progress Hearing on appropriate institutional calendar

| MONTEZ, VICTOR | C48215 | CTF-SOLEDAD | JUN/2004 |
|---|---|---|---|

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 6/03 to 3/31/04 (Present) | | | PLACEMENT: Remained at the Correctional Training Facility- II and housed in the General Population. CUSTODY: Medium A VOC. TRAINING: None noted during this review period. ACADEMICS: Enrolled into the Federal Emergency Management Agency Institute and completed (2) independent study courses and received Certificate(s) of Achievement in - Emergency Preparedness, USA dated 10/17/03 and Radiological Emergency Management dated 11/13/03. WORK RECORD: The prisoner remained assigned to the PIA Wood Furniture Assembly Factory. His attitude changed and his work performance reflected satisfactory work grades per CDC 101 dated 5/01/03, and 8/1/03. GROUP ACTIVITIES: None noted during this review period. PSYCH. TREATMENT: None noted during this review. PRISON BEHAVIOR: None noted during this review. OTHER: N/A. |

ORDER:

☐  BPT date advanced by      months.          ☐  BPT date affirmed without change.
☐  PBR date advanced by      months.          ☐  PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐  Previously imposed  conditions affirmed.
☐  Add or modify

☐  Schedule for Progress Hearing on appropriate institutional calendar

MONTEZ, VICTOR           C48215                    CTF-SOLEDAD              JUN/2004

BOARD OF PRISON TERMS                                                                    STATE OF CALIFORNIA

LIFE PRISONER EVALUAT    .EPORT
PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

H. Staten
Correctional Counselor I

7-14-04
Date

R. Leach
Correctional Counselor II

7-14-04
Date

R. Pope
Facility Captain

7-1?-04
Date

D. S. Levorse
Classification and Parole Representative

7-16-04
Date

MONTEZ, VICTOR          C48215          CTF-SOLEDAD          JUN/2004

BOARD OF PRISON TERMS                                                        STATE OF CALIFORNIA

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| | |
|---|---|
| ☐ DOCUMENTATION HEARING | |
| ☒ PAROLE CONSIDERATION HEARING | **ADDENDUM** |
| ☐ PROGRESS HEARING | |

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT.
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
                  ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 4/04 to 4/05 | | | **PLACEMENT:** CTF. |
| | | | **CUSTODY:** Medium A. |
| | | | **VOC. TRAINING:** None noted during this period. |
| | | | **ACADEMICS:** None noted during this period. |
| | | | **WORK RECORD:** Inmate Montez continued as a Furniture Assembler and received exceptional and above average ratings in various categories on his work supervisor's reports. |
| | | | **GROUP ACTIVITIES:** He continued his participation in A.A/N.A Program. On 6/10/04 Montez received a CDC 128B laudatory chrono for his participation in the Inmate Employability Program. |
| | | | **PSYCH. TREATMENT:** None during this review period. |
| | | | **PRISON BEHAVIOR:** Inmate Montez remained disciplinary free during this period. |
| | | | **OTHER:** None. |

| CORRECTIONAL COUNSELOR'S SIGNATURE | | DATE 5/12/05 |
|---|---|---|
| MONTEZ, VICTOR | C48215 | CTF-SOLEDAD |

COPY TO INMATE ON
Mal 18 2005

BPT 1004 (REV 7/86)

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                    ADDENDUM


_____          5/12/05
S. Arno                                      Date
Correctional Counselor I



_____          5/12/05
R. Leach                                     Date
Correctional Counselor II



_____          5-13-05
R. Pope                                      Date
Facility Captain



_____  C&PR  5-17-05
D.S. Levorse                                 Date
Classification and Parole Representative



MONTEZ                    C48215              CTF-SOLEDAD

BOARD OF PRISON TERMS                                                      STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING                           **ADDENDUM**

☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, i.e., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 4/05 to 4/06 (Present) | | | **PLACEMENT**: CTF. <br> **CUSTODY**: Medium A. <br> **VOC. TRAINING**: None noted during this period. <br> **ACADEMICS**: None noted during this period. <br> **WORK RECORD**: He continued his assignment as a Furniture Assembler in the P.I.A. Wood Products section and received exceptional and above average ratings in various categories on his Work Supervisor's Reports. <br> **GROUP ACTIVITIES**: Inmate Montez continued his fine participation in the AA Program per several CDC 128B laudatory chronos. <br> **PSYCH. TREATMENT**: None noted during this period. <br> **PRISON BEHAVIOR**: He remained disciplinary free during this period. <br> **OTHER**: None. |

CORRECTIONAL COUNSELOR'S SIGNATURE                            DATE  4 | 25 | 06

MONTEZ, VICTOR          C48215              CTF-SOLEDAD

BPT 1004 (REV 7/86)

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                    **ADDENDUM**


_____    _____
S. Amo                          Date
Correctional Counselor I


_____    _____
F.I. DeGuzman                   Date
Correctional Counselor II (A)


_____    _____
R. Pope                         Date
Facility Captain


_____    _____
D.S. Levorse                    Date
Classification and Parole Representative



MONTEZ, VICTOR                 C48215              CTF-SOLEDAD

EXHIBIT     "8"

MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
May, 2006 Lifer Calendar


CORRECTIONAL TRAINING FACILITY SOLEDAD
MAY, 2006


| | |
|---|---|
| **NAME:** | **MONTEZ, VICTOR** |
| **CDC#:** | **C-48215** |
| **DOB:** | 7/6/53 |
| **OFFENSE:** | **PC 187 MURDER, SECOND DEGREE** |
| **DATE OF OFFENSE:** | 8/9/80 |
| **SENTENCE:** | **17 YEARS TO LIFE** |
| **MEPD:** | 4/9/90 |
| **EVALUATION DATE:** | 5/11/06 |


I.     **IDENTIFYING INFORMATION:**

Mr. Victor Montez is a 52 year old, first term, divorced, Hispanic male. He is a Christian. He has served 25 years on his sentence.

**SOURCES OF INFORMATION:**

This evaluation is based upon a single 90 minute interview, plus review of the central and medical files.

The psychological evaluation, written on 6/20/00, at CTF-Soledad for the BPT by Dr. Terrini, Psychologist, contains a Psychosocial Assessment. This information was reviewed with the inmate and is still current and valid. As a result, this information will not be repeated at this time.

MONTEZ, VICTOR
C-48215
5/11/06
PAGE 2

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Montez related during the interview in a serious, outgoing, friendly and cooperative manner. His mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. His affect was appropriate. There was no evidence of anxiety or of depression. His eye contact was good. Intellectually, he was functioning in the average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were very good.

Mr. Montez has a criminal background associated with his heroin addiction. He continues to attend Alcoholics Anonymous. He has not used drugs since 1992, when he last received a positive urinalysis test. He has been clean and sober now for 14 years. Mr. Montez is very aware of the destructive effects of drugs or of alcohol in a person's life. He is aware of the importance of remaining clean and sober. He is very active in Bible studies. His understanding and knowledge of the Bible are significant and considerable. He has incorporated Biblical values into his life. As a result, he is determined to lead a wholesome, helpful to others, productive life, that pleases both God and man. Use of drugs is no longer a problem in his life. It certainly is not a current diagnostic problem.

He has acquired significant vocational skills. He has experience as a welder, working with the arc and gas. He also is certified in Vocational Office Machine Repair. He has worked as a plumber. He is working now in PIA Furniture Manufacturing. He also has worked as a heavy equipment operator in the past. He also attended Blackstone School of Law and is certified as a paralegal. In addition to this achievement, he has completed the Inmate Employability Program, Finding Employment, sponsored by Prison Industries Authority. He continues to attend Alcoholics Anonymous. He has his GED. He also has completed Anger Management.

In the past, based upon his criminal history, Mr. Montez has been diagnosed as having an Anti-Social Personality Disorder. At this point in his life there is no evidence of any antisocial thinking or values. His values are solidly pro-social. He has deep feelings of concern and empathy towards others. Therefore, this is no longer an appropriate diagnostic label.

MONTEZ, VICTOR
C-48215
5/11/06
PAGE 3

## CURRENT DIAGNOSTIC IMPRESSION

Axis I:      No mental disorder
Axis II:     No personality disorder
Axis III:    No physical disorder
Axis IV:     Life term incarceration
Axis V:      Current GAF: 90

## XIII.  REVIEW OF LIFE CRIME

Mr. Montez accepts full responsibility for the commitment offense. He put a gun to the victim's head in an effort to rob him. The victim's elbow hit the gun, and it went off accidentally. He stated that he did not intend to hurt the victim. He does take full responsibility for the victim's death. He stated that due to his actions, and the victim's loss of his life, the victim's family has suffered. He commented how he understands how the victim's family has never been able to recover from their suffering due to the victim's loss of life. He knows this, because he has developed insight into what the family feels when they lose a loved one. He lost a brother in a similar situation. The family is still suffering from this loss. His feelings of remorse appear to be sincere and genuine.

He stated that he had become a Christian through the ministry of Victory Outreach prior to this offense. He stated that he had begun to backslide. He stated that because he was disobedient to God and God's expectations for his life, he was a disobedient child and God placed him in a situation, where he would have ample opportunity to study the Bible, explore his own life, seek forgiveness for his sins, and grow spiritually. He stated that he believes that when this process in which he must continue to grow and advance spiritually is finished, God will allow him to be released from prison.

## XIV.  ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, he has remained disciplinary free for over 12 years. Prior to that time, he did receive disciplinaries for possession of marijuana and use of heroin. At that point in time, his potential for dangerous behavior was higher. However, due to his years of being disciplinary free, he no longer poses a risk to the institution, and compared to other inmates, his potential for dangerous behavior is below average.

B. In considering potential for dangerous behavior when released to the community, the Level of Service Inventory-Revised was administered.

MONTEZ, VICTOR
C-48215
5/11/06
PAGE 4

This is an actuarial measure that assesses criminal history, substance abuse history, institutional adjustment, social relationships and other factors to determine current risk level on parole. He obtained a score of 5.1 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 95 of them. This is a low risk score. At this point in his life, due to his maturity, growth, and increased insight, he poses no more risk to society than the average citizen in the community. In fact, based upon the positive changes in his life, he probably poses less risk to society than the average citizen.

C. There are no significant risk factors in this case.

## XV.   CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine parole planning. This man has a supportive family in the community. He plans on living with his mother in Oxnard. He also has developed job offers in the community. He also has letters in the file, indicating that he has been accepted for placement in a residential substance abuse program. He has numerous vocational skills that will enable him to maintain work in the community. All of these positive factors are strong indicators that he will do well on parole. The prognosis for successful adjustment in the community is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    5/11/06
T:    5/12/06

# EXHIBIT 9

Westlaw.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

**H**
Briefs and Other Related Documents

Supreme Court of Minnesota.
Richard James CARRILLO, Appellant,
v.
Joan FABIAN, Commissioner of Corrections,
Respondent.
No. A03-1663.

July 28, 2005.

**Background:** Petitioner sought habeas review of
disciplinary action taken by Department of
Corrections (DOC). The District Court, Washington
County, denied petition, and petitioner appealed.
The Court of Appeals affirmed, and petitioner
sought further review.

**Holdings:** The Supreme Court, Paul H. Anderson,
granted petition for review and held that:

8(1) petitioner had protected liberty interest in his
supervised release date triggering right to
procedural due process prior to extension of that
date as result of prison disciplinary proceeding;

21(2) "some evidence" standard employed by DOC
in prison disciplinary proceedings was
inappropriate for use at fact-finding level of
proceedings having potential to affect inmate's
liberty interest in his supervised release date; and

22(3) preponderance of the evidence standard was
appropriate for use by DOC at fact-finding level in
such proceedings.

Reversed.

Page, J., concurred with opinion.

Blatz, C.J., dissented with opinion in which

Anderson, Russell, J., joined.

West Headnotes

[1] Criminal Law 110 ⟲1139

110 Criminal Law
110XXIV Review
110XXIV(L) Scope of Review in General
110k1139 k. Additional Proofs and Trial
De Novo. Most Cited Cases
Whether due process is required in a particular case
is a question of law, which the Supreme Court
reviews de novo. U.S.C.A. Const.Amend. 14.

[2] Prisons 310 ⟲4(1)

310 Prisons
310k4 Regulation and Supervision
310k4(1) k. In General. Most Cited Cases
While a prison inmate does not enjoy the full range
of rights and privileges available to ordinary
citizens, he does not surrender all of his
constitutional rights upon incarceration.

[3] Constitutional Law 92 ⟲272(2)

92 Constitutional Law
92XII Due Process of Law
92k256 Criminal Prosecutions
92k272 Execution of Sentence
92k272(2) k. Imprisonment and
Incidents Thereof. Most Cited Cases
Inmates are entitled to some degree of protection
under the Due Process Clause; thus, prison
authorities must provide inmates with an

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

appropriate level of due process before they are deprived of a protected liberty interest. U.S.C.A. Const.Amend. 14.

[4] Constitutional Law 92 ⚚255(1)

92 Constitutional Law
  92XII Due Process of Law
    92k255 Deprivation of Life or Liberty in General
      92k255(1) k. In General. Most Cited Cases

Constitutional Law 92 ⚚278(1)

92 Constitutional Law
  92XII Due Process of Law
    92k278 Deprivation of Property in General
      92k278(1) k. In General. Most Cited Cases
When engaging in a due process analysis, a court must conduct two inquiries: first, the court must determine whether the complainant has a liberty or property interest with which the state has interfered; second, if the court finds a deprivation of such an interest, it must determine whether the procedures attendant upon that deprivation were constitutionally sufficient. U.S.C.A. Const.Amend. 14.

[5] Constitutional Law 92 ⚚254.1

92 Constitutional Law
  92XII Due Process of Law
    92k254.1 k. Liberties and Liberty Interests Protected. Most Cited Cases
Though the range of liberty interests protected by procedural due process is broad, it is not infinite. U.S.C.A. Const.Amend. 14.

[6] Constitutional Law 92 ⚚254.1

92 Constitutional Law
  92XII Due Process of Law
    92k254.1 k. Liberties and Liberty Interests Protected. Most Cited Cases
Constitutionally-protected liberty interest arises from a legitimate claim of entitlement rather than simply an abstract need or desire or a unilateral expectation. U.S.C.A. Const.Amend. 14.

[7] Constitutional Law 92 ⚚272(2)

92 Constitutional Law
  92XII Due Process of Law
    92k256 Criminal Prosecutions
      92k272 Execution of Sentence
        92k272(2)  k.  Imprisonment  and Incidents Thereof. Most Cited Cases

Prisons 310 ⚚13(2)

310 Prisons
  310k13 Custody and Control of Prisoners
    310k13(2)  k.  Discipline,  Security,  and Confinement. Most Cited Cases
For purposes of due process analysis, it was inappropriate to analyze inmate's liberty interest in his supervised release date by looking solely to statutory language; rather, the Supreme Court was required to examine nature of deprivation resulting from disciplinary action forming basis of inmate's complaint and extent to which that deprivation departed from basic conditions of inmate's sentence. U.S.C.A. Const.Amend. 14; M.S.A. §§ 244.05, 244.101.

[8] Constitutional Law 92 ⚚272(2)

92 Constitutional Law
  92XII Due Process of Law
    92k256 Criminal Prosecutions
      92k272 Execution of Sentence
        92k272(2)  k.  Imprisonment  and Incidents Thereof. Most Cited Cases

Prisons 310 ⚚13(2)

310 Prisons
  310k13 Custody and Control of Prisoners
    310k13(2)  k.  Discipline,  Security,  and Confinement. Most Cited Cases
Inmate had protected liberty interest in his supervised release date, under Due Process Clause of United States Constitution, triggering right to procedural due process prior to extension of that date as result of prison disciplinary proceeding, where statutory sentencing scheme provided that inmate was to be released on date specified at his sentencing unless he committed prison disciplinary

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

offense and finding that inmate committed disciplinary offense would inevitably affect length of his term of imprisonment, as extension of his date of release would be immediate consequence of disciplinary action. U.S.C.A. Const.Amend. 14; Minn.Stat. §§ 244.05, 244.101.

[9] Constitutional Law 92 ⟜272(2)

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k272 Execution of Sentence
                92k272(2) k. Imprisonment and Incidents Thereof. Most Cited Cases
For purposes of due process analysis, under Minnesota's current sentencing scheme, there is a presumption from the moment that a court imposes and explains a defendant's sentence that the defendant will be released from prison on a certain date, and that presumption is overcome only if the defendant commits a disciplinary offense while in prison. U.S.C.A. Const.Amend. 14.

[10] Constitutional Law 92 ⟜270(5)

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k270 Judgment and Sentence
                92k270(5) k. Probation or Suspension of Sentence. Most Cited Cases

Sentencing and Punishment 350H ⟜1943

350H Sentencing and Punishment
    350HIX Probation and Related Dispositions
        350HIX(F) Disposition of Offender
            350Hk1942 Duration
                350Hk1943 k. In General. Most Cited Cases
Inmate's liberty interest in his supervised release date was not equivalent to "right" to, specific minimum supervised release term. U.S.C.A. Const.Amend. 14; M.S.A. § 244.101, subd. 3.

[11] Constitutional Law 92 ⟜272(2)

92 Constitutional Law

92XII Due Process of Law
    92k256 Criminal Prosecutions
        92k272 Execution of Sentence
            92k272(2) k. Imprisonment and Incidents Thereof. Most Cited Cases
For purposes of due process analysis, any extension of an inmate's period of imprisonment represents a significant departure from the basic conditions of the inmate's sentence. U.S.C.A. Const.Amend. 14.

[12] Evidence 157 ⟜596(1)

157 Evidence
    157XIV Weight and Sufficiency
        157k596 Degree of Proof in General
            157k596(1) k. In General. Most Cited Cases
Purpose of a standard of proof for a particular type of adjudication is to instruct the fact finder on the degree of confidence society desires the fact finder to have in the correctness of his or her conclusions.

[13] Evidence 157 ⟜596(1)

157 Evidence
    157XIV Weight and Sufficiency
        157k596 Degree of Proof in General
            157k596(1) k. In General. Most Cited Cases
Three basic standards of proof exist: preponderance of the evidence; clear and convincing; and beyond a reasonable doubt.

[14] Prisons 310 ⟜13(7.1)

310 Prisons
    310k13 Custody and Control of Prisoners
        310k13(7) Requisites of Proceedings
            310k13(7.1) k. In General. Most Cited Cases
"Some evidence" standard employed by the Department of Corrections (DOC) in hearings on major violations of prison disciplinary rules allows a hearing officer to find that an inmate violated a disciplinary rule if there is some credible evidence presented to show that the inmate committed the offense charged.

[15] Prisons 310 ⟜13(7.1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

310 Prisons
    310k13 Custody and Control of Prisoners
        310k13(7) Requisites of Proceedings
            310k13(7.1) k. In General. Most Cited Cases

As a standard of proof, the "some evidence" employed by the Department of Corrections (DOC) in hearings on major violations of prison disciplinary rules is much less exacting than the preponderance of the evidence standard used in civil cases.

[16] Prisons 310 ⟲13(10)

310 Prisons
    310k13 Custody and Control of Prisoners
        310k13(7) Requisites of Proceedings
            310k13(10) k. Review and Judicial Supervision. Most Cited Cases

"Some evidence" standard, as applicable with respect to prison disciplinary proceedings, is a standard of appellate review, not a standard of proof.

[17] Constitutional Law 92 ⟲272(2)

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k272 Execution of Sentence
                92k272(2) k. Imprisonment and Incidents Thereof. Most Cited Cases

Prisons 310 ⟲13(7.1)

310 Prisons
    310k13 Custody and Control of Prisoners
        310k13(7) Requisites of Proceedings
            310k13(7.1) k. In General. Most Cited Cases

For purposes of due process analysis, private interest affected by use by Department of Corrections (DOC) of "some evidence" standard in prison disciplinary proceedings was inmate's protected liberty interest in his date of supervised release, where as direct result of DOC hearing officer's determination that inmate had engaged in disorderly conduct, inmate had seven days added to his term of incarceration. U.S.C.A. Const.Amend. 14.

[18] Constitutional Law 92 ⟲272(2)

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k272 Execution of Sentence
                92k272(2) k. Imprisonment and Incidents Thereof. Most Cited Cases

Prisons 310 ⟲13(7.1)

310 Prisons
    310k13 Custody and Control of Prisoners
        310k13(7) Requisites of Proceedings
            310k13(7.1) k. In General. Most Cited Cases

For purposes of due process analysis, risk of erroneous deprivation resulting from use by Department of Corrections (DOC) of "some evidence" standard in prison disciplinary proceedings in having potential to affect inmate's liberty interest in his supervised release date was high, where procedural safeguards provided by DOC's rules, including notice and opportunity to respond, were of no value in light of prison authorities' ability to extend inmate's term of incarceration even if balance of evidence failed to prove that inmate committed charged offense. U.S.C.A. Const.Amend. 14.

[19] Constitutional Law 92 ⟲272(2)

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k272 Execution of Sentence
                92k272(2) k. Imprisonment and Incidents Thereof. Most Cited Cases

Prisons 310 ⟲13(7.1)

310 Prisons
    310k13 Custody and Control of Prisoners
        310k13(7) Requisites of Proceedings
            310k13(7.1) k. In General. Most Cited Cases

For purposes of due process analysis, government interests affected by use by Department of Corrections (DOC) of "some evidence" standard in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

prison disciplinary proceedings were interests in assuring safety of inmates and employees, avoiding burdensome administrative requirements that might be susceptible to manipulation, and promotion of fair procedures. U.S.C.A. Const.Amend. 14.

[20] Constitutional Law 92 ☞272(2)

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k272 Execution of Sentence
                92k272(2)    k.    Imprisonment    and
Incidents Thereof. Most Cited Cases

Prisons 310 ☞13(7.1)

310 Prisons
    310k13 Custody and Control of Prisoners
      310k13(7) Requisites of Proceedings
        310k13(7.1) k.  In General. Most Cited
Cases
For purposes of due process analysis, government's interest in promotion of fair disciplinary procedures in its prisons weighed against use by Department of Corrections (DOC) of "some evidence" standard in prison disciplinary proceedings having potential to affect inmate's liberty interest in his supervised release date, especially where government derived no benefit from disciplining inmates who committed no offense; effect of DOC's use of "some evidence" standard was to imply that once any individual is convicted of a crime, he or she is presumed guilty of  every  subsequent  allegation.  U.S.C.A. Const.Amend. 14.

[21] Constitutional Law 92 ☞272(2)

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k272 Execution of Sentence
                92k272(2)    k.    Imprisonment    and
Incidents Thereof. Most Cited Cases

Prisons 310 ☞13(7.1)

310 Prisons
    310k13 Custody and Control of Prisoners

310k13(7) Requisites of Proceedings
    310k13(7.1)  k.  In General. Most Cited
Cases
"Some    evidence"    standard    employed    by Department  of  Corrections  (DOC)  in  prison disciplinary proceedings was inappropriate for use at fact-finding level in disciplinary proceedings having potential to affect inmate's liberty interest in his supervised release date.

[22] Constitutional Law 92 ☞272(2)

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k272 Execution of Sentence
                92k272(2)    k.    Imprisonment    and
Incidents Thereof. Most Cited Cases

Prisons 310 ☞13(7.1)

310 Prisons
    310k13 Custody and Control of Prisoners
      310k13(7) Requisites of Proceedings
        310k13(7.1) k.  In General. Most Cited
Cases
Preponderance  of  the  evidence  standard  was appropriate for use by Department of Corrections (DOC) at fact-finding stage of prison disciplinary proceedings  having  potential  to  affect  inmate's liberty interest in his supervised release date, as such standard better protected against erroneous deprivation  of  inmate's  liberty  interest  in  his supervised  release  date  than  did  use  of  "some evidence"    standard    and    did    not    impose unacceptable    burden    on    DOC.    U.S.C.A. Const.Amend. 14.

[23] Constitutional Law 92 ☞272(2)

92 Constitutional Law
    92XII Due Process of Law
        92k256 Criminal Prosecutions
            92k272 Execution of Sentence
                92k272(2)    k.    Imprisonment    and
Incidents Thereof. Most Cited Cases

Prisons 310 ☞13(7.1)

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

Page 6

310 Prisons
   310k13 Custody and Control of Prisoners
     310k13(7) Requisites of Proceedings
       310k13(7.1) k. In General. Most Cited
Cases
Principles of due process entitled inmate to have
Department of Corrections (DOC) hearing officer
find by preponderance of the evidence that inmate
committed disciplinary offense prior to extension of
date of his supervised release on basis of his having
committed such offense. U.S.C.A. Const.Amend. 14

*766 Syllabus by the Court
Under the Due Process Clause of the United States
Constitution, a Minnesota prison inmate has a
protected liberty interest in his supervised release
date that triggers a right to procedural due process
before that date can be extended for violating a
disciplinary rule.

The "some evidence" standard of proof is
inappropriate for use by the Department of
Corrections at the fact-finding level; rather, a
Department of Corrections fact finder must find by
a preponderance of the evidence that an inmate has
violated a disciplinary rule before the
Commissioner of Corrections can extend the
inmate's date of supervised release for the rule
violation.

Mike Hatch, Minnesota State Attorney General,
Elizabeth Richter Schaffer, Jennifer A. Service,
Assistant Attorneys General, St. Paul, MN, for
Respondent.
Mikael Merissa, Teresa Nelson, ACLU of
Minnesota, St. Paul, MN, for Amicus Curiae ACLU
of Minnesota.

Heard, considered, and decided by the court en
banc.

OPINION
ANDERSON, PAUL H., Justice.
Appellant Richard Carrillo seeks review of a
Minnesota Court of Appeals decision affirming the
Washington County District Court's denial of his
petition for writ of habeas corpus. Carrillo argues
that the Commissioner of Corrections violated his

constitutional rights by failing to provide him with
sufficient procedural due process before extending
his period of imprisonment by seven days. The
commissioner extended Carrillo's incarceration time
after a Department of Corrections (DOC) hearing
officer found that Carrillo committed the
disciplinary offense of disorderly conduct. In
finding that Carrillo had engaged in disorderly
conduct, the hearing officer used the following
standard of proof specified by the DOC's policy: "
some evidence in the record to support the charged
violation of the offender disciplinary regulations."
We reverse.

On November 23, 1999, a jury convicted appellant
Richard Carrillo of the offense of drive-by shooting
for the benefit of a gang. The district court
convicted him of this offense and imposed an
executed sentence of 114 months. At sentencing,
Carrillo was informed that he would serve
two-thirds of his time in prison and one-third on
supervised release unless he committed a
disciplinary offense. See Minn.Stat. § 244.101,
subds. 1-2 (2004). Carrillo is incarcerated at the
Minnesota Correctional Facility at Faribault
(MCFF).

On May 24, 2002, a fight broke out at MCFF while
Carrillo was on the prison baseball field with
several other inmates. As a result of the fight, the
prison guards called the inmates back inside the
prison living quarters. As Carrillo walked toward
the living quarters with a group of about ten other
inmates, one of the inmates in his group, Robert
Mendez, fell to the ground.

Lieutenant Susan Williams was in charge of
administering the prison that day in the warden's
absence. Williams *767 saw Mendez fall and filed
an incident report in which she stated that Carrillo
had shoved Mendez to the ground. Carrillo was
given a Notice of Violation that stated that he was
charged with violating Offender Discipline
Regulations 320 and 412-disorderly conduct and
assault of an inmate. A disciplinary hearing was
held on June 5, 2002, before a DOC hearing officer.
Carrillo was not represented by counsel at that
hearing, although he did have a right to have a "
representative" assist him in the preparation and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

presentation of his case.

At the hearing, Williams was the only witness to testify for the commissioner. She stated that she saw a white inmate put his hands on another inmate's shoulders and push him to the ground. She said she "couldn't identify [the inmate] that had gotten pushed," but that there was "no doubt in [her] mind" that Carrillo pushed the inmate. She testified that she identified Carrillo by his clothing and by "watch[ing] where he was walking." The record reflects that at the time of the incident, Carrillo wore a white t-shirt, gray sweatpants, and tennis shoes-the same outfit worn by all of the other inmates who were playing baseball.

Williams said she could not identify Carrillo's face because she was about 50 yards away from the inmates when the pushing incident occurred, but she maintained constant visual contact with Carrillo from the time she saw the incident until he reached the door to the living quarters. After witnessing the incident, Williams radioed the guards at the living quarters building and told them that a white inmate wearing a white t-shirt and gray sweatpants was approaching the building. Williams instructed the guards that when "the next white person comes in * * *, grab his ID." Based on Williams' information, the guards detained Carrillo.

Carrillo, Mendez, and a third inmate, Andrew McNalley, testified for Carrillo. Carrillo testified that he did not push anyone to the ground. Mendez testified that he stumbled and fell on his own while jogging toward the building and that no one shoved him. McNalley testified that he was present during the incident and that Mendez fell on his own and was not pushed.

In determining whether Carrillo had committed the disciplinary violations charged, the hearing officer relied on the standard of proof established by the DOC for major violations, which requires only that there be "some evidence in the record to support the charged violation of the offender disciplinary regulations." Minn. Dept. of Corr. Policy 303.010, H.[FN1] The hearing officer determined that Williams had clearly identified Carrillo as the person who pushed Mendez to the ground and that

Mendez and McNalley were not credible. The hearing officer then found that Carrillo committed the offense of disorderly conduct and imposed a punishment of 45 days in segregation.

> FN1. The Department of Corrections policy in effect at the time of Carrillo's disciplinary hearing did not differentiate between major and minor disciplinary violations, and both were subject to the standard of proof of "some evidence in the record to support the charged violation of the offender disciplinary regulations." Minn. Dept. Corr. Policy 303.010, H. (2001). We note for purposes of comparison that as of February 1, 2005, the Department of Corrections differentiated between major and minor violations. Minn. Dept. Corr. Policy 303.010, F.; G. (2005). This differentiation has resulted in a dual standard: the some evidence standard of proof for major violations remains in place, but the standard of proof for minor violations was raised to "more likely than not that the offender violated the disciplinary regulation." Id. at F.6; G.3.

*768 Carrillo appealed the hearing officer's decision to the warden, and the warden affirmed. As a direct result of the decision, Carrillo served 23 days in segregation, and the commissioner delayed Carrillo's supervised release date by seven days, from April 4 to April 11, 2006.

Carrillo brought a petition for a writ of habeas corpus in Washington County District Court, arguing that the commissioner violated his term of imprisonment without providing sufficient procedural due process. The district court denied Carrillo's petition on August 26, 2003. The court of appeals affirmed the district court, concluding that Carrillo had not shown a protected liberty interest in his release date, and that even if he had, he received all process due. Carrillo v. Fabian, 2004 WL 1049206 (Minn.App. May 11, 2004) (unpublished opinion). We granted Carrillo's

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

Page 8

petition for review.

I.

[1][2][3] Whether due process is required in a particular case is a question of law, which we review de novo. *Morrissey v. Brewer*, 408 U.S. 471, 481, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972); *Alcozer v. N. Country Food Bank*, 635 N.W.2d 695, 701 (Minn.2001). While a prison inmate does not enjoy the full range of rights and privileges available to ordinary citizens, he does not surrender all of his constitutional rights upon incarceration. *Wolff v. McDonnell*, 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). The United States Supreme Court has stated, "[t]here is no iron curtain drawn between the Constitution and the prisons of this country." *Id.* at 555-56, 94 S.Ct. 2963. Inmates are entitled to some degree of protection under the Due Process Clause; thus, prison authorities must provide inmates with an appropriate level of due process before they are deprived of a protected liberty interest. *Id.* at 556, 94 S.Ct. 2963.

[4] When engaging in a due process analysis, a court must conduct two inquiries. First, the court must determine whether the complainant has a liberty or property interest with which the state has interfered. *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). Second, if the court finds a deprivation of such an interest, it must determine whether the procedures attendant upon that deprivation were constitutionally sufficient. *Id.*

[5][6] We first must determine whether Carrillo has a liberty interest in his supervised release date. The Due Process Clause of the U.S. Constitution provides that a state shall not "deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. The Supreme Court has ruled that courts must look to the nature of an interest to determine if it is within the scope of the Fourteenth Amendment's protection of liberty and property. *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 570-71, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); *see also Sandin v. Conner*,

515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). Though the range of liberty interests protected by procedural due process is broad, it is not infinite. *Roth*, 408 U.S. at 570, 92 S.Ct. 2701. A constitutionally-protected liberty interest arises from a legitimate claim of entitlement rather than simply an abstract need or desire or a unilateral expectation. *Greenholtz v. Inmates of Neb. Penal and Corr. Complex*, 442 U.S. 1, 7, 99 S.Ct. 2100, 60 L.Ed.2d 668 (1979). Therefore, Carrillo must have a legitimate claim of entitlement to being released from prison on his supervised release date before his interest in being released on that date can qualify as a liberty interest.

*769 The Supreme Court has held that state law can create liberty interests that are protected by due process. *Wolff*, 418 U.S. at 557, 94 S.Ct. 2963; *Sandin*, 515 U.S. at 483-84, 115 S.Ct. 2293. In *Wolff*, the Court held that while the Due Process Clause itself does not create a liberty interest in credit for good behavior, the statutory provision adopted by the state of Nebraska created a liberty interest in a shortened prison sentence that resulted from good time credits. 418 U.S. at 557, 94 S.Ct. 2963; *see* Neb.Rev.Stat. § 83-185 (1971). In Nebraska, good time credits were revocable only if the prisoner was found guilty of serious misconduct. Neb.Rev.Stat. § 83-185. In another case, the Court held that "the expectancy of release" provided in Nebraska's sentencing scheme was entitled to some measure of constitutional protection. *Greenholtz*, 442 U.S. at 12, 99 S.Ct. 2100. The Court concluded that some measure of protection was due to inmates whose parole requests were denied under a discretionary parole statute that provided that an inmate "shall" be released when his minimum term of imprisonment less good time credits expired. *Id.* at 11-12, 99 S.Ct. 2100.

Both parties and amicus curiae American Civil Liberties Union of Minnesota argue that we should look to the language of Minn.Stat. §§ 244.101 and 244.05 (2004), establishing Minnesota's determinate sentencing scheme, to determine whether the state has created a liberty interest in an inmate's date of supervised release. Carrillo and amicus argue, based on *Greenholtz*, that the use of

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

mandatory language in Minnesota's statute establishes that Carrillo has a liberty interest in his supervised release date. Citing to *Greenholtz*, Carrillo argues that Minnesota's determinate sentencing scheme has triggered a similar expectancy of release from prison in inmates subject to that scheme. He asserts that the statute creates such an expectancy by requiring a sentencing court to explain the total length of a defendant's sentence, the amount of time the defendant will serve in prison, and the amount of time the defendant will serve on supervised release absent disciplinary offenses resulting in punishment while in prison. *See* Minn.Stat. § 244.101, subd. 2. Carrillo argues that the statute requires that a defendant be released from prison after serving two-thirds of his sentence, thereby establishing a liberty interest that is entitled to some measure of constitutional protection.

By contrast, the commissioner argues that Carrillo had no reasonable expectation that he would be released from prison on a specific date because the language of section 244.101, subd. 3 (2004), expressly provides that an inmate has no right to a specific, minimum length of a supervised release term. Additionally, the commissioner reasons that Carrillo's argument lacks merit because Minn.Stat. § 244.101, subd. 2, requires that the sentencing court explain to the defendant at the time of sentencing that "the amount of time the defendant actually serves in prison may be extended by the commissioner if the defendant commits any disciplinary offense in prison" and that such an extension "could result in the defendant's serving the entire executed sentence in prison." In the alternative, the commissioner contends that, if the *Greenholtz* mandatory language analysis remains intact, the statutes should be characterized as permissive because the length of an inmate's supervised release term is "subject to" the commissioner's authority to impose "any disciplinary confinement period" extending the term of imprisonment when the inmate has violated "any disciplinary rule adopted by the commissioner." Minn.Stat. §§ 244.101, subd. 1; 244.05, subd. 1b (2004).

*770 Both parties focus too narrowly on the

language of sections 244.101 and 244.05 to establish or defeat an inmate's expectation of supervised release and the existence of a protectable liberty interest. Since its decisions in *Wolff* and *Greenholtz*, the Supreme Court has expressed its disapproval of the emphasis that courts have placed on the mandatory or discretionary nature of statutes in seeking to determine whether the state has created liberty interest. *Sandin*, 515 U.S. at 479-84, 115 S.Ct. 2293.

In *Sandin*, an inmate brought a civil rights action against prison officials in the state of Hawai'i, challenging the imposition of disciplinary segregation for misconduct. *Id.* at 476, 115 S.Ct. 2293. The Ninth Circuit Court of Appeals drew a "negative inference" from the mandatory language of the prison regulation at issue and then, based on that language, concluded that the inmate had a liberty interest in not being subjected to disciplinary segregation. *Id.* at 476-77, 115 S.Ct. 2293; *see* Haw. Admin. Rule § 17-201-18(b)(2) (1983). The Supreme Court expressed concern about the Ninth Circuit's analysis, not because the analysis was unreasonable, but rather because it was indicative of a broader problem. *See Sandin*, 515 U.S. at 481, 115 S.Ct. 2293.[FN2] The Court said:

> FN2. The broader problem was rooted in the implicit reasoning of the Supreme Court's decision in *Greenholtz*, 442 U.S. at 11-12, 99 S.Ct. 2100, and made explicit in later cases. *See, e.g., Hewitt v. Helms*, 459 U.S. 460, 471-72, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); *Olim v. Wakinekona*, 461 U.S. 238, 249-50, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Thompson*, 490 U.S. at 454, 109 S.Ct. 1904.

By *shifting the focus* of the liberty interest inquiry to one based on the language of a particular regulation, and not the *nature of the deprivation*, the Court encouraged prisoners to comb regulations in search of mandatory language on which to base entitlements to various state-conferred privileges. Courts have, in response, and not altogether illogically, drawn negative inferences from mandatory language in the text of prison regulations.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

*Id.* (emphasis added). The Court then explained that "the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause." *Id.* at 483, 115 S.Ct. 2293.

The Supreme Court in *Sandin* did not overrule any prior decisions, but proclaimed that "[t]he time has come to return to the due process principles * * * correctly established and applied in *Wolff* and *Meachum.*" *Id.* The Court stated:
[State-created liberty] interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force * * * nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.

*Id.* at 484, 115 S.Ct. 2293. Accordingly, the Court rejected the approach of focusing narrowly on the language of a particular statute, and instead focused its liberty analysis on the nature of the deprivation at issue; that is, the degree to which that deprivation caused a departure from the basic conditions of the inmate's sentence. *See id.* at 485, 115 S.Ct. 2293. [FN3]

> FN3. The dissent, by making the language of Minn.Stat. § 244.101, subd. 3, the lynchpin of its analysis, effectively turns *Sandin* on its head. Instead of examining the nature of the deprivation at issue in the context of the statutory scheme as the Supreme Court in *Sandin* encouraged courts to do henceforth, the dissent allows the language of Minn.Stat. § 244.101, subd. 3, to entirely negate the possibility that there may have been a deprivation that implicates due process principles.

*771 In *Sandin,* the Supreme Court noted that the inmate's segregated confinement did not exceed similar discretionary confinement in either duration or degree of restriction and did not inevitably lead to an extension of the inmate's overall period of

confinement. *Id.* at 486-87, 115 S.Ct. 2293. The Court noted that under the Hawai'i statute, the cause-effect relationship between the outcome of the disciplinary proceedings and any possible extension of an inmate's period of confinement is " simply too attenuated to invoke the procedural guarantees of the Due Process Clause." *Id.* at 487, 115 S.Ct. 2293. The Court stated that the decision to release the inmate rests on "a myriad of considerations," and the inmate is afforded procedural protections at a parole hearing during which he has an opportunity to explain the circumstances behind his misconduct. *Id.* Thus, the Court held that neither the prison regulation in question nor the Due Process Clause itself created a protected liberty interest that would entitle the inmate to the procedural protections set forth in *Wolff. Id.*

[7] Based on the due process principles articulated in *Sandin,* we conclude that it is inappropriate to analyze Carrillo's liberty interest by looking solely to statutory language; rather, we must examine the nature of the deprivation and the extent to which that deprivation departs from the basic conditions of Carrillo's sentence. Under the Minnesota statutory scheme used to impose Carrillo's sentence, sentences presumptively consist of a specified minimum term of imprisonment equal to two-thirds of the executed sentence and a specified maximum term of supervised release equal to one-third of the executed sentence. *See* Minn.Stat. § 244.101, subd. 1. Under this scheme, an inmate's term of imprisonment may be extended by the commissioner only if the inmate commits a disciplinary offense. *See* Minn.Stat. §§ 244.101, subd. 2; 244.05, subd. 1(b). In fact, our courts are required to explain the following at sentencing:
(1) the total length of the executed sentence; (2) the amount of time the defendant will serve in prison; and (3) the amount of time the defendant will serve on supervised release, *assuming the defendant commits no disciplinary offense in prison that results in the imposition of a disciplinary confinement period.*

Minn.Stat. § 244.101, subd. 2 (emphasis added). The statute provides further guidance, stating: " [t]he court shall also explain that the amount of time

701 N.W.2d 763

Page 11

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

the defendant actually serves in prison may be extended by the commissioner if the defendant commits any disciplinary offenses in prison." *Id.*

[8] Here, the commissioner found that Carrillo committed a disciplinary offense and extended his incarceration time by seven days. In examining the nature and extent of Carrillo's deprivation, it becomes apparent that it is dissimilar to that in *Sandin*. The deprivation in *Sandin* involved the punishment of disciplinary segregation, and thus involved only the conditions under which the inmate served his time while in prison. 515 U.S. at 475-76, 115 S.Ct. 2293.[FN4] In *Sandin,* the Supreme Court concluded that the disciplinary segregation was not a departure from the basic conditions of the inmate's sentence, *772 and that the punishment did not "inevitably affect" the duration of his sentence. *Id.* at 487, 115 S.Ct. 2293.

> FN4. Carrillo's deprivation is similar to the deprivation in *Sandin* with respect to the 23 days that Carrillo spent in disciplinary segregation, but different from the deprivation in *Sandin* in that Carrillo's date of release from prison was extended by seven days.

It appears to us that Carrillo's deprivation is more similar to the deprivation experienced by the inmate in *Wolff*, where the Supreme Court held that the inmate had a liberty interest in the date of his release from prison. Thus, a further comparison between this case and *Wolff* is in order. Under the Nebraska statute examined in *Wolff*, inmates would accrue good time credits at a rate of two months for the first and second years of good behavior, three months for the third year, and four months for every year thereafter. *See Wolff,* 418 U.S. at 546 n. 6, 94 S.Ct. 2963 (citing Neb.Rev.Stat. § 83-1107 (Cum.Supp.1972)). The forfeiture or withholding of those good time credits affects the length of the term of imprisonment. *Wolff,* 418 U.S. at 547, 94 S.Ct. 2963.[FN5] When it examined Nebraska's sentencing scheme, the Court determined that the system of good time credits created a liberty interest strong enough to require due process protection. *Id.* at 558, 94 S.Ct. 2963.

FN5. We note that in Minnesota, an inmate sentenced for crimes committed before 1993 shall have his sentence "reduced in duration by one day for each two days during which the inmate violates none of the disciplinary offense rules promulgated by the commissioner." Minn.Stat. § 244.04, subd. 1 (2004). Such a reduction in sentence length is analogous to the reduction due to "good time credits" in *Wolff.* Carrillo was convicted in 1999, and therefore this statute is not applicable to him. But we cite the statute for purposes of comparison with the current Minnesota sentencing scheme and the sentencing scheme the Supreme Court considered in *Wolff. See* Footnote 7.

[9] The Nebraska sentencing scheme which the Supreme Court held to create a liberty interest contains a subtle but significant liberty interest difference from that in Minnesota's sentencing scheme-a difference which arguably may create an even greater liberty interest for Carrillo. Under the sentencing scheme at issue in *Wolff,* good time credits *only accrued if an inmate did not commit a disciplinary offense. See* Neb.Rev.Stat. § 83-1107. By contrast, under Minnesota's current sentencing scheme, there is a presumption from the moment that a court imposes and explains the sentence that the inmate will be released from prison on a certain date-and that presumption is overcome only if the inmate commits a disciplinary offense. While the distinction is subtle, we conclude that due to the presumptions that underlie Minnesota's sentencing scheme, Carrillo has an even stronger liberty interest at stake than did the inmate in *Wolff,* and accordingly any extension of his incarceration implicates due process protection.[FN6]

> FN6. Contrary to the dissent's assertion, the majority does not "bifurcate the analysis" by treating the statute and the nature of the deprivation separately. Our analysis is informed by our observation that the statutory scheme *establishes the basis for evaluating* the nature of the deprivation, and thus we consider both

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Page 12

together. Punishment schemes are imposed by statute; thus, the deprivation caused when an inmate's supervised release date is extended does not and cannot occur in a vacuum. If an inmate's established date of supervised release were arbitrary and could be modified by the commissioner for any reason or for no reason at all, or if the legislature did not clearly delineate the 2/3 imprisonment and 1/3 supervised release scheme in the statute, then the extension of that inmate's likely date of supervised release may not represent a departure from the basic conditions of his sentence. But it is precisely because Minnesota's statutory scheme sets up an ordered, standardized, clearly delineated system-under which an inmate *will be released* from prison on the date that he was informed by the judge at sentencing that he would be released *unless he commits a disciplinary offense* -that the extension of Carrillo's supervised release date represents a departure from the basic conditions of his sentence. Moreover, it follows that Carrillo's deprivation under the current-post-1993-Minnesota statutory scheme is more severe than is an inmate's deprivation under the statutory scheme in *Wolff* because Carrillo was given a more concrete expectation of release than was the inmate in *Wolff.*

*773 [10] We recognize that Minnesota's sentencing scheme contains a short provision entitled "No right to supervised release" that declares that "[n]otwithstanding the court's explanation of the potential length of a defendant's supervised release term, the court's explanation creates no right of a defendant to any specific, minimum length of a supervised release term." Minn.Stat. § 244.101, subd. 3. But the statutes, taken as a whole, plainly establish a sentencing scheme under which an inmate *will serve* two-thirds of his executed sentence in prison and one-third on supervised release *unless* he commits a disciplinary offense while in prison. Therefore, we are left with two possible ways to interpret section 244.101,

subd. 3. Either there is a difference between a " liberty interest" and a "right" which makes it possible to reconcile that provision with the rest of the sentencing scheme, or "liberty interest" and " right" are interchangeable and the legislature has established a sentencing scheme that is internally inconsistent. Our interpretation both gives the legislature the benefit of the doubt and harmonizes section 244.101, subd. 3, with the rest of the statutory scheme.[FN7]

> FN7. The dissent asserts that the majority ignores the statutory construction canon directing the court to construe every statute to give effect to all of its provisions; yet it is the dissent's analysis that appears to offend that canon. *See* Minn.Stat. § 645.16 (2004). By making section 244.101, subd. 3, the decisive provision, the dissent leaves nothing to prevent the commissioner from extending an inmate's date of supervised release for any reason or for no reason whatsoever. Such a result renders meaningless other statutory provisions that make it clear that the commissioner may extend an inmate's date of supervised release only if the inmate has committed a disciplinary offense. *See* Minn.Stat. §§ 244.101, subd. 2; 244.05, subd. 1(b) (2004).

[11] For all of the foregoing reasons, we conclude that, similar to the inmate in *Wolff* and unlike the inmate in *Sandin,* Carrillo has experienced a deprivation that "inevitably affects" the length of his term of imprisonment because his date of release from prison was extended by seven days as an *immediate consequence* of the disciplinary action against him. In reaching our conclusion, we recognize that seven days of additional incarceration time may not appear long relative to two-thirds of a 114-month sentence, but it is important to emphasize that we conclude any extension of an inmate's period of imprisonment represents a significant departure from the basic conditions of the inmate's sentence. *Cf. Foucha v. Louisiana,* 504 U.S. 71, 112 S.Ct. 1780, 118 L.Ed.2d 437 (1992). Therefore, we hold that under

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

the Due Process Clause of the United States Constitution, Carrillo has a protected liberty interest in his supervised release date that triggers a right to procedural due process before that date can be extended. Because we have reached this holding under the U.S. Constitution, we conclude that it is unnecessary to analyze Carrillo's liberty interest under the Minnesota Constitution, and therefore we decline to do so.

II.

[12] Having concluded that Carrillo has a protected liberty interest in his supervised release date under the United States Constitution, we turn now to the issue of whether the DOC's "some evidence" standard of proof offers sufficient protection of that interest. The purpose of a standard of proof for a particular type of adjudication is to instruct the fact finder *774 on the degree of confidence our society desires the fact finder to have in the correctness of his or her conclusions. *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979). The standard of proof "serves to allocate the risk of error between the litigants and to indicate the relative importance attached to the ultimate decision." *Id.*

[13] The evolution of our law has produced three basic standards of proof: preponderance of the evidence, clear and convincing, and beyond a reasonable doubt. *Id.* at 423-24, 99 S.Ct. 1804. The Supreme Court stated that civil cases typically use the preponderance of the evidence standard because society has a "minimal concern" with the outcome of private suits. *Id.* at 423, 99 S.Ct. 1804. Criminal cases employ the beyond a reasonable doubt standard because the defendant's interests are so strong that the likelihood of erroneous judgment must be minimized as much as possible. *Id.* at 423-24, 99 S.Ct. 1804. Civil cases involving allegations of fraud or other quasi-criminal wrongdoing may use the intermediate clear and convincing evidence standard because the defendant's interests at stake in those cases are more substantial than those present in a typical civil case. *Id.* at 424, 99 S.Ct. 1804.

[14][15] The DOC policy specifies that a fourth standard of proof-"some evidence"-shall be used in hearings on major violations of prison disciplinary rules. This standard allows a hearing officer to find that an inmate violated a disciplinary rule if there is some credible evidence presented to show that the inmate committed the offense charged. Thus, as a standard of proof, "some evidence" is much less exacting than the preponderance of the evidence standard used in civil cases.

The Supreme Court addressed the "some evidence" standard with respect to prison disciplinary hearings in *Superintendent, Massachusetts Correctional Institution at Walpole v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). In *Hill*, the Court held that the requirements of due process are satisfied if some evidence supports a decision by a prison disciplinary board to revoke good time credits. *Id.* at 455, 105 S.Ct. 2768. The Court explained that "[t]his standard is met if 'there was some evidence from which the conclusion of the administrative tribunal could be deduced.' " *Id.* (citing *United States ex rel. Vajtauer v. Comm. of Immigration*, 273 U.S. 103, 106, 47 S.Ct. 302, 71 L.Ed. 560 (1927)). Additionally, the Court stated:

Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board.

*Hill*, 472 U.S. at 455-56, 105 S.Ct. 2768 (emphasis added).

Since the release of *Hill*, courts have interpreted its holding regarding the use of the "some evidence" standard differently. Some courts, such as the Eighth Circuit, have concluded that due process is satisfied if the fact finder, generally a prison disciplinary committee, bases its decision on the existence of "some evidence" in the record that shows that the inmate committed the offense charged. *See, e.g., Goff v. Dailey*, 991 F.2d 1437, 1442 (8th Cir.1993). The Eighth Circuit reasoned that prison administration would be unduly burdened and institutional interests possibly

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

threatened if a more exacting evidentiary standard were required. *Id.* Additionally, the court noted that not all deprivations of interests protected by the Fourteenth Amendment require a full evidentiary hearing before an impartial decision-maker**775 using a preponderance of the evidence or higher standard. *Id.* at 1440-41, *citing Cleveland Bd. of Educ. v. Loudermill,* 470 U.S. 532, 546, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985) (concluding that an employer may terminate a tenured public employee for cause after giving the employee notice of the charges, an explanation of the evidence, and an opportunity for the employee to present his side of the story); *Goss v. Lopez,* 419 U.S. 565, 582, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (concluding that a school principal may deprive a student of a protected interest after informing the student of the accusations against him and "informally discuss [ing] the alleged misconduct with the student minutes after it has occurred"). The Eighth Circuit then concluded that prison inmates are not entitled to the level playing field created by a fully adversarial proceeding using a preponderance of the evidence standard, and that the "some evidence" standard is appropriate for use at the fact-finding level. *Id.* at 1441.

Though the Eighth Circuit and some other courts have concluded that the "some evidence" standard is appropriate at the fact-finding level, the prevailing view is that the standard is only suitable for use by an appellate court in the context of reviewing lower court decisions. Courts espousing this view interpret *Hill* as addressing the "some evidence" standard solely in the context of judicial review of prison administration decisions. *See Brown v. Fauver,* 819 F.2d 395, 399 n. 4 (3rd Cir.1987); *Kodama v. Johnson,* 786 P.2d 417, 420 (Colo.1990); *Harper v. State,* 397 N.W.2d 740, 743 (Iowa 1986). The Vermont Supreme Court carefully analyzed *Hill,* and concluded that *Hill* addressed the appropriate standard for judicial review of the actions of prison authorities rather than the proof necessary for a fact finder to conclude that an inmate violated a disciplinary rule. *LaFaso~v. Patrissi,* 161 Vt. 46, 633 A.2d 695, 697-98 (1993). The Vermont court went on to state that "[t]he safest reading of the Supreme Court's ambiguous analysis is that *Hill* does not

purport to resolve the question one way or the other." *Id.* at 698. The court then engaged in its own analysis on the due process issue. *Id.* Indeed, citing *Hill,* the Supreme Court recently explained in a plurality opinion that it has utilized the "some evidence" standard not as a standard of proof, but rather as a standard of review when examining an administrative record developed after an adversarial proceeding. *Hamdi v. Rumsfeld,* 542 U.S. 507, 124 S.Ct. 2633, 2651, 159 L.Ed.2d 578 (2004).[FN8]

> FN8. The Supreme Court used the following language in explaining the "some evidence" holding of *Hill:*
> Because we conclude that due process demands some system for a citizen detainee to refute his classification, the proposed "some evidence" standard is inadequate. Any process in which the Executive's factual assertions go wholly unchallenged or are simply presumed correct without any opportunity for the alleged combatant to demonstrate otherwise falls constitutionally short. As the Government itself has recognized, we have utilized the "some evidence" standard in the past as a standard of review, not as a standard of proof. * * * That is, it primarily has been employed by courts in examining an administrative record developed after an adversarial proceeding-one with process at least of the sort that we today hold is constitutionally mandated in the citizen enemy-combatant setting. *See* [*Hill* ]. This standard therefore is ill suited to the situation in which a habeas petitioner has received no prior proceedings before any tribunal and had no prior opportunity to rebut the Executive's factual assertions before a neutral decisionmaker. *Hamdi,* 124 S.Ct. at 2651.

[16] We agree with the prevailing view and conclude that *Hill* addressed only the *776 appropriateness of "some evidence" as a standard of appellate review, not a standard of proof. Therefore, we now seek to determine through our

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763                                                                                    Page 15

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

own analysis the appropriate fact-finding standard to be used by the DOC. To determine whether a standard of proof in a particular type of proceeding satisfies due process, the Supreme Court has prescribed a three-factor test that examines: (1) the private interest affected, (2) the risk of an erroneous deprivation of such interest, and (3) the government's interest. *Mathews v. Eldridge,* 424 U.S. 319, 335, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976).

[17] It is clear that the first factor is satisfied here, as we have already concluded that an inmate has a protected liberty interest in his date of supervised release. The Supreme Court has acknowledged that when an inmate has a liberty interest in good time credits, he also has a strong interest in assuring that the loss of his good time credits is not imposed arbitrarily because such a loss threatens his prospective freedom from confinement by extending the length of imprisonment. *See Hill,* 472 U.S. at 453, 105 S.Ct. 2768. Here, as a direct result of the DOC hearing officer's determination that Carrillo had engaged in disorderly conduct, Carrillo had seven days added to his term of incarceration.

[18] Under the second factor, the risk of erroneous deprivation of an interest is high when the fact finder uses the "some evidence" standard. The Vermont Supreme Court in *LaFaso* noted: "It is difficult to conceive of an aspect of disciplinary procedure with a greater impact on the accuracy of fact-finding than the evidentiary standard on which the ultimate conclusion must be based." 633 A.2d at 699. We agree. Under the "some evidence" standard, a fact finder could conclude that an inmate has committed a disciplinary offense even when the greater weight of the evidence indicates that he did not. Indeed, the fact finder could reach this conclusion even when significantly more than the greater weight of the evidence indicates that the inmate is not guilty. Thus, the use of the "some evidence" standard might result in the extension of many inmates' terms of incarceration, even when there is a strong likelihood that these inmates have not committed a disciplinary offense. Under this standard of proof, the benefits of certain procedural safeguards provided by the DOC's rules, such as notice and opportunity to respond, are of no value

when prison authorities can extend an inmate's term of incarceration for an alleged violation of a disciplinary rule even when the balance of the evidence fails to prove that the inmate committed the charged offense.

[19][20] We turn now to the third and final factor, the government's interest. The Eighth Circuit in *Goff* noted that the government has an interest in assuring the safety of inmates and employees, as well as avoiding burdensome administrative requirements that might be susceptible to manipulation. *Goff,* 991 F.2d at 1441. But the government also has an interest in promoting fair procedures, and the government derives no benefit from disciplining inmates who have committed no offense. The institution's goals of preparing and rehabilitating inmates for re-entry into society are better achieved if they have been treated fairly. *Cf. McKune v. Lile,* 536 U.S. 24, 36, 122 S.Ct. 2017, 153 L.Ed.2d 47 (2002) (stating that rehabilitation is an important penological objective, and a prison program bearing a rational relation to that objective does not violate the privilege against self-incrimination as long as the adverse consequences an inmate faces for not participating are related to the program objectives and do not constitute *777 atypical and significant hardships in relation to the ordinary incidents of prison life). The "some evidence" standard sends the message to prison inmates as well as society at large that once an individual is convicted of a crime, he is presumed guilty of every subsequent allegation. This message runs contrary to fundamental principles of criminal law in the United States.

[21][22][23] Taking the Supreme Court's three factors into consideration, we conclude that the " some evidence" standard is inappropriate for use by the DOC at the fact-finding level. We conclude that the preponderance of the evidence standard better protects against an erroneous deprivation of an inmate's liberty interest in his supervised release date and does not impose an unacceptable burden on the DOC. Therefore, we conclude that a DOC hearing officer must find by a preponderance of the evidence that Carrillo has committed a disciplinary offense before the commissioner can extend the date of his supervised release.

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763                                                                 Page 16

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

Accordingly, we hold that the district court and the court of appeals erred when they denied Carrillo's petition for a writ of habeas corpus.

Reversed.

ANDERSON, G. Barry, J., took no part in the consideration or decision of this case. PAGE, Justice (concurring).

I agree with the majority's holding that a Minnesota prison inmate has a constitutionally protected interest in a specific supervised release date. But I write separately to comment on the dissent's conclusion that an inmate has no such right under Minnesota's statutes. In my view, the dissent's analysis is flawed.

The object of statutory construction is "to ascertain and effectuate the intention of the legislature." Minn.Stat. § 645.16 (2004). As such, we must construe statutes as a whole, and give meanings to words and sentences in light of their context. *Christensen v. Hennepin Transp. Co., Inc.*, 215 Minn. 394, 409, 10 N.W.2d 406, 415 (1943). When the words of a statute are clear and free from all ambiguity, further construction is neither necessary nor permitted. *Owens ex rel. Owens v. Water Gremlin Co.*, 605 N.W.2d 733, 736 (Minn.2000). A statute's words and phrases are to be "construed according to rules of grammar and according to their common and approved usage." Minn.Stat. § 645.08(1) (2004).

Under Minn.Stat. § 244.101, subd. 1 (2004), an inmate must serve "a specified minimum term of imprisonment that is equal to two-thirds of the executed sentence," and a specified maximum supervised release term "subject to the provisions of section 244.05, subdivision 1b." Under Minn.Stat. § 244.05, subd. 1b (2004), for felony offenses committed on or after August 1, 1993, every inmate sentenced to prison "*shall* serve a supervised release term upon completion of the inmate's term of imprisonment and any disciplinary confinement period imposed by the commissioner" due to violation of disciplinary rules or failure to participate in a required rehabilitation program. (Emphasis added.) Read together, the language of section 244.101, subdivision 1, and section 244.05,

subdivision 1b, is clear and free from ambiguity. An inmate, such as Carrillo, who is sentenced for a felony offense that occurred on or after August 1, 1993, has a right to be placed on supervised release after serving two-thirds of the executed sentence plus any disciplinary confinement period properly imposed by the Commissioner of Corrections. Although the inmate has no right to be placed on supervised release on a date certain, he or she does have a liberty *778 interest in being released pursuant to the terms of the statutory scheme. As the inmate is entitled to supervised release after serving two-thirds of the executed sentence plus any properly imposed disciplinary confinement period, so too is the Commissioner of Corrections obligated to place the inmate on supervised release after that time period. Any failure to do so would be a due process violation because the language of the statute creates a mandatory supervised release requirement. *See State v. Calmes*, 632 N.W.2d 641, 645, 648 (Minn.2001) ("[D]ue process may be violated when a defendant's sentence is enhanced after the defendant has developed a crystallized expectation of finality in the earlier sentence."); *State v. Humes*, 581 N.W.2d 317, 319 (Minn.1998) (concluding that the use of the word "shall" in the conditional release term statute made the conditional release term mandatory).

The dissent reads section 244.101, subdivision 1, and section 244.05, subdivision 1b, in conjunction with section 244.101, subdivision 2 (2004), to conclude, "[t]hese provisions clearly demonstrate that there is no statutory right to a specified period of supervised release." That conclusion is wrong. Minnesota Statutes § 244.101, subdivision 2, provides:

When a court pronounces an executed sentence under this section, it *shall explain:* (1) the total length of the executed sentence; (2) the amount of time the defendant will serve in prison; and (3) the amount of time the defendant will serve on supervised release, assuming the defendant commits no disciplinary offense in prison that results in the imposition of a disciplinary confinement period. The court *shall also explain* that the amount of time the defendant actually serves in prison may be extended by the commissioner if the defendant commits any disciplinary offenses in prison and that

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763                                                    Page 17

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

this extension could result in the defendant's serving the entire executed sentence in prison.

(Emphasis added.) Thus, section 244.101, subdivision 2, merely confirms the application of section 244.05, subdivision 1b, and requires the sentencing court to explain to the defendant the requirements of section 244.05, subdivision 1b. In support of its conclusion, the dissent cites to section 244.101, subdivision 3 (2004), which provides that "[n]otwithstanding the court's explanation of the potential length of the defendant's supervised release term, the court's explanation creates no right of a defendant to any specific, minimum length of a supervised term." (Emphasis added.) Construing subdivision 3 in the context of section 244.101, it is clear that subdivision 3 only provides that the court's explanation does not create a right to a specific minimum length of a supervised release term. Subdivision 3 places no limits on the requirements of section 244.05, subdivision 1b. Section 244.101, subdivision 3, likely reflects the legislature's concern that any error in a sentencing court's explanation should not lead a defendant to claim a right to a particular supervised release term. An example, by way of analogy, illustrates this point. We have held that when a defendant is convicted of a crime that carries with it a conditional release term and the sentencing court fails to impose the conditional release term at the sentencing hearing, the conditional release is nonetheless mandatory and nonwaivable.[FN1] See Calmes, 632 N.W.2d at 649. *779 Section 244.101, subdivision 3, like our holding in Calmes, makes it clear that an error by the sentencing court in explaining the minimum period of incarceration and the maximum period of supervised release creates no right in the defendant to any specific minimum length of supervised release.

> FN1. We have recognized that the defendant has the right to the benefit of the bargain of his or her plea agreement. See, e.g., State v. Wukawitz, 662 N.W.2d 517, 520, 522 (Minn.2003) (holding that where imposition of mandatory conditional release term would violate a plea agreement and a plea withdrawal would

unduly prejudice the state, the district court has discretion to impose a conditional release term shorter than the statutory minimum); State v. Jumping Eagle, 620 N.W.2d 42, 45 (Minn.2000). This is so because "if a guilty plea is induced by a government promise, such a promise must be fulfilled or due process is violated." Wukawitz, 662 N.W.2d at 522. As a result, under certain circumstances, the terms of the mandatory and nonwaivable conditional release may not be imposed. The defendant's right to the benefit of the plea bargain derives from the defendant's right to due process, and not from some right created by the court's explanation of the potential length of the defendant's sentence.

Because section 244.05, subdivision 1b, creates a liberty interest in being released after an inmate has served the term of imprisonment plus any disciplinary confinement period properly imposed by the commissioner, Carrillo is entitled to review of the propriety of the imposed discipline.

BLATZ, Chief Justice (dissenting).
"[T]he interest of prisoners in disciplinary procedures is not included in that 'liberty' protected by the Fourteenth Amendment." Wolff v. McDonnell, 418 U.S. 539, 556-57, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). Only a statute can create a liberty interest in a specified date of supervised release, which gives rise to due process procedural protections before that date can be extended for violating a disciplinary rule. See Sandin v. Conner, 515 U.S. 472, 483-84, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); Wolff, 418 U.S. at 557, 94 S.Ct. 2963. Because I believe Minnesota's statutes do not create a liberty interest in a specified date of supervised release, I respectfully dissent.

Critical to the analysis of the question before this court are the United States Supreme Court decisions in Wolff, 418 U.S. at 539, 94 S.Ct. 2963, and Sandin, 515 U.S. at 472, 115 S.Ct. 2293. In Wolff, the Supreme Court addressed whether Nebraska's prison disciplinary procedures complied with due process. 418 U.S. at 555, 94 S.Ct. 2963. The

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763                                                                                                   Page 18

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

Court concluded that, while the federal constitution does not guarantee an inmate good-time credit for satisfactory behavior in prison, a state can provide a statutory right to good-time credit, giving rise to a protectible liberty interest. *Id.* at 556-57, 94 S.Ct. 2963.

In determining whether Nebraska's statutes had in fact created a liberty interest, the Supreme Court looked at relevant provisions of the Nebraska statute, which expressly provided for good time stating that:
The chief executive officer of a [correctional] facility *shall* reduce, for parole purposes, for good behavior and faithful performance of duties while confined in a facility the term of a committed offender.

*Id.* at 546 n. 6, 94 S.Ct. 2963 (quoting Neb.Rev.Stat. § 83-1,107 (Cum.Supp.1972)) (emphasis added). The "good-time" reduction by statute could only be forfeited if a disciplinary committee found that the inmate had been engaged in "flagrant or serious misconduct." *Id.* at 545 n. 5, 94 S.Ct. 2963 (quoting Neb.Rev.Stat. § 83-185 (Cum.Supp.1972)).

After reviewing these provisions of the Nebraska statute, the Court stated:
It is true that the Constitution itself does not guarantee good-time credit for satisfactory behavior while in prison. But here the State itself has not only provided a statutory right to good time *780 but also specifies that it is to be forfeited only for serious misbehavior. Nebraska may have the authority to create, or not, a right to a shortened prison sentence through the accumulation of credits for good behavior, and it is true that the Due Process Clause does not require a hearing "in every conceivable case of government impairment of private interest." But the State having created the right to good time and itself recognizing that its deprivation is a sanction authorized for major misconduct, the prisoner's interest has real substance and is sufficiently embraced within Fourteenth Amendment "liberty" to entitle him to those minimum procedures appropriate under the circumstances and required by the Due Process Clause to insure that the state-created right is not

arbitrarily abrogated.

*Id.* at 557, 94 S.Ct. 2963 (citation omitted). Thus, in holding that the prisoner was entitled to "the minimum requirements of procedural due process appropriate for the circumstances," the Court focused on the fact that the Nebraska statute created a statutory right to good time and the statute specified that good time could be forfeited only for " serious misconduct." *Id.* at 558, 94 S.Ct. 2963.

In *Sandin v. Conner*, the Supreme Court again addressed whether prison disciplinary procedures implicated a liberty interest, requiring procedural protections under the Due Process Clause. 515 U.S. at 487, 115 S.Ct. 2293. The prisoner in *Sandin*, Demont Conner, challenged the imposition of disciplinary segregation for misconduct. The prison regulation in question required a finding of guilt when the allegation of misconduct was " supported by substantial evidence." *Id.* at 475-77, 115 S.Ct. 2293. Although Connor was not allowed to present witnesses at the disciplinary hearing, a fact-finding committee nonetheless found him guilty of misconduct and put him in disciplinary segregation. *Id.* at 475-76, 115 S.Ct. 2293. Connor brought an action against the prison officials in federal district court alleging a deprivation of procedural due process in connection with the disciplinary hearing. *Id.* at 476, 115 S.Ct. 2293. The federal district court granted the state's motion for summary judgment in favor of the prison officials, but the Ninth Circuit reversed. *Id.* The Ninth Circuit concluded that Connor had a liberty interest in remaining free from disciplinary segregation and therefore held that the inmate was entitled to call witnesses at the disciplinary hearing pursuant to *Wolff. Id.* at 476-77, 115 S.Ct. 2293.

In reversing the Ninth Circuit, the Supreme Court noted that the Ninth Circuit's holding that the inmate was entitled to procedural protections set forth in *Wolff* was based on an incorrect "negative inference that the [disciplinary] committee may not impose segregation if it does not find substantial evidence of misconduct." *Id.* at 477, 115 S.Ct. 2293 . It was this "negative inference" creation of a liberty interest by the Ninth Circuit that the United States Supreme Court rejected in *Sandin*, stating:

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

Inferr[ing] from the mandatory directive that a finding of guilt "shall" be imposed under certain conditions the conclusion that the absence of such conditions prevents a finding of guilt * * * may be entirely sensible in the ordinary task of construing a statute defining rights and remedies available to the general public. It is a good deal less sensible in the case of a prison regulation primarily designed to guide correctional officials in the administration of a prison. Not only are such regulations not designed to confer rights on inmates, but the result of the negative implication jurisprudence is not to require the prison officials to follow *781 the negative implication drawn from the regulation, but is instead to attach procedural protections that may be of quite a different nature.

*Id.* at 481-82, 115 S.Ct. 2293. Again recognizing that states can create liberty interests protected by the Due Process Clause, the Court concluded that " Connor's discipline in segregated confinement did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." *Id.* at 486, 115 S.Ct. 2293. Thus, the Court held that "neither the Hawaii prison regulation in question, nor the Due Process Clause itself, afforded [the defendant] a protected liberty interest that would entitle him to the procedural protections set forth in *Wolff.*" *Id.* at 487, 115 S.Ct. 2293.

While the United States Supreme Court has clearly ruled that state statutes are the source of any due process right to be accorded to inmates in prison disciplinary procedures, the majority nonetheless states that "it is inappropriate to analyze Carrillo's liberty interest by looking solely to statutory language; rather, we must examine the nature of the deprivation and the extent to which that deprivation departs from the basic conditions of Carrillo's sentence." In so stating, the majority in effect interprets *Wolff* and *Sandin* as creating an analytical framework that has two separate legal considerations: (1) the statutory right and (2) the nature of the deprivation. Using this framework, the majority then concludes that Carrillo has a liberty interest in a specific supervised release date. This framework, I respectfully submit, is not grounded in or supported by Supreme Court

precedent because the Court's precedent does not bifurcate the analysis, but rather looks to the statute to see if there has been a deprivation. Accordingly, because a liberty interest, if created, is created by state statute, I begin by analyzing the applicable Minnesota statutes to determine whether they provide a protectible entitlement to a specified date of supervised release.

Under Minnesota statutes, an executed sentence " consists of two parts: (1) a specified minimum term of imprisonment that is equal to two-thirds of the executed sentence; and (2) a specified maximum supervised release term that is equal to one-third of the executed sentence." Minn.Stat. § 244.101, subd. 1 (2004). Importantly, the statutes provide that "[t]he amount of time the inmate actually serves in prison and on supervised release is subject to the provisions of [Minn.Stat.] § 244.05, subd. 1b. " Minn.Stat. § 244.101, subd. 1. Section 244.05 provides that an inmate convicted for a crime committed after August 1, 1993, "shall serve a supervised release term upon completion of the inmate's term of imprisonment *and* any disciplinary confinement period imposed by the commissioner due to the inmate's violation of any disciplinary rule adopted by the commissioner." Minn.Stat. § 244.05, subd. 1b (2004) (emphasis added). Minnesota statutes further require that the district court explain the two parts of the sentence-the minimum term of imprisonment and the maximum term of supervised release-to the defendant when the sentence is pronounced. Minn.Stat. § 244.101, subd. 2 (2004). As set forth in the statute, at sentencing the court must specifically "explain that the amount of time the defendant actually serves in prison may be extended by the commissioner if the defendant commits any disciplinary offenses in prison." *Id.* These provisions clearly demonstrate that there is no statutory right to a specified period of supervised release.

Reinforcing this clear expression of legislative intent is the statutory provision entitled "No right to supervised release" which provides: " Notwithstanding the court's explanation of the potential length *782 of a defendant's supervised release term, the court's explanation creates no right of a defendant to any specific, minimum length of a

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

701 N.W.2d 763

Page 20

701 N.W.2d 763
(Cite as: 701 N.W.2d 763)

supervised release term." Minn.Stat. § 244.101, subd. 3 (2004). In my view, this statement and the totality of the other relevant statutory provisions is determinative of the issue before us; the legislature clearly did not intend to create a liberty interest in a specified date of supervised release.

The majority's reliance on *Sandin* to look at the " deprivation" [FN1] suffered by the defendant, notwithstanding the plain language of our statute stating there is "no right," ignores the holding of *Wolff*-that there is no right to supervised release unless it is created by the state. Thus, the majority's analysis is in direct conflict with *Wolff* and, in consequence, with the Supreme Court's statement in *Sandin* that "the time has come to return to the due process principles we believe were correctly established and applied in *Wolff* and *Meachum.*" *Sandin*, 515 U.S. at 483, 115 S.Ct. 2293. Moreover, by ignoring the express language that there is "no right," the majority violates the canon of construction that we construe every law to give effect to *all* its provisions. Minn.Stat. § 645.16 (2004) (emphasis added).[FN2]

> FN1. The majority states: "It appears to us that Carrillo's deprivation is more similar to the deprivation experienced by the inmate in *Wolff*, where the Supreme Court held that the inmate had a liberty interest in the date of his release from prison." While his deprivation may be similar, the statutes are not. Unlike Minnesota Statutes, Nebraska's statute did not contain a provision stating that the prisoner had " no right" to supervised release, but in fact expressly provided that the chief executive officer of a prison "shall reduce" an inmates sentence for good behavior. *Wolff*, 418 U.S. at 546 n. 6, 94 S.Ct. 2963.

> FN2. The majority suggests that the statute is "internally inconsistent" if not interpreted to provide a liberty interest to Carrillo despite the provision stating that there is "no right." However, the Supreme Court in *Sandin* recognized that while there may be prison regulations "

designed to guide correctional officials in the administration of a prison," "such regulations [are] not designed to confer rights on inmates." *Sandin*, 515 U.S. at 481-82, 115 S.Ct. 2293. Similarly, our statute is not designed to confer rights on inmates.

In summary, there can be no deprivation if there is no constitutional or statutory right.[FN3] Indeed, there can be no deprivation where our statute specifically provides that a defendant has "no right * * *" to any specific, minimum length of a supervised release term." Minn.Stat. § 244.101, subd. 3. With such statutory language, I cannot conclude that an inmate was deprived, much less that, as the majority concludes, the deprivation caused "a significant departure from the basic conditions of the inmate's sentence."

> FN3. The majority distinguishes a "liberty interest" from a "right" in order to circumvent the legislature's express language that there is "no right." In doing so, the majority concludes that while there is no "right" to supervised release, an inmate has a "liberty interest" in a specific period of supervised release. This is inconsistent with the Supreme Court's decision in *Wolff* where the Court concluded that the inmate had an interest of "real substance" *because* the state " created the *right* to good time." *Wolff*, 418 U.S. at 557, 94 S.Ct. 2963.

While it may be preferable policy or practice to have such a statutory right, it is not the responsibility of this court to create one. It is our responsibility to afford inmates the process necessary to protect any right created by statute. Here, no right is created and I would so hold.
ANDERSON, Russell A., J. (dissenting).
I join the dissent of Chief Justice Blatz.

Minn.,2005.
Carrillo v. Fabian
701 N.W.2d 763

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

PROOF OF SERVICE BY MAIL

CASE NAME: MONTEZ v. CURRY, on habeas corpus

CASE NO. : To be assigned

I, Victor M. Montez, hereby declare that I am a party
to the above titled action and am over the age of eighteen (18),
and I did serve a true copy of the following:

WRIT OF HABEAS CORPUS WITH EXHIBITS

by placing a true copy in an envelope with first class postage fully
prepaid and said envelope surrendered to correctional staff at the
Correctional Training Facility for delivery to the prison mail room
and therefrom delivered to the local United States Post Office the
next business day from which there is postal service between the
place of mailing and the addressee:

    Bill Lockyer
    Attorney General
    110 W. "A" Street, #1100
    San Diego, CA 92101

    I declare under penalty of perjury that the foregoing is true
and correct, doing so this 2nd day of October, 2006, at
Soledad, California.

# EXHIBIT 2



FILED
LOS ANGELES SUPERIOR COURT

AUG 1 5 2007

JOHN A. CLARKE, CLERK

BY _____
                    DEPUTY

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**FOR THE COUNTY OF LOS ANGELES**

In re,                                    ) Case No.: BH004498
                                          ) ORDER RE: WRIT OF HABEAS CORPUS
VICTOR MONTEZ,                            )
                                          )
           Petitioner,                    )
                                          )
     On Habeas Corpus                     )
                                          )
_____)

     The Court has read and considered petitioner's Writ of Habeas Corpus filed on January 2,

2007. Having independently reviewed the record, giving deference to the broad discretion of the

Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record

contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole

(See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter

*Rosenkrantz*).)

     Petitioner was received in the Department of Corrections on June 1, 1982 after a

conviction for second-degree murder with use of a firearm. He was sentenced to seventeen years

to life. His minimum parole eligibility date was April 9, 1990. The record reflects that on

August 9, 1980, petitioner, his wife and a female companion were traveling to Oxnard when their

car broke down on the Ventura Freeway. The two women stood on the side of the freeway

waiting for someone to stop to offer help, while petitioner hid in the bushes. The victim stopped

for the two stranded women. As they entered the vehicle, petitioner ran up brandishing a gun.

md                                    1

He ordered the driver to take them to Oxnard. He then fired the weapon killing the victim. He dragged the body out of the car and hid it under a tree and shrubs. Then, petitioner and his crime partners drove off in the victim's car. Petitioner contends that he fired the gun accidentally when the victim attempted to adjust the seat.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on May 31, 2006. Petitioner was denied parole for one year. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.

The Court finds that there is some evidence to support the Board's finding that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal.App.4th 871, at 893.) In this case, petitioner and his crime partners killed the victim because they needed a ride to Oxnard. The Board was justified in concluding that this motive is materially less significant motives than those motives which conventionally drive people to commit murder, thus indicating that petitioner poses a greater risk of danger to society if released than is ordinarily present.

Additionally, the record reflects that petitioner had an unstable social history prior to the commitment offense, which is a factor tending to indicate unsuitability for parole. (Cal. Code Regs., tit. 15, §2402, subd. (c)(3).) Petitioner began using herion when he was thirteen years old. He eventually developed a $200 a day habit. He was first arrested at the age of thirteen and had several more arrests as an adult, leading to sentences of probation and state prison in New Mexico. He dropped out of high school when he was sixteen years old. Heavy drug use, school problems and prior criminality are some evidence of an unstable social history. (*In re Van Houten* (2004) 116 Cal.App.4th 339, 353.)

1    The Court rejects petitioner's argument that he is entitled to release based on the terms of

2  his plea agreement.  A plea bargain violation claim depends upon the actual terms of the

3  agreement, not the subjective understanding of the defendant or deficient advice provided by his

4  attorney.  (*In re Honesto* (2005) 130 Cal.App.4th 81, 91-93.)   According to the terms of his plea

5  bargain, petitioner pled guilty to second degree murder with use of a firearm and agreed to a

6  sentence that carried a maximum term of life in prison.  Petitioner has "no vested right to

7  determination of his sentence at less than the maximum."  (*In re Schoengarth* (1967) 66 Cal.2d

8  295, 302.)  Therefore, the Board did not violate the plea bargain in finding petitioner unsuitable

9  for parole.

10    Accordingly, the petition is denied.

11

12

13  Dated:    8/15/07

14                                                    

                                                        STEVEN VAN SICKLEN
15                                                      Judge of the Superior Court

16  Clerk to give notice.

17

18

19

20

21

22

23

24

25

26

27

28

md                                3

1

**Send copy of order to:**
Department of Justice – State of California
2    Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
3    110 West A Street, Suite 1100
San Diego, CA 92101
4

Victor M. Montez
5    Correctional Training Facility
P.O. Box 689 (ED-181L)
6    Soledad, CA 93960

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

md                                    4

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012 | **FILED**<br>LOS ANGELES SUPERIOR COURT<br>AUG 1 5 2007<br>JOHN A. CLARKE, CLERK<br>BY _Joseph M. Pulido_<br>DEPUTY<br>Joseph M. Pulido |
| PLAINTIFF/PETITIONER:<br><br>VICTOR M. MONTEZ | |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004498 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time       ☒ Order re: Writ of Habeas Corpus
☐ Order to Show Cause       ☐ Order
☐ Order for Informal Response       ☐ Order re:
☐ Order for Supplemental Pleading       ☐ Copy of Petition for Writ of Habeas Corpus for the
                                                  Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

August 15, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_ , Clerk
      Joseph M. Pulido

Victor M. Montez
C-48215
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

Department of Justice- State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

**EXHIBIT 3**
**Part 1 of 4**

CRIMINAL DOCKETING

RECEIVED IN

MC-275

Name   Victor M. Montez

Address   Correctional Training Facility

        P.O. Box 689 (ED-181L)

        Soledad, CA 93960

CDC or ID Number   C-48215

## CALIFORNIA COURT OF APPEALS

## SECOND APPELLATE DISTRICT

(Court)

| | |
|---|---|
| VICTOR M. MONTEZ, | PETITION FOR WRIT OF HABEAS CORPUS |
| Petitioner | |
| vs. | No. _____ |
| BEN CURRY (Warden),, | (To be supplied by the Clerk of the Court) |
| Respondent | (Supp. Ct. Case No. BH004498, Loas Angeles County) |

### INSTRUCTIONS—READ CAREFULLY

- If you are challenging an order of commitment or a criminal conviction and are filing this petition in the Superior Court, you should file it in the county that made the order.

- If you are challenging the conditions of your confinement and are filing this petition in the Superior Court, you should file it in the county in which you are confined.

- Read the entire form *before* answering any questions.

- This petition must be clearly handwritten in ink or typed. You should exercise care to make sure all answers are true and correct. Because the petition includes a verification, the making of a statement that you know is false may result in a conviction for perjury.

- Answer all applicable questions in the proper spaces. If you need additional space, add an extra page and indicate that your answer is "continued on additional page."

- If you are filing this petition in the Superior Court, you need file only the original unless local rules require additional copies. Many courts require more copies.

- If you are filing this petition in the Court of Appeal, file the original and four copies of the petition and, if separately bound, one copy of any supporting documents.

- If you are filing this petition in the California Supreme Court, file the original and ten copies of the petition and, if separately bound, two copies of any supporting documents.

- Notify the Clerk of the Court in writing if you change your address after filing your petition.

- In most cases, the law requires service of a copy of the petition on the district attorney, city attorney, or city prosecutor. See Penal Code section 1475 and Government Code section 72193. You may serve the copy by mail.

Approved by the Judicial Council of California for use under Rule 60 of the California Rules of Court [as amended effective January 1, 2005]. Subsequent amendments to Rule 60 may change the number of copies to be furnished to the Supreme Court and Court of Appeal.

Form Approved by the
Judicial Council of California
MC-275 [Rev. July 1, 2005]

**PETITION FOR WRIT OF HABEAS CORPUS**

Penal Code, § 1473 et seq.;
Cal. Rules of Court, rule 60(a)

American LegalNet, Inc.
www.USCourtForms.com

**This petition concerns:**

| | |
|---|---|
| ☐ A conviction | ☐ Parole |
| ☒ A sentence | ☐ Credits |
| ☐ Jail or prison conditions | ☐ Prison discipline |
| ☐ Other *(specify)*: _____ | |

1. Your name: <u>Victor M. Montez</u>

2. Where are you incarcerated? <u>Correctional Training Facility, P.O. Box 689, Soledad, CA 93960</u>

3. Why are you in custody? ☒ Criminal Conviction   ☐ Civil Commitment

   *Answer subdivisions a. through i. to the best of your ability.*

   a. State reason for civil commitment or, if criminal conviction, state nature of offense and enhancements (for example, "robbery with use of a deadly weapon").

   <u>2nd degree murder w/use of a firearm</u>

   b. Penal or other code sections: <u>187 / 12022.5</u>

   c. Name and location of sentencing or committing court: <u>Superior Court of California,</u>
   <u>County of Los Angeles</u>

   d. Case number: <u>LA A146105</u>

   e. Date convicted or committed: <u>March 26, 1982</u>

   f. Date sentenced: <u>May 21, 1982</u>

   g. Length of sentence: <u>15 years to life plus 2 years firearm enhancement</u>

   h. When do you expect to be released? <u>To be determined</u>

   i. Were you represented by counsel in the trial court? ☐ Yes.   ☐ No. If yes, state the attorney's name and address:
   N/A

4. What was the LAST plea you entered? *(check one)*

   ☐ Not guilty   ☒ Guilty   ☐ Nolo Contendere   ☐ Other: _____

5. If you pleaded not guilty, what kind of trial did you have?

   ☐ Jury   ☐ Judge without a jury   ☐ Submitted on transcript   ☐ Awaiting trial
   N/A

6. **GROUNDS FOR RELIEF**

**Ground 1:** State briefly the ground on which you base your claim for relief. For example, "the trial court imposed an illegal enhancement." *(If you have additional grounds for relief, use a separate page for each ground. State ground 2 on page four. For additional grounds, make copies of page four and number the additional grounds in order.)*

PLEASE SEE APPENDIX "A" PAGE 5 FOR ANSWERS TO 6, ET SEQ.

_____

_____

_____

a. Supporting facts:

Tell your story briefly without citing cases or law. If you are challenging the legality of your conviction, describe the facts upon which your conviction is based. *If necessary, attach additional pages.* CAUTION: You must state facts, not conclusions. For example, if you are claiming incompetence of counsel you must state facts specifically setting forth what your attorney did or failed to do and how that affected your trial. Failure to allege sufficient facts will result in the denial of your petition. (See *In re Swain* (1949) 34 Cal.2d 300, 304.) A rule of thumb to follow is: who did exactly *what* to violate your rights at what time *(when)* or place *(where)*. *(If available, attach declarations, relevant records, transcripts, or other documents supporting your claim.)*

PLEASE SEE APPENDIX "A" STARTING AT PAGE 5 FOR ANSWERS TO 6a

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

b. Supporting cases, rules, or other authority (optional):

*(Briefly discuss, or list by name and citation, the cases or other authorities that you think are relevant to your claim. If necessary, attach an extra page.)*

PLEASE SEE APPENDIX "B" STARTING A PAGE 17 FOR ANSWERS TO 6b

_____

_____

_____

_____

8.  Did you appeal from the conviction, sentence, or commitment?  ☐ Yes.  ☐ No.  If yes, give the following information:
    a.  Name of court ("Court of Appeal" or "Appellate Dept. of Superior Court"):  N/A
    _____

    b.  Result: _____    c.  Date of decision: _____

    d.  Case number or citation of opinion, if known: _____

    e.  Issues raised:  (1) _____

        (2) _____

        (3) _____

    f.  Were you represented by counsel on appeal?  ☐ Yes.  ☐ No.  If yes, state the attorney's name and address, if known:
        N/A
    _____

9.  Did you seek review in the California Supreme Court?  ☐ Yes.  ☐ No.  If yes, give the following information:
        N/A
    a.  Result: _____    b.  Date of decision: _____

    c.  Case number or citation of opinion, if known: _____

    d.  Issues raised:  (1) _____

        (2) _____

        (3) _____

10. If your petition makes a claim regarding your conviction, sentence, or commitment that you or your attorney did not make on appeal, explain why the claim was not made on appeal:
    N/A
    _____

11. Administrative Review:

    a.  If your petition concerns conditions of confinement or other claims for which there are administrative remedies, failure to exhaust administrative remedies may result in the denial of your petition, even if it is otherwise meritorious. (See *In re Muszalski* (1975) 52 Cal.App.3d 500 [125 Cal.Rptr. 286].) Explain what administrative review you sought or explain why you did not seek such review:

        THERE IS NO ADMINISTRATIVE REVIEW

    _____

    _____

    _____

    _____

    _____

    _____

    b.  Did you seek the highest level of administrative review available?  ☐ Yes.  ☐ No.
        N/A
        *Attach documents that show you have exhausted your administrative remedies.*

MC 275 [Rev. January 1, 1999]          PETITION FOR WRIT OF HABEAS CORPUS
                                              – 3 –

12. Other than direct appeal, have you filed any other petitions, applications, or motions with respect to this conviction, commitment, or **issue** in any court?  ☒ Yes. If yes, continue with number 13.  ☐ No. If no, skip to number 15.

13. a. (1) Name of court:  **Los Angeles County SUperior Court**

  (2) Nature of proceeding (for example, "habeas corpus petition"):  **Habeas Corpus**

  (3) Issues raised: (a)  **SAME AS RAISED HEREIN, except for subclaim "A": Superior**

  (b)  **Court exceeding its jurisdiction.**

  (4) Result (Attach order or explain why unavailable):  **Denied (see EXHIBIT 9)**

  (5) Date of decision:  **8/15/2007**

  b. (1) Name of court:

  (2) Nature of proceeding:

  (3) Issues raised: (a)

  (b)

  (4) Result (Attach order or explain why unavailable):

  (5) Date of decision:

  c.  For additional prior petitions, applications, or motions, provide the same information on a separate page.

14. If any of the courts listed in number 13 held a hearing, state name of court, date of hearing, nature of hearing, and result:
  **N/A**

15. Explain any delay in the discovery of the claimed grounds for relief and in raising the claims in this petition. (See In re Swain (1949) 34 Cal.2d 300, 304.)
  **No delay**

16. Are you presently represented by counsel?  ☐ Yes.  ☒ No. If yes, state the attorney's name and address, if known:

17. Do you have any petition, appeal, or other matter pending in any court?  ☐ Yes.  ☒ No. If yes, explain:

18. If this petition might lawfully have been made to a lower court, state the circumstances justifying an application to this court:

I, the undersigned, say: I am the petitioner in this action. I declare under penalty of perjury under the laws of the State of California that the foregoing allegations and statements are true and correct, except as to matters that are stated on my information and belief, and as to those matters, I believe them to be true.

Date:  **17 Sept. 2007**                          ▶ _(signature)_
                                                                    (SIGNATURE OF PETITIONER)

MC-275 [Rev. January 1, 1999]                 PETITION FOR WRIT OF HABEAS CORPUS
                                                        – 4 –

A P P E N D I X   "A"

Answer to 6, et seq.

Claim I

IT WAS A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
UNITED STATES CONSTITUTION; VIOLATING   PETITIONER'S
PLEA AGREEMENT, TO FIND HIM UNSUITABLE FOR PAROLE FOR
THE EIGHTH  TIME AFTER TWENTY-FIVE YEARS BASED ON
IMMUTABLE FACTORS WHEN THOSE FACTORS ARE NO LONGER
RELIABLE EVIDENCE AND OTHER FINDINGS ARE NOT
"CIRCUMSTANCES SPECIFIED BY STATUTE AND BY REGULATION";
THE DECISION BEING ARBITRARY AND AN ABUSE OF DISCRETION.

---

## Answers to 6a: Supporting facts

### The Plea Agreement

On August 11, 1980, Victor Montez (hereafter Petitioner) was

arrested for the murder of Michael Stewart, the murder occurring

on August 10, 1980.

In an "information" alleging several charges, all of which but

one were dropped (EXHIBIT 1), Petitioner was charged with "murder"

in violation of Penal Code § 187.[1/]  The charge being for the minimum

elements of the offense, that is, Petitioner, "with malice

aforethought (did) murder Michael Stewart, a human being."

On March 26, 1982, after being advised of his constitutional

rights, primarily, to trial by jury, confront witnesses and

cross-examination, and the right to present a defense (EXHIBIT 2,

p. 4-5), Petitioner entered into a stipulated plea agreement,

a contract, with the state of California to one count of second degree

murder, that is, "did unlawfully kill another human being with malice

aforethought" with the use of firearm in violation of Penal Code

---

1.  All codes and regulations are California, unless otherwise noted.

- 5 -

proffered that the murder of Mr. Stewart "was an unfortunate
situation...that Mr. Montez never intended to kill the victim; that
this was strictly an accident" (EXHIBIT 2, p. 9). There was no
objection by the prosecution.

On March 26, 1982, Petitioner was sentenced to 15 years to life
plus two years for the use of a firearm, to be served consecutively
(EXHIBIT 3), being credited with 648 days in custody, plus 324 days
good time credits, for a total of 972 days preconviction credit
(EXHIBIT 4). A probation officer's report (POR) (EXHIBIT 5) was
filed in conjunction with sentencing.

The Parole Hearing

On May 31, 2006, Victor Montez (hereafter Petitioner) appeared
before the Board of Parole Hearings (hereafter Board) for his EIGHTH
parole suitability hearing. Petitioner's minimum eligible parole
date (MEPD was fixed at April 9, 1990 (EXHIBIT 6, HT 1:7-16).[2]/

Petitioner was sworn to tell the truth (HT 8:3-7).

The commitment offense

The facts of Petitioner's commitment offense were read into
the record, being taken from Petitioner's Life Prisoner Evaluation
Report (LPER) from June 2002 (EXHIBIT 7), reading from the LPER at
HT 8:17-9:26:

> On August 9, 1980, Montez and two women, one of whom was his wife, were on their
> way to Oxnard when their vehicle became disabled. The two women began to
> hitchhike on the Ventura Freeway while Montez hid in the bushes. It was agreed
> that the two women would appear as two females stranded on the freeway while
> Montez would approach the motorist who stopped and exhibit a firearm he carried
> in his waistband. The victim, Michael Stewart stopped for the women. The women
> entered the rear seat while beckoning to Montez who was still hiding in the

2.  Reference to parole hearing transcript will be designated by HT followed
    by page and, when necessary, line number, e.g., (HT 1:1).

- 6 -

bushes. He ran to the car and brandished a small caliber firearm and entered the rear seat of the car. He pointed the firearm at the back of the victim's head and told him to drive them to Oxnard or he would kill him. Montez then fired, striking and killing the victim. Montez exited the car, dragged the body from the car and secreted the body beneath an overhanging tree and shrubs. After leaving the body, Montez, his wife and the other female companion drove the victim's car to Oxnard.

Petitioner "basically concurs with the report" (HT 10:3), with few exceptions; those exceptions being that "he never threatened the victim, in fact he offered the victim money for gas" (HT 10:4-6), Petitioner did have the gun pointed at the victim's head, but "believes the gun fired when the victim adjusted himself in the car seat and his elbow knocked the gun" (HT 10:6-11), Petitioner had no "intention to kill the victim" (HT 10:12-13), and "he never threatened the witness with violence if she contacted the police as is alleged" (HT 10:20-24). The facts of the offense are immutable and have remained consistent since the POR (EXHIBIT 5, pp. 6-10).

Prior criminal history

The Board reviews Petitioner's prior criminal history, starting with his juvenile record. Petitioner has no convictions as a juvenile (HT 11:16-24). As an adult, on April 26, 1973, given one year summary probation for entering non-commercial dwelling, while in custody for possession of marijuana charge, on October 19, 1973, convicted of sales and transportation of marijuana, January 7, 1974, Petitioner was convicted of "possession of marijuana and sent to CYA (HT 12:5-7), and has a conviction for "theft from motor vehicle" in the state of New Mexico, being released from custody on April 22, 1978 (HT 12:5-17; EXHIBIT 5, p. 5). None of Petitioner's prior convictions were serious or violent offenses.

///////

- 7 -

Prior social history

Petitioner began smoking marijuana at the age of 13, and started using heroin on weekends, progressing to a $200 a day habit by the age of 15 and would take Valium when heroin was not available (HT 14:8-15:2).

Petitioner dropped out of school at age 16 and entered Job Corps, remaining there eleven months learning to operate heavy equipment (HT 15:3-14).

From the Job Corps, Petitioner entered the United States Army, serving as a paratrooper in the Special Forces, being honorably discharged in 1972 (HT 15:14-26). Petitioner stayed free of drugs while in the military and believes he should have stayed in the military (HT 16:1-4).

While incarcerated in New Mexico, Petitioner earned his GED (HT 16:6-7). Petitioner earned certification as a welder during that time, also (HT 16:9-10).

Petitioner lived with a woman for approximately one year in New Mexico (HT 16:11-13), then returned to California where he met and entered into a relationship with Denise Garcia, marrying her in April, 1980, assuming responsibility for her two children, then having a daughter together (HT 16:14-17). Petitioner is now a grandfather (HT 17:5-8), and although divorced from his wife, who was also his crime partner in the instant offense, remains in contact and has support of his children (HT 33:19-20).

Prior to the instant offense, Petitioner was employed as roofer (HT 18:2-10).

Petitioner believes he had a good family life growing up

- 8 -

(HT 18:21-24); there was no abuse in the home (HT 19:1-11).

Parole plans

Petitioner will parole to his mother's home in Oxnard, which she owns (HT 19:15-22), and she will help financially and in any way she can (HT 35:13-20). Petitioner has a firm offer of employment from Ideal Upholstery in Ventura where he will start at $9.00 an hour (HT 20:6-20). Petitioner has alternative plans, arranging for an interview with a live-in program at the Ventura County Rescue Mission, with the requirements for admittance laid out for the Board (HT 22:23-23:13). Petitioner's daughter will provide housing, and, as her husband is starting his own business, the possibility of employment for Petitioner (HT 36:7-14).

Petitioner also has the support of Martha Duran, a woman whom he married while incarcerated, now divorced (due to the pressures of incarceration), residing in Oxnard and offering housing, and all the support "required so he can be a productive member of society" (HT 37:10-26), the Board finding this to be "very good" (HT 38:1).

Petitioner went to the effort to contact several organizations in the community that can provide housing and other services to re-enter society successfully, California Veterans Assistance, Luthern Social Services of Southern California, and New Directions of Los Angeles, as well as a pamphlet from Prison Industry Authority of job placement assistance and other services through parole services (HT 39:15-40:11).

Additionally, not only is Petitioner a certified welder, and heavy equipment operator, but since being incarcerated, among other vocational trades, has obtained certification as a paralegal (HT 48:11-13).

Postconviction behavior

It was noted that Petitioner has been "extremely active" since
his 2002 hearing (HT 24:18-20), having completed two certifications
from Federal Emergency Management in Emergency Preparedness, and
Radiological Emergency Management (HT 24:21-24). Petitioner received
three laudatory chronos for participation in the Prison Industries
Authority employability program (HT 24:24-27), and sixteen laudatory
chronos for his continued participation in Alcoholics Anonymous and
Narcotics Anonymous (HT 25:1-3).

Petitioner completed a thirteen week IMPACT workshop (a victim's
awareness self-help group) (HT 25:9-11).

Although Petitioner has disciplinary write-ups, the last one
being in 1993, "there are no write-ups for violence or weapons"
(HT 25:24-25).

Petitioner has received "exceptional and above-average work
reports" on his job in the furniture factory (HT 25:25-26:5).

Psychological evaluation

Petitioner's psychological evaluation, dated May 11, 2006
(EXHIBIT 8), was prepared by Dr. Macomber, one of the Board's own
forensic experts. Highlighting relevant factors, the Board notes:
"Dr. Macomber writes that in the past based upon your criminal history
you had been diagnosed as having antisocial personality disorder.
But at this point in your life there is no evidence of any antisocial
thinking or values. That your values are solidly pro-social, you
have deep feelings of concern and empathy toward others" and the
diagnostic label of antisocial is no longer appropriate (HT 28:7-17;
EXHIBIT 8, p. 2). Petitioner has a Global Assessment of Functioning

(GAF) Score of 90 (EXHIBIT 8, p. 3 [the highest score possible,
relating to global social functioning]).

Most importantly, relating to current threat to public safety,
covered at HT 28:26-29:20, Petitioner quotes directly from Dr.
Macomber's evaluation (EXHIBIT 8, pp. 3-4), under assessment of
dangerousness:

> In considering potential for dangerous behavior when released to the community,
> the Level of Service Inventory-Revised was administered.  This is an actuarial
> measure that assesses criminal history, substance abuse history, institutional
> adjustment, social relationships and other factors to determine current risk
> on parole.  He obtained a score of 5.1 cumulative frequency for prison inmates.
> This means that if 100 men were released on parole, he would do better on parole
> than 95 of them.  This is a low risk score.  At this point in his life, due to
> maturity, growth, and increased insight, he poses no more risk to society than
> the average citizen in the community.  In fact, based on the positive changes
> in his life, he probably poses less risk to society than the average citizen.

In response, the Board cogently stated: "That's a conclusion
I won't disagree with but that's certainly open to discussion at
some other time" (HT 29:20-22, emphasis added).  The Board continues,
"Under clinical observations and recommendations the doctor writes
that prognosis for successful adjustment in the community is
excellent" (HT 29:22-25; EXHIBIT 8, p. 4).

Correctional officials agree that Petitioner "would probably
pose a low degree of threat to the public at this time, if released
from prison" (EXHIBIT 7, p. 4, [that was two years prior]).

Opposition to parole

The deputy district attorney representing Los Angeles County,
after reiterating the facts of the case (HT 41:20-44:18), believing
Petitioner's substance abuse is merely in "institutional remission
(HT 45:2-7), and being critical of Petitioner exercising his
constitutional right not to discuss the case or incriminate himself,
believing that demonstrates failure to accept responsibility for

the offense (HT 45:7-15), opposed parole (HT 45:20-21).

D E C I S I O N

In concluding that Petitioner is "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety" if released from prison (HT 53:12-15), the Board relied on the following findings:

1.  The commitment offense, feeling "that the offense was carried out on an especially cruel manner" (HT 53: 21-22), stating the victim "was shot in the head after he stopped to render aid in what he thought were two individuals that were in distress along the side of the freeway" (HT 53:22-26); being "carried out in a very dispassionate and calculated manner" (HT 54:1-2), putting "the two women out on the freeway as a lure and that you were hiding in the bushes and unfortunately it was Mr. Stewart that was the first Samaritan that decided to stop and help. The victim was defiled after the offense in that he was stripped...(HT 54:3-12 [there is absolutely no evidence, and Petitioner denies, that Mr. Stewart was stripped of the clothing he was wearing, see EXHIBIT 5, pp. 6-7]); and the motive "was very trivial" (HT 54:14), in that the "worst case scenario you could have just ordered him out to the side of the freeway but that's neither here nor there at this point n time" (HT 54: 15-18).  The Board then reread the statement of facts into the record (HT 54:21-56:3).

2.  Prior criminal history, stating Petitioner had "an escalating pattern of criminal conduct and that you had failed previous grants of probation...previous attempts to correct your criminality through the CYA commitment" (HT 56:4-20), citing Petitioner's dismissed

- 12 -

charges and non-violent criminal convictions (HT 56:12-16).

3.   Parole plans needed to be shored up, the Board completely
ignoring the offer of residence and financial support from
Petitioner's mother (HT 19:15-22) and confirmed job offers (HT
20:6-20), criticizing the halfway houses Petitioner contacted as
not being satisfactory (HT 56:23-57:3), stating that Petitioner needs
a backup plan with a member of his family (which he has), and being
critical of the offer of residence and assistance from Ms. Duran
whom Petitioner married and divorced while incarcerated (HT 57:21-23),
the Board stating, "[i]t might be fine with the next Board but from
my experience with the parole division they probably would not approve
that" (HT 58:16-19).

4.   "[T]he representative from the Los Angeles County District
Attorney Office indicating opposition to parole" (HT 58:2-5).

Two factors were considered in Petitioner's favor: (1) "As far
as your institutional behavior you have programmed very well"
(HT 56:16-18); and (2) "[s]o far as the psychological report prepared
by Dr. Macomber in May 2006, it's favorable" (HT 56:22-23).   In
reference to Petitioner's long ago disciplinary write-ups, the Board
stated: "They are not an issue at least with this panel and I can't
see them being an issue with the next panel you come before"
(HT 60:24-61:1).

The Board recommended that Petitioner "continue in your AA/NA,
whichever is available, and continue to earn positive chronos"
(HT 58: 7-8).

### DECISION BY THE SUPERIOR COURT

The Honorable Steven R. Van Sicklen, Judge, Los Angeles County

- 13 -

Superior Court, found there was "some evidence" to support finding
Petitioner unsuitable for parole (EXHIBIT 9), stating, "The Board
based its decision on several factors, including the commitment
offense." Judge Van Sicklen writes (EXHIBIT 9, pp. 1-2):

> "The Court finds there is some evidence to support a finding that 'the motive
> for the crime is inexplicable or very trivial in relation to the offense' Cal.
> Code Regs., tit. 15, §2402, subd. (c)(1)(E).)  'To fit the regulatory description,
> the motive must be materially less significant (or more 'trivial') than those
> which conventionally drive people to commit the offense in question, and therefore
> more indicative of a risk of danger to society if the prisoner is released than
> is ordinarily present.' (In re Scott (2004) 119 Cal.App.4th 871, at 893.)
> In this case, petitioner and his crime partners killed the victim because they
> needed a ride to Oxnard. The Board was justified in concluding that this motive
> is materially less significant motive than those motives which conventionally
> drive people to commit murder, thus indicating that petitioner poses a greater
> risk of danger to society if released than is ordinarily present."

Judge Van Sicklen also cited the Board finding "that petitioner
had an unstable social history prior to the commitment offense, which
is a factor tending to indicate unsuitability for parole. (Cal. Code
Regs., tit. 15, § 2402, subd. (c)(3))"; concluding, "Heavy drug use,
school problems, and prior criminality are some evidence of unstable
social history. (In re Van Houton (2004) 116 Cal.App.4th 339, 353.)"
(EXHIBIT 9, p. 2).

Judge Van Sicklen rejected Petitioner's argument of, entering
into a contract with the state for second degree murder, expecting
to be punished for second degree murder and not first degree murder.
Petitioner did not argue that he is "entitled to release based on
the terms of his plea agreement," but that he has a reasonable
expectation to be punished within the legislatively prescribed matrix
for second degree murder and not first degree murder.

The trial court relied on In re Rosenkrantz (2002) 29 Cal.4th
616, 667 for the "some evidence" standard (EXHIBIT 9, p. 1), applying
only the first prong of the two prong test.

- 14 -

### C O N C L U S I O N

Based on the foregoing facts, exhibits in support of the facts, court records in this case, and the attached memorandum of law, it is respectfully requested that this Court issue an Order to Show Cause why relief should not be granted and the Board ordered to conduct a new hearing in accord with due process, or in the alternative, return the writ to the Los Angles County Superior Court with instructions to vacate its Order of 8/15/07 and reconsider Petitioner's claims in light of this Appellate District's controlling cases: In re Lee (2006) 143 Cal.App.4th 1400, 1408, 1412; In re Lawrence (2007) 150 Cal.App.4th 1511, 1543, 1544, 1551, 1561; and In re Gray (2007) 151 Cal.App.4th 379, 405.

DATED: 17 Sept. 2007

Respectfully submitted,

Victor M. Montez
Petitioner in pro per

V E R I F I C A T I O N

I, __Victor M. Montez__, declare under penalty of perjury
that I have read the foregoing facts and hereby state them to be
true and correct, and that the exhibits attached hereto in support
of the facts are true copies of the original documents, doing so
this __17__ day of __September__, __2007__ at Soledad, California.

_____
Victor M. Montez
Petitioner in pro per

P R A Y E R   F O R   R E L I E F

I, __Victor M. Montez__, hereby state that I have no other
plain or speedy remedy save habeas corpus, and therefore pray that
this Honorable Court will:

1. Order the respondent to show cause why the writ should
   not be granted;

2. Appoint counsel to protect the rights of Victor M. Montez
   against the weight and resources of the state;

3. Declare the rights of the parties;

4. Order discovery and/or an evidentiary hearing as needed to
   further develop the facts of the case;

5. Allow counsel to orally argue the case before the Court;

6. Grant the writ of habeas corpus; and

7. Grant any other relief in the furtherance of justice.

Date: __17 Sept. 2007__

Respectfully submitted,

_____
Victor M. Montez
Petitioner in pro per

- 16 -

A P P E N D I X  "B"

M E M O R A N D U M  O F  L A W

Answers to 6 b - Supporting points and authorities

A.  The Superior Court Exceeded its Jurisdiction When Making Findings
    to Support its Decision that were Not Made By the Board of Parole
    Hearings.

The Superior Court "gives an assist to the Panel by implying
findings concerning the commitment offense not articulated in its
decision" (In re Roderick (2007) ___ Cal.App.4th ___, 2007 WL 2343737,
*13 (8/17/07)).  When Comparing the Board's decision to the decision
of the Los Angeles County Superior Court (EXHIBIT 9 ), it is apparent
the Superior Court, not only did not follow this Appellate District's
authority on the issues at bench, but to justify its decision made
findings the Board did not make.

The Board stated in its decision, after Petitioner's twenty-six
years of imprisonment and rehabilitation: "the offense was carried
out in an especially cruel manner" (HT 53:21-22), "being carried
out in a very dispassionate and calculated manner" (HT 54:1-2), the
victim "was defiled after the offense in that he was stripped" (HT
54:3-12, and the motive "was very trivial" (HT 54:14).  There is
no evidence the victim was "stripped" of his clothing or that he
was "defiled."  Moreover, Petitioner has consistently maintained
that the shooting was an accident and the prosecution, throughout
plea proceedings, not once contested that.

Firstly, Petitioner's account of the commitment offense is the
only first hand account available and has never been proved otherwise,
or even contested; thus, it has been accepted that the shooting was
not intentional but accidental.  Therefore, the commitment offense

- 17 -

cannot fit the definition of "dispassionate and calculated" (Cal.
Code Regs., tit. 15, § 2402(1)(c)(B) ["such as an execution-style
murder"] (EXHIBIT 10). The Superior Court violated Petitioner's
right to due process by allowing that finding to stand. Secondly,
in that the commitment offense was unintentional and therefore
accidental, there was no motive, therefore the motive could not be
"trivial." Thirdly, the finding by the Board that Petitioner's parole
plans needed to be shored up, requiring a backup plan with a family
member was totally contrary to the evidence, Petitioner having
residential and financial support from his mother (HT 19:15-22),
confirmed job offers (HT 20:6-20, and half-way houses as a backup
plan (HT 56:23-57:3), rendering the decision arbitrary, capricious
and whimsical. The Superior Court violated Petitioner's right to
due process by allowing this finding to stand. Fourthly, after 26
years of imprisonment, "it is difficult to find [Petitioner's]
commitment crime supplies 'some evidence' rationally demonstrating
[]he represents an unreasonable danger to the public safety at the
present time" (In re Lawrence (2007) 150 Cal.App.4th 1511, 1558).
And fifthly, time, 26 years, even if the offense was as depicted
by the Board against Petitioner's rehabilitation, "aggravating facts
of the crime no longer amount to 'some evidence' supporting denial
of parole" (Id., at 1551).

With postconviction conduct credits, constructively, Petitioner
has served the equivalent of 34 years, and in calendar years is one
(1) year beyond what would have been the 25 year term if convicted
of first degree murder, thus, "it is appropriate to consider whether
his offense would still be considered especially egregious for a

- 18 -

first degree murder in order to promote the parole statute's goal
of proportionality between the length of sentence and the seriousness
of the offense" (In re Rosenkrantz (2002) 29 Cal.4th 616, 690, Moreno,
J., concurring, emphasis in original).

Additionally, contrary to the Superior Court's findings, to
give "an assist to the Panel by implying findings concerning the
[decision] not articulated in its decision" (In re Roderick, supra,
2007 WL 2343737, *13), the Board did not find as an unsuitability
factor "that petitioner had and unstable social history prior to
the commitment offense, which is a factor tending to indicate
unsuitability for parole. (Cal. Code Regs., tit. 15, §2402, subd.
(c)(3)) (EXHIBIT 9, p. 2). It is true the Board found Petitioner
had "an escalating pattern of criminal conduct and that you failed
previous grants of probation... (HT 56:4-20, citing Petitioner's
dismissed charges and non-violent criminal conviction (HT 56:12-16).
The Superior Court is mixing apples with oranges.

Firstly, the regulations "distinguish['] between criminal history
(§ 2402, subd. (b)) with the latter being defined in terms of social
relationships (§ 2402, subd. (c)(3)) as distinguished from criminal
activity. The two factors are thus distinct and should not be
confabulated" (In re Roderick, supra, 2007 WL 2343737, *16).
Secondly, arrests and/or convictions for non-violent offenses are
not a previous record of violence within the definition of the
regulations (Cal. Code Regs., tit. 15, § 2402(c)(2)). To the
contrary, in that Petitioner "lacks any significant history of violent
crime" (Cal. Code Regs., tit. 15, § 2402(d)(6)) tends to militate
toward suitability. Thirdly, contrary to the Superior Court's stating

- 19 -

Petitioner "dropped out of high school when he was sixteen years
old...school problems" (EXHIBIT 10, p. 2⁹), there is no evidence that
Petitioner dropped out of high school because he was having
"problems"; but rather, to join Job Corps, after which he joined
the Army (HT 15:3-18). The case relied on by the Superior Court
(In re Van Houton (2004) 116 Cal.App.4th 339, 353), is not a
comparison, especially in that Van Houton's arrests were while being
a member of the Manson family, certainly prejudicing her case.  The
Superior Court's decision on this issue was arbitrary and an abuse
of discretion, violating Petitioner's right to due process.

Finally, although there was no specific terms as to how long
Petitioner would be imprisoned on his contract with the State for
second degree murder, in that Petitioner has no postconviction
violence, has participated in a multitude of rehabilitative programs
and is indeed rehabilitated, and has now served five years beyond
the maximum lagislatively prescribed punishment for second degree
murder, the expectations of Petitioner and the spirit of the plea
must be given serious consideration.

It appears the Superior Court was bent on denying Petitioner's
writ and went in search of makeweight justifications to do so.  The
findings by the Superior Court were beyond what the Board used to
deny parole and were arbitrary.  "Accordingly, '[w]e (the courts)
must confine our review to the stated factors found by the Board...not
to findings that the Attorney General ... suggests the Board might
have made" (In re Roderick, supra, 2007 WL 2343737, * 13, citing
In re DeLuna (2005) 126 Cal.App.4th 585, 593-594), so can it be said
for the Superior Court in case at bench.

The Superior Court's decision in case at bench begs the question:
If "[a]n intermediate appellate court is required to follow the
holdings of the Supreme Court" (Auto Equity Sales v. Superior Court
(1962) 57 Cal.2d 450, 455), are Superior Courts in an Appellate
District required to follow the holdings of that Appellate District
Court?  Especially when those Appellate Court cases, and like cases
from other appellate districts, were denied review and have not been
depublished, implying, in that the law is a living organism, our
Supreme Court is allowing the appellate courts to develop the law
as it relates to parole by not granting review or depublishing the
cases (see People v. Steele (2000) 83 Cal.App.4th 212, 220).

The Superior Court exceeding its jurisdiction violated
Petitioner's right to due process guaranteed by the Fifth and
Fourteenth Amendments to the United States Constitution.  Two of
the Board's findings were not supported by any evidence, even contrary
to the evidence; thus, Petitioner is entitled to judicial review
based on the Board's decision solely relating to the commitment
offense in accord with relevant case law (In re Rosenkrantz (2002)
29 Cal.4th 616, 658).

B.   Standard of Judicial Review

In a detailed analysis of California and federal law, California's
Second Appellate District recently held under both the California
and United States constitutions, life prisoners in California have
a "liberty interest" in parole and judicial review is the "some
evidence" standard (In re Lawrence (2007) 150 Cal.App.4th 1511),
citing inter alia, Greenholtz v. Inmates of Nebraska Penal and
Correctional Complex (hereafter Greenholtz) (1979) 442 U.S. 1; Board

- 21 -

of Pardon v. Allen (1988) 482 U.S. 369; Superintendent v. Hill
(hereafter Hill) (1985) 472 U.S. 445; McQuillion v. Duncan (9th Cir.
2002) 306 F.3d 895; Biggs v. Terhune (9th Cir. 2003) 334 F.3d 910;
Sass v. California Board of Prison Terms (hereafter Sass) (9th Cir.
2006) 461 F.3d 1123; Irons v. Carey (9th ir. 2007) 479 F.3d 658;
In re Rosenkrantz (2002) 29 Cal.4th 616; In re Dannenberg (2005)
34 Cal.4th 1061). The Lawrence court held, supra, 150 Cal.App.4th,
at 1540: "the fact there is 'some evidence' the crime was committed
and committed a certain way at a certain time does not mean that
crime necessarily represents 'some evidence' the prisoner's release
on parole will pose an unreasonable risk of danger to the public
safety at the present time. Whether it possesses the necessary
predictive value depends both on the nature of the crime and how
long ago it happened."

Although the "some evidence" standard of review is highly
differential and extremely low, "it does not convert a court reviewing
the denial of parole into a potted plant" (In re Scott I (2004) 119
Cal.App.4th 871, 898). The United States Supreme Court "explained
that the 'some evidence' standard applies only to questions of
evidentiary sufficiency" (In re Ramirez (2001) 94 Cal.App.4th 549,
563-564, explaining Edwards v. Balisok (1997) 520 U.S. 641, 648).
Ramirez was disapproved on other grounds (In re Dannenberg, supra,
34 Cal.4th, at 1100). Moreover, as articulated by the United States
Supreme Court in the Nation's controlling case: "The decision turns
on...primarily what a man is and what he may become rather than simply
what he has done" (Greenholtz, supra, 442 U.S., at 10); the premise
"[t]he test is not whether some evidence supports the reasons the

- 22 -

Governor cites for denying parole, but whether some evidence indicates a parolee's release <u>unreasonably endangers public safety</u>" (<u>In re Lee</u> (2006) 143 Cal.App.4th 1400, 1408, Petition for Review denied, depublication denied), clearly articulates the spirit of the law. "'Not only does the passage of time in prison count for something, exemplary behavior and rehabilitation in prison count for something according to <u>Biggs</u> and <u>Irons</u>. <u>Superintendent v. Hill</u>'s standard might be quite low, but it does not require that the decision <u>not</u> be arbitrary'" (<u>In re Roderick</u>, <u>supra</u>, 2007 WL 2343737, *21, quoting <u>McCullough v. Kane</u> (N.D. Cal. 2007) 2007 WL 1593227, *7, *8). A two-prong test, therefore, is appropriate. The first prong to determine "sufficiency of the evidence"; and then the second prong, can a "rational connection be made between the evidence and the decision made" finding a CURRENT threat to public safety (see <u>Id.</u>, at 1408 fn. 3).

In reviewing a suitability determination, then, the Executive "must remain focused not on the circumstances that may be aggravating in the abstract but, rather, on facts indicating that release <u>currently</u> poses 'an unreasonable risk of danger to society' (§ 2402, subd. (a); accord, Pen.Code, § 3041, subd. (b))" (<u>In re Elkins</u> (2006) 144 Cal.App.4th 475, 499, emphasis added, Petition for Review denied, depublication denied).

The bottom line is, relative to time since the commitment offense and rehabilitation, "whether the inmate will be able to live in society <u>without committing additional antisocial acts</u>" (<u>In re Lawrence</u>, <u>supra</u>, 150 Cal.App.4th, at 1543), "it is not just 'some evidence' to support the Governor's findings, but 'some evidence'

- 23 -

sufficient to satisfy the statute's ultimate test, that is, 'some
evidence' the release of Lawrence would subject society to an
'unreasonable risk' of danger to public safety" (Id., at 1544; In
re Lee, supra, 143 Cal.App.4th, at 1408).  The focus, therefore,
is to be on CURRENT parole risk, not a risk over two decades in the
past.  Thus, if the prisoner has served the minimum term, and there
is no evidence he or she is not rehabilitated, the prisoner is to
be paroled; if not, it violates due process.

C.  The Commitment Offense Is Not Reliable Evidence that Petitioner
    Is A CURRENT Threat to Public Safety Twenty Years After the Fact.

"The only ground for a parole denial is found in Penal Code
section 3041, subdivision (b), which provides that a release date
shall be set 'unless [the Board] determines that ... consideration
of the public safety requires a more lengthy period of incarceration'"
(In re Roderick, supra, 2007 WL 2343737, *12).  The commitment
offense, however, loses predictability of threat to public safety
over time when weighed against rehabilitation (In re Lawrence, supra,
150 Cal.App.4th, at 1561; In re Lee, supra, 143 Cal.App.4th, at 1412;
In re Elkins, supra, 144 Cal.4th, at 500; In re Scott II (2005) 133
Cal.App.4th 573, 594-595; Rosenkrantz v. Marshall (C.D. Cal. 2006)
444 F.Supp.2d 1063, 1065; Sanchez v. Kane (C.D. Cal. 2006) 444
F.Supp.2d 1049, 1062).

Does the evidence of the accidental killing of Mr. Stewart
support, by the regulations, that the killing was "especially heinous,
atrocious, or cruel"?

In case at bench, Petitioner has maintained from its inception
that the killing of Mr. Stewart was an accident, Petitioner's pistol
accidentally firing when Mr. Stewart adjusted his seat.  Petitioner

had no reason to deliberately shoot, much less kill Mr. Stewart as
Mr. Stewart was ready to take the trio to Oxnard.   Throughout the
plea proceedings (EXHIBIT 2), not once did the prosecution object
to the characterization of Mr. Stewart's death being nothing other
than an accident.   How can any comparison be made to whether or not
the motive was "materially less significant (or more 'trivial') than
those which conventionally drive people to commit the offense in
question" (EXHIBIT 9, p. 1)?   It cannot.

    This finding is not supported by the evidence, violating
Petitioner's right to due process.

    The commitment offense could not have been "dispassionate and
calculated" as the Board declared (HT 54:1-2; Cal. Code Regs., tit.
15, § 2402(c)(1)(B) ["The offense was carried out in a dispassionate
and calculated manner, such as an execution-style murder"]).   The
accidental killing of Mr. Stewart does not fit the definition of
"execution-style murder" (see EXHIBIT 10).   The kidnapping of Mr.
Stewart at gunpoint to procure a ride may be characterized as
"dispassionate and calculated," but not the accidental killing of
Mr. Stewart (<u>In re Elkins</u>, <u>supra</u>, 144 Cal.App.4th, at 497).   The
focus, therefore, must be "on the life-term offense" (<u>Id.</u>).
Calculated denotes planning and premeditation.   In that Petitioner
was convicted of second degree murder, in a plea agreement only to
the minimum elements of the offense, "malice aforethought" (EXHIBIT
2, p. 5), the State is now precluded from retrying the case and
finding elements of first degree murder, especially when those
elements were not there to begin with (<u>In re Gray</u> (2007) 151
Cal.App.4th 379, 405-407).

This finding was not supported by the evidence, violating Petitioner's right to due process.

The Board also found that Mr. Stewart "was defiled after the offense in that he was stripped, his body was concealed along the shoulder of the Ventura Freeway and just basically left in the shrubbery" (HT 54:8-12). There is absolutely no evidence that Mr. Stewart was "stripped" of his clothing. In fact, the evidence is the contrary (EXHIBIT 5, pp. 6-7 ["The victim's pants were open and partially down, the zipper was partially broken and the top button pulled off"]). This most likely was caused when Mr. Stewart was dragged out of his car and across the ground, but it certainly is not any evidence he was defiled, that is, he was raped (see <u>People v. Moore</u> (1961) 196 Cal.App.2d 91).

In that most murderers try to cover their tracks to avoid prosecution, doing so certainly is not defilement, nor provides some evidence of current threat to public safety (<u>In re Lawrence</u>, <u>supra</u>, 150 Cal.App.4th, at 1561; <u>In re Cooper</u> (2007) ____ Cal.App.4th ____, 2007 WL 2164237, *14 (filed 7/27/07)). There is no evidence that Petitioner "defiled" Mr. Stewart, thus this finding violated Petitioner's right to due process.

How must punishment for the commitment offense, an indeterminate sentence with the possibility of parole, therefore, be weighed?

An indeterminate sentence under the Uniform Determinate Sentencing Act of 1976 (UDSA) is a "hybrid" (<u>In re Dannenberg</u>, <u>supra</u>, 34 Cal.4th, at 1083), applying both the rehabilitation model of the repealed indeterminate sentencing law (ISL) and punishment model of the UDSA. Punishment and rehabilitation are two lines on a graph

and when the two lines exceed at, or after, the time line, the
prisoner must be paroled. "For example, the provision under which
[Petitioner] was sentenced provides that a person guilty of second
degree murder 'shall be punished' in the state prison for a term
of 15 years to life" (In re Morrall (2002) 102 Cal.App.4th 280, 289).
The Morrall court continued: "With respect to persons sentenced to
indeterminate terms, the purpose of punishment is satisfied by the
requirement of service of a minimum period before eligibility for
parole" (Id., at 292); thus, punishment is based on the crime.  On
the other hand, under the ISL, the law operated "to mitigate the
punishment which would otherwise be imposed upon the offender.  These
laws place emphasis upon the reformation of the offender.  They seek
to make the punishment fit the criminal rather than the crime"
(In re Minnis (1971) 7 Cal.3d 639, 644).

Petitioner's commitment offense occurred on August 10, 1980,
and has been incarcerated since August 11, 1980.  Accepting a plea
agreement for second degree murder, Petitioner's minimum eligible
parole date (MEPD) was reached on April 9, 1990 (EXHIBIT 6, HT 1).
With conduct credits, 4 months for each year without a serious CDC
115 (Cal. Code Regs., tit. 15, § 2410), Petitioner has constructively
served 34 years, nine years beyond the minimum term for first degree
murder, and 16 years beyond his MEPD for second degree murder.

Relevant to case at bench is In re Weider (2006) 145 Cal.App.4th
570, 582-583, in which the court noted:

"[I]t should be self evident that after an inmate has served the
equivalent of 25 years, whether his actions were more than minimally
necessary for a second degree conviction .... is no longer the
appropriate question.  [The Board's] position, that inmates who
were only convicted of second degree may forever be denied parole
based on some modicum of evidence that their acts rose to the level

of a first, without acknowledging the fact that they have already
served the time for a first, should be seen as so ridiculous that
simply to state it is to refute it."

As the Ninth Circuit instructed in <u>Irons v. Carey, supra</u>, 479
F.3d, at 665:

> "We hope that the Board will come to recognize that in some
> cases, indefinite detention based solely on an inmate's commitment
> offense, regardless of the extent of his rehabilitation, will at
> some point violate due process, given the liberty interest that
> flows from the relevant California statutes."

There is no doubt Petitioner has served the legislatively
prescribed term for second degree murder. Having done so, the
commitment offense can no longer be a factor, as that line on the
graph has been satisfied. Parole suitability, therefore, turns on
rehabilitation: Is there any evidence "'whether the inmate will be
able to live in society <u>without committing additional antisocial
acts</u>'" (<u>In re Lawrence, supra</u>, 150 Cal.4th, at 1543, citing <u>In re
DeLuna, supra</u>, 126 Cal.App.4th, at 591, quoting <u>In re Rosenkrantz,
supra</u>, 29 Cal.4th, at 655, emphasis added by <u>Lawrence</u> court).

Petitioner has not received a disciplinary write up or counseling
chrono since 1993, and "there are no write-ups for violence or
weapons" (HT 25:24-25). Petitioner has completed several self-help
programs (HT 24:18-25:11), also having "exceptional and above average
work reports" (HT 25:25-26:5). The Board noted of Dr. Macomber's
forensic evaluation that Petitioner had previously "been diagnosed
as having antisocial personality disorder, there is no evidence of
any antisocial thinking or values. That your values are solidly
pro-social, you have deep feelings of concern and empathy toward
others" and the diagnostic label of antisocial is no longer
appropriate (HT 28:7-17; EXHIBIT 8, p. 2). It was Dr. Macomber's

expert opinion that, "due to maturity, growth, and increased insight, he poses no more risk to society than the average citizen in the community. In fact, based on the positive changes in his life, he probably poses less risk to society than the average citizen: (EXHIBIT 8, p. 4). The Commissioner stated, of the finding, "That's a conclusion I won't disagree with..." (HT 29:20-22).

When "the record provides no reasonable grounds to reject, or even challenge, the findings and conclusions of the psychologist and counselor concerning [Petitioner's] dangerousness" the Board may not do so (In re Smith (2003) 114 Cal.App.4th 343, 369). "The evidence must substantiate the ultimate conclusion that the prisoner's release poses an unreasonable risk of danger to the public. It violates a prisoner's right to due process when the Board or Governor attaches significance to evidence that forewarns no danger to the public" (In re Tripp (2007) 150 Cal.App.4th 306, 313). Petitioner has satisfied punishment under the UDSA model, and there is no evidence he is not rehabilitated under the ISL model, thus finding him unsuitable for parole violated his right to due process.

D.  Petitioner's Parole Plans Were Not Some Evidence He Is Unsuitable
    for Parole.

The Board did not outright reject Petitioner's parole plans, but stated he needs to "have a firm backup plan that's very comprehensive with a member of the family" (HT 57:4-6). The Board also told Petitioner if his family is in another county: "we have the authority to parole you into that county" (HT 57:8-13).

Petitioner provided to the Board letters from "family members" offering housing, finances, and whatever resources he may need upon parole, the first from Petitioner's mother (HT 35:13-20), and another

from Petitioner's <u>daughter</u> (HT 36:7-14). Petitioner's mother and
daughter are "family members." Additionally, Petitioner provided
a firm job offer with a starting wage of $9.00 an hour (HT 20:6-20).
Although these offers are in Ventura County, the Board told Petitioner
they have the authority to parole him into that county" (HT 57:8-13).

Additionally, Petitioner has marketable skills that can be put
to use upon parole, inter alia, being a certified welder, heavy
equipment operator, plumber, and paralegal (HT 48:11-13).

The evidence presented, Petitioner having parole plans with
housing with his mother or sister, juxtaposed to the Board's finding
that Petitioner needs parole plans with family members, is so lacking
in evidentiary support that it is supported by zero evidence. The
Board's regulations require one of two things: "The prisoner has
made realistic plans for release or has developed marketable skills
that can be put to use upon release" (Cal. Code Regs., tit. 15, §
2402(d)(8)). "Thus, based on its clear language, the regulation's
requirement that an inmate have parole plans is limited to requiring
realistic plans" (<u>In re Andrade</u> (2006) 141 Cal.App.4th 807, 817).
Not only did Petitioner have "realistic plans for release" in that
he has housing with his mother and a firm job offer, but the record
contains several vocational skills Petitioner has, "marketable skills
that can be put to use upon release." "By referring to 'realistic'
parole plans, the regulation does not contemplate iron-clad and
unrealistic plans" (<u>Id.</u>).

This finding is so lacking in evidence that it is not only
arbitrary and capricious, but based on whim, reducing Petitioner's
hearing to a sham and violating his right to due process.

- 30 -

E. **Petitioner's Contract With the State for Second Degree Murder Creates A Reasonable Expectation to Be Punished for Second Degree Murder and Not First Degree Murder.**

On March 26, 1982 Petitioner entered into a contract with the state of California to plead guilty to one count of second degree murder in violation of Penal Code § 187 with the use of a firearm in violation of Penal Code § 12022.5, to be sentenced pursuant to Penal Code § 190, 15 years to life, plus two years. It has been 25 years since that plea agreement, and 27 years since the commitment offense.

When a crime is divided into degrees and the defendant pleads guilty to the lesser degree, he or she cannot be punished for the greater degree (Penal Code § 1192.1; § 1192.2). When Petitioner entered into a contract with the state, although there was no specific time agreed to for Petitioner's punishment, it was implied that Petitioner would be punished proportionate to second degree murder, not first degree murder, the proportionate term being set out in Cal. Code Regs., tit. 15, § 2403(c), 15 to 21 years. "[W]hen a plea rests in any significant degree on a promise or agreement of the prosecutor, so that it can be said to be a part of the inducement or consideration, such promise must be fulfilled" (Santobello v. New York (1971) 404 U.S. 257, 262). If the language of the contract is ambiguous, it must be interpreted to the benefit of the defendant as he understood it (Buckley v. Terhune (9th CIr. 2006) 441 F.3d 688, 695). If Petitioner would have agreed to pled guilty to second degree murder with an expectation to be punished for first degree murder, he would have been declared incompetent and not allowed to enter a plea. And, if the prosecution can dupe a defendant into

- 31 -

waiving his constitutional rights and guarantees of a trial only
to later try the case as a first degree murder before an
administrative agency, what  then was the purpose of the plea bargain?
In such a situation it is impossible to conclude that Petitioner's
plea was "voluntary" (<u>Henderson v. Morgan</u> (1976) 426 U.S. 637, 646).

It is disingenuous for the State to give up certain benefits
of a trial then revisit what was given up at the parole suitability
hearing using the very same factors which were considered when
Petitioner was involved in the criminal process.  In determining
the sentence Petitioner should receive, at the inception of the
process, the district attorney exercised some discretion in
considering factors such as the manner in which the crime was
committed, motive, previous criminal history and the like, in reaching
a charging decision within the parameters of the law.  If a case
is bargained out of the process with a determination based on the
law and circumstances an indeterminate term of incarceration with
the possibility of parole is the appropriate sentence, again, the
very same factors set forth in the parole suitability regulations
are the factors obviously considered at plea bargaining time--agian
within the parameters of the law.  A sentence is then imposed with
the settled expectation that the possibility of parole is not a sham,
but that a meaningfully possibility exists.  And, that possibility,
if meaningful, has to be based on future  behavior as the past cannot
be undone, and was already considered.  The California parole
regulations have the potential, nonetheless, to allow for
reinstitution of the sentencing process such that if a commissioner
or a governor does not like the fact that a certain defendant was

granted parole, the established possibility of parole evaporates
simply because of a latter day redetermination that the offense was
egregious, or the motive was trivial, etc.--something that was
obviously apparent at the time the possibility of parole sentence
was issued. Such as case at bench, the Board finding the offense
was "dispassionate and calculated, such as an execution-style murder"
and the motive was "trivial."

What we have is, the very same factors that were considered
at the inception for Petitioner to be punished for second degree
murder, between 15 and 21 years, the seriousness of the offense,
or related factors, now preclude the possibility of parole. While
it is perfectly fine to have a system where no possibility of parole
exists for any murder, it is not perfectly fine to have a parole
system that is based on misrepresentation.

A plea of guilty is only an admission to the elements of the
offense as charged, not as it might have been charged (People v.
Jerome (1984) 160 Cal.App.3d 1087, 1096; Henderson v. Morgan, supra,
426 U.S., at 647 fn. 18; Apprendi v. New Jersey (2000) 530 U.S. 466,
526-528, Justice O'Connor, dissenting; United States v. Wuco (9th
Cir. 1976) 535 F.2d 12, 1202 fn. 1 ["it is the statement of facts
in the pleading, rather than the statutory citation that is
controlling"]). Relevant to the murder of Mr. Stewart, Petitioner
was charged with the minimum elements of the offense, "malice
aforethought" (EXHIBIT 1; Petitioner pled guilty to exactly that
(EXHIBIT 2, p. 6:13-19; p. 7:18-22), and no more. That was
Petitioner's contract.

When Petitioner entered into a contract for second degree murder,

and has served the minimum term for first degree murder, and with conduct credits exceed, constructively, the maximum term for first degree murder, 33 years, his sentence has been transmuted into one of life without the possibility of parole, something he did not bargain for, violating his right to due process.

F.  Opposition From the District Attorney Is Not Some Evidence.

The Board, and Superior Court, noted the Los Angeles County District Attorney's Office opposed parole (HT 58:2-5). This is not an unsuitability factor.

Both the state and federal courts have held that opposition by the district attorney, or victims, is not a factor within the regulations and guidelines upon which the Board can deny parole (In re Weider, supra, 145 Cal.App.4th, at 590; In re Barker, supra, 151 Cal.App.4th, at 375; Rosenkrantz v. Marshall, supra, 444 F.3d, at 1080 fn. 14).

                        C O N C L U S I O N

It was expressly pointed out in In re Lawrence, supra, 150 Cal.App.4th, at 1538, referring to Irons v. Carey, supra, 479 F.3d, at 665, the Ninth Circuit "expressly embraced the Biggs rationale and indeed emphasized its denial of relief was only for the time being - indeed predicated on the fact the prisoner had not yet served the minimum time required for the offense he committed." As opined by the Ninth Circuit: "We hope that the Board will come to recognize that in some cases, indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process, given the liberty interest in parole that flows from the relevant California statutes" (Irons

                            - 34 -

v. Carey, supra, 479 F.3d, at 665).

WHEREFORE, Petitioner having satisfied his minimum term, even exceeding the maximum legislatively prescribed punishment set forth in the Board's matrix for second degree murder, and having been fully rehabilitated and thereby fulfilling the implied end of the plea agreement, it is respectfully requested that the Court issue an Order to Show Cause why relief should not be granted and the Board ordered to conduct a new hearing that satisfies due process of law, basing the decision on Petitioner's rehabilitation. Or, in the alternative, remand the writ to the Los Angeles Superior Court with instructions to follow this Appellate District Court's decisions in In re Lawrence, supra, 150 Cal.App.4th, at 1542; In re Lee, supra, 143 Cal.App.4th, at 1408, 1412; In re Gray, supra, 151 Cal.App.4th, at 403; In re Rosenkrantz, supra, 29 Cal.4th, at 683.


DATED: 17 Sept 2007

                                        Respectfully submitted,

                                        Victor M. Montez
                                        Petitioner in pro per

# EXHIBIT 3
# Part 2 of 4

EXHIBIT "1"

255

SUPERIOR COURT OF THE STATE OF CALIFORNIA
FOR THE COUNTY OF LOS ANGELES

The People of the State of California,        No. A148105
                              Plaintiff,

            v.                                INFORMATION
    VICTOR MANUEL MONTEZ                       MURDER (Sec. 187, P.C.) - Ct. I
        and                                   ROBBERY (Sec. 211, P.C.) - Ct. II
    DENISE MARIE MONTEZ,                       ATTEMPTED KIDNAPPING (Sec. 664/209,
                              Defendants       P.C.) - Ct. III


The said VICTOR MANUEL MONTEZ and DENISE MARIE MONTEZ

are
by accused by the District Attorney of and for the County of Los Angeles, State of California, by this

information, of the crime of MURDER, in violation of Section 187, Penal Code of

California,

a felony, committed as follows: That the said VICTOR MANUEL MONTEZ and DENISE MARIE MONTEZ

on or about the  10th      day of August , 1980, at and in the County of Los Angeles, State of California,

did willfully and unlawfully , and with malice aforethought murder Michael Stewart, a

human being.

It is further alleged that the murder of Michael Stewart was committed by
defendant VICTOR MANUEL MONTEZ while the defendant was engaged in the com-
mission of robbery in violation of Penal Code Section 211 within the meaning
of Penal Code Section 190.2(a)(17).

It is further alleged that the murder of Michael Stewart was committed by
defendant DENISE MARIE MONTEZ while defendant was an accomplice in the com-
mission of robbery in violation of Penal Code Section 211, within the meaning
of Penal Code Section 190.2(a)(17).

It is further alleged that the murder of Michael Stewart was committed by
defendant VICTOR MANUEL MONTEZ while the defendant was engaged in the attempted
commission of kidnapping in violation of Penal Code Sections 207 and 209,
within the meaning of Penal Code Section 190.2(a)(17).

            SEE SPECIAL ALLEGATIONS CONTINUED ON ATTACHED SHEET

Filed in open Superior Court of the State of      JOHN K. VAN DE KAMP, District Attorney
California, County of Los Angeles, on motion      for the County of Los Angeles, State of California
of the District Attorney of said County.          By _____ XXXXXXXXX
                                                                            Deputy
DATED:

JOHN J. CORCORAN, Clerk

By
                              Deputy

Filed in open Superior Court of the State of      JOSEPH P. BUSCH, District Attorney
California, County of Los Angeles, on motion      for the County of Los Angeles, State of California

EXHIBIT "2"

ORIGINAL FILED

APR 15 1982

COUNTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO R                    HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA, )
                     Plaintiff,      )
                                     )    NO. A 146 165
          vs.                        )
                                     )    PLEA
VICTOR MANDEL MONTEZ,                )
DENISE MARIE MONTEZ,                 )
                     Defendants.     )

VAN NUYS, CALIFORNIA; FRIDAY, MARCH 26, 1982; 9:25 A.M.

          Upon the above date, the defendants being
present in court and represented by counsel, CARL BURROW, Esq.
representing defendant Victor, IRWIN FRANSKY, Deputy Public
Defender of the County of Los Angeles representing defendant
Denise, the people being represented by IRVIN COHEN, Deputy
District Attorney of the County of Los Angeles, the following
proceedings were held:

          (Bonnie Frankfurt, Official Reporter, CSR #2312.)

          THE COURT:   203, 204, Victor Montez and Denise Marie

Montez.

MR. FRANSKY:   Your Honor, at this time I believe the District Attorney has gotten together and has understood what the plea agreement is.

MR. COHEN:   That is correct.   I have conferred with Mr. Weisberg and it is my understanding that---

THE COURT:   Can you hear?

A DEFENDANT:   Not that good.

THE COURT:   Speak up, Mr. Cohen.

MR. COHEN:   Yes, Your Honor.

Since the matter was previously called, I have discussed the case with Mr. Weisberg who is the trial Deputy District Attorney.

It is my understanding that it is agreeable with the People that if the defendant Victor Montez withdraws his previous plea of not guilty to a violation of Section 187 of the Penal Code, that being the charge of murder, and enters a guilty plea to that charge as murder in the second degree and admits the use of a firearm, to-wit, a handgun, that this would be agreeable with the People.

The defendant's exposure to time in custody would be from 17 years to life.

As to the defendant Denise Marie Montez, it is the People's intention to add an additional count, violation of Section 32 of the Penal Code, accessory after the fact.

It is my understanding the defendant Denise Montez will enter a plea of guilty to that charge.

The maximum exposure to time in custody for

that charge is an open plea, and the maximum time she can serve is up to three years in the State Prison, the sentence being up to the court.

Have I accurately outlined the disposition of this case, Mr. Pransky?

MR. PRANSKY: Yes.

MR. COHEN: Mr. Burkow?

MR. BURKOW: Yes.

MR. COHEN: Mr. Montez, did you understand what I said concerning the disposition of this case?

DEFENDANT VICTOR MONTEZ: Yes, sir, I did.

MR. COHEN: Is it your desire to enter a plea as I outlined in the disposition?

DEFENDANT VICTOR MONTEZ: Yes, sir.

MR. COHEN: At this time do you withdraw your previous plea of not guilty to the murder charge so you can enter this plea?

DEFENDANT VICTOR MONTEZ: Yes, sir.

MR. COHEN: Has anyone made any other promises to you other than what I have said in open court to get you to enter this guilty plea?

DEFENDANT VICTOR MONTEZ: No, sir.

MR. COHEN: Mr. Pransky, may it be stipulated that an additional count be alleged as to your client, a violation of Section 32 of the Penal Code, that being the felony of accessory after the fact?

MR. PRANSKY: So stipulated.

MR. COHEN: Waive further reading of the amendment and

statement of rights as to the amendment?

MR. PRINCIPI: So waive further reading.

MR. COHEN: Denise Montez, do you understand what I said as to the disposition of this case concerning yourself?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Is that your desire to proceed in that manner?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Has anyone made any other promises to you other than what I have said in open court to get you to enter this guilty plea?

DEFENDANT DENISE MONTEZ: No.

MR. COHEN: I must advise each of you that if you are not citizens of the United States that the entry of these guilty pleas may have the consequences of deportation, exclusion from admission to the United States or denial of naturalization pursuant to the laws of the United States.

If you are citizens of the United States, this would not apply to you.

Further, in order for each of you to enter these guilty pleas you must know, understand and give up certain constitutional rights.

Each of you have the right to a trial by jury or, if both sides agree, you can have a trial by the judge.

Each of you have a right to confront witnesses against you in open court and have your attorney cross-examine these witnesses.

Each of you have a right to present a defense

1  by having witnesses brought into court who would testify for

2  you by using the subpoena powers of the court at no cost to

3  either of you.

4           Finally, each of you have the right against

5  self-incrimination. This means that neither of you have to say

6  anything against yourself.

7           Now, Mr. Victor Montez, have you discussed all

8  these rights with your attorney Mr. Burkow?

9           DEFENDANT VICTOR MONTEZ: Yes, sir, I have.

10          MR. COHEN: After discussing these rights with Mr.

11 Burkow, do you believe you understand them?

12          DEFENDANT VICTOR MONTEZ: Yes, sir.

13          MR. COHEN: Understanding these rights and knowing

14 that you must give them up in order to enter this guilty plea,

15 do you give up these rights?

16          DEFENDANT VICTOR MONTEZ: Yes, sir.

17          MR. COHEN: Mr. Burkow, join?

18          MR. BURKOW: Join in the waivers.

19          MR. COHEN: Denise Montez, have you discussed all these

20 constitutional rights with your attorney Mr. Pransky?

21          DEFENDANT DENISE MONTEZ: Yes.

22          MR. COHEN: After discussing these rights with Mr.

23 Pransky, do you believe you understand them?

24          DEFENDANT DENISE MONTEZ: Yes.

25          MR. COHEN: Understanding these rights and knowing

26 that you must give them up in order to enter this guilty plea,

27 do you give up these rights?

           DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Mr. Victor Montez, are you pleading guilty or entering this plea freely and voluntarily?

DEFENDANT VICTOR MONTEZ: Yes, sir, I am.

MR. COHEN: Denise Montez, are you entering this plea freely and voluntarily?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Has anyone used any force or threats of force or anything similar to that against either of you in order to get you to enter these pleas, Victor Montez?

DEFENDANT VICTOR MONTEZ: No.

MR. COHEN: Denise Montez?

DEFENDANT DENISE MONTEZ: No.

MR. COHEN: Victor Montez, is it a correct statement that in the county of Los Angeles you did unlawfully kill another human being with malice aforethought? Is that what you did?

DEFENDANT VICTOR MONTEZ: Pardon me?

MR. COHEN: Is that what you did?

DEFENDANT VICTOR MONTEZ: Yes, I did.

MR. COHEN: In the commission of this particular offense, did you personally use a handgun?

DEFENDANT VICTOR MONTEZ: Yes, I did.

MR. COHEN: Counsel, stipulate to a factual basis for the plea?

MR. BURTON: Stipulate.

MR. COHEN: Denise Montez, is it a correct statement that you knew after this murder had been committed that you harbored concealed and aided your co-defendant with the intent

that your co-defendant avoided or escaped arrest, trial,

conviction or punishment for this offense?

Is that what you did?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Counsel, stipulate to a factual basis for

the plea?

MR. PFARSKY: So stipulated.

THE COURT: Excuse me. Victor Montez, Mr. Montez, do

you understand that at the end of doing your actual time in

custody in the State Prison that you would be subject to parole?

Do you understand that?

DEFENDANT VICTOR MONTEZ: Yes.

THE COURT: Mrs. Montez, likewise if you should end up

in State Prison on this matter when you finish doing your

actual time in custody you also will be subject to parole.

Do you understand that?

DEFENDANT DENISE MONTEZ: Yes.

MR. COHEN: Victor Mandel Montez, in this case

A 146 105 to a violation of Section 187 of the Penal Code, that

being the felony of murder in the second degree, how do you

plead, guilty or not guilty?

DEFENDANT VICTOR MONTEZ: Guilty.

MR. COHEN: As to the allegation that in the commission

of this murder you personally used a firearm, do you admit or

deny that?

DEFENDANT VICTOR MONTEZ: I admit.

MR. COHEN: Counsel, concur in the plea?

MR. BURLOW: Concur.

7

MR. COHEN: Denise Marie Monter, to the violation of Section 32 of the Penal Code, that being the felony of accessory after the fact, how do you plead, guilty or not guilty?

DEFENDANT DENISE MONTER: Guilty.

MR. COHEN: Mr. Pransky, concur in the plea?

MR. PRANSKY: Counsel concurs in the plea.

THE COURT: All right. The court finds as to each defendant they have knowingly, understandingly and intelligently given up their constitutional rights. The plea is made freely and voluntarily with an understanding of the nature and the consequences thereof.

The court finds there is a factual basis for the plea. The court accepts the plea.

MR. PRANSKY: April 21st, Your Honor?

THE COURT: 21, no. After the 23rd.

MR. PRANSKY: April 23rd?

THE COURT: 23rd. Probation and sentence hearing April the 23rd, 9:00 o'clock. Both of you are ordered back at that time.

MR. PRANSKY: Your Honor, I want to be heard as to bail in this matter.

THE COURT: Go ahead.

MR. PRANSKY: Your Honor, bail in this matter has been in excess of $50,000.00. In addition thereto, there has been a $20,000.00 bail imposed upon my client on a misdemeanor matter in Ventura County.

She has now entered a plea of guilty to an

offense which carries a maximum of three years.  She had been

in custody for 19 months.

       This matter has gone to the Court of Appeals

and it has gone up to the Supreme Court.

       Immediately following the Supreme Court's

ruling, I started to negotiate this case with Mr. Weisberg,

and he came to an agreement that as to my client the worst that

they could ever prove would be an accessory after the fact.

       This was an unfortunate situation.  But I

honestly believe that Mr. Montez never intended to kill the

victim; that this was strictly and accident.

       My client's wife or -- I should say, excuse

me -- the wife of Mr. Montez was present at the time; that she

was quite frightened.  She was upset as well as Mr. Montez

being quite upset.

       They did not know what to do under the

circumstances.

       I think that it is only natural that a wife

would come to the assistance of her husband.

       The extent of her being accessory after the

fact is driving the vehicle back to Oxnard where they had

originally -- where there original destination.

       The victim had agreed to take them to Oxnard,

but unfortunately by accident he was killed.

       The other part of this accessory after the

fact is that my client and her husband temporarily resided in

a motel for probably less than 24 hours.

       I would urge the court, since she has done 19

months, the maximum that she would have to do would be three years.

Although she has a prior record, she has never been to State Prison and I don't believe she has any felony convictions.

What would probably be done in this particular case at the worst would be to impose the mid-term, because I cannot foresee any elements in aggravation.

Considering what her involvement was, as a wife who was there to assist her husband under the worst of circumstances, if she got two years in the State Penitentiary she will have already served that time, since one does 16 months on two years.

If the court saw fit to place her on probation, she really would only have approximately five months more to do if she was ever incarcerated in the future.

I think Ventura County on a 647B violation of probation has been totally unreasonable in setting a bail of over $20,000.00.

By the court releasing her on her own recognizance, it would require the Ventura County to come and pick up Miss Montez, and she could clear up that matter prior to probation and sentencing.

I urge the court on behalf of Mrs. Montez to release her on her own recognizance. She has been in the county jail under the worst of circumstances because she has been charged with a 187. She was in a special barracks.

It was only recently that she was allowed to

work in the kitchen. Now she stands convicted of the least
serious of all felonies.

    THE COURT: What is the People's position?

    MR. COHEN: I have no idea what the People's position
is, Your Honor.

    MR. PRANSKY: I would ask this:

    MR. COHEN: I was trying to get hold of Mr. Weisberg
to see what his position was. His line has been busy for the
last ten minutes while Mr. Pransky has been --

    MR. PRANSKY: Additionally, I would add this, Your
Honor: That Mrs. Montez while she was incarcerated did give
birth. There is a child.

    Her time should be reduced as quickly as
possible and she would like to get there as quickly as possible.

    Under the totality of the circumstances, I
don't think the court would certainly be misplacing any
confidence or abusing its discretion by leaving her out OR.

    THE COURT: Okay. Mr. Burkow, do you wish to be
heard on this matter?

    MR. BURKOW: Yes, I do have an additional request.

    THE COURT: Go ahead.

    MR. BURKOW: I understand there is no opposition if
somehow there is a way they could visit today under --

    THE COURT: They can visit today. It is agreeable
with me if it is agreeable with the sheriff.

    MR. BURKOW: Could Your Honor request that through the
sheriff somehow that they be permitted to visit today? If
possible, prior to their being taken back --

THE BAILIFF:  For a couple moments of th        wantto sit
here, yes.

MR. BURKOW:  We were——

MR. PFANSTY:  We were somewhat promised by Mr. Mayer
that they would have some time together.

THE COURT:  Let's try to arrange that.  Have you
heard from Mr. Weisberg?

MR. COHEN:  No, I haven't, Your Honor.  I am working
on it.

THE COURT:  Let me hold that matter then.  I want to
hear from the District Attorney.

MR. BURKOW:  May I then be excused?

THE COURT:  Yes, you are finished.

MR. BURKOW:  Thank you, Your Honor.

MR. COHEN:  Your Honor, on that matter I have just
spoken to Mr. Weisberg.  His feeling is that the People oppose
an OR release.

THE COURT:  Did he have any reason?

MR. COHEN:  Apparently it is a State Prison case.

THE COURT:  All right.

(Recess taken in this matter.)

11:25 A.M.

THE COURT        204, Montez.  All right.  In this
matter Denise Montez        the OR motion——

MR. COHEN:  Your Honor, in that particular matter
apparently it is Mr. Weisberg's position that she should not
be released on her own recognizance.

Apparently, there is just a very short time
until her sentence date. Mr. Weisberg's feeling is that there
is a good possibility if she is released on her own
recognizance she wouldn't report to the probation officer.

Further, that in the past she has had a failure
to appear in Ventura County, and also based on the nature of
the offense that she should not be released at this time.

MR. FRANSKY: In answer to that, Your Honor, as stated
by Mr. Burkow, there are so many equities in this particular
case that I overlooked probably the most important one is the
fact that she did while in custody give birth to a child who
is in the care of her mother.

Mrs. Montez has worked in the Oxnard area
almost all of her life. She has been informed that her mother
is ill, that the child is ill.

She failed to appear on that Ventura matter and
I think that is on the basis of failing to pay a fine.

I am sure that she has a very keen interest in
what happens to her husband as well as what happens to her.

There is just five months more that if she
would have to serve, if the court gave her the maximum.

I don't believe that there is any risk that
she would not come back to this court. If she has all those
matters cleared up in Ventura, and I anticipate that that would
summarily take care of the matter in Ventura.

THE COURT: All right. In this matter, the bail is
reduced to $2,500.00. Motion to reduce to OR is denied.

MR. FRANSKY: Thank you.

(Proceedings adjourned.)

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NO. R                    HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,

                          Plaintiff,

        vs.                                    NO. A 146 195

VICTOR MANUEL MONTES,                          REPORTER'S
DENISE MARIE MONTES,                           CERTIFICATE

                          Defendants.

STATE OF CALIFORNIA  )
                     )  ss.
COUNTY OF LOS ANGELES )

        I, BONNIE FRANKFURT, Official Reporter of the Superior
Court of the State of California, for the County of Los Angeles
do hereby certify that the foregoing is a true and correct
transcript of all of the admonitions given and waivers and
admissions taken at the time of the taking of the plea in the
above-entitled cause.

        Dated this 13th day of April, 1982.

                        Bonnie Frankfurt   CSR #2337
                        Official Reporter

EXHIBIT "3"

ORIGINAL FILED

JUL 13 1982

COUNTY CLERK

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

HON. DAVID A. HOROWITZ, JUDGE

DEPARTMENT NO. F

THE PEOPLE OF THE STATE OF CALIFORNIA,

                Plaintiff,

             vs.

VICTOR MANUEL MONTEZ,

                Defendant.

NO. A 146105

STATE PRISON

VAN NUYS, CALIFORNIA; FRIDAY, MAY 21, 1982; 10:20 A.M.

           Upon the above date, the defendant being present in court and represented by counsel, CARL BURROW, Esq., the People being represented by RALPH MAYER, Deputy District Attorney of the County of Los Angeles, the following proceedings were held:

           (Alexandria Walsh, Official Reporter, CSR #4065.)

           THE COURT: Number 302, Victor Montez.

           As of April 23, he had 618 days actually served. What is the total now?

MR. BURKAW: -- or -- I did not compute it from the
23rd of April or, but I think that today would make it another
29 days, which would make it 448 days.

THE COURT: Okay.

The court has read and considered the probation
report.

Waive arraignment for judgment?

MR. BURKAW: Yes, Your Honor. There is no legal cause.

THE COURT: Do you wish to be heard?

MR. BURKAW: I would just briefly ask the court to
understand one thing. I think the sentence is locked in so
far as the sentencing is concerned. I think that's pretty
much preordained. But I think on behalf of Mr. Homden I'd
be less than open with the court if I didn't indicate that this
individual is not the same individual who was arrested on the
night in question. He has undergone many, many changes.

He would hope that the court -- society would
somehow understand that. But at no time was it his intention
to have the incident/culminate in the way that it did. It's
bad enough that he admitted that there was a crime involved,
but it certainly in his mind had never but for an accident and
his rash judgment in having a weapon would have never ended
in the way that it did. He would hope that somehow the court
would understand that and the prison authorities would
understand that.

With that it's submitted, Your Honor.

THE COURT: I agree with you. It's unfortunate to see
a person who was honorably discharged, a paratrooper in the

1    Special Forces ending up with seventeen to life in the State

2    Prison.  It's very unfortunate, Mr. Montez.  I hope you are

3    successful in the future.

4              Very well.  In this matter probation is denied.

5    You're sentenced to the State Prison for a period of seventeen

6    years to life.  It's fifteen to life plus the enhancement.

7    12022.5, which is an additional two years.  Seventeen to life

8    is the total.

9              Given credit for 465 days actually served plus

10   234 days good time and work time.

11             Motion on remaining counts?

12   MR. MAYER:  To dismiss, Your Honor.

13   THE COURT:  Granted.

14             (Proceedings were concluded.)

15

16

17

18

19

20

21

22

23

24

25

26

27

28

SUPERIOR COURT OF THE STATE OF CALIFORNIA

FOR THE COUNTY OF LOS ANGELES

DEPARTMENT NW R                    HON. DAVID A. HOROWITZ, JUDGE

THE PEOPLE OF THE STATE OF CALIFORNIA,

          Plaintiff,

       vs.                                NO. A-146105

VICTOR MANUEL MONTEZ,                      REPORTER'S
                                           CERTIFICATE
         Defendant.

STATE OF CALIFORNIA      )
                         ) ss.
COUNTY OF LOS ANGELES    )

      I, ALEXANDRIA WALSH, Official Reporter of the
Superior Court of the State of California, for the County of
Los Angeles, do hereby certify that the foregoing is a true
and correct transcript of the proceedings held at the time of
pronouncing sentence; that the views and recommendations of
the court, if any, were contained therein, pursuant to section
1203.01 of the Penal Code.

      Dated this 6th day of July, 1987.

                      /s/ Alexandria Walsh      CSR # 4419
                      Official Reporter

EXHIBIT "4"

SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

THE PEOPLE OF THE STATE OF CALIFORNIA
vs
MONTEZ, VICTOR ANGELO

PROBATION DENIED, SENTENCE IS IMPOSED AS FOLLOWS:

EXHIBIT  "5"

COURT COPY

302

SUPERIOR COURT OF CALIFORNIA

COUNTY OF LOS ANGELES

PROBATION OFFICERS REPORT    REPORT SEQUENCE # 1

THE PEOPLE OF THE STATE OF CALIFORNIA,
                                    Plaintiff

        vs.

VICTOR MONTEZ,                      Defendant

VICTOR MANUEL MARQUEZ-MONTEZ

| DEPT. | CITY. | JUDGE |
|---|---|---|
| NW-F | BURROW | HOROWITZ |
| HEARING | | COURT CASE NO. |
| 4-23-82 | A01294715 | A-148105 |
| OFFENSE | AGE AT PRES. | PRIOR NO. |
| GRISHORE | 18 SRV | |
| RELEASED | APR 23 1982 | |

(LAST)
431 NORTH BALZAM
OXNARD, CA
(NO TELEPHONE)

CHARGED WITH THE OFFENSE OF
CT. I: 187 PC (MURDER) WITH USE ALLEGATION PURSUANT TO PENAL CODE 12022(A) AND
PENAL CODE SECTION 12022.5; CT. II: 211 PC (ARMED ROBBERY) WITH USE ALLEGATION
PURSUANT TO PENAL CODE SECTION 12022(A) AND PENAL CODE SECTION 12022.5;

CONVICTED OF THE OFFENSE OF
CT. I: 187 PC WITH USE ALLEGATION PURSUANT TO SECTION 12022.5
CT. III: 664/209 PC WITH ALLEGATIONS AND ALLEGATIONS OF CT. I
CONTINUED TO P&S HEARING.  CT. II: 211 PC DISMISSED AT **

☐ Pre-conviction Invest (1203.3 C.C.P.)    ☐ Drug Diversion Invest (1000.1 (a) P.C.)

| DISPOSITION | |
|---|---|
| DENISE MONTEZ | P&S HEARING 4-23-82 |

PERSONAL HISTORY

| AGE | BIRTHDATE | RACE | FORMAL EDUCATION | AGE LEFT SCHOOL |
|---|---|---|---|---|
| 28 | 7-6-53 | MEX/AM | 15 YEARS | 16 |
| | | | | NO. OF DEPENDENTS |
| | | | | FOUR |
| MARITAL STATUS | HOW EMPLOYED | | WHERE EMPLOYED | |
| MARRIED | WIFE, THREE CHILDREN | | | |
| | INCOME PER MONTH | INTENT EMPLOYED | | |
| | $ | NO | | |
| LAST OCCUPATION | ROOFER | | BRANCH MILITARY SERVICE | TYPE OF DISCHARGE |
| CODE | 1956-1957 | NEW TO COUNTY | U.S. ARMY | HONORABLE |

CT. III: 664/209 PC (ATTEMPTED KIDNAPPING WITH INTENT TO COMMIT
ROBBERY) PURSUANT TO PENAL CODE SECTION 12022(A) AND PENAL CODE
SECTION 12022.5.

** APPELLATE COURT HEARING OF 11-25-80.

(AS SUPPLIED BY DEFENDANT AND CLARIFIED BY WIFE.)

DEFENDANT IS THE FOURTH OF NINE CHILDREN BORN TO
MANUEL ALVAREZ MONTEZ AND PETRILLA MARQUEZ MONTEZ IN ELSA, TEXAS.
HE WAS RAISED BY HIS PARENTS IN OXNARD, CALIFORNIA. THE DEFENDANT
AND HIS FAMILY CAME TO CALIFORNIA WHEN HE WAS APPROXIMATELY THREE AND



FOUR YEARS OF AGE AND SETTLED IN SATICOY, CALIFORNIA. THEY
SUBSEQUENTLY MOVED TO OXNARD, CALIFORNIA. THE DEFENDANT HAS NEVER
LIVED IN LOS ANGELES COUNTY.

THE DEFENDANT, HIS WIFE, TWO CHILDREN AND A STEPSON,
LAST RESIDED AT THE HOME OF THE DEFENDANT'S PARENTS IN OXNARD,
CALIFORNIA FOR APPROXIMATELY TWO MONTHS. UPON RELEASE, THE DEFENDANT
EXPECTS TO EITHER RETURN TO OXNARD OR LIVE IN SAN BERNADINO.

THE DEFENDANT'S PARENTS WERE DIVORCED IN 1973 OR 1974.
THE FATHER IS A MECHANIC-WELDER AND HAS NOT REMARRIED. THE MOTHER'S
OCCUPATION IS UNKNOWN. SHE REMARRIED IN 1980 TO A MR. COLON.

THE DEFENDANT ATTENDED CHANNEL ISLAND HIGH SCHOOL FOR
APPROXIMATELY ONE YEAR AND DROPPED OUT AT THE AGE OF 16 YEARS WHEN HE
ENROLLED IN THE JOB CORPS FOR APPROXIMATELY 11 MONTHS STUDYING HEAVY
EQUIPMENT OPERATOR. HE LEFT THE JOB CORPS IN NOVEMBER OF 1968.
WHILE IN THE NEW MEXICO STATE PENITENTIARY IN 1977 OR 1978, THE
DEFENDANT OBTAINED HIS GENERAL EDUCATION DIPLOMA THROUGH THE DIVISION
OF VOCATIONAL REHABILITATION. HE RECEIVED A CERTIFICATE FOR WELDING.
HE APPEARS TO BE OF AVERAGE INTELLIGENCE.

THE DEFENDANT CO-HABITATED WITH LORENA R. MOLINA IN
NEW MEXICO FROM APRIL OF 1975 UNTIL JUNE OF 1976 WHEN HE WAS COMMITTED
TO THE NEW MEXICO STATE PENITENTIARY. HE RETURNED TO THE HOME OF
MISS MOLINA IN APRIL OF 1978 AND REMAINED THERE UNTIL FEBRUARY OF 1979.
THE DEFENDANT CO-HABITATED WITH DENISE GARCIA FROM MAY OF 1979 UNTIL

-2-

THEY MARRIED IN APRIL OF 1980. HE ASSUMED RESPONSIBILITY FOR HIS
WIFE'S SON, WHO WAS THEN ONE YEAR OF AGE. THERE WERE TWO DAUGHTERS
BORN OF THIS UNION; ONE ON FEBRUARY 9, 1980, AND THE SECOND IN
JANUARY OF 1981.

THE DEFENDANT'S 27-YEAR-OLD BROTHER, ANASTACIO,
HAD ONE LAW ENFORCEMENT CONTACT AS A JUVENILE FOR CURFEW AND MALICIOUS
MISCHIEF.

THE DEFENDANT WAS LAST EMPLOYED AS A ROOFER FOR
SOUTHERN CALIFORNIA ROOFING COMPANY IN DOWNEY FROM JUNE OF 1980 UNTIL
MID-JULY OF 1980. HE INDICATES THE JOB WAS THEN FINISHED AND HIS
SALARY WAS $11.90 PER HOUR. THE DEFENDANT INDICATES THERE HAS BEEN
NO OTHER EMPLOYMENT. HE PLANS TO RETURN TO ROOFING OR WELDING UPON
HIS RELEASE.

THE DEFENDANT ENLISTED IN THE UNITED STATES ARMY ON
SEPTEMBER 8, 1970, ACHIEVED A RATING OF E-2, AND WAS HONORABLY
DISCHARGED ON SEPTEMBER 18, 1972. HE WAS A PARATROOPER IN THE
SPECIAL FORCES.

FINANCIAL INFORMATION:

THE DEFENDANT LAST PAID RENT OF $75 PER MONTH. HE
OWNS A 1952 GMC, PICK UP VALUED AT $700. HE INDICATES THE CITY
TOWED THE TRUCK AWAY AND ITS WHEREABOUTS ARE NOW UNKNOWN. HIS
FINANCIAL STATUS IS CURRENTLY POOR.

SUBSTANCE ABUSE:

THE DEFENDANT FIRST BEGAN SMOKING MARIJUANA AT THE
AGE OF 13 YEARS UTILIZING IT TWO TO THREE TIMES PER WEEK. AT THE
AGE OF 13, HE BEGAN SHOOTING HEROIN ON WEEKENDS AT A COST OF FIVE
DOLLARS PER CAPSULE. THIS HABIT SUBSEQUENTLY PROGRESSED UNTIL HIS
DAILY USE AMOUNTED TO $200 PER DAY. AT THE AGE OF 15, HE BEGAN
TAKING VALIUMS "WHENEVER THERE WAS NO STUFF". THE DEFENDANT TOOK
QUAALUDES ONE TIME ONLY AT THE AGE OF 19 YEARS. HE SUPPORTED HIS
HABIT THROUGH ODD JOBS AND BURGLARIES. THE DEFENDANT HAS NEVER
OVERDOSED.

FROM MAY OF 1979 THROUGH MAY OF 1980, THE DEFENDANT
WAS IN THE VICTORY OUT REACH PROGRAM LOCATED ON STAR ROUTE 27,
HELENDALE, CALIFORNIA. THE MAIN OFFICE IS LOCATED AT
747 MOUNT VERNON AVENUE IN SAN BERNADINO.

GANG ACTIVITY:

THE DEFENDANT DENIES ANY GANG AFFILIATIONS.

PRIOR RECORD:

SOURCES OF INFORMATION:
DEPARTMENT OF JUSTICE (2-24-82), CII (4-16-82),

DEFENDANT.

JUVENILE HISTORY:
OXNARD PD - MALICIOUS MISCHIEF, CLR N/A
AGE 9
OXNARD PD - MARKS ON ARM.
AGE 13

(DEFENDANT SAYS MATTER DISMISSED AS HE STATED HE WAS GOING
INTO THE JOB CORPS.)

ADULT HISTORY:

3-5-73        VENTURA SO - 459 PC (BURGLARY) - 4-26-73, DISMISSED IN
              FURTHERANCE OF JUSTICE.

4-13-73       VENTURA SO - 11550 H&S (UNDER INFLUENCE CONTROLLED
              SUBSTANCE) - 11364 H&S (POSSESSION CONTROLLED SUBSTANCE
              PARAPHERNALIA) - 459 PC (BURGLARY). 1-7-74, CONVICTED
              OF 11550 H&S (POSSESSION MARIJUANA) - CYA COMMITMENT.

4-17-73       VENTURA SO - 459 PC (BURGLARY) - DISMISSED.
              4-26-73, PC, 602.5 PC (ENTERING NON-COMMERCIAL
              DWELLING) - ONE YEAR SUMMARY PROBATION.

10-19-73      VENTURA SO - 11360 H&S (SELL OR TRANSPORT MARIJUANA/
              HASH) FTA.

1-16-74.      VENTURA SO - 242 PC (BATTERY) -

         (DEFENDANT STATES THE INCIDENT HAPPENED WHILE IN COUNTY JAIL
         AND MATTER WAS DISMISSED.)

DATE UNKNOWN   NEW MEXICO - 459 PC (THEFT FROM MOTOR VEHICLE) -
               COMMITTED TO NEW MEXICO STATE PENITENTIARY. RELEASED
               4-22-78.

         (DEFENDANT STATES HE TURNED HIMSELF IN AS HE WAS AWARE OF A
         BENCH WARRANT HAVING BEEN ISSUED. HE SAYS HE WAS DISHONORABLY
         DISCHARGED FROM THE CALIFORNIA YOUTH AUTHORITY JURISDICTION ON
         JUNE 3, 1977 WHEN COMMITTED ON THIS CHARGE.)

PRESENT OFFENSE:

         DEFENDANT WAS ARRESTED ON AUGUST 11, 1980 AT 12:00 NOON
BY THE LOS ANGELES POLICE DEPARTMENT WITH THE ASSISTANCE OF THE
OXNARD POLICE DEPARTMENT AT THE PLAZA MARINA HOTEL, LOCATED AT
711 WEST HUENEME, OXNARD AND BOOKED FOR 187 OF THE PENAL CODE (MURDER).
AT THE TIME OF THE ARREST, THERE WAS AN OUTSTANDING OXNARD WARRANT

-5-

1  NUMBER 013334A001 WITH BAIL SET AT $75.  THERE WAS NO BAIL SET ON
2  HIS CURRENT ARREST.  HE WAS CHARGED ON THE INFORMATION WITH COUNT
3  ONE, 187 PENAL CODE (MURDER) DURING THE COMMISSION OF A ROBBERY AND
4  KIDNAPPING PURSUANT TO PENAL CODE SECTION 190.2(A)(17); COUNT TWO,
5  211 PENAL CODE (ROBBERY); COUNTS THREE, 664/209 PENAL CODE (ATTEMPTED
6  KIDNAPPING TO COMMIT ROBBERY).  ALL THREE COUNTS ALLEGED THE USE OF
7  A FIREARM PURSUANT TO SECTION 12022.5 OF THE PENAL CODE AND, PURSUANT
8  TO SECTION 12022(A) OF THE PENAL CODE.  IT WAS ALSO ALLEGED, IN ALL
9  THREE COUNTS, DEFENDANT INFLICTED GREAT BODILY INJURY AS DEFINED IN
10 SECTION 12022.7 OF THE PENAL CODE.  COUNT TWO WAS DISMISSED ON
11 OCTOBER 1, 1980 AND UPHELD BY THE APPELLATE COURT ON NOVEMBER 25, 1980.
12 ON MARCH 26, 1982, THE DEFENDANT PLED GUILTY TO COUNT ONE WITH THE
13 USE ALLEGATION PURSUANT TO PENAL CODE SECTION 12022.5.  REMAINING
14 COUNTS AND ALLEGATIONS WERE CONTINUED TO THE PROBATION AND SENTENCING
15 HEARING.
16 FACTS:  BASED ON THE ARREST REPORT, A WITNESS, MARK LABASH,
17 INFORMED LOS ANGELES COUNTY SHERIFFS THAT HE HAD OBSERVED TWO MALE
18 SUSPECTS ON AUGUST 10, 1980 AT 1:48 A.M. DRAGGING A BODY TO THE
19 SHOULDER OF THE VENTURA FREEWAY WEST OF VALLEY CIRCLE OFF RAMP.  AT
20 4:00 A.M. ON THE SAME DATE, DEPUTIES OBSERVED THE VICTIM WITH A
21 GUNSHOT WOUND TO HIS UPPER TORSO AND LYING IN A SUPINE POSITION ON
22 THE FREEWAY SHOULDER.  DEATH WAS INDICATED AS OCCURRING AT 2:18 A.M.
23 THE VICTIM'S PANTS WERE OPEN AND PARTIALLY DOWN, THE ZIPPER WAS

-5-

PARTIALLY BROKEN AND THE TOP BUTTON WAS PULLED OFF. A BULLET HOLE
WAS OBSERVED BEHIND HIS RIGHT EAR AND A GUITAR PICK WAS STUCK TO
HIS LEFT CHEEK WITH BLOOD. MRS. IRMA CEBALLOS (22), 237 LARK STREET,
OXNARD, CALIFORNIA, INFORMED OFFICERS AT THE LOS ANGELES POLICE
DEPARTMENT, WEST VALLEY STATION, ON AUGUST 11, 1980 THAT AT
APPROXIMATELY 10:30 P.M. ON AUGUST 9, 1980, SHE AND TWO ASSOCIATES,
VICTOR MONTEZ, AND DENISE MONTEZ, HAD BEEN VISITING SAN BERNADINO
AND HAD STOPPED IN SAN FERNANDO VALLEY FOR A PIZZA ON THEIR RETURN
TRIP. WHEN THE THREE ATTEMPTED TO START THEIR BROWN STATION WAGON
AFTERWARDS, IT FAILED TO START AND THEY DECIDED TO HITCHHIKE ON THE
VENTURA FREEWAY. THEY FIRST APPROACHED AN UNKNOWN MALE APPROXIMATELY
ONE-HALF HOUR LATER. SUBSEQUENTLY, IT WAS AGREED THAT THE WITNESS
AND MRS. MONTEZ WOULD APPEAR AS TWO FEMALES STRANDED ON THE FREEWAY
WHILE MR. MONTEZ WOULD APPROACH ANY MOTORIST WHO STOPPED AND EXHIBIT
A FIREARM HE CARRIED IN HIS WAISTBAND. THE DEFENDANT HID IN A BUSH
AREA WHILE THE WOMEN HITCHHIKED. THE VICTIM APPROACHED IN A SILVER
DATSUN, STATION WAGON, LICENSE NUMBER 838YHP, CONVERSED WITH
MRS. MONTEZ, THEN ALLOWED THEM TO ENTER HIS VEHICLE. THE WITNESS
ENTERED THE FRONT SEAT AND MRS. MONTEZ ENTERED THE REAR SEAT WHILE
BECKONING TO THE DEFENDANT WHO WAS HIDING IN THE BUSHES. THE
DEFENDANT RAN TO THE VEHICLE BRANDISHING A SMALL CALIBER FIREARM
AND ENTERED THE REAR SEAT OF THE VEHICLE. HE THEN POINTED THE
WEAPON AT THE REAR PORTION OF THE VICTIM'S HEAD AND TOLD HIM TO TAKE

THEM TO OXNARD OR HE WOULD KILL HIM. THE DEFENDANT FIRED ONE ROUND, WITHOUT WARNING, STRIKING THE VICTIM APPROXIMATELY IN THE LOWER RIGHT OF HIS HEAD. THE VICTIM FELL FORWARD. THE DEFENDANT EXITED THE REAR PASSENGER DOOR AND OPENED UP THE FRONT PASSENGER DOOR. THE DEFENDANT THEN DRUG THE VICTIM'S BODY ACROSS THE FRONT SEATS FROM THE DRIVER'S SIDE AND SECRETED THE BODY BENEATH AN OVERHANGING TREE AND SHRUB AREA. THE WITNESS THEN OBSERVED THE DEFENDANT GOING THROUGH THE VICTIM'S GARMENTS BUT WAS UNSURE OF WHAT WAS REMOVED. THE WITNESS AND MRS. MONTEZ HAD ALSO EXITED THE VEHICLE. THE DEFENDANT THEN INSTRUCTED THE WITNESS TO RE-ENTER THE VEHICLE AND TOLD HIS WIFE TO WEAR GLOVES SO AS NOT TO LEAVE HER FINGERPRINTS ON THE VEHICLE. HE THEN ENTERED THE REAR SEAT AND INSTRUCTED HIS WIFE TO DRIVE THE VEHICLE TO 456 CHANNEL ISLAND BOULEVARD IN OXNARD. UPON ARRIVAL AT THE RESIDENCE WHICH IS OCCUPIED BY THERESA RAMIREZ, MRS. MONTEZ REMOVED CLOTHING WHICH HAD BELONGED TO THE VICTIM AND ATTEMPTED TO WASH THEM. THE WITNESS WAS UPSET AND THE DEFENDANT COMFORTED HER INDICATING THEY COULD NOT BE IDENTIFIED AND THERE WAS NO WAY TO TRACE THEIR LOCATION. WHEN THE WITNESS SUGGESTED THEY TURN THEMSELVES IN, THE DEFENDANT THREATENED HER WITH ACTS OF VIOLENCE AND STATED SHE WOULD BE KILLED IF SHE CONTACTED THE POLICE. THE WITNESS THEN STATED THE WEAPON HAD BEEN SOLD TO AN UNKNOWN FEMALE IN THE OXNARD AREA AND A GUITAR, WHICH HAD BEEN TAKEN FROM THE VICTIM'S VEHICLE, WAS ALSO SOLD TO SOMEONE IN THE OXNARD AREA. THE WITNESS THEN

Con't.

-8-

WILLINGLY ACCOMPANIED LOS ANGELES POLICE DEPARTMENT DETECTIVES TO THE
OXNARD POLICE STATION AND IDENTIFIED A PHOTO OF THE DEFENDANT. AT
APPROXIMATELY 12:10 P.M. ON AUGUST 11, 1980, THE WITNESS IDENTIFIED
THE VICTIM'S VEHICLE AT 149 ELIZA COURT IN THE CITY OF OXNARD.
THERESA RAMIREZ LATER INFORMED OFFICERS THAT MR. AND MRS. MONTEZ
HAD LEFT HER RESIDENCE AT APPROXIMATELY 4:00 P.M. ON AUGUST 10, 1980.
MRS. RAMIREZ INFORMED OFFICERS THAT SHE HAD ORDERED THE DEFENDANT
AND HIS WIFE OUT OF HER HOME AS THEY WERE ATTEMPTING TO SELL STOLEN
GOODS AND STATED THEY COULD BE LOCATED AT THE PLAZA MARINA HOTEL.
LOS ANGELES POLICE OFFICERS WENT TO THAT LOCATION ACCOMPANIED BY
OXNARD POLICE OFFICERS AND WERE INFORMED THE DEFENDANT AND HIS WIFE
WERE OCCUPYING APARTMENT NUMBER 25. THE DEFENDANT ANSWERED THE DOOR
TO APARTMENT 25 AND A REVOLVER WAS OBSERVED ON THE NIGHTSTAND. BOTH
THE DEFENDANT AND HIS WIFE WERE THEN ARRESTED.

DEFENDANT'S STATEMENT:

THE DEFENDANT HAS NOT SUBMITTED A WRITTEN STATEMENT.
ORALLY, HE STATES THAT HE, HIS WIFE, AND IRMA CEDALLOS WERE LOOKING
FOR A RIDE IN THE SAN FERNANDO VALLEY WHERE HE HAD DRIVEN HIS CAR
AND IT HAD BROKEN DOWN. THEY WERE EN ROUTE TO OXNARD FROM
SAN BERNADINO. HE SAW A GUY PARKED AT A GAS STATION AND OFFERED
HIM $20 FOR A RIDE, BUT THE PERSON HAD NO GAS. THEY THEN WALKED ON
TO THE 101 FREEWAY AND THE WOMEN WERE TOLD TO ATTEMPT TO GET A RIDE
WHILE THE DEFENDANT HID. HE STATED HE WOULD CATCH THEM LATER. A

-9-

CAR STOPPED AND OFFERED THEM A RIDE. THE DEFENDANT THEN CHANGED HIS
MIND, RAN TO THE CAR, AND PUSHED HIS WIFE OUT OF THE WAY, KNOCKING
HER DOWN. THE VICTIM WAS SCARED AND THE DEFENDANT TOLD HIM THAT
"NOTHING WOULD HAPPEN TO HIM. JUST GIVE ME A RIDE." THE VICTIM
AGREED AND THE DEFENDANT LET HIM GO. HE STATES HE HAD A GUN IN HIS
HAND AND, WHEN THE VICTIM ADJUSTED HIMSELF IN HIS SEAT, HE ACCIDENTLY
HIT THE GUN WHICH WENT OFF AND KILLED HIM. THE DEFENDANT TOOK THE
VICTIM OUT OF THE CAR, PUT HIS BODY IN THE BUSHES, RE-ENTERED THE
VEHICLE AND DROVE TO OXNARD. HE DENIES HAVING GONE THROUGH THE
VICTIM'S POCKETS AS HE STATES HE HAD NO INTENTION OF ROBBING OR
HURTING ANYONE.

INTERESTED PARTIES:

          CYNTHIA STEWART, VICTIM'S SISTER, INDICATES THE
VICTIM WAS SIX FEET TWO INCHES, APPROXIMATELY 170 POUNDS, AGE 33
YEARS, SINGLE WITH NO DEPENDENTS. SHE STATES THAT IN 1976 HE HAD
AN ATTACK IN HIS LEFT EYE OF HISTOPLASMOSIS WHICH IS AN EYE DISEASE
AND CAUSES BLINDNESS. SHE INDICATED THE ILLNESS CLOGS ONE'S VISION
AND THAT THE DOCTOR HAD STATED THIS WAS THE WORST CASE EVER SEEN.
SHE STATES HER BROTHER WAS RETURNING TO ALTADENA FROM BAND PRACTISE
IN WOODLAND HILLS. THE CAR WAS SUBSEQUENTLY RETURNED, BUT WAS TOTALLY
STRIPPED. MISS STEWARD RECEIVED A CALL FROM THE OXNARD POLICE
DEPARTMENT INDICATING HER BROTHER'S CAR HAD BEEN FOUND; HOWEVER, SHE
DID NOT KNOW AT THE TIME THAT THE HOMICIDE VICTIM WAS ACTUALLY HER

-10-

BROTHER. SHE STATES THERE WAS INSURANCE WHICH COVERED HER BROTHER'S FUNERAL EXPENSES. ALSO, MISS STEWART WAS INFORMED BY THE POLICE DEPARTMENT OF HER ELIGIBILITY FOR VICTIM'S COMPENSATION.

EVALUATION:

THE DEFENDANT, WHO INDICATES HIS ONLY EMPLOYMENT WAS FOR A PERIOD OF ONE AND ONE-HALF MONTHS SINCE HIS RELEASE FROM THE NEW MEXICO STATE PENITENTIARY IN 1978, HAS HAD THE ADVANTAGE OF BEING THE PRODUCT OF AN INTACT FAMILY ENVIRONMENT UNTIL THE AGE OF 20 OR 21 YEARS. HOWEVER, HE WAS COMMITTED TO THE CALIFORNIA YOUTH AUTHORITY SOON AFTER HIS 21ST BIRTHDAY FOR POSSESSION. HIS ONLY OTHER CONTACT WITH LAW ENFORCEMENT HAS BEEN OF A MODERATE NATURE. HE COMES FROM A LARGE FAMILY AND NO OTHER MEMBERS ARE INDICATED AS HAVING BEEN ARRESTED. THE DEFENDANT HAS OBTAINED THE EQUIVALENT OF A HIGH SCHOOL DIPLOMA AND HAS HAD TRAINING AS A HEAVY EQUIPMENT OPERATOR AND TRAINING IN WELDING, YET NO ATTEMPTS WERE MADE TO OBTAIN CONTINUAL EMPLOYMENT. THE DEFENDANT HAS BEEN HEAVILY INVOLVED IN THE USE OF NARCOTICS AND HAS BEEN ADDICTED TO SAME FOR THE MAJORITY OF HIS LIFETIME. HE INDICATES REMORSE OVER THIS CURRENT MATTER AND DENIES ANY INTENT OF HARM TO ANYONE. THE VICTIM WAS A YOUNG MAN WITH NO DEPENDENTS; HOWEVER, IT APPEARS HE MAY HAVE HAD A VISION PROBLEM AND POSSIBLY NOT OBSERVED THE DEFENDANT APPROACHING HIS VEHICLE.

THIS WAS A CRIME OF A VIOLENT NATURE AND THE DEFENDANT'S

-11-

STATEMENT OF FEELING REMORSE IS IN DIRECT CONTRADICTION TO STATEMENTS

OBTAINED FROM THE ONLY EYEWITNESSES TO THE INCIDENT.

### SENTENCING CONSIDERATIONS:

DUE TO THE CHARGE OF MURDER WITHIN THE USE ALLEGATION

HAVING BEEN FOUND TRUE, THE DEFENDANT IS INELIGIBLE FOR PROBATION

PURSUANT TO SECTION 1203.06 OF THE PENAL CODE AND 1203.075 OF THE

PENAL CODE.

CIRCUMSTANCES IN AGGRAVATION:

1. PRE-PLANNED USE OF A FIREARM.

2. A VIOLENT CRIME WHICH CAUSED THE DEATH TO THE VICTIM.

3. DEFENDANT THREATENED THE VICTIM WITH A FIREARM.

4. DEFENDANT ATTEMPTED TO CONCEAL THE VICTIM FROM SIGHT.

5. THE DEFENDANT TAMPERED WITH EVIDENCE USEFUL IN THE INVESTIGATION OF THIS CRIME.

CIRCUMSTANCES IN MITIGATION:

1. DEFENDANT'S VEHICLE WAS INOPERATIVE.

2. THE DEFENDANT IS A HEROIN ADDICT.

CIRCUMSTANCES IN MITIGATION AND IN AGGRAVATION SUPPORT

A MOTION FOR THE HIGHER BASED TERM.

### RECOMMENDATION:

IT IS RECOMMENDED THAT PROBATION BE DENIED AND THAT

-12-

1  DEFENDANT BE SENTENCED TO STATE PRISON WITH PRE-IMPRISONMENT OF

2  649 DAYS.

3  RESPECTFULLY SUBMITTED,

4  KENNETH E. KIRKPATRICK
   PROBATION OFFICER

5

6  BY
7  LYNETTE GRISMORE, DEPUTY
   EAST SAN FERNANDO VALLEY AREA OFFICE
8  901-3979

9                                        I HAVE READ AND CONSIDERED
                                         THE FOREGOING REPORT OF THE
10 READ AND APPROVED:                    PROBATION OFFICER.

11

12 ART KEENER, SDPO                      JUDGE OF THE SUPERIOR COURT

13 (SUBMITTED 4-16-82)
   (TYPED 4-20-82)
14 LG:BS        (6)

15 -13-

16

17

18

19

20

21

22

23

EXHIBIT "6"

**EXHIBIT 3**
**Part 3 of 4**

SUBSEQUENT PAROLE CONSIDERATION HEARING

STATE OF CALIFORNIA

BOARD OF PAROLE HEARINGS

In the matter of the Life )
Term Parole Consideration )
Hearing of: )          CDC Number C-48215
                       )
VICTOR MONTEZ          )
                       )
_____)

# INMATE COPY

CORRECTIONAL TRAINING FACILITY

SOLEDAD, CALIFORNIA

MAY 31, 2006

10:57 A.M.

PANEL PRESENT:

JACK GARNER, Presiding Commissioner
DENNIS SMITH, Deputy Commissioner

OTHERS PRESENT:

VICTOR MONTEZ, Inmate
KATERA E. RUTLEDGE, Attorney for Inmate
HERBERT LAPIN, Deputy District Attorney
TWO CORRECTIONAL OFFICERS, Unidentified

CORRECTIONS TO THE DECISION HAVE BEEN MADE

```
_____   No      See Review of Hearing
_____   Yes     Transcript Memorandum
```

Ramona Cota              Peters Shorthand Reporting

ii

# INDEX

|                              | PAGE |
|------------------------------|------|
| Proceedings                  | 1    |
| Case Factors                 | 8    |
| Pre-Commitment Factors       | 11   |
| Post-Commitment Factors      | 23   |
| Parole Plans                 | 19   |
| Closing Statements           | 41   |
| Recess                       | 52   |
| Decision                     | 53   |
| Adjournment                  | 61   |
| Transcriber Certification    | 62   |

--oOo--

1

```
                    P R O C E E D I N G S
```

1       P R O C E E D I N G S

2           DEPUTY COMMISSIONER SMITH:  We are on the

3   record.

4           PRESIDING COMMISSIONER GARNER:   All

5   right, this is a Subsequent Parole Consideration

6   Hearing for Victor Montez, M-O-N-T-E-Z, CDC

7   number C-48215.  The date today is May 31, 2006.

8   It is now 10:57 a.m. and we are located at the

9   Correctional Training Facility in Soledad.   The

10  inmate was received on June 1, 1982 from Los

11  Angeles County.   The offense is murder in the

12  second degree with the use of a firearm, the

13  case number is A Adam, 146105.   Count number one

14  is PC 187 with 12022.5.   The term was 15 years

15  to life plus 2 and the minimum eligible parole

16  date was April 9, 1990.   This hearing is going

17  to be tape-recorded and for purposes of voice

18  identification for the transcriber each of us at

19  the table is going to be required to state our

20  first name, last name, spelling the last name.

21  When we get to you, Mr. Montez, if you'd also

22  give us your CDC number, please.

23          INMATE MONTEZ:  Yes sir.

24          PRESIDING COMMISSIONER GARNER:    I'll

25  start and go to my left.   I'm Jack Garner, G-A-

26  R-N-E-R, Commissioner.

27          DEPUTY COMMISSIONER SMITH:  My name is

1   Dennis Smith, S-M-I-T-H, I'm a Deputy

2   Commissioner.

3          DEPUTY DISTRICT ATTORNEY LAPIN:   Herbert

4   Lapin, L-A-P-I-N, Deputy District Attorney Los

5   Angeles County.

6          ATTORNEY RUTLEDGE:   Katera E. Rutledge,

7   R-U-T-L-E-D-G-E, attorney for Mr. Montez.

8          INMATE MONTEZ:   Victor M. Montez, M-O-N-

9   T-E-Z, C number is C-48215.

10          PRESIDING COMMISSIONER GARNER:   Okay,

11   thank you.   And for the record, we do have two

12   correctional peace officers in the room for

13   purposes of security.   Okay, Ms. Rutledge and

14   Mr. Montez, I have a BTB (sic) 1073.   This is

15   the reasonable accommodation associated with the

16   Americans with Disabilities Act.   And the form

17   was signed over a year ago now, it was May 10,

18   2005, and at that time you indicated you didn't

19   need any help for your parole hearing.   No

20   disabilities were identified from the file and

21   the fact that you had a GED was noted.   Let me

22   go ahead and ask you, has anything occurred

23   since May 10 of 2005 that we need to provide an

24   accommodation for today?

25          INMATE MONTEZ:   As far as ADA?   No.

26          PRESIDING COMMISSIONER GARNER:   Your

27   ability to see, hear, mobility, anything like

3

1    that.

2        INMATE MONTEZ:  No, I'm all right.

3        PRESIDING COMMISSIONER GARNER:  You're

4    okay.  Are you on any medications?

5        INMATE MONTEZ:  No.

6        PRESIDING COMMISSIONER GARNER:  No

7    medications.  So you're set to go?

8        INMATE MONTEZ:  Ready to go, sir.

9        PRESIDING COMMISSIONER GARNER:

10   Ms. Rutledge?

11       ATTORNEY RUTLEDGE:  Yes.

12       PRESIDING COMMISSIONER GARNER:  All

13   right, thank you.  This hearing is being

14   conducted pursuant to Penal Code Section 3041

15   and 3042 and the rules and regulations of the

16   Board of Parole Hearings governing parole

17   consideration hearings for life inmates.  The

18   purpose of today's hearing is to consider your

19   suitability for parole.  In doing so we will

20   consider the number and nature of the crimes you

21   were committed for, your prior criminal and

22   social history and your behavior and programming

23   since your commitment.  We have had the

24   opportunity to review your Central File and your

25   prior hearing transcript.  You will be given the

26   opportunity to correct or clarify the record.

27   We will consider your progress since your

4

1    commitment and since your last hearing.  Your

2    updated counselor's report and psychological

3    report will also be considered.  And any change

4    in your parole plans should be brought to our

5    attention.  We will reach a decision today and

6    inform you whether or not we find you suitable

7    for parole and the reasons for our decision.  If

8    you are found suitable for parole the length of

9    your confinement will be explained to you.  This

10   hearing will be conducted in two phases.  I will

11   discuss with you the crime you were committed

12   for, your prior criminal and social history,

13   your parole plans and any letters of support or

14   opposition that may be in the file.

15   Commissioner Smith will discuss with you your

16   progress since your commitment, your counselor's

17   report and your psychological evaluation.  Once

18   that is concluded the Commissioners, the

19   district attorney and your attorney will be

20   given an opportunity to ask you questions.  The

21   questions from the district attorney will be

22   asked through the Chair and you should direct

23   your answers back to the panel.  Before we

24   recess for deliberations the district attorney,

25   your attorney and you will be given an

26   opportunity to make a final statement regarding

27   your parole suitability.  Your statement should

5

1  be directed to why you feel you are suitable for

2  parole.  We will then recess, clear the room and

3  deliberate.  Once we have completed our

4  deliberations we will resume the hearing and

5  announce our decision.  The California Code of

6  Regulations states regardless of time served a

7  life inmate shall be found unsuitable for and

8  denied parole if in the judgment of the panel

9  the inmate would pose an unreasonable risk of

10  danger to society if released from prison.  Now

11  Mr. Montez, you have certain rights.  The rights

12  included a timely notice to this hearing, the

13  right to review your Central File and the right

14  to present relevant documents.  And I'd ask you

15  at this time, have those rights been met?

16        INMATE MONTEZ:  Yes.

17        PRESIDING COMMISSIONER GARNER:  All

18  right.

19        ATTORNEY RUTLEDGE:  Yes.

20        PRESIDING COMMISSIONER GARNER:  You also

21  have a right to be heard by an impartial panel.

22  Today the panel will be myself and Commissioner

23  Smith.  Any objection to the panel?

24        INMATE MONTEZ:  No sir.

25        ATTORNEY RUTLEDGE:  No.

26        PRESIDING COMMISSIONER GARNER:  Thank

27  you.  You will receive a copy of our written

6

1    tentative decision today.  The decision is

2    subject to review by the Decision Review Unit

3    and by the entire Board meeting as a body.  It

4    will become effective in 120 days and a copy of

5    the tentative decision and a copy of the

6    transcript will be sent to you.  You might

7    recall from previous Boards, in May 2004 the

8    appeal procedure changed and now you are

9    required to go through the courts if you want to

10   appeal a panel decision.

11          INMATE MONTEZ:  Yes sir.

12          PRESIDING COMMISSIONER GARNER:  All

13   right.  And you are not required to admit your

14   offense or discuss your offense if you do not

15   wish to do so.  However, this panel does accept

16   as true the findings of the court and you are

17   invited to discuss the facts and circumstances

18   of the offense if you desire.  The Board will

19   review and consider any prior statements you

20   have made regarding the offense in determining

21   your suitability for parole.  At this time I

22   will ask Commissioner Smith if there is any

23   confidential material in your C File and if

24   we'll be using it today?

25          DEPUTY COMMISSIONER SMITH:  There is

26   confidential information but it will not be used

27   this morning.

7

1          PRESIDING COMMISSIONER GARNER:  All

2  right, thank you.  Counselors, I have the

3  hearing checklist back, thank you.  And do we

4  have any additional documents to submit today?

5          ATTORNEY RUTLEDGE:  Yes, we'll submit

6  them when we get to the parole plans.

7          PRESIDING COMMISSIONER GARNER:  All

8  right.  Any preliminary objections?

9          ATTORNEY RUTLEDGE:  No.  We only have --

10  We just want to note for the record that

11  Mr. Montez's hearing is eight months late.

12          PRESIDING COMMISSIONER GARNER:  Okay.

13  We'll note that and just tell you we're making

14  progress.  A year ago it might have been a year

15  or more so we're getting down there.  The

16  backlog is getting chipped away at.  And if we

17  keep a full house of Commissioners we'll get to

18  you a little more quickly.

19          INMATE MONTEZ:  Yes.

20          DEPUTY COMMISSIONER SMITH:  Counsel, if

21  Mr. Montez does have letters regarding any

22  parole plans, if I could see those now to review

23  those so that Commissioner Garner will be able

24  to address those as soon as we get to that

25  point.  I would appreciate that, thank you.

26          PRESIDING COMMISSIONER GARNER:  Okay, and

27  will Mr. Montez be speaking with us today?

1          ATTORNEY RUTLEDGE:  He'll speak on all

2    issues except the commitment offense.

3          PRESIDING COMMISSIONER GARNER:  Okay, get

4    you to raise your right hand, sir.  Do you

5    solemnly swear or affirm that the testimony you

6    give at this hearing will be the truth, the

7    whole truth and nothing but the truth?

8          INMATE MONTEZ:  Yes I do.

9          PRESIDING COMMISSIONER GARNER:  All

10   right, thank you.  Okay.  Insomuch as Mr. Montez

11   has elected not to speak about the commitment

12   offense I'll go ahead and put into the record a

13   summary of the commitment offense.  And I am

14   taking this from the June 2002 Board Report that

15   was prepared by Correctional Counselor I initial

16   M. Rubio, R-U-B-I-O.

17          "In that on August 9, 1980 Montez

18          and two women, one of whom was

19          his wife, were on their way to

20          Oxnard when their vehicle became

21          disabled.  The two women began

22          to hitchhike on the Ventura

23          Freeway while Montez hid in the

24          bushes.  It was agreed that the

25          two women would appear as two

26          females stranded on the freeway

27          while Montez would approach the

1    motorist who stopped and exhibit

2    a firearm he carried in his

3    waistband.  The victim, Michael

4    Stewart (phonetic) stopped for

5    the women.  The women entered

6    the car and Ms. Montez entered

7    the rear seat while beckoning to

8    Montez who was still hiding in

9    the bushes.  He ran to the car

10   and brandished a small caliber

11   firearm and entered the rear

12   seat of the car.  He pointed the

13   firearm at the back of the

14   victim's head and told him to

15   drive them to Oxnard or he would

16   kill him.  Montez then fired,

17   striking and killing the victim.

18   Montez exited the car, dragged

19   the body from the car and

20   secreted the body beneath an

21   overhanging tree and shrubs.

22   After leaving the body Montez,

23   his wife and the other female

24   companion drove the victim's car

25   to Oxnard.  Montez was arrested

26   on August 11, 1980."

27   From the same report the version that was placed

1    into the report by the correctional counselor

2    for the prisoner's version indicates that Montez

3    basically concurs with the report.

4              "He states he never threatened the

5              victim, in fact he offered the

6              victim money for gas.  He had the

7              gun pointed at the time at the

8              victim's head.  Montez believes

9              the gun fired when the victim

10             adjusted himself in the car seat

11             and his elbow knocked the gun.

12             Montez states it was not his

13             intention to kill the victim.

14             Montez explained he was in

15             possession of the gun, that it was

16             stolen, as he was attempting to

17             sell it to purchase drugs.  He

18             claimed he was not intoxicated or

19             under the influence of drugs at

20             the time of the offense.  He

21             claims he never threatened the

22             witness with violence if she

23             contacted the police as is

24             alleged.  His wife was

25             subsequently convicted of

26             accessory to murder and committed

27             to CDC for a period of three

1        years, at which time she paroled.

2        He has had no subsequent contact

3        with her.  He claims the purpose

4        of stopping the vehicle on the

5        freeway was simply to get a ride

6        back to Oxnard.

7        DEPUTY COMMISSIONER SMITH:  Commissioner,

8    if I may.  The two letters that were provided

9    are both from the same individual, they are both

10   employment letters.  The most recent one is

11   March, is dated March 1, 2006.  That's in the

12   Board packet so you will be addressing that when

13   we get to that point.  So I am going to return

14   these two letters to counsel.

15       PRESIDING COMMISSIONER GARNER:  Okay.

16   Okay, thank you.  All right, so far as a prior

17   record.  Reading from the same report it

18   indicates that the first arrest was at the age

19   of nine, arrested for malicious mischief,

20   counseled and released.  At the age of 13

21   released for needle marks on his arm.  According

22   to Montez this matter was dismissed as you were

23   going to go into the Job Corps.  Both those

24   correct, sir?

25       INMATE MONTEZ:  Yes sir.

26       PRESIDING COMMISSIONER GARNER:  All

27   right, thank you.  The first adult arrest

12

1    occurred at the age of 19, arrested for

2    burglary, the case was dismissed.  One month

3    later arrested for under the influence of a

4    controlled substance and possession of substance

5    paraphernalia and burglary.  And then on January

6    7, 1974, convicted of possession of marijuana

7    and sent to CYA.  Arrest history is inclusive of

8    burglary April 17 of '73 which was dismissed,

9    entering a non-commercial dwelling.  April 26,

10   '73 for which you sustained one year probation.

11   Selling and transporting marijuana October '73.

12   FTA and a battery on January 16, '74, which was

13   dismissed.  Theft of a vehicle in February of

14   1976.  And the indication was that that one was

15   in the state of New Mexico and you were

16   sentenced to the New Mexico State Penitentiary,

17   being paroled April 22, 1978.  Is that the

18   correct period of time?

19            INMATE MONTEZ:  Yes.

20            PRESIDING COMMISSIONER GARNER:  Okay.

21            INMATE MONTEZ:  I believe it is.

22            PRESIDING COMMISSIONER GARNER:  All

23   right.  And so far as the commitment offense,

24   again we have that.  That was August 11 in 1980.

25   So far as your personal life.  You were the

26   fourth of eleven children born to your parents

27   whose marriage remained intact until you were 20

13

1    years of age.  Your parents, did they separate

2    or divorce?

3            INMATE MONTEZ:  My father has since

4    deceased but my mother is still alive.

5            PRESIDING COMMISSIONER GARNER:  Your

6    mother is still alive.  So when you were 20

7    years of age, that's when your mother and father

8    split up?

9            INMATE MONTEZ:  Yes.

10           PRESIDING COMMISSIONER GARNER:  And then

11    he subsequently passed away?

12           INMATE MONTEZ:  That was about the time,

13    yes.

14           PRESIDING COMMISSIONER GARNER:  All

15    right.  And your mother remarried in 1980.  Is

16    that correct?

17           INMATE MONTEZ:  I believe so, yes.

18           PRESIDING COMMISSIONER GARNER:  Okay.

19           DEPUTY COMMISSIONER SMITH:  Mr. Montez,

20    if I could ask you to move to the microphone

21    just a little bit closer to you.  That way you

22    don't have to lean forward and I can make sure I

23    can get your voice on the tape.

24           INMATE MONTEZ:  Okay.

25           DEPUTY COMMISSIONER SMITH:  Thank you.

26           INMATE MONTEZ:  Sorry.

27           PRESIDING COMMISSIONER GARNER:  All

14

1    right, all right.  You were born in Texas and

2    the family relocated to California when you were

3    three or four years old.  Your father was

4    employed as a mechanic and a welder and you have

5    a brother that was committed to CDC for murder.

6    You had another brother who has had contact_with

7    law enforcement but never received a commitment

8    to CDC.  Began smoking marijuana two to three

9    times a week at the age of 13 and at the age of

10   13 began using heroin on weekends.  And it

11   progressed to the point where you were

12   supporting a $200 a day habit, correct?

13           INMATE MONTEZ:  Yes sir.

14           PRESIDING COMMISSIONER GARNER:  And about

15   what age was that?

16           INMATE MONTEZ:  The heroin?

17           PRESIDING COMMISSIONER GARNER:  The

18   heroin, yeah.

19           INMATE MONTEZ:  I believe I was 13 or 14.

20           PRESIDING COMMISSIONER GARNER:  That's a,

21   that's a pretty healthy budget for dope.

22           INMATE MONTEZ:  Well that came --

23           PRESIDING COMMISSIONER GARNER:  That came

24   later?

25           INMATE MONTEZ:  Years later.

26           PRESIDING COMMISSIONER GARNER:  All

27   right.  And at the age of 15 you began taking

15

1  Valium when you couldn't get the heroin and you

2  supported your habit via odd jobs and

3  burglaries. And you dropped out of high school

4  at 16. Was that associated with some of the

5  criminal difficulties?

6      INMATE MONTEZ: I just -- it might have

7  been.

8      PRESIDING COMMISSIONER GARNER: Prior to

9  dropping out of school how did you do in school?

10     INMATE MONTEZ: Average student, I guess.

11     PRESIDING COMMISSIONER GARNER: All

12  right. And you stayed in the job corps for

13  about 11 months studying as a heavy equipment

14  operator. It looks like you went into the Army

15  in 1970, got honorably discharged in '72,

16  serving as a paratrooper in the Special Forces.

17  Correct?

18     INMATE MONTEZ: Yes.

19     PRESIDING COMMISSIONER GARNER: Where did

20  you serve?

21     INMATE MONTEZ: I served in the 82nd.

22     PRESIDING COMMISSIONER GARNER: Okay.

23     INMATE MONTEZ: Stateside.

24     PRESIDING COMMISSIONER GARNER: All

25  stateside?

26     INMATE MONTEZ: Yes sir.

27     PRESIDING COMMISSIONER GARNER: Okay.

16

1  Did you get clean while you were in the

2  military?

3          INMATE MONTEZ:  I did, I did, I did all

4  right in the military.  I should have stayed in.

5          PRESIDING COMMISSIONER GARNER:  Okay.

6  And you got your GED while you were at the

7  penitentiary in New Mexico.

8          INMATE MONTEZ:  Yes sir.

9          PRESIDING COMMISSIONER GARNER:  And that

10 you have got certificates for welding.  And that

11 you lived in a common law relationship for about

12 a year in New Mexico and you remained in that

13 relationship until February of '79.  You then

14 lived with a Denise Garcia from May of '79 until

15 you got married in April of '80.  And you

16 assumed the responsibility for your wife's son

17 and then you had two daughters together.  They

18 are now being cared for and raised by

19 grandparents.

20         INMATE MONTEZ:  Yes.

21         PRESIDING COMMISSIONER GARNER:  How old

22 are they now?

23         INMATE MONTEZ:  One is 26 and the other

24 one is 25.

25         PRESIDING COMMISSIONER GARNER:  Okay.

26 How are they doing?

27         INMATE MONTEZ:  They're doing real good.

17

1          PRESIDING COMMISSIONER GARNER:   Both
2    doing good?   Married?
3          INMATE MONTEZ:   Yes.   The youngest one
4    just recently got married in November.
5          PRESIDING COMMISSIONER GARNER:   And the
6    oldest one, does she have grandchildren for you?
7          INMATE MONTEZ:   Yeah, both of them got
8    grandchildren for me.
9          PRESIDING COMMISSIONER GARNER:   Okay.
10   And it speaks to your crime partner, your wife
11   and the time she served and that you remain in
12   contact with her and divorced in '83.   At the
13   time of the offense your wife and the children
14   resided in your parents' home in Oxnard.
15         INMATE MONTEZ:   Yes.
16         PRESIDING COMMISSIONER GARNER:   Okay.
17   While you were growing up, up until let's say
18   the time you were about 16 or 17, were you ever
19   hospitalized for any reason?
20         INMATE MONTEZ:   No.
21         PRESIDING COMMISSIONER GARNER:   Never
22   been hospitalized, okay.
23         INMATE MONTEZ:   I had my tonsils out when
24   I was a kid but that was way before that.
25         PRESIDING COMMISSIONER GARNER:   Okay.
26   That's kind of a routine thing.   While you were
27   living with your wife at your folks' home in

18

```
1   Oxnard were you working?

2          INMATE MONTEZ:  I was working as a

3   roofer.

4          PRESIDING COMMISSIONER GARNER:  Working

5   as a roofer.

6          INMATE MONTEZ:  Some company out of

7   Industrial City.

8          PRESIDING COMMISSIONER GARNER:  All

9   right.  Full time or just by the job?

10         INMATE MONTEZ:  It was just a job site.

11         PRESIDING COMMISSIONER GARNER:  Okay.

12  Were you paid under the table or did you get a

13  real check?

14         INMATE MONTEZ:  Well I got a check but I

15  signed it over to the guy that hired me so I

16  don't know if it was under the table or what?

17         PRESIDING COMMISSIONER GARNER:  Then he

18  gave you cash?

19         INMATE MONTEZ:  And then he gave me cash.

20         PRESIDING COMMISSIONER GARNER:  Okay.

21  How was your, how was your family life growing

22  up?

23         INMATE MONTEZ:  It was good.  I believed

24  it was good.

25         PRESIDING COMMISSIONER GARNER:  Any

26  issues of abuse in the household?

27         INMATE MONTEZ:  None.
```

1            PRESIDING COMMISSIONER GARNER:  With you

2    or your brothers and sisters?  Your mother, was

3    she ever abused?

4            INMATE MONTEZ:  You mean beatings or

5    stuff like that?

6            PRESIDING COMMISSIONER GARNER:  I'm going

7    to distinguish between a whipping and a

8    righteous beating.

9            INMATE MONTEZ:  No, no, no.  I mean, you

10   know, we got our, we got our whippings when we

11   had them coming.

12           PRESIDING COMMISSIONER GARNER:  Okay.  So

13   far as your parole plans, and this is going back

14   and it may change based on some of the letters.

15   But at the time this report was written you were

16   going to be released to your mother's home in

17   Oxnard.  Is that the same home you were living

18   in at the time you got arrested --

19           INMATE MONTEZ:  Yes.

20           PRESIDING COMMISSIONER GARNER:   -- or has

21   she moved?  Does she own the home or renting it?

22           INMATE MONTEZ:  It's her home, yes.

23           PRESIDING COMMISSIONER GARNER:  Okay.

24           INMATE MONTEZ:  But as far -- May I say

25   something?  As far as that, there were certain

26   programs that I had written to and the latest

27   was this one right here that I haven't given to

1    -- it was a drug program.

2            PRESIDING COMMISSIONER GARNER:  Well this

3    is old enough, let me go right to, right to the

4    letters, which will give me a more current

5    assessment as to what you plan to do.  All

6    right.  The first one is March 1, 2006.  It's

7    typed and signed and it's signed by a Sal, S-A-

8    L, Flores and Flores is with an S on the end.

9    And there is also a business card attached to it

10   for the firm of Ideal Upholstery with an address

11   in Ventura, California.  And the person that

12   wrote the letter, his name is on the business

13   card.  Remind the Board that my offer for

14   employment for him is still available and the

15   place of business again is noted in Ventura,

16   California.  And that upon his release he is to

17   contact me, establish a work schedule.  An

18   hourly salary of $9, advancement based on

19   performance.  And it provides a telephone number

20   if we want to contact Mr. Flores.  The second

21   letter is --

22           DEPUTY COMMISSIONER SMITH:  Commissioner,

23   if I may.  The letter on the second -- the date

24   of the second letter is 5/30/2002.

25           PRESIDING COMMISSIONER GARNER:  Um-hmm.

26   INMATE MONTEZ:  Yes.

27           DEPUTY COMMISSIONER SMITH:  Was that

1  letter addressed at your last hearing in June

2  2002?

3            INMATE MONTEZ:  No.  I think it might

4  have been, I'm not sure.. I presented one of the

5  letters.

6            DEPUTY COMMISSIONER SMITH:  Do you have a

7  more current letter from them?

8            INMATE MONTEZ:  I think it was the one

9  you just, the one for 2006.

10           ATTORNEY RUTLEDGE:  Let me just clarify.

11 The letters that we've given you were the

12 updated job letter.  Now he doesn't have -- if

13 you're talking about the Freedom House dated

14 2002, that's no longer his plan.

15           INMATE MONTEZ:  I think he's referring to

16 the job letters, right?

17           DEPUTY COMMISSIONER SMITH:  No, I'm

18 referring to Freedom House, your residential

19 plans.

20           INMATE MONTEZ:  No, these are it right

21 here.

22           ATTORNEY RUTLEDGE:  Yes, these no longer

23 apply, this one.  It's an old letter they should

24 have never put in here.

25           INMATE MONTEZ:  That bed might be gone by

26 now, you know.

27           DEPUTY COMMISSIONER SMITH:  Well that's

1   my point, it's a letter that is four years old.

2   Not only may the bed be gone but that entire

3   operation may be gone.

4           INMATE MONTEZ:  Yeah.  I have a current

5   letter.

6           DEPUTY COMMISSIONER SMITH:  Okay, great,

7   that's what I wanted to ask.  Because there is

8   no reason for the Commissioner to read a letter

9   in that one, may have been addressed at your

10  last hearing, and two, is four years old.  So I

11  appreciate you bringing the more current one.

12          INMATE MONTEZ:  Thank you.

13          PRESIDING COMMISSIONER GARNER:  All

14  right, this is a letter that is dated May 9,

15  2006 and it is from the Ventura County Rescue

16  Mission.  And it's an outreach of the ministry

17  of Rescue Mission Alliance.  And it is from a

18  Kyle, K-Y-L-E, Venning, V like Victor, E-N-N-I-

19  N-G, he is the interim chaplain counselor.  The

20  staff at Ventura County Rescue Mission has

21  accepted your request for an interview to

22  determine if you qualify for your drug and

23  alcohol program.  It speaks to upon a release

24  that you report directly to the Mission for

25  intake and all your court-appointed obligations

26  with the exception of parole meetings must be

27  taken care of before you commit to the nine-

1    month recovery program. You will need a

2    driver's license, ID card and social security

3    card. The indication is they don't provide

4    transportation. The letter is not a guarantee

5    of acceptance into the program. You've got to

6    go through the intake interview process before

7    being accepted. Then it speaks to being a

8    Christ-centered and Biblically based program and

9    provides a telephone number for you to call

10   prior to your arrival. And attached to it is a

11   description of the program, a brochure that was

12   provided. I'll get these back to you before the

13   end of the hearing. Okay, let me go ahead and

14   note that we sent out our legal notices, the

15   3042 notices that went to all the agencies that

16   had a direct involvement in your case. For the

17   record there is no written correspondence but we

18   do have a representative from the Los Angeles

19   County District Attorney's Office who will be

20   speaking later in the hearing. At this time let

21   me ask you to direct your attention over here to

22   Commissioner Smith who is going to talk to you

23   about your post-conviction factors.

24        DEPUTY COMMISSIONER SMITH: Mr. Montez,

25   you were received by the Department of

26   Corrections June 1, 1982. You were received

27   here at CTF January 21, 1998. You have a

1    classification score of 19.   Your last hearing

2    was held on June 20, 2002.   That was your sixth

3    subsequent hearing and you received a two year

4    denial at that time.

5         INMATE MONTEZ:   Yes.

6         DEPUTY COMMISSIONER SMITH:   The next

7    hearing was scheduled for August 31, 2004.  That

8    was postponed as the psychological evaluation

9    that was available for that hearing was old and

10   a new evaluation was requested.  And we have

11   that and I'll address that.   It's unfortunate

12   that it took as long as it did for you to come

13   back before the Board again.  But as

14   Commissioner Garner indicated, at that time the

15   Board was short of staff to conduct the hearings

16   and we're catching up with that.  So we

17   apologize for the delay but obviously you are

18   here nevertheless.  Since your last hearing you

19   have been, you have been extremely active, for

20   lack of a better word.  You completed two EMI

21   certificates from the Federal Emergency

22   Management Agency October of '03 and November of

23   '03 for Emergency Preparedness, Radiological

24   Emergency Management.  You received three

25   laudatory chronos, two in April of 2006 and one

26   in June of 2004 for a completion and

27   participation in the employability program.  You

```
 1   received six -- pardon me -- 16 laudatory

 2   chronos all referencing your active AA and NA

 3   participation but it appears to be primarily AA.

 4          INMATE MONTEZ:  Yes.

 5          DEPUTY COMMISSIONER SMITH:  And those

 6   laudatory chronos go back from July of 2002

 7   through April of this year.  And because your

 8   last hearing was June 2002 that's basically as

 9   far back as I went.  You also received a

10   laudatory chrono December of 2002 for completing

11   the 13-week IMPACT workshop.  Your disciplinary

12   history has actually become quite positive.  You

13   have received only four CDC 128(a)s, the last

14   one was in May 1989 and that was for a broken

15   window in a cell.  And you received seven CDC

16   115s, the last one September of 1993 and that

17   was for non-performance.  In looking over the

18   list there were a couple of initial 115s for

19   possession of a controlled substance.  But since

20   that point, and that goes back to 1992 was the

21   last one and that was a positive test for

22   opiates.  There has certainly been no indication

23   that you have been involved in any controlled

24   substance use since 1992 and there are no write-

25   ups for violence or weapons.  You have been

26   assigned for some period of time to the PIA wood

27   product area as a furniture assembler.  Is that
```

1  still accurate?

2          INMATE MONTEZ:  Yes.

3          DEPUTY COMMISSIONER SMITH:  And you

4  received exceptional and above-average work

5  reports in that area.  Your participation in AA

6  has certainly been ongoing and been very

7  consistent.  Is that a program that you find

8  important to you?  And the reason that I ask

9  that question is that some individuals simply

10  attend that kind of a program because it looks

11  better than not, and others of course have a

12  real commitment to the program.  And that's the

13  reason I asked the question.  How do you feel

14  about the program?

15          INMATE MONTEZ:  The program is, some

16  people would say it's a crutch, like religion.

17  But other people see it, the seriousness of it,

18  as a fellowship.  If you feel that, if you feel

19  that you're going to relapse then you've got

20  somebody that you can lean on and help you

21  through it.  That's what AA/NA is really about.

22  To guide you through your hard times.

23          DEPUTY COMMISSIONER SMITH:  Is that a

24  program that you'll continue to participate in

25  in the community?

26          INMATE MONTEZ:  Yes, that's why I, that's

27  why one of the reasons that I got that program

1    from that Rescue Mission because they offer

2    AA/NA and fellowship. But really AA/NA, the 12

3    principles, they're all Biblical but they have

4    taken the religion aspect out of it.

5         DEPUTY COMMISSIONER SMITH:  Do you know

6    the steps?

7         INMATE MONTEZ:  I know the steps as they

8    pertain to me to keep me from relapsing. The

9    way I apply them to myself and the things, I

10   have to do for people that I might have hurt,

11   you know. How to make amends, how to keep from

12   falling back.

13        DEPUTY COMMISSIONER SMITH:  Before I

14   review the psychological evaluation are there

15   any other activities that you have been involved

16   in since your last hearing that I haven't

17   addressed that we should be aware of?

18        INMATE MONTEZ:  No, basically you've

19   covered all bases.

20        DEPUTY COMMISSIONER SMITH:  You certainly

21   have a very positive -- if something should come

22   to mind before we recess let me know because we

23   want to make sure that we've captured all the

24   positives.

25        INMATE MONTEZ:  Yes sir.

26        DEPUTY COMMISSIONER SMITH:  The

27   psychological evaluation was dated May 11, 2006

```
 1   prepared by Dr. Macomber, M-A-C-O-M-B-E-R.   And
 2   I am going to identify or address just a couple
 3   of sections that I think are most, most
 4   important.  And then if you or counsel have any
 5   comments or would like to address any of the
 6   other sections I'll certainly give you that
 7   opportunity.  Going to page two Dr. Macomber
 8   writes that in the past based upon your criminal
 9   history you had been diagnosed as having
10   antisocial personality disorder.  But at this
11   point in your life there is no evidence of any
12   antisocial thinking or values.  That your values
13   are solidly pro-social, you have deep feelings
14   of concern and empathy toward others.  The
15   doctor concludes that therefore there is no
16   longer an appropriate diagnostic label of
17   antisocial behavior.  Moving to page three under
18   assessment of dangerousness the doctor writes
19   that in considering the potential for dangerous
20   behavior in the institution you have remained
21   disciplinary-free for over 12 years.  And that
22   due to your years of being disciplinary-free the
23   doctor concludes that you no longer possess a
24   risk to the institution.  And compared to other
25   inmates your potential for dangerous behavior is
26   below average.  In considering the potential for
27   dangerous behavior when released to the
```

1   community the doctor addresses a measure or an

2   exam that was given, identified as the Level of

3   Service Inventory Revised document.  And that

4   document is an actuarial measure that assesses

5   criminal history, substance abuse history,

6   institutional adjustment, social relationships

7   and other factors that are used to determine

8   current risk level on parole.  You obtained a

9   score of 5.1.  And as the doctor notes in the

10  report, that means that if 100 men were released

11  on parole you would do better on parole than 95

12  of them.  And the doctor notes, obviously, that

13  this is a low risk.  The doctor goes on to

14  conclude that at this point in your life due to

15  your maturity, growth, increased insight, that

16  you possess no more risk to society than the

17  average citizen in the community.  In fact,

18  based upon the positive changes in your life you

19  probably pose less risk to society than the

20  average citizen.  That's a conclusion I won't

21  disagree with but that's certainly open for

22  discussion at some other time.  Under clinical

23  observations and recommendations the doctor

24  writes that the prognosis for successful

25  adjustment in the community is excellent.

26  Mr. Montez, counsel, any comments or any other

27  sections you would like to have addressed for

1  the record?

2        ATTORNEY RUTLEDGE:  Not at this time,

3  nothing.

4        INMATE MONTEZ:  No sir.

5        DEPUTY COMMISSIONER SMITH:  All right,

6  thank you, I'll return it to Commissioner

7  Garner.

8        PRESIDING COMMISSIONER GARNER:

9  Mr. Montez, let me ask you.  It looks like the

10  last indication of drug use while incarcerated

11  was 1992 when you tested positive on a urine

12  analysis for opiates, is that correct?

13        INMATE MONTEZ:  Yes sir, that is correct.

14        PRESIDING COMMISSIONER GARNER:  Have you

15  been clean since that point?

16        INMATE MONTEZ:  Yes sir.  Well that's

17  when, that was a wake-up call.  Because I said,

18  if I'm not going to change now, you know, I'm

19  not ever going to change.

20        PRESIDING COMMISSIONER GARNER:  So '92

21  would have been your last --

22        INMATE MONTEZ:  My last abuse, yes.

23        PRESIDING COMMISSIONER GARNER:  Your last

24  abuse, okay.  And you did have the little

25  episode at Folsom where you were actually

26  charged but they chose not to prosecute you and

27  you wound up with 115s.

1          INMATE MONTEZ:  I think the one in Folsom

2    was '82, wasn't it?

3          PRESIDING COMMISSIONER GARNER:  Yeah, I

4    think --

5          INMATE MONTEZ:  The one in CRC was in

6    '92.

7          PRESIDING COMMISSIONER GARNER:  That's

8    correct, yeah.  Yeah, you had an October 22 of

9    '82 and that was the marijuana and then December

10   29 of '82.  Both of those were Folsom.  But the

11   last urinalysis was at CRC.

12         INMATE MONTEZ:  Yes sir.

13         PRESIDING COMMISSIONER GARNER:  Okay.

14   What caused the change from your plans in 2002

15   when you were going to live with your mother to

16   the present date?

17         INMATE MONTEZ:  Well I had -- actually I

18   had two letters.  I had the Freedom Home one and

19   I had my mother's.  And they had given me a

20   choice, right, where I would, where I would like

21   to stay it.  I said I would like to stay at my

22   mother's house but the Freedom Home offered the

23   program.  That's why I had answered my mother's

24   house.

25         PRESIDING COMMISSIONER GARNER:  Okay.

26   Are you, are you in contact with your family?

27         INMATE MONTEZ:  Yes.

1              PRESIDING COMMISSIONER GARNER:  Let me,

2    let me just quit beating around the bush.

3    Normally what we find in situations where we

4    have large families we find a lot of letters of

5    support that come in from the family, albeit

6    offering financial support, offering you a place

7    to live, offering you a car, or just offering

8    you spiritual and emotional support.  I note

9    that there are some family members that have

10   problems but you still have a lot of other folks

11   left over.  And I was just wondering why you

12   don't have any letters from your family?

13         INMATE MONTEZ:  They're right here.

14         ATTORNEY RUTLEDGE:  He means -- They

15   write you letters in the institution but have

16   they provided support letters for you?

17         INMATE MONTEZ:  Yes.

18         PRESIDING COMMISSIONER GARNER:  Have you

19   provided those to your counselor to get into

20   your file?

21         INMATE MONTEZ:  The counselor that I was

22   going to give them to, he said just to bring

23   them over here.

24         PRESIDING COMMISSIONER GARNER:  When did

25   he tell you that?

26         INMATE MONTEZ:  A couple of weeks ago.

27         PRESIDING COMMISSIONER GARNER:  All

33

1    right, well that's good advice a couple of weeks

2    ago because they wouldn't have made it in in

3    that time.

4         ATTORNEY RUTLEDGE:  (Inaudible).

5         PRESIDING COMMISSIONER GARNER:  Okay,

6    okay.

7         ATTORNEY RUTLEDGE:  (Inaudible).

8         PRESIDING COMMISSIONER GARNER:  Thanks.

9    Well it just surprised me because normally with

10   large, intact families like that we get a lot of

11   letters.

12        ATTORNEY RUTLEDGE:  (Inaudible)?

13        INMATE MONTEZ:  My mother and my ex-wife

14   and her kids.

15        PRESIDING COMMISSIONER GARNER:  Okay,

16   Okay, thank you.

17        ATTORNEY RUTLEDGE:  And this is since the

18   last hearing?

19        INMATE MONTEZ:  And this is from my

20   daughter.  Some of those are from my last

21   hearing and some of those I just received.

22        PRESIDING COMMISSIONER GARNER:  Okay, I

23   am going to read recent ones so that we don't --

24   and particularly those that I'm able to find --

25        INMATE MONTEZ:  Well the last hearing I

26   was supposed to have.

27        PRESIDING COMMISSIONER GARNER:  The one

 1   where it was postponed?

 2              ATTORNEY RUTLEDGE:   That was one --

 3              INMATE MONTEZ:   And current.   There's

 4   some current ones in there.

 5              PRESIDING COMMISSIONER GARNER:   Okay.

 6   Well, let me get started.   The first one is done

 7   in a memo form, it's from Victoria Garcia.   It

 8   doesn't provide a date.   Daughter of Victor.

 9   Inform you that my father has my full support in

10   whatever he may need to get onto his feet and

11   become a productive member of society.   That you

12   won't fall again.   That you have been doing many

13   things to get yourself together and ask that we

14   give you a chance.   For the record, the address

15   noted in this is in the city of Oxnard.   I'll

16   try to make this next one out.   This goes back

17   to '04 and it's from Renee Montez with an

18   address in Denver.   It says, but you can tell

19   the Board you have a place to reside wherever I

20   am and Armando said you can stay with him.   Let

21   me just do the one that's contained here.   A

22   place to reside wherever I am at and that

23   whatever you need I'll do what I can.   In fact,

24   the Coors Brewing Company has an ex-felon

25   program.   They could put you to work in the

26   brewery warehouse welding or whatever.   And if

27   you have access to the Internet check out the

35

1    job listing at Coors and other places.  And this

2    was from Renee Montez who is a sister.

3         INMATE MONTEZ:  Actually that was my

4    brother.

5         PRESIDING COMMISSIONER GARNER:  Oh, Renee

6    is a brother?

7         INMATE MONTEZ:  Yeah.

8         PRESIDING COMMISSIONER GARNER:  Okay, I'm

9    sorry about that.

10        INMATE MONTEZ:  He's my youngest one.

11        PRESIDING COMMISSIONER GARNER:  That one

12   can go either way.

13        DEPUTY COMMISSIONER SMITH:  There's an

14   undated letter from his mother, the one --

15        PRESIDING COMMISSIONER GARNER:  Okay, we

16   have a handwritten letter from your mother.

17   She's Reynalda, R-E-Y-N-A-L-D-A, address noted

18   in Ventura.  Victor does have a place to live

19   ion my home.  Also if finances are needed he'll

20   have that as well.  Take that into consideration

21   and what he has done to better himself since

22   incarcerated.  She is now 78, she was 54 when

23   you went into prison.  That she lost a son to a

24   violent act and still miss him.  Mercy for those

25   last few years of my life by letting him come

26   home to me.  SO that one is from your mother.

27   August 12, 2004, it's handwritten, and this one

1    is from -- is Garcia the last name?  I can't

2    make it out.

3        INMATE MONTEZ:  That's Victoria Garcia.

4        PRESIDING COMMISSIONER GARNER:  Victoria

5    Garcia.  And this would be?

6        INMATE MONTEZ:  My daughter.

7        PRESIDING COMMISSIONER GARNER:  Daughter,

8    okay.  Daughter of Victor.  Father has my

9    support and my husband's.  Full support as

10   helping him financially.  Also my husband

11   Richard is in the process of opening his own

12   small business which enables him to offer my

13   father employment.  In the process of buying our

14   own home.  We'll have a place for him to live.

15   Only a few months old when you were

16   incarcerated.  Speaks to you not making the best

17   choices but that you have changed and that --

18   allow my father to come home to his family, his

19   mother, daughters and three beautiful

20   grandchildren ages one through five.  We are

21   anxiously awaiting his arrival.  And that one,

22   again, I think I said it was August 12, 2004.

23       DEPUTY COMMISSIONER SMITH:  There are two

24   letters here from Martha Duran, the most recent

25   is dated May 4, '06.  That will be the one that

26   Commissioner Garner will address.  There are

27   actually two letters attached but the other one

1    is older so we'll address the most current.

2    Also just in case you're wondering, there was a

3    copy of the letter that your mother sent that I

4    just pulled, pulled out to the side.    That

5    letter has already been addressed.    And before

6    you read that I'm going to turn the tapes.

7              (The tape was turned over.)

8         DEPUTY COMMISSIONER SMITH:   Thank you.

9         PRESIDING COMMISSIONER GARNER:   Okay.

10   The date has already been noted on the letter

11   and it's from Martha Duran, who is your ex-wife.

12   I want to again reaffirm that I am still willing

13   and able to support in whatever area is needed.

14   We'll work together with the assigned parole

15   agent to make sure he keeps his appointments,

16   signs up for all services that are required so

17   he can be a productive member of society, assist

18   him in finding a job.    And as far as having a

19   place to parole, he has a place to live with me.

20   I am employed, I have transportation it will not

21   be a problem.    I stand with him and still

22   support his strongly.    And this is from Martha

23   Duran who provided a cell phone telephone number

24   and there is an address, it looks like it's in

25   Oxnard.    So Ms. Duran is in the Oxnard area?

26         INMATE MONTEZ:   Yes.

27         PRESIDING COMMISSIONER GARNER:   All

1   right, very good.  With that, that pretty much

2   got all the letters of support from your family?

3        INMATE MONTEZ:  Yes.  I was going to

4   bring the real old ones to show a pattern but I

5   didn't think they were needed.

6        PRESIDING COMMISSIONER GARNER:  No, this

7   is, this is fine.  Okay, with that I'm going to

8   ask you to direct your attention -- excuse me,

9   we've already done that.  I'm ahead of myself.

10  Okay, I will ask if Commissioner Smith has any

11  follow-up questions.

12       DEPUTY COMMISSIONER SMITH:  No, I have no

13  questions.

14       PRESIDING COMMISSIONER GARNER:  All

15  right.  Mr. Lapin, any questions?

16       DEPUTY DISTRICT ATTORNEY LAPIN:  I know

17  that the inmate refuses to discuss the offense.

18  I'm wondering if he will refuse to also discuss

19  where he may have gotten the gun regarding the

20  offense?

21       INMATE MONTEZ:  I don't see no reason to.

22  I believe this was settled when the District

23  Attorney's Office offered me a plea bargain.

24  All this was supposed to be, have been taken

25  care of.  I don't know why they keep bringing it

26  up.

27       ATTORNEY RUTLEDGE:  That would mean he

1    doesn't --

2                    DEPUTY DISTRICT ATTORNEY LAPIN: Then

3    that's a refusal. Also I would like to know if

4    he committed any other crime prior to the crime

5    that he is being incarcerated for on that

6    evening?

7                    INMATE MONTEZ: I don't see how that has

8    any bearing on this hearing.

9                    PRESIDING COMMISSIONER GARNER: Other

10   than those read into the record, sir?

11                   DEPUTY DISTRICT ATTORNEY LAPIN: I have

12   no other questions.

13                   PRESIDING COMMISSIONER GARNER: All

14   right. Ms. Rutledge, questions?

15                   ATTORNEY RUTLEDGE: I wanted to ask my

16   client to authenticate these letters. What are

17   these letters?

18                   INMATE MONTEZ: Those were, those were

19   more letters from different programs to give the

20   Board. If they weren't satisfied with the ones,

21   the choice that I made that they might be able

22   to pick from those.

23                   ATTORNEY RUTLEDGE: I would note that

24   Mr. Montez has written to several other social

25   services like California Veterans Assistance,

26   Lutheran Social Services in Southern California

27   and New Directions of Los Angeles, if the Board

1   wishes to view those during deliberations.   But

2   I just wanted to note that he has also pursued

3   other areas.   And he also had -- I saw a flier

4   in your file about assistance offered through

5   the parole program.   What was that about?

6        INMATE MONTEZ:   That was from -- The PIA

7   has a -- I don't know if you gave it back to me.

8   The PIA that I work for has a representative in

9   the EDD that when we get out we go directly to

10  them and if we don't have a job they'll help us

11  get one and our driver's license.

12       ATTORNEY RUTLEDGE:   All right.   And then

13  the last question would be, you told the

14  Commissioner that you stopped the drugs about

15  '93.   Have you had any other life changes?   Do

16  you want to explain to us why you, what's

17  happened to you since you have been in prison as

18  far as life changes go.

19       INMATE MONTEZ:   Well it's like I

20  explained earlier.   In 1992, you know, I was

21  like, you know, I was doing the same things up

22  until 1992.   When I got that last write-up for

23  the dirty UA I said, you know, there has to be a

24  change, you know.   If I'm going to make it in

25  the streets if you guys ever let me out I have

26  to, I have to prove to myself that I can make

27  it.   And being in prison with all this madness

1    going around and keeping myself clean without

2    getting any write-ups and trying to be a model

3    citizen as far as prison is concerned is trying

4    to show that I can be a model citizen out in the

5    street.  But it has to start in here.  I had to

6    start in here.

7        ATTORNEY RUTLEDGE:  All right, no further

8    questions.

9        PRESIDING COMMISSIONER GARNER:  All

10    right, Mr. Lapin, would you like to close.

11        DEPUTY DISTRICT ATTORNEY LAPIN:  Yes I

12    would.  And Commissioner Garner, I would like to

13    add to the facts as you disclosed them earlier.

14    Going from the probation officer's report

15    starting at page seven line three.  Where I

16    believe Mrs. Irma Sabalos (phonetic), who was

17    the third person in the vehicle, informed

18    officers of the Los Angeles Police Department

19    West Valley Division on August 11, 1980 that:

20            "At approximately 10:30 p.m. on

21            August 9, 1980 she and two

22            associates, Victor Montez and

23            Denise Montez, had been visiting

24            San Bernardino and had stopped in

25            San Fernando Valley for a pizza on

26            the return trip.  When the three

27            attempted to start the brown

1    station wagon afterwards it failed

2    to start and they decided to

3    hitchhike on the Ventura Freeway.

4    They first approached an unnamed

5    male approximately one-half hour

6    later.  Subsequently it was agreed

7    that the witness and Mrs. Montez

8    would appear as two females

9    stranded on the freeway while

10   Mr. Montez would approach any

11   motorist who stopped and exhibit a

12   firearm he carried in his

13   waistband.  The defendant hid in

14   the bush area while the women

15   hitchhiked.  The victim approached

16   in a silver Datsun station wagon,

17   license number 828 YHP, conversed

18   with Mrs. Montez then allowed them

19   to enter his vehicle.  The witness

20   entered the front seat and

21   Mrs. Montez entered the rear seat

22   while beckoning to the defendant

23   who was hiding in the bushes.  The

24   defendant ran to the vehicle

25   brandishing a small caliber

26   firearm and entered the rear seat

27   of the vehicle.  He then pointed

43

1       the weapon at the rear portion of
2       the victim's head and told him to
3       take them to Oxnard or he would
4       kill him.   The defendant fired one
5       round without warning striking the
6       victim approximately in the lower
7       right of the head.   The victim
8       fell forward.   The defendant
9       exited the rear passenger door and
10      opened the front passenger door.
11      The defendant drug the victim's
12      body across the front seat from
13      the driver's side and secreted the
14      body beneath an overhanging tree
15      and shrub area.   The witness then
16      observed the defendant going
17      through the victim's garment but
18      was unsure of what was removed.
19      The witness and Mrs. Montez had
20      also exited the vehicle.   The
21      defendant then instructed the
22      witness to re-enter the vehicle
23      and told his wife to wear gloves
24      so as not to leave her
25      fingerprints on the vehicle.   He
26      then entered the rear seat and
27      instructed his wife to drive the

44

```
 1          vehicle to 456 Channel Islands
 2          Boulevard in Oxnard.  Upon arrival
 3          at that residence, which was
 4          occupied by Teresa Ramirez,
 5          Mrs. Montez removed clothing which
 6          had belonged to the victim and
 7          attempted to wash them.  The
 8          witness was upset and the
 9          defendant comforted her,
10          indicating they could not be
11          identified and there was no way to
12          trace their location.  When the
13          witness suggested they turn
14          themselves in the defendant
15          threatened her with acts of
16          violence and stated she would be
17          killed if she contacted the
18          police."
19   I believe those factors need to be considered by
20   this Board, those factors in aggravation of this
21   offense.  This is an extremely atrocious crime
22   committed by a admitted heroin addict.  There
23   was absolutely no reason for this individual to
24   have been killed.  The inmate, his wife and a
25   friend, the car broke down and they were trying
26   to get a ride to Oxnard and apparently the
27   victim agreed to take them.  Why he had to kill
```

1  him is only known to him.  His drug abuse can be

2  documented back to the age of 13 when he was

3  noticed by a law enforcement agency to have

4  marks on his arms.  And that drug abuse

5  apparently continued at least through 1992 and

6  is only in remission at this point because he is

7  in prison.  The fact that he has refused to

8  discuss the offense, I understand he has that

9  right to do so.  He has also refused to discuss

10  any other factors regarding where he got the gun

11  or if there were any other crimes committed.

12  That only shows that this individual has not

13  really accepted responsibility for his crime, a

14  crime that can only be determined to be an

15  aggravated situation.  There is nothing in

16  mitigation other than the psychiatric report and

17  his recent years of laudatory type chronos in

18  his file and a lack of discipline.  But the

19  crime is so atrocious and so wanton and uncalled

20  for that I'm suggesting the Board deny him

21  parole for another five years.  Thank you.

22       PRESIDING COMMISSIONER GARNER:  Thank

23  you.  Ms. Rutledge.

24       DEPUTY COMMISSIONER SMITH:  Ms. Rutledge,

25  before we go into your closing, and Mr. Lapin,

26  I'll certainly give you an opportunity to

27  follow-up, I have one quick question I want to

1    interrupt.  Mr. Montez, what period of time were

2    you and Martha Duran married?

3            INMATE MONTEZ:  I think it was '93 to

4    '95.

5            DEPUTY COMMISSIONER SMITH:  So you were

6    married while you were in prison?

7            INMATE MONTEZ:  Yes sir.

8            DEPUTY COMMISSIONER SMITH:  Okay.  So you

9    have never resided together.

10           INMATE MONTEZ:  No.

11           DEPUTY COMMISSIONER SMITH:  Okay, thank

12   you.  I appreciate that.  Mr. Lapin, any follow-

13   up questions?

14           DEPUTY DISTRICT ATTORNEY LAPIN:  No,

15   thank you.

16           DEPUTY COMMISSIONER SMITH:  Okay.

17           ATTORNEY RUTLEDGE:  All right, thank you.

18   I just wanted to note that the Commissioner read

19   the prisoner's version from the 2002 Board

20   report.  And in that it indicates that

21   Mr. Montez gave a statement to his counselor,

22   the probation officer that he had the gun

23   pointed at the victim's head and he believed the

24   gun fired when the victim adjusted himself.

25   That it was not his intention to kill the

26   victim.  I would also note that the narrative

27   read by the People taken from the probation

```
 1   report was by the third accomplice who was
 2   granted immunity.  That statement would likely
 3   have problems being admissible in a regular
 4   court of law due to certain evidence rules.  I *
 5   know the evidence rules don't apply here but
 6   however information still has to be reliable.
 7   And I would ask the Board to give that statement
 8   its due weight on what you think would be
 9   reliable.  Going to the factors in suitability
10   for Mr. Montez.  This crime only involved one
11   victim.  It wasn't dispassionate, calculated or
12   an execution-style murder based upon what he has
13   told, his comments he has made about the murder.
14   It appears that the -- also based on the facts
15   that the victim, they had a plan that he was
16   supposed to drive them somewhere.  So it really
17   wouldn't make sense, I would speculate, for him
18   to shoot the guy if they were asking him for a
19   ride somewhere and he got back in the car with
20   them.  There was -- It wasn't an especially
21   heinous crime or atrocious.  The motive for the
22   crime, it appears that it was an accident.
23   Mr. Montez looks like he had a stable family
24   when he was growing up.  He doesn't have any
25   history of psychological problems.  His
26   institutional behavior since 1993 has been very
27   positive.  He has a very positive psych report,
```

1   which I will go into in a moment, and he has not
2   had any write-ups in it looks like 13 -- his
3   last 115 I believe was in '93. None of those
4   write-ups have been violent. His prior prison
5   term was for car theft. It sounded like most of
6   his crimes were property, theft of property type
7   offenses. This would appear to be his first
8   conviction for violence. He did serve the
9   United States in the Army for two years and
10  while he's been here he has gotten several
11  vocations. He is also a certified legal
12  assistant and paralegal?
13          INMATE MONTEZ:  Yes.
14          ATTORNEY RUTLEDGE:  And he did
15          that, that's in his C File,
16          through a mail program. He has
17          been in AA and NA consistently for
18          the last, since his last hearing.
19          He's had two different anger
20          management courses, he's done peer
21          education. He has laudatory
22          chronos from IEP. He's done the
23          IMPACT program and I think that
24          just -- kind of parlay that.
25          Aside from his work with the PIA
26          and the IEP program I want to go
27          into his insight and remorse into

1        the crime.  It looks like the

2        IMPACT program may have had some

3        impact on him.  In the 2004, I

4        think it's the Board Report --

5        this is by your counselor, right?

6        Yeah.  It states on the very last

7        page, but I can't see the page

8        number.  Oh, it's page number

9        five.  It says:

10       "While discussing the facts of the

11       crime Montez was candid when

12       expressing remorse for the victim

13       and makes no excuses for his

14       behavior.  He realizes that his

15       actions is what led to the demise

16       of the victim. He indicates that

17       he must prove to himself and

18       society, thereby earning society's

19       trust in order to integrate back

20       into the free world in the future.

21       He expressed the need to continue

22       AA and NA counseling in order to

23       eliminate the unnecessary

24       stressors in his life.  In terms

25       of employment the prisoner has

26       acquired skills in welding,

27       plumbing, furniture assembly --"

```
 1   And in parentheses:
 2              "-- standard line and semi-custom,
 3              roofing, cement finisher and
 4              upholstery repair.  He has a GED
 5              and has earned a certificate as a
 6              legal assistant and paralegal."
 7   So it appears that the rehabilitation programs
 8   available to him have helped him gain insight
 9   and helped him with his remorse.  And that
10   counselor recommended that he remain
11   disciplinary-free, which he has done,
12   participate in NA programs, which he's continued
13   to do.  I think it would appear that he is
14   definitely trying to deal with the contributing
15   factor to this crime, the drug addiction, the
16   long-term drug addiction issues.  I would note
17   in the file too that he is -- in the recent
18   psych report by Dr. Macomber it indicates that
19   he became a Christian at some point and he is
20   aware -- I'm quoting from page two, I'm reading:
21              "He is aware of the importance of
22              remaining clean and sober.  He is
23              very active in Bible studies.  His
24              understanding and knowledge of the
25              Bible are significant and
26              considerable.  He has incorporated
27              Biblical values into his life.  As
```

1          a result he is determined to lead
2          a wholesome, helpful to others
3          productive life that pleases both
4          God and man.  He asserts drugs is
5          no longer a problem in his life."
6    So all those things considered what I think we
7    have here is a rehabilitated inmate.  Somebody
8    who is the poster boy for the reason why we have
9    sentences that start with a certain number of
10   years and go to life.  We have a 53-year-old man
11   who has been in the system now for 24 years.
12   And those 24 years have been good to him as far
13   as helping him with his substance abuse issues
14   and to get some insight into the crime and
15   change the person that he is.  He does not pose
16   an unreasonable risk of danger, he does meet the
17   suitability factors and I would ask that the
18   Board give him a parole date, thank you.
19        PRESIDING COMMISSIONER GARNER:  Okay,
20   thank you.  Mr. Montez, this is your opportunity
21   to address the panel on the subject of your
22   suitability for parole.
23        INMATE MONTEZ:  Yes sir.  Before when I
24   came up before the Board I was always asked, do
25   you think you're ready?  Up until 1997 my answer
26   was always, and because I believed it, no, I'm
27   not ready.  I admitted at that time that I

1   wasn't ready.  Now I can tell you that this day,

2   that I am ready.  Mind, spirit and soul I am

3   ready to go out there and be a productive member

4   to society.  If I wasn't I'd tell you myself I

5   wasn't ready.  I am more than ready.  I wish I

6   could take back that day but I can't.  His

7   people suffer, my people suffer, you know,

8   because we went through the same thing.  I am

9   deeply sorry.  I never tried to make contact

10  with the family because I think that would hurt

11  them more.  But if I could apologize to them I

12  would.  I wouldn't ask for forgiveness because,

13  you know, I think that would be an insult to

14  them.  I just hope you take that into

15  consideration.  Thank you.

16       PRESIDING COMMISSIONER GARNER:  Thank

17  you.  It is now 11:59 a.m. and we'll recess for

18  deliberations.

19                    R E C E S S

20                    --oOo--

21

22

23

24

25

26

27

1          CALIFORNIA BOARD OF PAROLE HEARINGS

2                    D E C I S I O N

3          DEPUTY COMMISSIONER SMITH:  We are back

4    on the record.  Everyone previously identified

5    is back in the hearing room.

6          PRESIDING COMMISSIONER GARNER:  Very

7    good, thank you.  It's 12:20 p.m. in the matter

8    of Victor Montez, C Charles 48215.  Mr. Montez,

9    the panel has reviewed all the information

10   received from the public and relied on the

11   following circumstances in concluding you are

12   not suitable for parole and would pose an

13   unreasonable risk of danger to society or a

14   threat to public safety if you were released

15   from prison.  I want to tell you right out of

16   the chute we're going to deny you for a year and

17   we'll talk a little bit more about that as we

18   proceed through the hearing.  We started with

19   the commitment offense.  Although we considered

20   many factors we started with the commitment

21   offense and we felt that the offense was carried

22   out in an especially cruel manner.  The victim,

23   Michael Stewart, 33 years of age, was shot in

24   the head after he stopped to render aid to what

25   he thought were two individuals that were in

26   distress along the side of the freeway.  The

27   VICTOR MONTEZ C-48215  DECISION PAGE 1  05/31/06

1    offense was carried out in a very dispassionate

2    and calculated manner in that the first vehicle

3    to stop was going to be the target.  It was

4    pretty clearly drawn that you put the two women

5    out on the freeway as a lure and that you were

6    hiding in the bushes and unfortunately it was

7    Mr. Stewart that was the first Samaritan that

8    decided to stop and help.  The victim was  no facts

9    defiled after the offense in that he was

10   stripped, his body was concealed along the

11   shoulder of the Ventura Freeway and just

12   basically left in the shrubbery.  The motive for

13   the crime, when you consider the magnitude of

14   the offense, it was very trivial.  You had the

15   car.  The worst case scenario you could have

16   just ordered him out to the side of the freeway

17   but that's neither here nor there at this point

18   in time.  The conclusions were drawn from the

19   statement of facts that were taken from the June

20   2002 calendar in that:

21           "On August 9, 1980 Montez and two

22           women, one of whom was his wife,

23           were on their way home, on their

24           way to Oxnard when their car

25           became disabled.  The two women

26           began to hitchhike on the Ventura

27   VICTOR MONTEZ C-48215  DECISION PAGE 2  05/31/06

```
 1          Freeway while Montez hid in the
 2          bushes.  It was agreed that the
 3          two women would appear as two
 4          females stranded on the freeway
 5          while Montez would approach the
 6          motorist who stopped and exhibit a
 7          firearm he carried in his
 8          waistband.  The victim, Michael
 9          Stewart stopped for the women.
10          The women entered the car and Ms.
11          Montez entered the rear seat while
12          beckoning to Montez who was still
13          hiding in the bushes.  He ran to
14          the car brandishing a small
15          caliber firearm and entered the
16          rear seat of the car.  He pointed
17          the firearm at the back of the
18          victim's head and told him to
19          drive them to Oxnard or he would
20          kill him.  Montez then fired,
21          striking and killing the victim.
22          Montez exited the car, dragged the
23          body from the car and secreted the
24          body beneath an overhanging tree
25          and shrubs.  After leaving the
26          body Montez, his wife and the
27    VICTOR MONTEZ C-48215  DECISION PAGE 3  05/31/06
```

1          other female companion drove the

2          victim's car to Oxnard.  Montez

3          was arrested on August 11, 1980."

4    So far as your previous record the panel noted

5    at the time that you did have an escalating

6    pattern of criminal conduct and that you had

7    failed previous grants of probation.  And that

8    you had failed from society's previous attempts

9    to correct your criminality through the CYA

10   commitment.  So far as the social history the

11   panel noted -- the criminality, excuse me.  The

12   controlled substances and entering a non-

13   commercial dwelling which was an offense, a

14   602.5 offense, which was associated with a

15   burglary, which was dismissed in the interest of

16   justice.  Excuse me.  As far as your

17   institutional behavior you have programmed very

18   well.  So far as the misconduct goes it is old

19   and dated.  The last 128, you've had a total of

20   four, was May 26, 1989 and the last 115 was

21   September 16, 1995 for non-performance of work.

22   So far as the psychological report prepared by

23   Dr. Macomber in May 2006, it's favorable.  So

24   far as your parole plans the one thing that we

25   wanted to note is we did take into consideration

26   the letter that you had from essentially the

27   **VICTOR MONTEZ C-48215  DECISION PAGE 4  05/31/06**

1   halfway house is for an interview only.  And we
2   realize that very few of the halfway houses will
3   give you a firm commitment but one of that
4   things that really amplifies is the need to have
5   a firm backup parole plan that's very
6   comprehensive with a member of the family.  Or
7   two; you can certainly have more than one.  Also
8   if you are concerned about paroling back to the
9   county of the commitment offense, if the panel
10  thinks that you have a better shake and a better
11  chance going to another location to another
12  county we have the authority to parole you into
13  that county.  So in this situation it looks like
14  the lion's share of your family is in the
15  Ventura County area.  So if your letters come
16  forward from Ventura County with respect to
17  offers of housing, those would coincide with the
18  job offer that you have from Mr. Flores because
19  I believe that the job offer and his business is
20  in Ventura County.  So get started as soon as
21  you can.  I will share with you that the panel
22  does have some concerns about the offer of
23  housing from Martha Duran.  We think you would
24  be better served with family members.  That's
25  not to say it would be excluded.  We're just
26  thinking that the family members are more of a
27  VICTOR MONTEZ C-48215  DECISION PAGE 5  05/31/06

58

1   positive and might serve your interest in a more

2   positive way. You were here, you heard the

3   response from the representative from the Los

4   Angeles County District Attorney's Office

5   indicating opposition to parole. So what we're

6   going to do at this point is we're going to

7   encourage you to continue your AA/NA, whichever

8   is available, and continue to earn the positive

9   chronos. And with that I'll ask Commissioner

10  Smith if he has got additional comments.

11       DEPUTY COMMISSIONER SMITH: Sir, quite

12  frankly with regard to the residential plan with

13  Ms. Duran. The parole division probably would

14  not approve that since you no longer have a

15  relationship. She's an ex-wife and that you

16  don't have a history of residing. It might be

17  fine with the next Board but from my experience

18  with the parole division they probably would not

19  approve that.

20       INMATE MONTEZ: I understand.

21       DEPUTY COMMISSIONER SMITH: You know, I

22  am certainly not being critical of your efforts,

23  your efforts are all positive. But I am just

24  suggesting that in this next year spend time to

25  really, really firm up the plans. You have got

26  a lot of options. You know, I'd focus on the

27  **VICTOR MONTEZ C-48215   DECISION PAGE 6  05/31/06**

1    strongest ones.

2            INMATE MONTEZ:  Okay.

3            DEPUTY COMMISSIONER SMITH:  You are

4    certainly moving in the right direction.  You

5    may be disappointed and if you are I certainly

6    understand that.  But you are headed in the

7    right direction, in my opinion.  I believe that

8    all things being equal with some improvements

9    that at your next hearing you will be a much

10   stronger candidate.  A strong candidate today

11   but a much stronger candidate the next time.  So

12   don't lose focus on what your objective is --

13           INMATE MONTEZ:  No.

14           DEPUTY COMMISSIONER SMITH:  -- which is

15   to get out of here.  Okay?

16           INMATE MONTEZ:  Yes.

17           DEPUTY COMMISSIONER SMITH:  I wish you

18   well sir.  Good luck to you.

19           INMATE MONTEZ:  Thank you.

20           PRESIDING COMMISSIONER GARNER:  I'll go

21   ahead and echo the comments.  I am certainly

22   glad I asked about letters from your family now

23   because they really are -- they are more of an

24   asset than you will ever know.  We have a lot of

25   inmates that come before us that basically have

26   no one on the outside, absolutely no one on the

27   VICTOR MONTEZ C-48215   DECISION PAGE 7   05/31/06

1   outside.  They have either outlived them all or

2   the family has just basically written them off.

3   So you have got an asset there.  It's going to

4   be your strength.  It's going to be your social

5   and support network.  Your employer is not going

6   to provide that, you're family is going to

7   provide your support network.  The other thing,

8   that whatever family member you think offers you

9   the best plan for yourself, it would be helpful

10  also to have that family member identify AA/NA

11  resources that are immediately in the

12  neighborhood near them or the closest possible

13  to them.  And whether they're along public

14  transportation routes or they are going to offer

15  to drive you there.  Those are all things that

16  shore you up as a better candidate.  I echo his

17  sentiment.  I hope that you are not too

18  disappointed.  Keep your focus because right now

19  the only thing that in my mind you have to work

20  on is shoring up the parole plans.  I'll tell

21  you, don't slip on any banana peels calling a 15

22  or a 128 because that's not going to help you.

23  You've got some distance between those and you

24  don't have to worry abut them right now.  They

25  are not an issue at least with this panel and I

26  can't see them being an issue with the next

27  VICTOR MONTEZ C-48215  DECISION PAGE 8  05/31/06

61

1   panel you come before.  With that I'll go ahead

2   and note that it is now 12:28 p.m. and I am

3   going to wish you the best of luck.  Get to

4   work.

5        INMATE MONTEZ:  Okay.  Well I just want

6   to say that I read First Peter's 2:14 and I

7   submitted to that so I am not disappointed.

8   (Indiscernible).

9        ATTORNEY RUTLEDGE:  Thanks a lot.

10       DEPUTY COMMISSIONER SMITH:  Thank you

11  both.

12       ATTORNEY RUTLEDGE:  Good luck to you.

13       INMATE MONTEZ:  Thank you.

14                    --oOo--

15

16

17

18

19

20

21

22

23  PAROLE DENIED ONE YEAR

                                SEP 2 8 2006

24  THIS DECISION WILL BE FINAL ON:_____

25  YOU WILL BE PROMPTLY NOTIFIED, IF PRIOR TO THAT

26  DATE, THE DECISION IS MODIFIED.

27  VICTOR MONTEZ C-48215  DECISION PAGE 9  05/31/06

62

## CERTIFICATE AND
## DECLARATION OF TRANSCRIBER

I, RAMONA COTA, a duly designated
transcriber, PETERS SHORTHAND REPORTING, do
hereby declare and certify under penalty of
perjury that I have transcribed tape(s) which
total one in number and cover a total of pages
numbered 1 - 61, and which recording was duly
recorded at CORRECTIONAL TRAINING FACILITY,
SOLEDAD, CALIFORNIA, in the matter of the
SUBSEQUENT PAROLE CONSIDERATION HEARING of
VICTOR MONTEZ, CDC NO. C-48215, on MAY 31, 2006,
and that the foregoing pages constitute a true,
complete, and accurate transcription of the
aforementioned tape to the best of my ability.

I hereby certify that I am a
disinterested party in the above-mentioned
matter and have no interest in the outcome of
the hearing.

Dated August 13, 2006, at Sacramento
County, California.


RAMONA COTA
TRANSCRIBER
PETERS SHORTHAND REPORTING

**EXHIBIT 3**
**Part 4 of 4**

EXHIBIT "7"

LIFE PRISONER EVALUATION REPORT.
SUBSEQUENT PAROLE CONSIDERATION HEARING
JUNE 2004 CALENDAR

MONTEZ, VICTOR MANDEL                                          C48215

I.    COMMITMENT FACTORS:

   A.    Life Crime:  All relevant documents from the previous hearing including the transcripts, have been considered and that information appears valid, and the writer has no further information to add.

      1.    Summary of Crime:  Remains the same as stated in the previous hearings.

      2.    Prisoner's Version:  Remains the same as stated in the previous hearings.

      3.    Aggravating/Mitigating Circumstances:

         a.    Aggravating Factors:  Remains the same as stated in the previous hearings.

         b.    Mitigating Factors:  Remains the same as stated in the previous hearings.

   B.    Multiple Crime(s):  None.

      1.    Summary of Crime:  N/A.

      2.    Prisoner's Version:  N/A.

II.   PRECONVICTION FACTORS:

   A.    Juvenile Record:  Documents from the previous hearings have been considered and that information remains valid.

   B.    Adult Convictions:  Documents from the previous hearing have been considered and that information remains valid.

COPY TO INMATE ON:

MONTEZ, VICTOR          C48215              CTF-SOLEDAD              JUN/2004

    C.     **Personal Factors:** Documents from the previous hearings have been considered and that information remains valid.

III.    **POSTCONVICTION FACTORS:**

    A.     **Special Programming/Accommodations:** None.

    B.     **Custody History:** Documents from the previous hearings have been considered and the information remains valid. During the period of time since the last hearing, the prisoner has remained at the Correctional Training Facility and housed in the general population in a dorm setting. He has maintained a stable work record and presently assigned to the PIA Wood Furniture Assembly Factory. In review of the prisoner's work performance covering a period from 4/1/02 to 7/01/02, he demonstrated satisfactory work grades. However, noting a period from 7/1/02 to 11/01/02 per CDC 101 Work Supervisor's Reports dated 9/1/02, 10/1/02 and 11/1/02, the prisoner's work performance declined due to his attitude towards his supervisor and staff, his interest in his respective assigned work, teamwork building participation and quality of work. His supervisor comments were: Inmate Montez continued to actively pursue a transfer out of the Assembly Shop and has not worked since his last report dated 10/02. His quarterly report periods from 11/01/02 to 8/1/03 dated 2/1/03; 5/1/03 and 8/1/03, reflect improvement grades of satisfactory to above average work grades. In addition, during this review period, Montez enrolled in an Independent Study Program through Coastline Community College and was unable to complete the semester. However, he enrolled into the Federal Emergency Management Agency Institute, which is an independent study course. He earned two (2) Certificates of Achievement dated 11/13/03, in Radiological Emergency Management and Emergency Preparedness, USA dated 10/17/03. Finally, there are no documents in the Central File to reflect any vocational training upgrading experience during this review period.

    C.     **Therapy and Self-Help Activities:** Participation in Narcotics Anonymous per CDC 128B dated 7/2/01, 7/10/01, 10/01/01, 10/2/01, 1/11/02, 1/17/02, 2/15/02, 3/29/02, 4/11/02, 07/01/02, 07/17/02, 10/01/02, 10/16/02, 12/21/02, 1/8/03, 4/23/03 and 5/6/03.

        Participated in the donation drive for the American Red Cross in response to the terrorist attacks of September 11, 2001 in New York, Pennsylvania and Washington D.C. per CDC 128 dated 12/13/01.

        Participated in and completed the Muslim Development Center's Anger Management Course per CDC 128B dated 2/20/02.

Successfully completed a thirteen-week Impact workshop - self-help group designed to provide education and awareness relative to the profound negative impact of crime and its affect on victims and the ripple effect on society per CDC 128-B dated 12/16/02.

D.  **Disciplinary History:**  None during this review period. However, (7) CDC 115's and (4) 128-A's are noted.

CDC 128A's

| | | |
|---|---|---|
| 11/06/84 | CTF | Unauthorized Covering on Window. |
| 08/19/85 | CTF | Failure to Report to Work. |
| 11/21/86 | CTF | Unexcused Absence from School. |
| 05/26/89 | CMC-East | Broken Window in Cell. |

CDC 115's

| | | |
|---|---|---|
| 10/22/82 | FOL | Possession of Marijuana. Disposition: Guilty. 10 days disciplinary detention suspended, plus 90 days screen visits. |
| 12/29/82 | FOL | Possession of Marijuana. Disposition: Guilty. 10 days disciplinary detention plus 90 days screen visits. |
| 06/25/83 | FOL | Out of Cell Without Authorization. Disposition: Guilty. Counseled and reprimanded. |
| 03/03/86 | CTF | Possession of Contraband Shirt. Charged $8.50 plus 30 days loss of yard privileges. |
| 01/09/89 | CMC | Non-Performance (work). Disposition: Guilty, 15 days loss of credit. |
| 02/12/92 | CRC | Positive U/A for Opiates. Disposition: Guilty, 150 days loss of credit plus 120 days loss of contact visiting. |
| 09/16/93 | CRC | Non Performance (work). Disposition: Guilty, assessed 10 hours extra duty. |

E.  **Other:**  On 6/20/02, Montez was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #6. The Board's decision was to deny

MONTEZ, VICTOR                    C48215                         CTF-SOLEDAD                JUN/2004

parole for (2) years, and recommend that the prisoner remain disciplinary free and participate in narcotic anonymous self-help and therapy programs.

IV.  **FUTURE PLANS:**

A.  **Residence:** The prisoner indicates that his parole plans have changed. His plans are to live at the Freedom House, located at 460 South "F" Street, Oxnard, CA 93030. Telephone: 805-483-8343. Contact person: Jeff Simpson, Administrator. This facility is a 90- day clean and sober living environment for men. A letter of conditional acceptance was noted in the Central File dated 5/30/03. If released from prison, Montez states that he wants to make it on his own merit out in the free world, without the assistance or help of his family. However, he states that updated letters of support from his family and friends are forthcoming.

B.  **Employment:** Remains the same as indicated in the previous Board Report dated 6/2002. In addition, the prisoner completed 915 hours and received a Certificate of Legal Assistant/ Paralegal from the Blackstone School of Law Paralegal Studies, Inc. dated 11/9/01, at Dallas, Texas. During this interview, the prisoner did not offer a job reference, however, he feels confident that he will secure employment once he is released. His secondary plans are to work in the oil fields around in the state.

C.  **Assessment:** At the present time, the prisoner's parole plans appears stable at this time. Montez indicates that his plans are to reside in a residential home with a 12 step program that offers a sober and clean living environment for drug and alcohol offenders. He also indicates, once he completes this program, he will be able to secure employment and become independent to reintegrate back into society. He has acquired skills in welding, plumbing, furniture assembly (standard line and semi-custom), roofing, cement finisher and upholstery repair. He received a Certificate from the Blackstone Paralegal Studies, Inc., as a legal assistant/paralegal by completing 915 hours of correspondence studies. However, Montez did not offer a job reference at this time, he feels confident that he will secure employment once he is released.

V.  **USINS STATUS:** N/A.

VI.  **SUMMARY:**

A.  Considering the commitment offense, prior record and prison adjustment, this writer believes the prisoner would probably pose a low degree of threat to the public at this time, if released from prison. This impression is based on the

prisoner's disciplinary history for eleven years, his stable work record, participation in self-help programs and his efforts of educational upgrading experience during this review period. While discussing the facts of the crime, Montez was candid when expressing remorse for the victim, and makes no excuses for his behavior. He realizes that his action's is what lead to the demise of the victim. He indicates that he must prove to himself and society thereby earning society's trust, in order to integrate back into free world in the future. He expressed the need to continue A.A. and N.A. counseling in order to eliminate the unnecessary stressors in his life. In terms of employment, the prisoner has acquired skills in welding, plumbing, furniture assembly (standard line and semi-custom), roofing, cement finisher and upholstery repair. He has a GED, and has earned a certificate as a legal assistant and paralegal. Montez indicates, once he is released, he is confident that he will secure employment and use the tools that he has gained and experienced to become a positive member of society.

B.   Prior to release the prisoner could benefit from:
1)    Remaining disciplinary free,
2)    Participate in Narcotics Anonymous Self-Help Programs and therapy programs.

C.   This report is based upon an interview with the prisoner on 3/25/04 lasting approximately 1.5 hours and a complete review of the Central File lasting 3 hours.

D.   Montez was afforded an opportunity to examine his Central File on 3/25/04 per the Olson decision per CDC 128B.

E.   No accommodation was required per the Armstrong vs. Davis BPT Parole Proceedings Remedial Plan (ARP) for effective communication.

STATE OF CALIFORNIA                                                      BOARD OF PRISON TERMS

## LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| | |
|---|---|
| ☐ | DOCUMENTATION HEARING |
| ☒ | PAROLE CONSIDERATION HEARING |
| ☐ | PROGRESS HEARING |

INSTRUCTIONS
  TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
  TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
             ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 07/01 to 6/02 | | | **PLACEMENT:** Remained at the Correctional Training Facility - II and housed in the general population. **CUSTODY:** Medium A. **VOC. TRAINING:** None during this review period. **ACADEMICS:** None noted this review period. **WORK RECORD:** Assigned to the PIA Wood Furniture Factory Assembly Shop. There are no work supervisor reports in the Central File noting work performance during this period. **GROUP ACTIVITIES:** Participated in N/A per CDC 128B's dated 7/10/01, 10/01/01, 10/02/01, 1/11/02, 1/17/02, 2/15/02, 3/29/02 an 4/11/02. Participated in and completed the Muslim Development Center's Anger Management Course per CDC 128B dated 2/20/02. **PSYCH. TREATMENT:** None during this review period. **PRISON BEHAVIOR:** None during this review period. **OTHER:** N/A. |

| | | DATE |
|---|---|---|
| MONTEZ, VICTOR        C48215 | CTF-SOLEDAD | JUN/2004 |

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER : POSTCONVICTION PROGRESS REPORT

| STCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 06/02 to 06/03 | | | **PLACEMENT:** Remained at the Correctional Training Facility- II and housed in the general population. |
| | | | **CUSTODY:** Medium A |
| | | | **VOC. TRAINING:** None during this review period. |
| | | | **ACADEMICS:** None during this rating period. |
| | | | **WORK RECORD:** Assigned to the PIA Wood Furniture Assembly Shop. He earned above average work grades and received exceptional grades for the use of tools and equipment per CDC 101 dated 7/1/02. However, a CDC 101 dated 9/1/02, reflects the prisoner's performance declined due to his attitude toward his supervisor and staff, his interest in his respective assigned work, teamwork building and participation and quality of work. His supervisor comments: Montez continues to "opt out" of work, whenever he is given the chance, as noted a CDC 101 dated 11/01/02.. He continues to actively pursue a transfer and has not worked since his last report per CDC 101 dated 11/1/02. |
| | | | **GROUP ACTIVITIES:** Participated in NA per CDC 128B's dated 7/17/02, 7/1/02, 10/1/02, 10/16/02, 12/1/02, 1/8/03, 4/23/03, and 5/6/03. He completed a thirteen week Impact workshop self help group designed to provide education and awareness relative to the profound negative impact of crime and its affect on society and the ripple effect on society per CDC 128B dated 12/16/02. |
| | | | **PSYCH. TREATMENT:** None during this review period. |
| | | | **PRISON BEHAVIOR:** None during this review period. |
| | | | **OTHER:** On 6/20/02, Montez was seen by the Board of Prison Terms for his Subsequent Parole Consideration Hearing #6. The Board's decision was to deny parole for (2), and recommend that the prisoner remain disciplinary free and participate in Narcotic Anonymous self-help and therapy programs. |

ORDER:

- ☐ BPT date advanced by      months.
- ☐ PBR date advanced by      months.
- ☐ BPT date affirmed without change.
- ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

- ☐ Previously imposed conditions affirmed.
- ☐ Add or modify
- ☐ Schedule for Progress Hearing on appropriate institutional calendar

| MONTEZ, VICTOR | C48215 | CTF-SOLEDAD | JUN/2004 |
|---|---|---|---|

BOARD OF PRISON TERMS

STATE OF CALIFORNIA

BPT 1004 (REV 7/86)

BOARD OF PRISON TERMS                                                                 STATE OF CALIFORNIA

CONTINUATION SHEET: LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

| POSTCONVICTION CREDIT | | | |
|---|---|---|---|
| YEAR | BPT | PBR | REASONS |
| 6/03 to 3/31/04 (Present) | | | **PLACEMENT:** Remained at the Correctional Training Facility- II and housed in the General Population. **CUSTODY:** Medium A **VOC. TRAINING:** None noted during this review period. **ACADEMICS:** Enrolled into the Federal Emergency Management Agency Institute and completed (2) independent study courses and received Certificate(s) of Achievement in - Emergency Preparedness, USA dated 10/17/03 and Radiological Emergency Management dated 11/13/03. **WORK RECORD:** The prisoner remained assigned to the PIA Wood Furniture Assembly Factory. His attitude changed and his work performance reflected satisfactory work grades per CDC 101 dated 5/01/03, and 8/1/03. **GROUP ACTIVITIES:** None noted during this review period. **PSYCH. TREATMENT:** None noted during this review. **PRISON BEHAVIOR:** None noted during this review. **OTHER:** N/A. |

ORDER:

☐ BPT date advanced by     months.          ☐ BPT date affirmed without change.
☐ PBR date advanced by     months.          ☐ PBR date affirmed without change.

SPECIAL CONDITIONS OF PAROLE:

☐ Previously imposed conditions affirmed.
☐ Add or modify

☐ Schedule for Progress Hearing on appropriate institutional calendar

MONTEZ, VICTOR          C48215                    CTF-SOLEDAD                JUN/2004

BOARD OF PRISON TERMS                                                           STATE OF CALIFORNIA

BPT 1004 (REV 7/86)                          Page _3_

_____     7-14-04
H. Staten                         Date
Correctional Counselor I

                                  3

_____     7-14-04
R. Leach, CCII(A)                 Date
Correctional Counselor II

_____     7-14-04
R. Pope                           Date
Facility Captain

4) _____  7-16-04
D. S. Levorse                     Date
Classification and Parole Representative

MONTEZ, VICTOR          C48215              CTF-SOLEDAD          JUN/2004

BOARD OF PRISON TERMS                                                                                    STATE OF CALIFORNIA

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐  DOCUMENTATION HEARING

☒  PAROLE CONSIDERATION HEARING                                         **ADDENDUM**

☐  PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF: DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF: FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
        ESTABLISHED, ie., 0-2 MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
| YEAR | BPT | PBR | |
|---|---|---|---|
| 4/04 to 4/05 | | | **PLACEMENT:** CTF.<br>**CUSTODY:** Medium A.<br>**VOC. TRAINING:** None noted during this period.<br>**ACADEMICS:** None noted during this period.<br>**WORK RECORD:** Inmate Montez continued as a Furniture Assembler and received exceptional and above average ratings in various categories on his work supervisor's reports.<br>**GROUP ACTIVITIES:** He continued his participation in A.A/N.A Program. On 6/10/04 Montez received a CDC 128B laudatory chrono for his participation in the Inmate Employability Program.<br>**PSYCH. TREATMENT:** None during this review period.<br>**PRISON BEHAVIOR:** Inmate Montez remained disciplinary free during this period.<br>**OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE _____          DATE  5/12/05

MONTEZ, VICTOR          C48215                    CTF-SOLEDAD

COPY TO INMATE ON
May 18, 2005

BPT 1004 (REV 7/8G)

LIFE PRISONER: POSTCONVICTION PROGRESS REPORT                    ADDENDUM

_____          5/12/05
S. Arno                          Date
Correctional Counselor I


_____          5/12/05
R. Leach                         Date
Correctional Counselor II


_____          5-13-05
R. Pope                          Date
Facility Captain


_____ C&PR  5-17-05
D.S. Levorse                     Date
Classification and Parole Representative


MONTEZ                    C48215              CTF-SOLEDAD

BOARD OF PRISON TERMS                                                                                   STATE OF CALIFORNIA
LIFE PRISONER: POSTCONVICTION PROGRESS REPORT

☐   DOCUMENTATION HEARING

☒   PAROLE CONSIDERATION HEARING                                    **ADDENDUM**

☐   PROGRESS HEARING

INSTRUCTIONS
    TO CDC STAFF:  DOCUMENT EACH 12-MONTH PERIOD FROM THE DATE THE LIFE TERM STARTS TO PRESENT
    TO BPT STAFF:  FOR EACH 12-MONTH INCREMENT APPLY THE GUIDELINES UNDER WHICH THE PAROLE DATE WAS ORIGINALLY
          ESTABLISHED, ie., 0-2  MONTHS FOR PBR AND 0-4 MONTHS FOR BPT. SEE BPT §§2290 - 2292, 2410 AND 2439.

| POSTCONVICTION CREDIT | | | REASONS |
|---|---|---|---|
| YEAR | BPT | PBR | |
| 4/05 to 4/06 (Present) | | | **PLACEMENT:** CTF. <br> **CUSTODY:** Medium A. <br> **VOC. TRAINING:** None noted during this period. <br> **ACADEMICS:** None noted during this period. <br> **WORK RECORD:** He continued his assignment as a Furniture Assembler in the P.I.A. Wood Products section and received exceptional and above average ratings in various categories on his Work Supervisor's Reports. <br> **GROUP ACTIVITIES:** Inmate Montez continued his fine participation in the AA Program per several CDC 128B laudatory chronos. <br> **PSYCH. TREATMENT:** None noted during this period. <br> **PRISON BEHAVIOR:** He remained disciplinary free during this period. <br> **OTHER:** None. |

CORRECTIONAL COUNSELOR'S SIGNATURE                                           DATE  4/25/06

MONTEZ, VICTOR          C48215                    CTF-SOLEDAD

BPT 1004 (REV 7/86)

_S. Arno_          4/25/06      Date

S. Arno
Correctional Counselor I

_F.I. DeGuzman_          5-2-06      Date

F.I. DeGuzman
Correctional Counselor II (A)

_R. Pope_          5-2-06      Date

R. Pope
Facility Captain

_D.S. Levorse_    C&PR    5-5-06      Date

D.S. Levorse
Classification and Parole Representative

MONTEZ, VICTOR          C48215          CTF-SOLEDAD

EXHIBIT "8"

MENTAL HEALTH EVALUATION FOR
THE BOARD OF PRISON HEARINGS
May, 2006 Lifer Calendar


CORRECTIONAL TRAINING FACILITY SOLEDAD
MAY, 2006


| | |
|---|---|
| **NAME:** | **MONTEZ, VICTOR** |
| **CDC#:** | C-48215 |
| **DOB:** | 7/6/53 |
| **OFFENSE:** | PC 187 MURDER, SECOND DEGREE |
| **DATE OF OFFENSE:** | 8/9/80 |
| **SENTENCE:** | 17 YEARS TO LIFE |
| **MEPD:** | 4/9/90 |
| **EVALUATION DATE:** | 5/11/06 |


I.    **IDENTIFYING INFORMATION:**

Mr. Victor Montez is a 52 year old, first term, divorced, Hispanic male. He is a Christian. He has served 25 years on his sentence.

**SOURCES OF INFORMATION:**

This evaluation is based upon a single 90 minute interview, plus review of the central and medical files.

The psychological evaluation, written on 6/20/00, at CTF-Soledad for the BPT by Dr. Terrini, Psychologist, contains a Psychosocial Assessment. This information was reviewed with the inmate and is still current and valid. As a result, this information will not be repeated at this time.

MONTEZ, VICTOR
C-48215
5/11/06
PAGE 2

---

## CLINICAL ASSESSMENT

### XII.    CURRENT MENTAL STATUS/TREATMENT NEEDS

Mr. Montez related during the interview in a serious, outgoing, friendly and cooperative manner. His mental status was within normal limits. He was alert and well oriented. His thinking was rational, logical and coherent. His speech was normal, fluent and goal oriented. His affect was appropriate. There was no evidence of anxiety or of depression. His eye contact was good. Intellectually, he was functioning in the average ranges. His memory was intact. His judgment was intact. His insight and self-awareness were very good.

Mr. Montez has a criminal background associated with his heroin addiction. He continues to attend Alcoholics Anonymous. He has not used drugs since 1992, when he last received a positive urinalysis test. He has been clean and sober now for 14 years. Mr. Montez is very aware of the destructive effects of drugs or of alcohol in a person's life. He is aware of the importance of remaining clean and sober. He is very active in Bible studies. His understanding and knowledge of the Bible are significant and considerable. He has incorporated Biblical values into his life. As a result, he is determined to lead a wholesome, helpful to others, productive life, that pleases both God and man. Use of drugs is no longer a problem in his life. It certainly is not a current diagnostic problem.

He has acquired significant vocational skills. He has experience as a welder, working with the arc and gas. He also is certified in Vocational Office Machine Repair. He has worked as a plumber. He is working now in PIA Furniture Manufacturing. He also has worked as a heavy equipment operator in the past. He also attended Blackstone School of Law and is certified as a paralegal. In addition to this achievement, he has completed the Inmate Employability Program, Finding Employment, sponsored by Prison Industries Authority. He continues to attend Alcoholics Anonymous. He has his GED. He also has completed Anger Management.

In the past, based upon his criminal history, Mr. Montez has been diagnosed as having an Anti-Social Personality Disorder. At this point in his life there is no evidence of any antisocial thinking or values. His values are solidly pro-social. He has deep feelings of concern and empathy towards others. Therefore, this is no longer an appropriate diagnostic label.

MONTEZ, VICTOR
C-48215
5/11/06
PAGE 3

## CURRENT DIAGNOSTIC IMPRESSION

Axis I:      No mental disorder
Axis II:     No personality disorder
Axis III:    No physical disorder
Axis IV:     Life term incarceration
Axis V:      Current GAF: 90

## XIII.   REVIEW OF LIFE CRIME

Mr. Montez accepts full responsibility for the commitment offense. He put a gun to the victim's head in an effort to rob him. The victim's elbow hit the gun, and it went off accidentally. He stated that he did not intend to hurt the victim. He does take full responsibility for the victim's death. He stated that due to his actions, and the victim's loss of his life, the victim's family has suffered. He commented how he understands how the victim's family has never been able to recover from their suffering due to the victim's loss of life. He knows this, because he has developed insight into what the family feels when they lose a loved one. He lost a brother in a similar situation. The family is still suffering from this loss. His feelings of remorse appear to be sincere and genuine.

He stated that he had become a Christian through the ministry of Victory Outreach prior to this offense. He stated that he had begun to backslide. He stated that because he was disobedient to God and God's expectations for his life, he was a disobedient child and God placed him in a situation, where he would have ample opportunity to study the Bible, explore his own life, seek forgiveness for his sins, and grow spiritually. He stated that he believes that when this process in which he must continue to grow and advance spiritually is finished, God will allow him to be released from prison.

## XIV.   ASSESSMENT OF DANGEROUSNESS

A. In considering potential for dangerous behavior in the institution, he has remained disciplinary free for over 12 years. Prior to that time, he did receive disciplinaries for possession of marijuana and use of heroin. At that point in time, his potential for dangerous behavior was higher. However, due to his years of being disciplinary free, he no longer poses a risk to the institution; and compared to other inmates, his potential for dangerous behavior is below average.

B. In considering potential for dangerous behavior when released to the community, the Level of Service Inventory-Revised was administered.

Montez              C-48215              CTF-Soledad              5/11/06

MONTEZ, VICTOR
C-48215
5/11/06
PAGE 4

This is an actuarial measure that assesses criminal history, substance abuse history, institutional adjustment, social relationships and other factors to determine current risk level on parole. He obtained a score of 5.1 cumulative frequency for prison inmates. This means that if 100 men were released on parole, he would do better on parole than 95 of them. This is a low risk score. At this point in his life, due to his maturity, growth, and increased insight, he poses no more risk to society than the average citizen in the community. In fact, based upon the positive changes in his life, he probably poses less risk to society than the average citizen.

C.  There are no significant risk factors in this case.

## XV.    CLINICIAN OBSERVATIONS/COMMENTS/RECOMMENDATIONS

There are no mental or emotional problems in this case that would interfere with routine parole planning. This man has a supportive family in the community. He plans on living with his mother in Oxnard. He also has developed job offers in the community. He also has letters in the file, indicating that he has been accepted for placement in a residential substance abuse program. He has numerous vocational skills that will enable him to maintain work in the community. All of these positive factors are strong indicators that he will do well on parole. The prognosis for successful adjustment in the community is excellent.

M. Macomber, Ph.D.
Correctional Psychologist
Correctional Training Facility, Soledad

B. Zika, Ph.D.
Senior Psychologist
Correctional Training Facility, Soledad

D:    5/11/06
T:    5/12/06

# EXHIBIT "9"

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | |
|---|---|
| Date:       AUGUST 15, 2007 | |
| Honorable: STEVEN R. VAN SICKLEN    Judge   JOSEPH M. PULIDO | Deputy Clerk |
| NONE                                  Bailiff  NONE | Reporter |

| | (Parties and Counsel checked if present) | |
|---|---|---|
| BH004498 | | |
| In re, | | |
| VICTOR M. MONTEZ, | Counsel for Petitioner: | |
| Petitioner, | | |
| On Habeas Corpus | Counsel for Respondent: | |

### Nature of Proceedings: ORDER RE: WRIT OF HABEAS CORPUS

The Court has read and considered petitioner's Writ of Habeas Corpus filed on January 2, 2007. Having independently reviewed the record, giving deference to the broad discretion of the Board of Parole Hearings ("Board") in parole matters, the Court concludes that the record contains "some evidence" to support the Board's finding that petitioner is unsuitable for parole (See Cal. Code Reg. Tit. 15, §2402; *In re Rosenkrantz* (2002) 29 Cal.4th 616, 667 (hereafter *Rosenkrantz*).)

Petitioner was received in the Department of Corrections on June 1, 1982 after a conviction for second-degree murder with use of a firearm. He was sentenced to seventeen years to life. His minimum parole eligibility date was April 9, 1990. The record reflects that on August 9, 1980, petitioner, his wife, and a female companion were traveling to Oxnard when their car broke down on the Ventura Freeway. The two women stood on the side of the freeway waiting for someone to stop to offer help, while petitioner hid in the bushes. The victim stopped for the two stranded women. As they entered the vehicle, petitioner ran up brandishing a gun. He ordered the driver to take them to Oxnard. He then fired the weapon killing the victim. He dragged the body out of the car and hid it under a tree and shrubs. Then, petitioner and his crime partners drove off in the victim's car. Petitioner contends that he fired the gun accidentally when the victim attempted to adjust the seat.

The Board found petitioner unsuitable for parole after a parole consideration hearing held on May 31, 2006. Petitioner was denied parole for one year. The Board concluded that petitioner was unsuitable for parole and would pose an unreasonable risk of danger to society and a threat to public safety. The Board based its decision on several factors, including his commitment offense.

The Court finds that there is some evidence to support the Board's finding that "the motive for the crime is inexplicable or very trivial in relation to the offense" (Cal. Code Regs., tit. 15, §2402, subd. (c)(1)(E).) "To fit the regulatory description, the motive must be materially less significant (or more "trivial") than those which conventionally drive people to commit the offense in question, and therefore more indicative of a risk of danger to society if the prisoner is released than is ordinarily present." (*In re Scott* (2004) 119 Cal.App.4th 871, at 893.) In this case, petitioner and his crime partners killed the victim because they needed a ride to Oxnard. The Board was justified in concluding that this motive is materially less significant motives than those motives which

| Minutes Entered |
|---|
| 08-15-07 |
| County Clerk |

# SUPERIOR COURT OF CALIFORNIA, COUNTY OF LOS ANGELES

**DEPT 100**

| | | |
|---|---|---|
| Date:     AUGUST 15, 2007 | | |
| Honorable: STEVEN R. VAN SICKLEN | Judge | JOSEPH M. PULIDO    Deputy Clerk |
|                 NONE | Bailiff | NONE    Reporter |

(Parties and Counsel checked if present)

BH004498
In re,
VICTOR M. MONTEZ,
           Petitioner,

On Habeas Corpus

Counsel for Petitioner:

Counsel for Respondent:

---

conventionally drive people to commit murder, thus indicating that petitioner poses a greater risk of danger to society if released than is ordinarily present.

Additionally, the record reflects that petitioner had an unstable social history prior to the commitment offense, which is a factor tending to indicate unsuitability for parole. (Cal. Code Regs., tit. 15, §2402, subd. (c)(3).) Petitioner began using heroin when he was thirteen years old. He eventually developed a $200 a day habit. He was first arrested at the age of thirteen and had several more arrests as an adult, leading to sentences of probation and state prison in New Mexico. He dropped out of high school when he was sixteen years old. Heavy drug use, school problems, and prior criminality are some evidence of an unstable social history. (*In re Van Houten* (2004) 116 Cal.App.4th 339, 353.)

The Court rejects petitioner's argument that he is entitled to release based on the terms of his plea agreement. A plea bargain violation claim depends upon the actual terms of the agreement, not the subjective understanding of the defendant or deficient advice provided by his attorney. (*In re Honesto* (2005) 130 Cal.App.4th 81, 91-93.) According to the terms of his plea bargain, petitioner pled guilty to second degree murder with use of a firearm and agreed to a sentence that carried a maximum term of life in prison. Petitioner has "no vested right to determination of his sentence at less than the maximum." (*In re Schoengarth* (1967) 66 Cal.2d 295, 302.) Therefore, the Board did not violate the plea bargain in finding petitioner unsuitable for parole.

Accordingly, the petition is denied.

The court order is signed and filed this date. The clerk is directed to give notice.

A true copy of this minute order is sent via U.S. Mail to the following parties:

Victor M. Montez
C-48215
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

Department of Justice- State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

2

| Minutes Entered |
|---|
| 08-15-07 |
| County Clerk |

| SUPERIOR COURT OF CALIFORNIA<br>COUNTY OF LOS ANGELES | Reserved for Clerk's File Stamp |
|---|---|
| COURTHOUSE ADDRESS:<br>Clara Shortridge Foltz Criminal Justice Center<br>210 West Temple Street<br>Los Angeles, CA 90012<br><br>PLAINTIFF/PETITIONER:<br><br>VICTOR M. MONTEZ | CONFORMED COPY<br><br>AUG 1 5 2007<br><br>LOS ANGELES<br>SUPERIOR COURT<br><br>Joseph M. Pulido |
| **CLERK'S CERTIFICATE OF MAILING**<br>CCP, § 1013(a)<br>Cal. Rules of Court, rule 2(a)(1) | CASE NUMBER:<br><br>BH004498 |

I, the below-named Executive Officer/Clerk of the above-entitled court, do hereby certify that I am not a party to the cause herein, and that this date I served:

☐ Order Extending Time                    ☒ Order re: Writ of Habeas Corpus
☐ Order to Show Cause                     ☐ Order
☐ Order for Informal Response             ☐ Order re:
☐ Order for Supplemental Pleading         ☐ Copy of Petition for Writ of Habeas Corpus for the
                                             Attorney General

I certify that the following is true and correct: I am the clerk of the above-named court and not a party to the cause. I served this document by placing true copies in envelopes addressed as shown below and then by sealing and placing them for collection; stamping or metering with first-class, prepaid postage; and mailing on the date stated below, in the United States mail at Los Angeles County, California, following standard court practices.

August 15, 2007
DATED AND DEPOSITED

JOHN A. CLARKE, Executive Officer/Clerk

By: _Joseph M. Pulido_ , Clerk
     Joseph M. Pulido

Victor M. Montez
C-48215
Correctional Training Facility
P.O. Box 689
Soledad, California 93960

Department of Justice- State of California
Office of the Attorney General
Gregory J. Marcot, Deputy Attorney General
110 West A Street, Suite 1100
San Diego, CA 92101

# EXHIBIT  "10"

**Memorandum**

State of California             Department of Corrections

October 23, 1997

cc:   CDW'S
AW'S
C&PR CCRM
HCM
LIT COOR

To:   Wardens
Classification and Parole Representatives
Classification Staff Representatives
Correctional Counselor IIIs

Subject:    CLARIFICATION OF CALIFORNIA CODE OF REGULATIONS SECTION 3375.2 HOUSING FOR LEVEL I AND LEVEL II LIFE-TERM INMATES

This memorandum clarifies questions regarding the California Department of Corrections' policy for housing life-term inmates. The California Code of Regulations Section 3375.2 (a)(7)(A) explains an inmate serving any life term shall not be housed in a Level I or II facility if "...the commitment offense involved multiple murders, unusual violence, execution-type murders or received high notoriety."

Staff repeatedly question the meaning and intent of these exclusionary factors. Staff shall use the following definitions in applying this policy:

- "Multiple murders" means the inmate killed more than one victim during the commission of the crime for which the inmate is currently serving the life term. This does not include inmates who have killed more than one person during their criminal career. Serial killers shall be excluded from Level I or II placement even if the murders were prosecuted separately.

- "Unusual violence" means offenses wherein the inmate tortured the victim over a period of time or intentionally made the victim endure great pain and suffering. While stabbing, shooting, or beating the victim may be very violent, it is not necessarily "unusual violence."

- "Execution-type murders" include those crimes wherein the victim was shot in the head after being bound or cuffed, made to kneel, made to lie down, or made to face a wall. This does not include all crimes wherein the victim was killed to prevent testimony, killed in a "drive-by" shooting, or killed as an informant by orders of prison or street-gang leadership.

- "High notoriety" is meant to describe those cases that received, at least, statewide media coverage. Extensive coverage by local newspapers or television stations is not sufficient for exclusion.

PROOF OF SERVICE BY MAIL

CASE NAME: MONTEZ v. CURRY

CASE NO. : To be assigned (L.A. Supp.Ct no. BH004498)

    I, Victor M. Montez____, hereby declare that I am a party to the above titled action and am over the age of eighteen (18), and I did serve a true copy of the following:

WRIT OF HABEAS CORPUS W/EXHIBITS

by placing a true copy in an envelope with first class postage fully prepaid and said envelope surrendered to correctional staff at the Correctional Training Facility for delivery to the prison mail room and therefrom delivered to the local United States Post Office the next business day from which there is postal service between the place of mailing and the addressee:

    Jerry Brown
    Attorney General
    110 West "A" Street, #1100
    San Diego, CA 92101

    I declare under penalty of perjury that the foregoing is true and correct, doing so this 17 day of September , 2007, at Soledad, California.

DOCKETING
OUTGOING

2007 SEP 25 PM 4: 15

ATTORNEY GENERAL
LOS ANGELES

# EXHIBIT 4

# S158142

SUPREME COURT
FILED

NOV - 9 2007

Frederick K. Ohlrich Clerk
───────────────────
DEPUTY

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re                                    CASE No. _____
                                         (App. Ct. Case No. B202287
     Victor M. Montez,                   Second Appellate District;
                                         Supp.Ct. Case No. BH004498,
On Habeas Corpus                         Los Angeles County)
_____/

P E T I T I O N   F O R   R E V I E W

After Decision of the Court of Appeal, Second Appellate District,

Denying the Petition for Writ of Habeas Corpus on November 2, 2007.

Victor M. Montez, C-48215
Correctional Training Facility
P.O. Box 689
Soledad, CA 93960

Petitioner in pro per

RECEIVED
NOV 9 - 2007
CLERK SUPREME COURT

IN THE SUPREME COURT OF THE STATE OF CALIFORNIA

In re

　　Victor M. Montez,

On Habeas Corpus

_____/.

CASE No. _____

(App. Ct. Case No. B202287
Second Appellate District;
Supp.Ct. Case No. BH004498,
Los Angeles County)

TO THE HONORABLE CHIEF JUSTICE OF THE CALIFORNIA SUPREME COURT AND
THE ASSOCIATE JUSTICES OF THE COURT:

　　COMES NOW Victor M. Montez (hereafter Petitioner) respectfully
requesting review of the decision of the Court of Appeals, Second
Appellate District, filed on November 2, 2007 (ATTACHMENT A).

I.

QUESTION FOR REVIEW

　　This case presents the following questions for review:

1.　WAS IT A VIOLATION OF PETITIONER'S RIGHT TO DUE PROCESS
　　GUARANTEED BY THE FIFTH AND FOURTEENTH AMENDMENTS TO THE
　　UNITED STATES CONSTITUTION TO FIND HIM UNSUITABLE OR
　　PAROLE TWENTY-SIX YEARS AFTER THE COMMITMENT OFFENSE
　　RESULTING IN A SECOND DEGREE MURDER CONVICTION WHEN THE
　　BOARD OF PAROLE HEARINGS NOR THE LOWER COURTS MADE ANY
　　RATIONAL CONNECTION BETWEEN THE COMMITMENT OFFENSE AND
　　PRESENT THREAT TO PUBLIC SAFETY?

II.

NECESSITY FOR REVIEW

　　Review is necessary to bring lower state courts into uniformity
in applying the two prong test of the "some evidence" standard of
review approved of by this Court in cases cited below.

- 1 -

III.

## JURISDICTION OF THE COURT

This Court has jurisdiction to decide cases of statewide interest (Cal. Rules of Court, Rule 29(a)(1)).

IV.

## HISTORY OF THE CASE

On August 19, 1980, Petitioner and his wife, accompanied by a female friend, were hitchhiking along the Ventura Freeway. As a ruse to get a car to stop, Petitioner hid in the bushes while the two women hitchhiked. When Michael Stewart stopped to pick up the two women, Petitioner entered the car through the passenger side rear door and pointed a gun behind Mr. Stewart's head, demanding that he give them a ride to Oxnard. Mr. Stewart agreed. Mr. Stewart then adjusted his seat, and when he did, the seat hit Petitioner's arm and the pistol he was pointing at Mr. Stewart's head fired, hitting Mr. Stewart in the head and killing him instantly. Mr. Stewart's body was dragged from his car and hid in the bushes along the Freeway. Petitioner was arrested the next day, August 11, 1980, and has been incarcerated since.

On March 26, 1982, Petitioner pled guilty to one count of second degree murder. Throughout judicial proceedings, that the death of Mr. Stewart was an accidental shooting, was never contested by the prosecution.

Petitioner's minimum eligible parole date was fixed by the Board of Parole Hearings (hereafter Board) to be April 9, 1990. On May 31, 2006, Petitioner appeared before the Board for the EIGHTH time.

Over Petitioner's 26 years of imprisonment, he has completed

- 2 -

all self-help programs available to him, the Board recognizing he
has been "extremely active"; Petitioner's last disciplinary action
was in 1993, and he has never received a disciplinary action for
violence or weapons.

The Board's own forensic experts concluded that Petitioner,
"due to maturity, growth, and increased insight, he poses no more
risk to society than the average citizen in the community. In fact,
based on the positive changes in his life, he probably poses less
risk to society than the average citizen.". The Commissioner stated:
"That's a conclusion I won't disagree with." Thus, the experts agree,
including the Board, that Petitioner is NOT a present danger.

The primary reason Petitioner was denied parole was the
commitment offense from 26 years ago, but the Board did not, nor
even attempt, to make a rational connection between the offense 26
years ago and Petitioner's current threat to public safety.
Petitioner has exceeded the minimum term for first degree murder
(25 years), and with custody credits, has exceeded the 33 year term
on the Board's matrix for first degree murder. Petitioner was
offered, and agreed, to plead guilty to second degree murder.

The Board also cited, in its decision, Petitioner's minor,
non-violent, prior criminal history.

Also, although Petitioner had parole plans for half-way houses,
and with his mother, trying to show the Board options, with residence
and financial support from his mother, the Board criticized plans
for halfway houses, and told Petitioner he needed parole plans with
a family member. Perhaps the Board does not consider a prisoner's
mother to be a "family member."

VI

## ARGUMENT

An indeterminate sentence under the Uniform Determinate Sentencing Act of 1976 (UDSA) is a "hybrid" (In re Dannenberg (2005) 34 Cal.4th 1061 at 1083), applying both the rehabilitation model of the repealed indeterminate sentencing law (ISL) and punishment model of the UDSA. The underlying question is, and perhaps the real question is, under the "hybrid" articulated by this Court in Dannenberg, to satisfy the intent and spirit of an indeterminate sentence under the determinate sentencing law, the tension between Penal Code §§ 3041(a) and (b), when does punishment end and rehabilitation begin?

Punishment and rehabilitation are two lines on a graph. The time line, or punishment line, is fixed proportionate to degree of conviction for murder; in case at bench, second degree murder, 15 years, and fine tuned to the facts and circumstances of his offense in Cal. Code Regs., tit. 15, 2403(c), 15 to 21 years. Only the most egregious offenses, cannibalism, axe murders, dismemberment, sex with the corps, etc., are not set out in the matrix. Thus, just about every indeterminately sentenced prisoner will satisfy the legisaltively prescribed punishment for his or her commitment offense. On this point, the determinate component of the sentence which is clearly objective, there can be no question. "For example, the provision under which [Petitioner] was sentenced provides that a person guilty of second degree murder 'shall be punished' in the state prison for a term of 15 years to life" (In re Morrall (2002) 102 Cal.App.4th 280, 289). The Morrall court continued: "With respect

- 4 -

to persons sentenced to indeterminate terms, the purpose of punishment is satisfied by the requirement of service of a minimum period before eligibility for parole" (Id., at 292); thus, punishment is based on the crime. The problem arises in the subjectivity of the rehabilitation component of the sentence. The Board confuses the commitment offense with rehabilitation and no matter the time lapsed uses the commitment offense to deny parole.

On the other hand, under the indeterminate sentencing law (ISL), the law operated "to mitigate the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime" (In re Minnis (1971) 7 Cal.3d 639, 644; In re Lee (1917) 177 Cal. 690, 692). Thus, rehabilitation is the other line on our graph. For some, rehabilitation may exceed the punishment line by years, and for a few, may never occur, remaining in prison for life. That was the intent and spirit of this "hybrid." For the law to work as intended, when a prisoner satisfies the punishment line on the graph, and the rehabilitation line at, or after the punishment line, parole must be granted because any further incarceration serves no legitimate penological purpose.

What is happening today with the Board, gross abuse of discretion and disparity in punishment for similar offenses committed under similar circumstances, is what this Court condemned in In re Rodriguez (1975) 14 Cal. 3d 639, resulting in the Uniform Determinate Sentencing Act of 1976. Thirty years later, however, with the influence of politics via "victims' rights," and prison guards union, the parole process is broke, even corrupt, with the Board being stacked with

victims of violent crime and law enforcement, ignoring court decisions
in applying principles of law.  Any attempt reformation through the
legislature is for naught because of political pressure from special
interest.  Thus, as it stands, the Board can forever use the
commitment offense to deny parole.

In case at bench, the Board ignored the facts to justify a
decision already made.  Most obvious was telling Petitioner to come
up with parole plans that include family support when during the
evidence portion of the hearing the Board read a letter from
Petitioner's mother offering him a home and financial support and
anything he needs to succeed on parole.  Secondly, contrary to the
Board's own regulations, the Board used Petitioner's minor non-violent
prior convictions to deny him parole.  Thirdly, at no time has the
prosecution ever contest that the shooting of Mr. Stewart was not
accidental, which therefore cannot possibly exceed the minimum
necessary to sustain the conviction.  Finally, although agreeing
with the forensic experts that Petitioner poses even less of a threat
to the community than the average citizen in the community, found
Petitioner to be an unreasonable threat to public safety.  Based
on the facts, after serving 26 years on a 15 years to life sentence,
there is no evidence Petitioner is not suitable for parole and the
Board's decision was therefore arbitrary.

In a detailed analysis of California and federal law, inter alia,
Greenholtz v. Inmates of Nebraska Penal and Correctional Complex
(hereater Greenholtz) (1979) 442 U.S. 1; Sass v. California Board
of Prison Term (9th Cir. 2006) 461 F.3d 1123; In re Rosenkrantz,
(2002) 29 Cal.4th 616; In re Dannenberg, supra, 34 Cal.4th 1061,

California's Second Appellate District recently held under both the
California and United States constitutions, life prisoners in
California have a "liberty interest" in parole and judicial review
is the "some evidence" standard (<u>In re Lawrence</u> (2007) 150 Cal.App.4th
1511, Petition for Review granted, request for stay denied).

   "The only ground for a parole denial is found in Penal Code
section 3041, subdivision (b), which provides that a release date
shall be set 'unless [the Board] determines that ... consideration
of the public safety requires a more lengthy period of incarceration'"
(<u>In re Roderick</u> (2007) ___ Cal.App.4th ___, 2007 WL 2343737, *12
(8/17/2007)).  The commitment offense, however, loses predictability
of threat to public safety over time when weighed against
rehabilitation (<u>In re Lawrence</u>, <u>supra</u>, 150 Cal.App.4th, at 1561;
<u>In re Lee</u> (2006) 143 Cal.App.4th 1400, 1412, Petitioner fore Review
denied, depublication denied; <u>In re Elkins</u> (2006) 144 Cal.4th 475,
500, Petition for Review denied, depublication denied; <u>In re Scott
II</u> (2005) 133 Cal.App.4th 573, 594-595; <u>Rosenkrantz v. Marshall</u> (C.D.
Cal. 2006) 444 F.Supp.2d 1063, 1065; <u>Sanchez v. Kane</u> (C.D. Cal. 2006)
444 F.Supp.2d 1049, 1062).

   Although the "some evidence" standard of review is highly
differential and extremely low, "it does not convert a court reviewing
the denial of parole into a potted plant" (<u>In re Scott I</u> (2004) 119
Cal.App.4th 871, 898.).  The United States Supreme Court "explained
that the 'some evidence' standard applies only to questions of
evidentiary sufficiency" (<u>In re Ramirez</u> (2001) 94 Cal.App.4th 549,
563-564), explaining <u>Edwards v. Balisok</u> (1997) 520 U.S. 641, 648.)
<u>Ramirez</u> was disapproved on other grounds (<u>In re Dannenberg</u>, <u>supra</u>,

34 Cal.4th, at 1100). Moreover, as articulated by the United States
Supreme Court in the Nation's controlling case: "The decision turns
on...primarily what a man is and what he may become rather than simply
what he has done" (Greenholtz, supra, 442 U.S., at 10); therefore,
the principle of law that "[t]he test is not whether some evidence
supports the reasons the Governor cites for denying parole, but
whether some evidence indicates a parolee's release unreasonably
endangers public safety" (In re Lee, supra, 143 Cal.App.4th, at 1408),
In re Elkins, supra, 144 Cal.App.4th, at 499), clearly articulates
the spirit of the law. "'Not only does the passage of time in prison
count for something, exemplary behavior and rehabilitation in prison
count for something according to Biggs and Irons. Superintendent
v. Hill's standard might be quite low, but it does not require that
the decision not be arbitrary'" (Willis v. Kane (N.D. Cal. 2007)
485 F.Supp.2d 1126, 1130); In re Roderick, supra, 2007 WL 2343737,
*21). A two-prong test, therefore, is appropriate. The first prong
to determine "sufficiency of the evidence"; then the second prong,
can a rational connection be made between the evidence and finding
a CURRENT threat to public safety (In re Lee, supra, 143 Cal.App.4th,
at 1408 fn. 3).

As the Ninth Circuit instructed in Irons v. Carey (9th Cir.
2007) 479 F.3d, 568, at 665:

"We hope that the Board will come to recognize that in some
cases, indefinite detention based solely on an inmate's commitment
offense, regardless of the extent of his rehabilitation, will at
some point violate due process, given the liberty interest that
flows from the relevant California statutes."

In light of the foregoing, California courts are correct in
following Greenholtz and Irons in the principle that "the fact there

-8-

is 'some evidence' the crime was committed and committed a certain way at a certain time does not mean that crime necessarily represents 'some evidence' the prisoner's release on parole will pose an unreasonable risk of danger to the public safety at the present time. Whether it possesses the necessary predictive value depends both on the nature of the crime and how long ago it happened" (In Lawrence, supra, 150 Cal.App.4th, at 1540); In re Lee, supra, 143 Cal.App.4th, at 1408 ["The test is not whether some evidence supports the reasons the Governor cites for denying parole, but whether some evidence indicates a parolee's release unreasonably endangers public safety"]; see also In re Elkins, supra, 144 Cal.App.4th, at 499). These cases, and other state and federal cases, clearly articulate the spirit of the law. The bottom line is, relative to time since the commitment offense and rehabilitation, "whether the inmate will be able to live in society without committing additional antisocial acts" (In re Lawrence, supra, 150 Cal.App.4th, at 1543).

The significance of the above observations is this: there will come a point, which already may have arrived, when petitioner would have become eligible for parole if he had been convicted of first degree murder. Once petitioner reaches that point, it is appropriate to consider whether his offense would still be considered especially egregious for a first degree murder in order to promote the parole statute's goal of proportionality between the length of sentence and the seriousness of the offense" (In re Rosenkrantz, supra, 29 Cal.4th, at 690, Moreno, J., concurring, emphasis in original).

Was Petitioner a threat to public safety 26 years ago? Yes. The focus, however, is to be on CURRENT parole risk, not a risk over

a quarter century in the past.  Thus, if the prisoner has served
the minimum term, which Petitioner has, exceeding it by 16 years,
and there is no evidence he is not rehabilitated, which there is
not, then he is to be paroled; if not, it violates due process because
it serves no legitimate penological interest to continue punishing
him repeatedly with "adversary hearings in order to continue the
confinement" (<u>Greenholtz</u>, 442 U.S., at 14, <u>supra</u>).

### C O N C L U S I O N

Because the lower court decision was not based on CURRENT threat
to public safety, being unreasonable in light of the facts, in that
this Court has granted review and issued an Order to Show Cause
returnable to the offending appellate court, in at least five cases
over the past six months when the petitioner is represented by
counsel, when the appellate court denied the writ on the commitment
offense after 15 to 20 years had lapsed since the commitment offense,
and it has now been 26 years since Petitioner's commitment offense,
16 years beyond his minimum, it is respectfully requested that the
Court grant review and issue an Order to Show Cause returnable to
the Appellate Court, Second Appellate District, to vacate its decision
in this case and redecide the case pursuant to <u>Lee</u>, <u>Elkins</u>, <u>Scott
II</u>, and <u>Lawrence</u>.  Anything less would be a denial of equal protection
of the law.

DATED: 6 Nov. 2007

Respectfully submitted,

Victor M. Montez
Petitioner in pro per

A T T A C H M E N T   "A"

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

In re

    VICTOR M. MONTEZ,

on

Habeas Corpus.

B202287

(L.A.S.C. Nos. A146105, BH004498)

O R D E R

COURT OF APPEAL - SECOND DIST.

F I L E D

NOV - 2 2007

JOSEPH A. LANE      Clerk

P. GONZALEZ     Deputy Clerk

THE COURT*:

    The petition for writ of habeas corpus, filed September 21, 2007, has been read and considered.

    The petition is denied.

   \*MALLANO, Acting P. J.       VOGEL, J.       JACKSON, J.**

---

**Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

PROOF OF SERVICE BY MAIL

CASE NAME: <u>MONTEZ v. CURRY</u>

CASE NO. : <u>Second App.Dist. No. B202287</u>

    I, <u>Victor M. Montez</u> , hereby declare that I am a party to the above titled action and am over the age of eighteen (18), and I did serve a true copy of the following:

    PETITION FOR REVIEW

by placing a true copy in an envelope with first class postage fully prepaid and said envelope surrendered to correctional staff at the Correctional Training Facility for delivery to the prison mail room and therefrom delivered to the local United States Post Office the next business day from which there is postal service between the place of mailing and the addressee:

> Office of Attorney General     **California Court of Appeals**
> 110 West "A" Street, #1100     **Second Appellate District**
> San Diego, CA 92101     **300 S. Spring St., Fl.2, N-Tower**
>     **Los Angeles, CA 90013**

    I declare under penalty of perjury that the foregoing is true and correct, doing so this <u>7th</u> day of <u>November</u>, 200<u>7</u>, at Soledad, California.

**Persuant to the Mailbox Rule, this document is filed when handed over to prison staff for mailing (see <u>In re Jordan</u> (1992) 4 Cal.4th 116, 119-120, citing <u>Houston v. Lack</u> 487 U.S. 266).**

# EXHIBIT 5

ORIGINAL

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

In re

VICTOR M. MONTEZ,

on

Habeas Corpus.

B202287

(L.A.S.C. Nos. A146105, BH004498)

O R D E R

COURT OF APPEAL - SECOND DIST.
F I L E D
NOV - 2 2007
JOSEPH A. LANE          Clerk
P. GONZALEZ         Deputy Clerk

THE COURT*:

The petition for writ of habeas corpus, filed September 21, 2007, has been read and considered.

The petition is denied.

_____     _____     _____
*MALLANO, Acting P. J.          VOGEL, J.                      JACKSON, J.**

_____

**Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# EXHIBIT 6

Court of Appeal, Second Appellate District, Div. 1 - No. B202287
**S158142**

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re VICTOR M. MONTEZ on Habeas Corpus

The petition for review is denied.

Werdegar, J., was absent and did not participate.

SUPREME COURT
FILED

JAN - 3 2008

Frederick K. Ohlrich Clerk

_____
Deputy

GEORGE
_____
Chief Justice